IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

JOHNATHAN JOHNSON,

                Plaintiff,           Civil Action No.
                                        9:14-CV-0811 (GLS/DEP)

    v.

RICHARD ADAMS, *et al.*,

                Defendants.
_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

JOHNATHAN JOHNSON, *Pro se*
89-A-1042
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN      DAVID J. SLEIGHT, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Johnathan Johnson, a New York State prison inmate, has commenced this action against various individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983, alleging the deprivation of his civil rights. Currently pending before the court is a motion brought by six of the defendants seeking the entry of summary judgment dismissing plaintiff's claims based on the absence of any record evidence from which a reasonable factfinder could conclude that any of them denied plaintiff adequate medical care or retaliated against him. For the reasons set forth below, I recommend that the motion be granted in part and denied in part. In particular, I recommend that plaintiff's medical indifference claims that relate to the treatment plaintiff received up through January 2011, as well as the retaliation claims, be dismissed. Defendants' motion seeking dismissal of plaintiff's medical indifference claims concerning the treatment received by him between February 2011 and August 2012, however, should be denied without prejudice to defendants' right to file a second motion for summary judgment. Finally, although defendants contest whether defendant Rock has been served in this matter, it is clear from their answer that he has appeared in this action and waived any objection to personal

jurisdiction. For that reason, and because the pending summary judgment motion does not include defendant Rock, I recommend the claims asserted against that individual survive, but that he be permitted to file a motion for summary judgment.

I.     BACKGROUND[1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 4. At the times relevant to his claims in this action, he was confined in the Upstate Correctional Facility ("Upstate"), located in Malone, New York.[2] *Id.*

Plaintiff suffers from a sinus condition caused by a broken nose, dry skin, allergies, and cardio obstructive pulmonary disease ("COPD"). Dkt. No. 22-5 at 19-20; *see also* Dkt. No. 4 at 2. Medical staff at Upstate have provided plaintiff with regular medical treatment for these conditions, including providing ointments for his skin condition, a Proventil inhaler for his COPD, gas relief medications, and other medications as needed. Dkt. No. 21-1 at 5, 30, 50, 51, 70. Plaintiff alleges that defendants Richard

---

[1]     In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]     Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

Adams and Patrick Johnston, a medical doctor and physician's assistant employed at the facility, improperly directed prison medical staff to stop providing these medications in April and June 2010, and continued to deny him medication through August 2012. Dkt. No. 4 at 2, 4.

According to defendant Nancy Smith, a nurse administrator stationed at Upstate, the prison nurse on duty each day administers medication to inmates seven days per week, three times daily, or as otherwise prescribed by an inmate's provider. Dkt. No. 21 at 2. When the on-duty nurse arrives at a housing unit, an announcement is made that medication rounds are beginning, and inmates who wish to receive treatment are directed to be at their door with the lights on. *Id.* at 3. Any inmate not at his door with the lights on is deemed to have declined medication. *Id.* If an inmate is at his door, the nurse administering the medication is required to ask the inmate for his name and department identification number ("DIN") to ensure that the proper medication goes to the correct inmate. *Id.* at 2. If an inmate does not comply with these requirements, medications are not dispensed to him. *Id.*

Defendant Smith further states that medications may not be dispensed without periodic verification that an inmate has a continued medical need for them. Dkt. No. 21 at 3. Therefore, an inmate receiving

medications is regularly required to submit to a medical examination by a doctor or nurse practitioner to determine the continued need for medication. *Id.* If an inmate refuses to cooperate, the medications are discontinued. *Id.*

During the course of a deposition conducted in connection with a lawsuit earlier filed by plaintiff,[3] plaintiff acknowledged that he is aware of the above-described procedures for receiving medication. Dkt. No. 22-5 at 46-47, 64-67. He further admitted to refusing to provide his name and DIN "every day." *Id.* at 46. Plaintiff's medical records confirm this, demonstrating that, between January 26, 2010 and January 31, 2011, Johnson refused to comply with the nurses' request for his name and DIN more than 250 times. Dkt. No. 21-1 at 2-138. As a result of his non-compliance, prison staff did not dispense medications to plaintiff on those occasions. *Id.* Additionally, although plaintiff alleges in his complaint that defendants Adams and Johnston discontinued his medications specifically on April 8, 2010, and June 10, 2010, in deliberate indifference to his serious medical needs, his medical records reflect that, on those dates, plaintiff refused to come out of

---

[3]     In support of their motion, defendants have submitted declarations and corresponding exhibits from defendant Smith and Assistant Attorney General Adele Taylor-Scott that were prepared and filed in connection with a lawsuit filed by plaintiff in 2010, *Johnson v. Adams* ("*Adams I*"), No. 10-CV-1082 (N.D.N.Y. filed Sept. 9, 2010). Dkt. No. 23 at 2. According to defendants' counsel, *Adams I* is "identical" to the pending action. *Id.* As is discussed more completely below, however, there are allegations in plaintiff's current complaint that were not included in the complaint filed in *Adams I*, and therefore were not addressed in that earlier motion.

his cell to be evaluated by a physician. *Id.* at 88, 115. In a report issued to plaintiff on June 10, 2010, the on-duty nurse, who is not a party to this action, wrote, "Your [medications] were discontinued by MD on 6/10/10 due to your refusal to be seen by the Dr. He will evaluate your need for the medications once you are seen for a medical evaluation." *Id.* at 88. After receipt of this notice, plaintiff cooperated, asked to see the doctor, and was issued medications on June 12, 2010. Dkt. No. 21-1 at 86. After receiving treatment, however, plaintiff returned to a pattern of refusing to cooperate with medical staff. *Id.* at 70-86.

During this same time period, plaintiff submitted numerous grievances through the DOCCS Inmate Grievance Program ("IGP") regarding his complaints about not receiving his medications. Dkt. No. 28-3 at 16-25. In addition, plaintiff submitted a series of letters between April and June 2010 to the DOCCS Central Office pertaining to the discontinuation of his medications. Dkt. No. 22-3 at 8-9, 11-16, 18-19, 20-22, 28-29. Defendant Lester Wright, the DOCCS Deputy Commissioner and Chief Medical Officer, responded personally or through a representative to each of plaintiff's letters, indicating that "the issues to which [he] refer[red] in [his] letter are being addressed" and suggesting that plaintiff "continue to bring [his] medical concerns to the attention of the health care staff using the

existing sick call procedure." *Id.* at 5, 10, 17, 23, 27, 31, 34. The letters also notified plaintiff that the IGP "makes no provision for an inmate to refer grievances directly to the Central Office." *Id.*

Plaintiff contends that his filing of these grievances caused "defendants to commence to retaliate against plaintiff's [sic] . . . by falsely alleging that plaintiff's medications was [sic] not being effective to doctor Adams." Dkt. No. 4 at 3. He alleges that defendants George Waterson, Heath Baker – both registered nurses at Upstate – and Smith "had the nurses in upstate to implement a non-exist [sic] policy that required plaintiff to state his name and identification number even though these nurses/defendants knew his name." *Id.*

Plaintiff contends that he is "exempt" from the requirement that he state his name and DIN because he has been the only resident of his cell since he came to Upstate and the medical staff knows who he is. Dkt. No. 22-5 at 46-47, 58, 62-63. He also contends that, because he has been diagnosed with COPD, a chronic condition that he alleges will not change, he should not be subjected to an examination to verify the continuing need for any medications because "the medication speaks for itself." *Id.* at 37.

According to plaintiff, defendants Wright, Smith, and David Rock, the Superintendent at Upstate, are subject to supervisory liability for the

behavior of defendants Baker, Waterson, Adams and Johnston, "whom implemented the unconstitutional policies, protocols and directives." Dkt. No. 4 at 3-4.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on or about January 28, 2013, by the filing of a complaint in New York State Supreme Court, Franklin County. Dkt. No. 4 at 5. Plaintiff's complaint named as defendants the following seven Upstate employees or former employees: (1) Dr. Richard Adams, a physician; (2) Patrick Johnston, a physician's assistant; (3) David Rock, the Superintendent of Upstate; (4) Nancy Smith, a nurse administrator; (5) George Waterson, a registered nurse; (6) Lester Wright, the DOCCS Deputy Commissioner and Chief Medical Officer; and (7) Heath Baker, a registered nurse. *Id.* at 1. Liberally construed, plaintiff's complaint asserts (1) an Eighth Amendment medical indifference claim against defendants Adams, Johnston, Rock, Wright, and Smith, based upon the discontinuation of plaintiff's medications and/or their refusal to provide plaintiff with medication "from April and June 2010 through August 2012"; and (2) a First Amendment retaliation claim against defendants Waterson, Baker, and Smith following plaintiff's filing of grievances against them in 2010.[4] *See*

---

[4]    In his response to the pending motion, plaintiff recharacterizes the nature of his

*generally id.*

Relying on federal question jurisdiction, defendants Adams, Johnston, Baker, Wright, Waterson, and Smith removed the action to this court on July 3, 2014.[5] Dkt. No. 1. A subsequent motion brought by the plaintiff seeking an order remanding the action to state court, Dkt. No. 2, was denied by Judge Sharpe on December 15, 2014. Dkt. No. 14. In his decision, Judge Sharpe construed plaintiff's complaint as asserting (1) a deliberate indifference claim against defendants Adams and Johnston; (2)

---

claims, suggesting that he asserts a substantive due process claim against defendants regarding the constitutionality of the requirements that he provide his name and DIN before receiving medication and submit to examinations to ensure that certain medications continue to be necessary. Dkt. No. 28 at 1. Additionally, plaintiff claims that he has asserted a retaliation claim against defendants Baker, Waterson, Adams, and Johnston. *Id.* at 1-2. Because plaintiff's complaint clearly asserts a deliberate indifference claim, rather than a due process claim, and asserts a retaliation claim against only defendants Waterson, Baker, and Smith, Dkt. No. 4 at 1-2, and because the parties have been on notice of the court's construction of plaintiff's claims since District Judge Gary L. Sharpe's decision and order denying plaintiff's remand, Dkt. No. 14, the court will not address any of plaintiff's due process arguments or contentions of retaliation against defendants Adams and Johnston in this report. The court notes that, as a prolific litigator who has considerable experience litigating summary judgment motions, plaintiff is not entitled to the same degree of special solicitude at this stage of the proceedings that the court might extend to other *pro se* litigants. *See Sledge v. Kooi*, 564 F.3d 105, 109 (2d Cir. 2009) ("[I]t is appropriate to charge a *pro se* litigant with knowledge of, and therefore withdraw special status in relation to, particular requirements with which he is familiar as a result of his extensive prior experience in the courts."); *see also Johnson v. Connolly*, No. 07-CV-0158, 2008 WL 724167, at *1 (N.D.N.Y. Mar. 17, 2008) (Kahn, J., *adopting report and recommendation by* Lowe, M.J.) (declining to extend special solicitude to plaintiff in light of plaintiff's prolific litigation history and because "[t]he Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions – ***including two occasions involving Plaintiff***" (emphasis in original)).

[5]     Defendant Rock did not join in the removal notice.

retaliation claim against defendants Waterson, Baker and Smith; and (3) supervisory claims against defendants Wright and Smith. *Id.* at 2.

Following the close of discovery, defendants Adams, Johnston, Baker, Wright, Waterson, and Smith[6] filed the currently pending motion for summary judgment, arguing that the record evidence does not give rise to a genuine dispute of material fact regarding whether (1) defendants Adams and Johnston were deliberately indifferent to plaintiff's serious medical needs; (2) defendants Waterson, Baker, and Smith retaliated against plaintiff; or (3) defendants Wright and Smith were personally involved in the constitutional violations alleged. *See generally* Dkt. No. 24. On May 19, 2015, plaintiff filed his response in opposition to the motion, Dkt. No. 28, and defendants have since submitted papers in reply to plaintiff's opposition, Dkt. No. 29. Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

On January 6, 2016, the court issued a text order directing defendants' counsel to file a report regarding the status of defendant Rock in light of the fact that he is not listed on either the notice of removal or

---

[6]     Defendant Rock did not join the motion for summary judgment.

defendants' motion for summary judgment. Dkt. No. 31. In response, defendants' counsel filed a letter indicating that defendant Rock has not requested the New York State Office of the Attorney General to represent him in this action and that counsel had reason to believe that this individual was not served with a summons and complaint. Dkt. No. 32. Plaintiff subsequently responded to the court's text order, indicating, and providing an indicia of proof, that defendant Rock was served on the same date and in the same manner as the other named defendants. Dkt. No. 33. In light of the proof submitted by plaintiff with respect to service on defendant Rock, the court issued defendants an order to show cause why that individual should not be deemed to be in default in this matter and judgment be issued against him. Dkt. No. 35. Defendants' response to that order to show cause was filed on January 29, 2016, arguing that a default judgment should not be entered against defendant Rock because (1) he was never properly served, (2) he has a meritorious defense to the claims asserted against him, and (3) default is precluded as a matter of law. *See generally* Dkt. No. 36.

III.     DISCUSSION

   A.     Defendants' Motion for Summary Judgment

        1.     Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250

n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### 2.    Plaintiff's Deliberate Medical Indifference Claim

In his complaint, plaintiff asserts a deliberate medical indifference claim against defendants Adams and Johnston arising from allegations that they discontinued his ointment, inhaler, soap, and stomach medication in April and June 2010. Dkt. No. 4 at 1-2. In support of their motion, defendants argue that the discontinuation of treatment was solely the result of plaintiff's

refusal to cooperate with medical staff and refusal to follow prison protocols.

[Dkt. No. 24 at 5-6](Dkt. No. 24 at 5-6).

i.     <u>Legal Standard Governing Deliberate Medical<br>Indifference Claims</u>

The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, . . . neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255,

268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions

characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

ii.     Analysis of Plaintiff's Claims Through January 2011

Turning first to the objective element of plaintiff's medical indifference claim, plaintiff alleges that he suffers from dry skin, sinus issues, and COPD. Dkt. No. 4 at 2; Dkt. No. 22-5 at 19. Specifically, he contends that he is allergic to the ordinary soap issued in state prisons and is prescribed Neutrogena soap as a substitute. Dkt. No. 4 at 2; Dkt. No. 22-5 at 29. Plaintiff contends that when he is unable to use Neutrogena soap, his face

"burns" and "turn[s] red." Dkt. No. 22-5 at 29. Plaintiff also believes he is entitled to certain skin care products because "[i]f [he] don't [sic] keep [his] skin nice and oily, [he] might run around . . . looking like the Wicked Witch of the West[.]" *Id.* With respect to his COPD, plaintiff argues that it is "defined as persistent decrease in the rate of air flow through the lungs[.]" Dkt. No. 28 at 5. Plaintiff alleges that, as a result of this chronic condition, he is short of breath "all the time," but specifically when he exercises. Dkt. No. 22-5 at 19-20, 29. He insists that he needs his Proventil inhaler at least six times per day for this condition. Dkt. No. 28 at 6.

Notwithstanding these allegations, plaintiff's medical records clearly reflect that plaintiff was not in urgent need of any of the medications he contends were discontinued by defendants Adams and Johnston in light of the fact that several days would elapse between being provided medications due to plaintiff's conduct. *See, e.g.,* Dkt. No. 21-1 at 2-4 (reflecting that, because plaintiff refused to provide medical staff his name and DIN between January 25, 2011 and January 31, 2011, he was not provided any medical treatment on those dates). Moreover, plaintiff's consistent refusal to provide medical staff his name and DIN, in accordance with prison policies, and his repeated harassment of medical staff as reflected in his medical records (and acknowledged by plaintiff at his

deposition in connection with *Adams I*), [Dkt. No. 22-5 at 33](), 36, 43, give rise to a reasonable inference that he did not suffer from an objectively serious medical condition. *See, e.g., Evering v. Rielly*, No. 98-CV-6718, 2001 WL 1150318, at *10 (S.D.N.Y. Sept. 28, 2001) ("[A]n inmate's refusal to accept medical treatment in no way signifies a deliberate indifference to serious medical needs.") (citing cases)).

Turning to the subjective element of the deliberate medical indifference claim, even construing the evidence in most the light most favorable to plaintiff, the record fails to demonstrate that defendants Adams and Johnston acted with the requisite deliberate indifference to plaintiff's serious medical needs. Plaintiff contends that, although he was neither seen nor examined by defendant Adams, Adams discontinued his medications. [Dkt. No. 22-5 at 31-32](). According to plaintiff, however, defendant Adams did so because defendants Waterson, Baker, and Smith informed him that they were no longer effective for plaintiff. [Dkt. No. 4 at 3](). As to defendant Johnston, plaintiff alleges he "discontinued plaintiff's A+D-ointment and his stomach medications, for failing to attend a scheduled medical-call-out." [Dkt. No. 4 at 2](). Thus, plaintiff's own allegations suggest that defendants Adams and Johnston did not act with deliberate indifference to plaintiff's serious medical needs. Instead, the record reflects

that those defendants had reasons for discontinuing plaintiff's medications. Although plaintiff contends that defendants Waterson, Baker, and Smith "fabricated" the contention that his medications were no longer effective and told defendant Adams as much in retaliation for his having filed grievances against them, Dkt. No. 1 at 3; Dkt. No. 22-5 at 33-35, 59-61, there is no record evidence to suggest that defendant Adams was aware that those defendants were not communicating accurate information. Accordingly, because plaintiff has failed to adduce evidence giving rise to a genuine dispute of material fact with respect to the subjective element of his deliberate indifference claim, I recommend that defendants' motion with respect to that claim, as asserted against defendants Adams and Johnston for the time period between April 2010 through January 2011, be granted.

        iii.    <u>Analysis of Plaintiff's Medical Indifference Claims From February 2011 through August 2012</u>

In support of their motion, defendants have submitted a declaration from defendant Smith that included, as an exhibit, plaintiff's ambulatory health records between January 26, 2010 and January 31, 2011, Dkt. Nos. 21, 21-1, as well as a declaration from New York Assistant Attorney General ("AAG") Adele Taylor-Scott, which included several exhibits, Dkt. Nos. 22, 22-1–22-6. According to defendants' attorney in this matter, AAG David Sleight, the declarations from defendant Smith and AAG Taylor-Scott, and

accompanying exhibits, were originally submitted to the court in connection

with *Adams I*, a previous lawsuit filed by plaintiff in this district. Dkt. No. 23 at

2. More specifically, AAG Sleight notified the court in his declaration in

support of defendants' pending motion for summary judgment in this matter

as follows:

> Based on the identical nature of this action with the
> prior action, I have submitted two factual documents
> submitted in support of the summary judgment
> motion in the prior action in support of the summary
> judgment motion for this action. They are the
> declarations of Defendant Smith and Adele
> Taylor-Scott, the AAG that handled Plaintiff's prior
> action.

*Id.* While the sum and substance of the evidence submitted by defendants

in this matter in support of their pending motion is contained in the

declarations of defendant Smith and AAG Taylor-Scott and accompanying

exhibits, all of it addresses plaintiff's medical treatment up to, at the latest,

only January 31, 2011, whereas plaintiff's complaint clearly alleges that he

was deprived of adequate medical treatment by defendants "through

August 2012." Dkt. No. 4 at 4. At this time, there is no record evidence,

aside from the allegations in plaintiff's verified complaint, that indicate the

type or degree of medical treatment he received between February 2011

and August 2012. Because the verified complaint constitutes competent

evidence at this juncture, and in light of my obligation to draw all inferences

in favor of the non-moving party, I feel constrained to recommend that defendants' motion be denied without prejudice to their right to file a second summary judgment motion with respect to plaintiff's medical indifference claims against defendants Adams and Johnston for any treatment received between February 1, 2011 and August 31, 2012.

### 3. Plaintiff's Retaliation Claim

In his complaint, plaintiff asserts a First Amendment retaliation claim against defendants Smith, Baker, and Waterson alleging that they retaliated against him for filing inmate grievances by telling defendant Adams to discontinue plaintiff's medication and also by enforcing the policy regarding medical call-outs. Dkt. No. 4 at 2-3. In support of their motion, defendants argue that plaintiff's claims do not rise to a constitutional violation. Dkt. No. 24 at 7-9.

### i. Legal Standard Governing Retaliation Claims

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate that is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights

guaranteed by the Constitution or federal laws."). As the Second Circuit has repeatedly cautioned, however, because such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus, courts must approach such claims "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003).

To succeed on a section 1983 claim for retaliatory conduct, a plaintiff must demonstrate that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

For conduct to constitute as adverse for purposes of satisfying this test, it must "deter a similarly situated individual of ordinary firmness from

exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). "In order to satisfy the causation requirement, allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Davis*, 320 F.3d at 354 (quotation marks omitted).

ii.    Analysis

Plaintiff alleges that defendants Baker, Waterson, and Smith told defendant Adams not to prescribe medication to plaintiff in retaliation for filing grievances and lawsuits against them and for "call[ing] all of them arrogant names." Dkt. No. 4 at 2-3; Dkt. No. 22-5 at 33-35, 59-61.

For the sake of brevity, I have assumed without deciding, for purposes of this report, that plaintiff can satisfy the first and second elements of a retaliation claim. *See, e.g., Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."); *Johnson v. Schiff*, No. 11-CV-0531, 2013 WL 5466218, at *13 (N.D.N.Y. Sept.13, 2013) (Dancks, M.J.) (finding adverse action where defendants, *inter alia*, allegedly denied the plaintiff medical care). Plaintiff's claim fails, however, with respect to the causation element. While plaintiff has adduced evidence supporting his allegations

that he filed grievances complaining of the medical treatment he received while at Upstate between October 2009 and April 2013, the list of grievances provided does not indicate against whom the grievances were filed. Dkt. No. 38-3 at 16-25. Even assuming each of the grievances that relate to plaintiff's medical treatment were filed against defendants Waterson, Baker, and Smith, there is no evidence to suggest that defendants indicated to defendant Adams that plaintiff's medications were no longer effective as a result of those grievances. Indeed, there is an absence of any evidence, aside from plaintiff's bare allegation, that defendants Waterson, Baker, and Smith told defendant Adams that plaintiff's medications were no longer effective or when they did so. There is also no evidence from which a reasonable factfinder could conclude that defendants Waterson, Baker, and Smith were aware of the grievances plaintiff filed at the time they purportedly communicated with defendant Adams. While it is worth noting that temporal proximity, on its own, is not sufficient to satisfy the causation element of a retaliation claim at the summary judgment stage, *see, e.g., Williams v. Goord*, 111 F. Supp. 2d 280, 190 (S.D.N.Y. 2000) ("Although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to

survive summary judgment."), the record does not disclose when defendants talked with defendant Adams or which particular grievance(s) triggered the alleged adverse action. Therefore, even if temporal proximity was sufficient at this stage, there is no evidence to support a finding that it existed in this matter.

Accordingly, because the record is devoid of any evidence from which a reasonable factfinder could conclude that defendants Waterson, Baker, and Smith retaliated against plaintiff by telling defendant Adams to discontinue his medications, I recommend that defendants' motion be granted with respect to this claim.

### 4. Supervisory Liability

Plaintiff's claims against defendants Wright and Smith are based on the theory of supervisory liability. In particular, plaintiff's complaint alleges the following:

> That the defendants are the supervisors of the defendants, Baker, Waterson, Adams, Smith, and Johnston, whom implemented the unconstitutional policies, protocols and directives, whom were notified by, plaintiff, through inmate grievance complaints and written-complaints, who, have failed to remedial [sic] the denial of the plaintiff's discontinued and denial of medical treatment.

Dkt. No. 4 at 3-4; *see also* Dkt. No. 22-5 at 36.

"Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). It is well established, however, that a supervisor cannot be liable under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.

To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*,

556 U.S. 554 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

As an initial matter, plaintiff's claims against defendants Wright and Smith fail because, if the above-described recommendations regarding plaintiff's deliberate medical indifference and retaliation claims are adopted by the assigned district judge, there is no remaining underlying cause of action upon which to hold defendants Wright and Smith liable in their capacities as supervisors. *See Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."). In any event, although there is record evidence reflecting that plaintiff wrote letters to defendant Wright about the allegedly inadequate medical treatment, there is also ample evidence suggesting that defendant Wright responded to plaintiff's letters, either directly or by referring them to a subordinate, and explained to plaintiff that, because he had filed grievances at Upstate regarding the same matters, defendant Wright was precluded from addressing them simultaneously. Dkt. No. 22-3 at 5, 9, 15, 20, 23. In addition, defendant Wright urged plaintiff to address his concerns with "facility health services staff using existing sick call procedures." *Id.* There is no other evidence in the record regarding plaintiff's alleged communications

to defendants Wright or Smith regarding his alleged inadequate medical treatment and/or retaliation.

To the extent plaintiff seeks to confer supervisory liability upon defendants Wright and Smith because they created and/or implemented the policy requiring medical staff to verify plaintiff's name and DIN prior to dispensing medication, the underlying constitutional claim in that instance would be a substantive due process claim, which, as noted above in Part II. of this report, was neither asserted in plaintiff's complaint nor considered by the court as having been included in plaintiff's complaint. For that reason, I have neither analyzed the merits of any substantive due process claim nor the alleged supervisory liability regarding that cause of action with respect to defendants Wright and Smith.

Because I have recommended that the underlying constitutional claims asserted in plaintiff's complaint be dismissed, and because there is no record evidence from which a reasonable factfinder could conclude that defendants Wright and Smith were personally involved in any alleged constitutional violation, I recommend defendants' motion be granted with respect to those individuals.

B.    Status of Defendant Rock

As was described above in Part II. of this report, defendant Rock did not join either the effort to remove this action from state to federal court or the pending motion for summary judgment. Dkt. Nos. 1, 19. Significantly, however, he is listed in the defendants' answer, which did not contain a defense of lack of jurisdiction or otherwise claim that defendant Rock was not properly served. Dkt. No. 9. Accordingly, any argument that he was not properly served is rendered moot, and the court finds that his filing of an answer, which does not contest personal jurisdiction, "is equivalent to personal service" of the summons and complaint. N.Y. C.P.L.R. §§ 320(b), 3211(e); *see also Burr ex rel. Burr v. Toyota Motor Credit Co.*, 478 F. Supp. 2d 432 (S.D.N.Y 2006) ("Thus, it has always been and still remains the rule that service of process can be waived by respondent simply by appearing in the proceeding and submitting to the court's jurisdiction.").

Under ordinary circumstances, the fact that defendant Rock appeared in the action but failed to file a summary judgment motion by the dispositive motion deadline would result in the action moving forward against that individual. In this instance, however, it is clear that defendants did not file a motion on defendant Rock's behalf because of their belief that he had not been served in the action. Dkt. Nos. 32, 36. In light of the parties' dispute as

to whether defendant Rock was served prior to the action being removed to federal court, I recommend that he be permitted to file a motion for summary judgment on his behalf no later than April 15, 2016.

IV.    SUMMARY AND RECOMMENDATION

While defendants Adams, Johnston, Smith, Waterson, Wright, and Baker have moved for summary judgment seeking dismissal of all of plaintiff's claims, I find that the record is incomplete with respect to plaintiff's medical indifference claims asserted against defendants Adams and Johnston regarding the treatment he received between February 2011 and August 2012. For this reason, I recommend defendants' motion regarding that portion of plaintiff's claim be denied without prejudice to their right to file a second motion for summary judgment.

As for plaintiff's medical indifference claims asserted against defendants Adams and Johnston up through January 2011, as well as his retaliation claims, however, the record is well developed and no reasonable factfinder could conclude that any of the defendants violated plaintiff's constitutional rights.

Lastly, because defendant Rock filed an answer in this action and did not contest personal jurisdiction, I find that he has appeared and the claims against him should move forward but that he should be afforded an

opportunity to file a summary judgment motion.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 19) be GRANTED in part and DENIED in part, as follows:

> (1)   Plaintiff's deliberate medical indifference claims asserted against defendants Adams and Johnston regarding the medical treatment plaintiff received through January 2011 should be DISMISSED;
>
> (2)   Plaintiff's deliberate medical indifference claims asserted against defendants Adams and Johnston regarding the medical treatment plaintiff received between February 2011 and August 2012 should survive, and defendants should be permitted to file a second motion for summary judgment with respect to this claim;
>
> (3)   Plaintiff's retaliation claims asserted against defendants Waterson, Baker, and Smith should be DISMISSED; and
>
> (4)   Plaintiff's supervisory liability claims asserted against defendant Wright be DISMISSED; and it is further

RECOMMENDED that the supervisory claims asserted against defendant Rock survive defendants' motion for summary judgment and he

be permitted to file a motion for summary judgment on or before April 15, 2016.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     February 24, 2016
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

2001 WL 1150318
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Danielle EVERING, Plaintiff,
v.
Lieutenant RIELLY et al., Defendants.

No. 98 CIV. 6718.
|
Sept. 28, 2001.

**Attorneys and Law Firms**

Danielle Evering, pro se, Bedford Hills Correctional Facility, Bedford.

Marisa Longo, Assistant Attorney General of the State of New York, New York.

MEMORANDUM AND ORDER

BATTS, District J.

**\*1** Danielle Evering ("Plaintiff"), proceeding *pro se,* commenced this action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Lieutenant Richard Rielly ("Lt.Rielly"), Sergeant Dominick Crisafulli ("Sgt.Crisafulli") and Correction Officers Steven Schurmann ("C.O.Schurmann"), James Johnson ("C.O.Johnson"), John MacEsker ("C.O.MacEsker"), Joseph Gentile ("C.O.Gentile") and Eric Ford ("C.O.Ford") of the Bedford Hills Correctional Facility ("Bedford Hills") (collectively the "Defendants") violated certain rights guaranteed to her under the Eighth Amendment of the Constitution. Specifically, Plaintiff claims that the Defendants subjected her to cruel and unusual punishment through the use of excessive force. Plaintiff also claims that certain officers at Bedford Hills exhibited a deliberate indifference to her serious medical needs.

Defendants move for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In their Motion for Summary Judgment, Defendants argue that Plaintiff has failed to establish an Eighth Amendment violation. In addition, Defendants assert they are entitled to qualified immunity and that the Eleventh Amendment bars the claims Plaintiff seeks to raise here. For the following reasons, Defendants' motion is DENIED in part and GRANTED in part.

I. BACKGROUND

A. Plaintiff's Background
Plaintiff is an inmate currently incarcerated at the Bedford Hills Correctional Facility. (Defs.' 56.1 Stmt. ¶ 8.) In 1993, Plaintiff pled guilty to a Violation of Probation and Robbery in the First Degree. (Defs.' 56.1 Stmt. ¶ 10.) She received concurrent prison terms of 1 ½ to 3 years and 4 ½ to 9 years for these convictions. (Defs.' 56.1 Stmt. ¶ 11.) During her incarceration, Plaintiff has been disciplined over 100 times for various incidents, some of which include fighting with other inmates and correctional officers. (Defs.' 56.1 Stmt. ¶ 14.) During the times relevant to the claims that Plaintiff alleges in her Complaint, she resided in the Special Housing Unit at Bedford Hills ("SHU"). (Defs.' 56.1 Stmt. ¶ 18.) The Plaintiff was placed in the SHU as a result of a disciplinary hearing finding that she had violated various prison rules. (*Id.*)

B. "The Shower Incident"
On the morning of June 29, 1998 Plaintiff awoke to loud banging on her cell door by Correction Officer R.A. Brown ("C.O.Brown"), the officer responsible for escorting Plaintiff to the shower that morning. (Pl.'s Opp'n to Brown ¶ 4; Pl.'s Opp'n to Crisafulli ¶ 4.) [1] Defendants claim that C.O. Brown asked Sgt. Crisafulli to be present during this trip to the shower. (Defs.' 56.1 Stmt. ¶ 16 .) C.O. Brown apparently requested Crisafulli's presence due to a confrontation [2] between the Plaintiff and C.O. Brown which occurred the previous day. (Defs.' 56.1 Stmt. ¶ 17.) Plaintiff, however, disputes the timing of the request for Sgt. Crisafulli's presence. Plaintiff claims that Sgt. Crisafulli summoned Crisafulli only after Plaintiff complained to C.O. Brown about the noise and C.O. Brown handcuffed Plaintiff to her cell. (Pl.'s Opp'n to Brown ¶ 4; Pl.'s Opp'n to Crisafulli ¶ 4.)

**\*2** Upon exiting her cell, Plaintiff complained about C.O. Brown's behavior to Sgt. Crisafulli. The Parties, however, dispute the manner that the Plaintiff exited her cell. Defendants claim that Plaintiff "yell[ed], sream[ed], wav[ed] her arms in an aggressive manner and threaten[ed] C.O. Brown." (Defs.' 56.1 Stmt ¶ 19.) Plaintiff claims that Sgt. Crisafulli responded to Plaintiff's complaints in a much louder tone of voice than that used by the Plaintiff. (Pl.'s

Opp'n to Crisafulli ¶ 5.) Plaintiff also disputes the Defendants' characterization of her behavior since, as Plaintiff alleges, she was handcuffed, and incapable of waving her arms in an aggressive manner. (Pl.'s Opp'n to Brown ¶ 5.)

Sgt. Crisafulli ordered Plaintiff to stop complaining and suggested that they revisit the subject during rounds. (Defs.' 56.1 Stmt. ¶ 20.) Apparently, Crisafulli's suggestion that Plaintiff revisit her complaints during rounds did not convince Plaintiff to desist—she continued to yell in Crisafulli's face. (Defs.' 56.1 Stmt. 21.) Defendants claim that while walking down the corridor, Plaintiff turned to address Sgt. Crisafulli directly. (*Id.*) Plaintiff's abrupt turn was construed as an attempted "head butt." (Defs.' 56.1 Stmt. ¶ 22.) At this point Plaintiff told Crisafulli that he did not "have the last fucking word in here," and that she was "tired [of Crisafulli] acting like the [ ] officers are always right." (Pl.'s Opp'n to Brown at ¶ 6.) Sgt. Crisafulli asserts that once the Plaintiff stopped and confronted him, he stepped back from Plaintiff and placed his right hand on her left shoulder to keep her away from him. (Defs.' 56.1 Stmt. ¶ 24.) Plaintiff, however, claims that Sgt. Crisafulli argued with her on their way to the shower. (Pl.'s Opp'n to Crisafulli ¶ 6.) Plaintiff agrees that she turned to face Sgt. Crisafulli, (*id.*), but states that she did not attempt to "head butt" him. Instead, she claims that Crisafulli almost walked into her once she stopped to face him. (Pl.'s Opp'n to Crisafulli ¶ 6.) Then, according to Plaintiff, Crisafulli stopped suddenly and pushed Plaintiff forcefully with both hands into a door. (*Id.*) Sgt. Crisafulli then directed Plaintiff enter the shower area. (Defs.' 56.1 Stmt. ¶ 25.) After C .O. Ford placed Plaintiff in the shower she threatened him.[3] (Ford Aff. ¶ 5.) Once plaintiff was locked in the shower she stated that she would not leave until she could see a superior officer. (Pl.'s Opp'n to Crisafulli ¶ 7; Defs.' 56.1 Stmt. ¶ 27.) Sgt. Crisafulli claims he told her that she would be unable to take a shower until she calmed down. (Crisafulli Aff. ¶ 7.) Plaintiff, however, alleges she was never told her shower was contingent upon a change in her behavior. (Pl.'s Opp'n to Crisafulli ¶ 7.) Rather, according to Plaintiff, she was locked in the shower and all of the officers exited the corridor without uttering a word. (Pl.'s Opp'n to Crisafulli ¶ 7.) Her pleas to remove the handcuffs were apparently ignored.[4] (*Id.*) Sgt. Crisafulli asserts that he contacted Lt. Rielly and Lt. Tiberia for assistance. (Defs.' 56.1 Stmt. ¶ 29.)

**\*3** While in the shower, Plaintiff attempted to hang herself by tying a shower curtain around her neck. (Pl.'s Opp'n to Crisafulli ¶ 8; Defs.' 56.1 Stmt. ¶ 30.) Sgt. Crisafulli ordered C.O. Schurmann to cut the shower curtain down. (Pl.'s Opp'n

to Crisafulli ¶ 8; Defs.' 56.1 Stmt. ¶ 31.) A few minutes later, Plaintiff attempted to tie the shower curtain around her neck a second time. (Defs.' 56.1 Stmt. ¶ 33.) Once again C.O. Schurmann cut the shower curtain. (Crisafulli Aff. ¶ 8.) However, before C.O. Schurmann left the shower Plaintiff claims that he punched her in the head. (Pl.'s Opp'n to Crisafulli ¶ 8.)[5] Upon Lt. Tiberia's instructions and based on Plaintiff's suicide attempts, Sgt. Crisafulli ordered the shower door to be opened. (Defs.' 56.1 Stmt. ¶ 34.) Sgt. Crisafulli accompanied by C.O. Schurmann, C.O. Ford and C.O. Johnson went to the shower. (Pl.'s Opp'n to Crisafulli ¶ 9; Defs.' 56.1 Stmt. ¶ 35.) C.O. Ford opened the door and asked Plaintiff to exit. (Pl.'s Opp'n to Crisafulli ¶ 9; Defs.' 56.1 Stmt. ¶ 36.) After several refusals, C.O.s Johnson, Ford and Schurmann entered the shower to bring Plaintiff out. (Pl.'s Opp'n to Crisafulli ¶ 9–10; Defs.' 56.1 Stmt. ¶ 37.) Plaintiff then alleges that her feet were swept from under her causing her to fall to the floor. (Pl.'s Opp'n to Crisafulli ¶ 9.) Plaintiff resisted the officers' grip as they tried to usher her out of the shower. (*Id.*) C.O.s Schurmann, Ford and Johnson carried Plaintiff back to her cell. (Pl.'s Opp'n to Crisafulli ¶ 10.) Sgt. Crisafulli followed. (*Id.*)

Plaintiff states that while the officers carried her back to her cell, one of the officers kicked her in the back. (Pl.'s Opp'n to Crisafulli ¶ 11.) After Plaintiff was placed in her cell, she attempted to leave her cell three times before the officers were able to exit her cell and close the door. (Defs.' 56.1 Stmt. ¶ 44.) Plaintiff claims she was not attempting to leave, but rather was in a paranoid state and did not want the cell door locked. (Pl.'s Opp'n to Schurmann ¶ 12.) During her last alleged attempt to leave the cell, she grabbed onto C.O. Schurmann who pulled free of her grip and attempted to calm her down. (Pl.'s Opp'n to Schurmann ¶ 13–14; Defs.' 56.1 Stmt. ¶ 47.) Plaintiff asserts that when C.O. Schurmann shut the door he used his legs and knees to push Plaintiff back into her cell. (Pl.'s Opp'n to Schurmann ¶ 14.) In the course of keeping Plaintiff in her cell, Plaintiff alleges that C.O. Schurmann kicked her in the vagina. (*Id.*) Shortly thereafter, a nurse arrived in the SHU. (Pl.'s Opp'n to Crisafulli ¶ 14; Defs.' 56.1 Stmt. ¶ 50–1.) Sgt. Crisafulli, responding to Plaintiff's complaints that she was kicked in the groin, requested that the nurse examine Plaintiff. (*Id.*) Plaintiff contends that the security staff as a whole decided that the cell door would not be reopened given the difficulty the officers had just encountered in closing the Plaintiff's cell door. (Pl.'s Opp'n to Crisafulli ¶ 14.) Defendants on the other hand, argue that Plaintiff refused the nurse access to her cell. (Defs.' 56.1 Stmt. ¶ 52.) According to the Plaintiff, she complained to

the nurse who arrived at her cell that she had been kicked in the groin area. (Pl.'s Opp'n Crisafulli ¶ 14.) Sgt. Crisafulli ordered a corrections officer to take pictures of the Plaintiff in her cell. (Pl.'s Opp'n to Crisafulli ¶ 15; Defs.' 56.1 Stmt. ¶ 53.) Although Plaintiff attempted to obstruct the camera's view a corrections officer managed to take two pictures of the Plaintiff standing by her cell door. [6] (Pl.'s Opp'n to Crisafulli ¶ 15; Defs.' 56.1 Stmt. ¶ 54–5.) After the pictures were taken Sgt. Crisafulli recommended that "mechanical restraints" be placed on the plaintiff before the nurse entered Plaintiff's cell. (Pl.'s Opp'n to Crisafulli ¶ 16.) However, despite the decision to allow the nurse to enter Plaintiff's cell, Plaintiff refused to see the nurse, and remained steadfast in her decision. (Pl.'s Opp'n to Crisafulli ¶ 16; Crisafulli Aff. ¶ 16)

**\*4** As a result of the alleged forced used by various correction officers, Plaintiff sustained bruises to her arms, a knot on her back and soreness and redness around her vaginal area. (Pl.'s Opp'n to Schurmann ¶ 17.)

Subsequently, Sgt. Crisafulli, C.O. Schurmann, and C.O. Ford filed separate misbehavior reports against the Plaintiff for violating various New York State Department of Correctional Services ("NYSDOCS") Rules and Regulations. Following separate disciplinary hearings on the reports Plaintiff was found to have in fact violated the rules and regulations enumerated in the misbehavior reports. (Pl.'s Opp'n to Crisafulli ¶ 17; Pl.'s Opp'n to Schurmann ¶ 16; Pl.'s Opp'n to Ford ¶ 11; Defs.' 56.1 Stmt. ¶ 56–61.)

### C. "Feed Slot Incident"

On July 2, 1998 Plaintiff contends that since her various pleas to staff for mental health attention were ignored, (Pl.'s Opp'n to Rielly ¶ 4), she tied a blanket to the feed slot of her cell to prevent it from closing. This enabled Plaintiff to more readily attract staff's attention. (*Id.*) Lt. Rielly arrived at the SHU and was informed that Plaintiff refused to close the feed slot of her cell door. (*Id.;* Defs.' 56.1 Stmt. ¶ 62.) After being told to close her feed slot Plaintiff refused and renewed her request for mental health attention. (Pl.'s Opp'n to Rielly ¶ 5.) Plaintiff positioned her arms out of the slot to protest the staff's neglect of her requests. [7] Lt. Rielly ordered Correction Officers Middleton and Virella to place her arms back in the cell. (Pl.'s Opp'n to Rielly ¶ 6; Defs.' 56.1 Stmt. ¶ 67.) Unsuccessful in their attempt, Lt. Rielly then cut the blanket off the slot with a Swiss Army Knife. The Parties dispute whether Rielly's use of his knife injured the Plaintiff. Defendants claim that the blanket was removed without any

injury to the Plaintiff. (Defs.' 56.1 Stmt. ¶¶ 68–9; Rielly Aff. ¶ 7.) Plaintiff alleges Lt. Rielly cut her face. (Pl.'s Opp'n to Rielly ¶ 7.) [8] Subsequently, C.O.s Gentile and MacEsker were summoned to the SHU to assist in a second attempt to place Plaintiff's arms inside her cell. (Pl.'s Opp'n to Rielly ¶ 8; Defs.' 56.1 Stmt. ¶ 71.) Defendants assert that after Plaintiff ignored Gentile's order to place her arms in her cell, Gentile held Plaintiff's left forearm while MacEsker applied "the bent wrist come along" to Plaintiff's right arm, a move approved by the NYSDOCS. [9] (Defs.' 56.1 Stmt. ¶¶ 74–75.) Plaintiff maintains that C.O.s Gentile and MacEsker punched and kicked her arms in order to get them inside the cell. (Pl.'s Opp'n to Rielly ¶ 9.) Plaintiff also claims that C.O. Gentile never "communicated with [Plaintiff] verba[ly] through the entire incident." (*Id.*) Furthermore, Plaintiff alleges that C.O. MacEsker twisted her right arm to its snapping point, and placed it under strenuous pressure by bouncing his weight on it until the pain became unbearable. (*Id.*) Plaintiff then backed away from the slot and it was closed. (*Id.*) Plaintiff sustained bruises to her forearms due to the officers' force. (*Id.*)

**\*5** A nurse arrived in the SHU to examine the Plaintiff. (Defs.' 56.1 Stmt. ¶ 76.) Defendants contend Plaintiff refused to be seen by her, placing a sanitary napkin over the plexiglass portion of the gate. (Defs.' 56.1 Stmt. ¶ 77.) Plaintiff asserts that since she was denied the opportunity to have a full examination, she ignored the nurse and the officers. According to Plaintiff, the nurse only wanted "to look" at Plaintiff, not examine her. (Pl.'s Opp'n to Rielly ¶ 10.) One of the officers was able to displace the sanitary napkin and the nurse observed Plaintiff standing against the wall of her cell. (Defs.' 56.1 Stmt. ¶¶ 78–9.) The nurse observed nothing to suggest that Plaintiff was in need of further medical attention. (Defs.' Notice of Motion Ex. B, Doc. # 0000027 (stating that Plaintiff did not seem to be in any distress, and did not behave in "any manner suggesting the need for medical attention").)

As noted above, Plaintiff allegedly sustained a cut on her left arm from Lt. Rielly's knife and bruises to her forearm from alleged punches and kicks from C.O.s Gentile and MacEsker. (Pl.'s Opp'n to Rielly ¶ 7; Pl.'s Opp'n to MacEsker ¶ 8.) After this incident Plaintiff was again charged with various violations of NYSDOCS Rules and Regulations. (Defs.' 56.1 Stmt. ¶¶ 81–6.) Of the violations charged, Plaintiff was found to have (1) interfered with an employee, (2) refused to obey a direct order, (3) created a disturbance, and (4) stole, destroyed or damaged property of another. (Defs.' 56.1 Stmt. ¶¶ 84, 86.)

Plaintiff was found not guilty of the violent conduct and threat charges. (Longo Decl. Ex. C.)

## II. DISCUSSION

The Court's role on a motion for summary judgment is not to resolve disputed issues of fact, but to determine whether there are any genuine issues for trial. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (stating that summary judgment requires that there be "no genuine issue of material fact"); *Corselli v. Coughlin,* 842 F.2d 23, 25 (2d Cir.1988) (holding that summary judgment was inappropriate when there were "obvious factual conflicts in the record").

In assessing whether summary judgment should be granted, the Court must "resolv[e] ambiguities and draw[ ] reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986). "Viewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991) If the nonmovant's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (citations omitted). A party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight,* 804 F.2d at 12.

**\*6** However, since Plaintiff is proceeding *pro se* she is entitled to special latitude. *See McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (stating that courts "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest' ") (quoting *Burgos v. Hopkins,* 14 F .3d 787, 790 (2d Cir.1994)).

## A. Eighth Amendment Claims

To state a claim under § 1983, Plaintiff must establish that (1) the conduct in question deprived her of rights, privileges, or immunities secured by the Constitution or laws of the United States, and (2) the conduct complained of was committed by a person acting under color of state law. *See Santiago v. Campisi,* 91 F.Supp.2d 665, 672 (S.D.N.Y.2000) (citing

*Gomez v. Toledo,* 446 U.S. 635, 640 (1980)). Here, Plaintiff alleges Defendants violated her Eighth Amendment rights. Specifically, Plaintiff contends Bedford Hills Correctional Officers used excessive force during both The Shower Incident and The Feed Slot Incident. Plaintiff also argues that the correctional officers demonstrated a deliberate indifference to her medical needs after both of these incidents by not allowing her a full medical examination.

### 1. Excessive Force

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," including the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976). " '[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." ' *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999) (quoting *Helling v. McKinney,* 509 U.S. 25, 32 (1993)). To establish an excessive force claim under the Eighth Amendment, a plaintiff must satisfy both an objective and a subjective component. *Hudson v. McMillian,* 503 U.S. 1, 8–9 (1992).

#### a. Objective Component

To satisfy the objective component, the injury actually inflicted must be sufficiently serious to warrant Eighth Amendment protection. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). The Eighth Amendment "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. 9–10 (internal quotataions omitted). Defendants argue that the injuries Plaintiff complains to have sustained are *de minimis.* In addition, Defendants argue that the Plaintiff's claim is defective since the complained of physical contact did not cause her serious pain or significant injury. (Defs.' Mem. Law at 13.)

Resolving all ambiguities and drawing reasonable inferences against the Defendants, the Court finds that the injuries Plaintiff sustained from each incident were not *de minimis* as a matter of law. As a result of both incidents, Plaintiff claims to have suffered bruises, a knot in her back, soreness and redness in her vaginal area and a knife wound on her right arm. As an initial matter, an excessive force claim does not, as Defendants contend, require that a plaintiff suffer serious pain or significant injury. *See Griffin v. Crippen,* 193 F.3d 89, 92 (2d Cir.1999) (stating that a plaintiff "need not prove

'significant injury' to make out an excessive force claim and, thus, the fact that [a plaintiff] suffered only minor injuries does not warrant dismissal"); *see also Hudson,* 503 U.S. at 9 (stating that Eighth Amendment may be violated "whether or not significant injury is evident"). Injuries like those which the Plaintiff complains are regarded as more than *de minimis* and have survived motions for summary judgment. *See, e.g., Griffin,* 193 F.3d at 92 (finding a bruised shin and swelling over the left knee were not *de minimis* as a matter of law); *Miner v. Ramsey,* No. 99 Civ. 11661, 2001 WL 540746, at *3 (S.D.N.Y. May 22, 2001) (denying summary judgment where plaintiff allegedly sustained bruised and swollen wrist after officer slammed plaintiff into a van); *Crawford v. Braun,* No. 99 Civ. 5851, 2001 WL 127306, at *4 (S.D.N.Y. Feb. 9, 2001) (denying summary judgment where plaintiff sustained discoloration of forehead from an alleged blow to the face and swollen wrists from the use of extremely tight handcuffs; plaintiff also alleged he was subjected to force on his arms which he characterized as an attempt to break them); *Davis v. Patrick,* No. 92 Civ. 0548, 2000 WL 1154065, at *2–3 (S.D.N.Y. Aug. 14, 2000) (denying summary judgment where plaintiff alleged he sustained bruises, claw marks, and a blood line on his left arm, and bruises on his neck even though when he was examined the injuries were no longer visible); *Carter v. Kiernan,* No. 98 Civ. 2664, 2000 WL 760303, at *4–5 (S.D.N.Y. June 12, 2000) (maintaining a swollen ankle, bruised knee, cuts on the wrist and forehead, lumps on the jaw, forearms, and elbow, as well as tenderness of the scalp were more than *de minimis,* and summary judgment was inappropriate). Accordingly, this Court finds that the Plaintiff's injuries allegedly sustained as a result of each incident are not *de minimis* as a matter of law. Whether Plaintiff's injuries were sufficiently serious as to satisfy the objective element of Plaintiff's excessive force claims is for the jury to decide. [10]

**b. Subjective Component**

**\*7** To satisfy the subjective component the inmate must show that the prison officials involved "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994). In a case involving the alleged use of excessive force by prison officials, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7. "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between

that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response." ' *Id.* at 8 (quoting *Whitley v. Albers,* 475 U.S. 312, 321 (1986)).

Where conflicts exist in the record regarding the degree and justification for the use of force, dismissal is inappropriate. *See, e.g., Griffin,* 193 F.3d at 91 (concluding dismissal inappropriate because there were genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him); *Davidson,* 32 F.3d at 30 (finding material questions of fact remained as to whether the proffered justification for the force used made it necessary for defendants to shackle plaintiff so tightly as to cause severe pain and permanent injury); *Moore v. Ortiz,* No. 93 Civ. 2626, 1998 WL 226195, at *2 (S.D.N.Y. May 4, 1998) (denying summary judgment due to material disputes regarding defendants' claim that they were acting in a manner to protect themselves when plaintiff lunged at them in a threatening manner, while plaintiff denied lunging at defendants and claims he obeyed orders); *Ortiz v. Pearson,* 88 F.Supp.2d 151, 160 (S.D.N.Y.2000) (finding conflicting evidence in the record as to whether the defendants acted with a malicious and sadistic intent or whether they were simply applying force in a good-faith effort to maintain discipline, which is more appropriately resolved by a jury). As in the cases cited above, disputed issues of material fact remain concerning the amount of force used during both incidents, and the manner with which that force was exercised, i.e. whether the force was applied in good-faith or maliciously and sadistically.

**i. Shower Incident**

During the Shower Incident, Plaintiff claims Bedford Hills Correctional Officers pushed her into a door, punched her in the face, swept her feet causing her to fall to the floor, and kicked her in the back and vaginal area. Defendants however, deny Plaintiff's claims of force and assert that they acted in good-faith in order to prevent Plaintiff from harming herself and further disrupting order in the SHU. (Defs.' Mem. Law at 19.) While Plaintiff admits that she was agitated and argued with C.O. Brown and Sgt. Crisafulli she denies acting in a threatening manner. (Plaintiff's Opp'n to Brown ¶ 5.) Further, Plaintiff denies attempting to head butt Sgt. Crisafulli. (Plaintiff's Opp'n to Crisafulli ¶ 6.) Thus, crediting the Plaintiff's story, the push into the door would not appear to be force applied in good-faith to restore order. A reasonable jury could find that the push was delivered with

frustration and with the purpose of injuring the Plaintiff. The alleged punch in the face delivered to the Plaintiff in the shower is disputed by the Defendants. Even if the Plaintiff was acting in an uncooperative manner from her suicidal episode, a reasonable jury could find that a blow to the face was delivered maliciously and sadistically. Of the many possible ways to use force in order to control a suicidal inmate, an alleged punch in the face is too peculiar and cannot, as a matter of law, be said to fit within the good-faith safety harbor of the Eighth Amendment's subjective component. Finally, the facts and circumstances surrounding the alleged leg sweep and the kicks to the Plaintiff's back and groin area are sufficiently unclear for this Court to make any determination, at this time, whether this use of force was justified. The issue raised is whether the alleged forced used by the correctional officers against the Plaintiff was warranted in light of Plaintiff's suicide attempts and alleged refusals to comply with the officers' requests to exit the shower and stay in her cell. This is a factual determination that must be resolved by a jury.

### ii. Feed Slot Incident

**\*8** Disputed issues of material fact likewise make summary judgment inappropriate with respect to the Feed Slot Incident. Resolving factual disputes in the light most favorable to the nonmoving party, Plaintiff did not threaten any officers on the day her pleas for a mental health evaluation were ignored. Since, according to Plaintiff, "an inmate must go to extremes before such requests are even acknowledged," (Pl.'s Opp'n to Rielly ¶ 4), she tied a blanket to her feed slot. The space created by the blanket allowed Plaintiff to continue her protest by waving her arms outside the cell. In the course of placing Plaintiff's arms back in her cell, Defendants allegedly cut her arm with a knife, punched and kicked her arms and bent her right arm to its breaking point. Defendants deny the allegations of punching and kicking her arms and claim they used the "bent wrist come along" maneuver that is approved by the NYSDOCS.

Again, there are genuine issues of material facts as to whether the Defendants acted with a sufficiently culpable state of mind. If fact finders credit the Plaintiff's version of The Feed Slot Incident, there appears to be little justification for the amount of the force used against the Plaintiff. Further, it is not unreasonable to construe Rielly's statement " 'You don't want to move your arm? I bet you [sic] move them now[.']", if made, as suggesting that he maliciously and sadistically wielded the knife so to injure the Plaintiff. Also, Plaintiff's averment that C.O. Gentile never verbally ordered

Plaintiff to desist from her allegedly disruptive activities, but rather punched and kicked Plaintiff's arms along with C.O. MacEsker also creates a genuine issue of material fact as to whether Gentile and MacEsker acted maliciously.

In sum, Defendants have failed to establish as a matter of law that Plaintiff's injuries are not serious enough to trigger Eighth Amendment protection, nor, have Defendants demonstrated that the circumstances surrounding Plaintiff's claims establish that Defendants acted in good-faith as a matter of law. Accordingly, Defendants' motion for Summary Judgment on Plaintiff's excessive force claims is DENIED.

### 2. Deliberate Indifference to Medical Needs

"An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met ." *West v. Atkins,* 487 U.S. 42, 54 (1988) (citing *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)). "In light of this, the [Supreme] Court held that the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated." *West,* 487 U.S. at 54. To establish an unconstitutional denial of medical care, a prisoner must prove a deliberate indifference to serious medical needs. *Estelle,* 429 U.S. at 104; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Deliberate indifference to medical needs, like an excessive force claim, also requires that a plaintiff satisfy an objective and a subjective component. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). To satisfy the objective prong, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). To be sufficiently serious the deprivation must contemplate " 'a condition of urgency, one that may produce death, degeneration or extreme pain." ' *Hathaway,* 37 F.3d at 66 (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). "A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (internal quotations omitted). The subjective prong requires that the plaintiff demonstrate the official acted with a sufficiently culpable state of mind. *Wilson,* 501 U.S. at 298. "The required state of mind, equivalent to criminal recklessness, is that the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

a. Seriousness of the Deprivation

**\*9** It is well established that more than minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical need. *Compare Sonis v. St. Barnabas Hosp. Correctional Health Servs.,* No. 00 Civ. 4968, 2001 WL 664402 (S.D.N.Y. May 21, 2001) ("cut finger, even where skin is 'ripped off,' ... does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief"); *Henderson v. Doe,* No. 98 Civ. 5011, 1999 WL 378333, at \*2 (S.D.N.Y. June 10, 1999) (broken finger does not rise to sufficient level of urgency); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (foot condition involving a fracture fragment, bone cyst and degenerative arthritis not sufficiently serious) *with Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (asserting that suffering "great pain" for six months from abscessed teeth where plaintiff could not chew properly and choked on his food, arose to the level of sufficiently serious condition); *Hathaway,* 37 F.3d at 67 (finding that plaintiff had serious medical needs where his degenerative hip condition required surgery prior to incarceration and produced extreme pain that led to registered complaints on almost seventy occasions).

The severity of Plaintiff's alleged injuries do not warrant Eighth Amendment protection under a deliberate indifference theory. Unlike the excessive force standard, deliberate indifference requires injuries that demonstrate urgency leading to death, degeneration or extreme pain. *Hathaway,* 37 F.3d at 66. In this case, Plaintiff complains of soreness and redness to her vaginal area, bruises, a knot on her back and a cut on her right forearm. These injuries simply do not satisfy the objective component of a deliberate indifference claim. Rather, they are superficial injuries that require time to heal. Indeed, there is little that can be done to assist the healing of a bruise or a knot in the back. The same is true for an injury marked by soreness or redness. As for the knife wound, nothing in the record suggests that it caused Plaintiff extreme pain. Further, and as discussed in greater detail *infra,* after each incident Plaintiff refused to cooperate with the nurse who arrived at her cell door. Plaintiff's refusal to cooperate with the nurse belies any claim of extreme pain or degeneration sufficient to satisfy the objective prong of a medical indifference claim.

Accordingly, the Court finds that Defendants are entitled to summary judgment on Plaintiff's deliberate indifference to medical needs claim. Nevertheless, even assuming *arguendo* that Plaintiff's injuries are sufficiently serious, Plaintiff

still fails to demonstrate that the Defendants acted with a sufficiently culpable state of mind. Even when drawing every inference in favor of Plaintiff, her allegations of deliberate indifference are legally insufficient.

b. Deliberate Indifference

Deliberate indifference requires that the official knows of and disregards an excessive risk to inmate health or safety. *Hemmings,* 134 F.3d at 108. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.* "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66; *see also Farmer,* 511 U.S. at 836 ("[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

**\*10** Where the treatment provided is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation. *Chance,* 143 F.3d at 703; *see also Reyes v. Turner,* No. 93 Civ. 8951, 1996 WL 93728, at \*9 (S.D.N.Y. Mar. 5, 1996) ("Plaintiff's preference for an examination by a physician does not sustain a claim for denial of medical assistance. 'There is no right to the medical treatment of one's choice if the prescribed treatment is based upon applicable medical standards." ' (quoting *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988))). Furthermore, an inmate's refusal to accept medical treatment in no way signifies a deliberate indifference to serious medical needs. *See Ruffin v. Deperio,* 97 F.Supp.2d 346, 355 (W .D.N.Y.2000) (citing *Brown v. Selwin,* No. 98 Civ. 3008, 1999 WL 756404, at \*6 (S.D.N.Y. Sept. 24, 1999) (finding no deliberate indifference when it was uncontroverted that plaintiff refused medical treatment on several occasions); *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (plaintiff's removal from special diet did not constitute deliberate indifference where plaintiff refused to eat the meals provided to him); *Ross v. Kelly,* 784 F.Supp. 25, 46–47 (W.D.N.Y.1992) (no deliberate indifference where plaintiff to blame for delays in treatment in part due to refusal of treatment).

i. The Shower Incident

Immediately after the Shower Incident, a nurse was available to Plaintiff, thereby negating any notion of outright denial or delay in providing medical attention. Rather than showing

deliberate indifference, the nurse's availability demonstrates that Defendants attended to Plaintiff with "sufficient speed." *See Simmons v. Artuz,* No. 94 Civ. 6777, 1996 WL 233504, at *4 (S.D.N.Y. May 8, 1996) (plaintiff's injuries were treated with "sufficient speed" when he was injured in the morning and treated by an evening-duty nurse). Drawing every inference in favor of Plaintiff and assuming the officers would not allow the nurse access to the cell at first, Plaintiff verbally articulated her concerns about the kick to her groin area. However, once the decision was made to allow the nurse to enter the cell once "mechanical restraints" were in place, Plaintiff refused to see the nurse despite attempts to persuade her otherwise. (Pl.'s Opp'n to Crisafulli 16; Crisafulli Aff. 16.) Here, Plaintiff was not denied medical treatment, and no Defendant exhibited deliberate indifference to her medical needs. A nurse was available to the Plaintiff soon after she was taken back to her cell. Given Plaintiff's refusal to cooperate with the prison officials, coupled with her admitted refusal to allow the nurse to enter her cell, this Court GRANTS Defendants' Summary Judgment Motion on Plaintiff's deliberate indifference claim arising out of the Shower Incident.

ii. The Feed Slot Incident

Similarly, Plaintiff was not denied medical care after the Feed Slot Incident. Although a nurse arrived in the SHU to examine Plaintiff, Plaintiff refused to cooperate. (Defs.' 56.1 Stmt. ¶ 76; Defs.' Notice of Motion Ex. B.) Instead, Plaintiff placed a sanitary napkin over the plexiglass portion of the door to obstruct the nurse's view. (Pl.'s Opp'n to Rielly ¶ 10.) According to Plaintiff, she refused to cooperate because the nurse would not provide her with a full examination. (Pl.'s Opp'n to Rielly ¶ 10–11.) Nevertheless, one of the officers was able to displace the sanitary napkin and the nurse observed Plaintiff standing against the wall of her cell. The nurse observed nothing to suggest that Plaintiff was in need of further medical attention. (Defs.' Notice of Motion Ex. B, Doc # 0000027.) Communication between a prospective patient and her treating physician or nurse is necessary to the effective treatment of a patient's ailments. Having failed to communicate anything to the nurse, Plaintiff may not argue that the prison officials she names as Defendants in this action somehow exhibited deliberate indifference to her medical needs. Since the Plaintiff was not denied medical care, but rather refused to cooperate with the nurse provided, Plaintiff did not suffer deliberate indifference to her medical needs.

**\*11** Accordingly, Plaintiff's fails to meet the objective prong of the deliberate indifference standard—as her injuries

are insufficient to rise to the level of a serious medical condition. Furthermore, considering medical attention was available to Plaintiff after both incidents, there is no evidence that Defendants demonstrated a sufficiently culpable state of mind to deprive or delay Plaintiff medical treatment. Thus, Defendants are therefore GRANTED summary judgment on both of Plaintiff's medical indifference claims.

B. Qualified Immunity

Although Plaintiff has sufficiently established a viable Eighth Amendment claim based on excessive force, Defendants contend they are nonetheless entitled to qualified immunity. Public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *Weyant v. Okst,* 101 F.3d 845, 857 (2d Cir.1996). The availability of the defense depends on whether a "reasonable officer could have believed" his action "to be lawful, in light of clearly established law and the information he possessed." *Anderson v. Creighton,* 483 U.S. 635, 441 (1987).

At the time of the complained of incidents, the legal principles governing the use of excessive force and deliberate indifference to serious medical needs were well established. Whether the conduct of the officers was reasonable in light of Eighth Amendment jurisprudence depends upon whose story the jury credits. Since genuine issues of material facts exist as to the Plaintiff's excessive force claims, the officers' qualified immunity cannot be resolved as a matter of law. *Compare Weyant,* 101 F.3d at 858 (finding facts sharply in dispute and that the matter of qualified immunity could not be resolved as a matter of law); *with Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995) (asserting that when the factual record is not in serious dispute, the ultimate legal determination of qualified immunity is a question of law left for the court to decide); *and Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990) ("Once disputed factual issues are resolved, the application of qualified immunity is ... ultimately a question of law for the court to decide.") Accordingly, this Court rejects Defendants' contention that on this record, they are entitled to qualified immunity.

C. Eleventh Amendment

Under the Eleventh Amendment, federal courts generally lack jurisdiction over suits brought by a private party against a state, unless the state has consented to suit or Congress has expressly abrogated the state's immunity. *See Board of*

*Trustees v. Garrett,* 121 S.Ct. 955, 962 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."). Where state officials, rather than the state, are named defendants, the Eleventh Amendment will still bar the suit if "the state is the real, substantial party in interest." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984). Therefore, suits for money damages brought against state officials in their official capacities are barred by the Eleventh Amendment. *See Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir.1997); *see also Kostok v. Thomas,* 105 F .3d 65, 69 (2d Cir.1997). Nonetheless, it is well settled that the Eleventh Amendment does not bar suits against state officials in their individual capacities. *Hafer v. Melo,* 502 U.S. 21, 31 (1991); *Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993).

**\*12** Defendants argue to the extent that Plaintiff names them in their official capacities and seeks damages from Department of Correctional Services officials, the Court is without jurisdiction to hear the claim. (Defs.' Mem. Law at 24.) While the Defendants are correct in this assertion, Plaintiff's failure to specify that her claims are asserted against the state officials in their individual capacities does not justify an outright dismissal. *Belli v. Supple,* No. 98 Civ. 0772, 1999 WL 461002, at *2 (S.D.N.Y. July 7, 1999) (citing *Oliver Schools Inc. v. Foley,* 930 F.2d 248, 252 (2d Cir.1991)).

Since Plaintiff is a *pro se* litigant the Court interprets her pleadings to raise the strongest arguments they suggest. *McPherson v. Coombe,* 174 F.3d at 279. Upon a liberal reading of Plaintiff's Complaint and other pleadings, this Court finds that Plaintiff intended to assert claims against Defendants in their individual capacity. Plaintiff's use of the Defendants' official titles in her pleadings is not enough to show that she intended to sue them only in their official capacities. *George v. Lorenzo,* No. 98 Civ. 0769, 1999 WL 397473, at *2 (S.D.N.Y. June 15, 1999). Accordingly, to the extent Plaintiff seeks to sue Defendants in their official capacities, those claims are DISMISSED. The claims against the Defendants in their individual capacities survive.

### III. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is DENIED in part and GRANTED in part. Genuine issues of material fact remain as to Plaintiff's excessive force claims. Plaintiff, however, fails to state a claim of deliberate indifference to her serious medical needs. These claims are therefore dismissed. There can be no resolution of the qualified immunity defense since genuine issues of material fact are in dispute. Finally, this Court rejects Defendant's Eleventh Amendment argument and retains subject matter jurisdiction of Plaintiff's claims.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1150318

---

Footnotes

1   Plaintiff submitted Opposition Statements to Defendants' Affidavits in lieu of a statement pursuant to Local Rule 56.1. These statements shall be cited as "Pl.'s Opp'n to _____ ¶ ___." The Court accepts Plaintiff's Opposition Statements as her 56.1 Statement and shall decide this motion as it is clear Plaintiff understood the nature and consequences of summary judgment. *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 621 (2d Cir.1999).

2   C.O. Brown claims that Plaintiff threatened her on June 28, 1998. (Brown Aff. ¶ 4; Crisafulli Aff. ¶ 4.) Plaintiff disputes this fact, and points out that no "deprivation order" or other report was filed in connection with this alleged threat. (Pl.'s Opp'n to Brown ¶ 4; Pl.'s Opp'n to Crisafulli ¶ 4.)

3   Apparently C.O. Ford observed Plaintiff being escorted to the shower. The record is unclear at what point C.O. Ford joined C.O. Brown and Crisafiulli in accompanying Plaintiff to the shower.

4   The Plaintiff claims that during much of the shower incident, if not its entirety, she was handcuffed. Defendants do not make or directly respond to this claim. However, both parties agree that Plaintiff did attempt to hang herself while in the shower. The Court does not make any finding with respect to whether the Plaintiff was in fact wearing handcuffs, and at what time if any said handcuffs were removed. To be sure, while in the shower Plaintiff told C.O. Ford "I'm not leaving the shower and giving up cuffs." (Ford Aff. ¶ 6.) It is unclear what Plaintiff meant by this statement. However, Plaintiff clearly asserts that she was in handcuffs while in the shower and that these handcuffs were not removed. (Pl.'s Opp'n to Ford ¶ 6.)

5   Although it is unclear what happened after C.O. Schurmann cut Plaintiff down a second time, it appears as if Schurmann exited the shower and locked the door. The Court draws this inference from the fact that (1) Schurmann cut the curtain to prevent the second suicide attempt, (Crisafulli Aff. ¶ 8), (2) Lt. Tiberia ordered Crisafulli to have Plaintiff removed from

the shower, (*id.*), and (3) in response, Crisafulli ordered Schurmann, Johnson, and Ford to accompany him to the shower to remove the Plaintiff, (Defs.' 56.1 Stmt. ¶ 35).

6   Unfortunately, neither party has seen fit to attach copies of the photographs to their motion papers.

7   Defendants claim that Plaintiff also threatened to douse staff with feces if the officers did not step away from her cell, thereby creating a hazardous situation in the corridor. (Defs.' 56.1 Stmt. ¶¶ 64, 66.) Plaintiff denies making any threats at all. (Pl.'s Opp'n to Rielly ¶¶ 5–6.)

8   Plaintiff states that once Rielly saw Middleton and Virella having difficulty with the Plaintiff "he produced a Swiss Army Knife, (Approx[imately] 4 inches long) which is not the standard knife thats [sic] permitted in the facility, [sic] prior to using it to cut the material he stated 'You don't want to move your arm? I bet you [sic] move them now [.']][H]e then began cutting at the fabric, and in the course of his actions he cut me on my left arm. When I noticed the cut I stated that I wanted to see medical. Furthermore, Lt. Rielly coached his officers and told them to say the wound I had on my arm was a self inflicted burn that I reopened, which is not true." (Pl.'s Opp'n to Rielly ¶ 7.)

9   Defendants have offered no explanation of what "the bent wrist come along" entails.

10  The Defendants also argue that since the Plaintiff's injuries are *de minimis* the Plaintiff has failed to state a claim for mental or emotional injury. Pursuant to 42 U.S.C. § 1997e(e) "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." However, since Plaintiff has sustained injuries that are more than *de minimis* she has satisfied the physical injury requirement of 42 U.S.C. § 1997e(e). *See Cole v. Artuz,* No. 97 Civ. 0977, 2000 WL 76749, at *4 n. 2 (S.D.N.Y. June 12, 2000) (stating that the 1997e(e) standard is essentially the same as the standard under the Eighth Amendment, and recognizing that the determination regarding the sufficiently of harm under the Eighth Amendment resolves any argument pursuant to 1997e(e) concerning the physical injury requirement (citing *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir.1997)); *see also Warren v.. Westchester County Jail,* 106 F.Supp.2d 559, 570 (S.D.N.Y.2000) (dismissing claim for emotional distress where the plaintiff's injuries were *de minimis* ).

**End of Document**                                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

REPORT-RECOMMENDATION

SHARPE, Magistrate J.
I. *Introduction* [FN2]
> FN2. This matter was referred to the undersigned
> for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

**\*1** Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

II. *Procedural History*

On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

> FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

> FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)*(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at *2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at *2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at *1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> [FN7]. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at *2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

**\*5** More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged violation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2013 WL 5466218 (N.D.N.Y.)
**(Cite as: 2013 WL 5466218 (N.D.N.Y.))**

Ⓗ

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Angelo JOHNSON, Plaintiff,
v.
Michael A. SCHIFF, Lt. William Devito, Thomas Loughern, Sgt. Friot, Sgt. Shoale, [FN1] Sgt. Ryan, C.O. Chesebro, C.O. Moscato, C.O. Alemar, C.O. Rotundo, C.O. Demun, C.O. Parker, C.O. Lacotta, C.O. John Doe, R.N. Joanne Locke, C.O. Hackett, Lt. Schult, Defendants.

> FN1. In her affidavit filed in support of the motion for summary judgment, this defendant spells her name "Tonya Shoales." The Clerk is directed to change the caption to reflect the correct spelling of Defendant Shoales' surname.

No. 9:11–CV–0531 (MAD/TWD).
Sept. 13, 2013.

Angelo Johnson, Monticello, NY, pro se.

Levene, Gouldin & Thompson, LLP, Maria Lisi–Murray, Esq., of Counsel, Vestal, NY, for Chenango County Defendants.

**REPORT–RECOMMENDATION and ORDER**
THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

**\*1** This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Angelo Johnson claims that Defendants subjected him to excessive force, denied him medical care, retaliated against him for filing grievances, and denied him access to his attorney. (Dkt. No. 93.) Currently pending before the Court is Defendants' motion for summary

judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 117.) For the reasons discussed below, I recommend that Defendants' motion be granted in part and denied in part.

**I. FACTUAL AND PROCEDURAL SUMMARY**

During the month of May 2008, Plaintiff was confined at the Chenango County Correctional Facility as a pretrial detainee. (Dkt. No. 93 ¶¶ 3, 36, 66.) On May 10, 2008, Plaintiff filed a grievance requesting that he be returned to Sullivan County, where criminal charges were pending. (Dkt. No. 93 ¶¶ 36–37; Dkt. No. 117–9 at 60.) Plaintiff alleges that Defendant Correction Officer Mark Alemar retaliated against him for filing the grievance by falsely informing his supervisor that Plaintiff had threatened to stab an officer. (Dkt. No. 93 ¶ 56.) In response to Defendant Alemar's report, it was determined that Plaintiff should be moved to administrative segregation. (Dkt. No. 117–15 ¶ 8.) Defendants Ryan, Friot, Hackett, Chesebro, Moscato, Rotundo, and DeMun came to Plaintiff's cell to transport him to administrative segregation. (Dkt. No. 93 ¶ 38.) Plaintiff alleges that the officers subjected him to excessive force without provocation. (Dkt. No. 93 ¶¶ 42–48.) Defendants assert that they used only the amount of force appropriate under the circumstances, given Plaintiff's alleged threats and his behavior. (Dkt. Nos. 117–12 ¶¶ 3–7, 117–15 ¶¶ 3–7, 117–16 ¶¶ 3–7, 117–17 ¶¶ 3–7, 117–18 ¶¶ 3–7, 117–19 ¶¶ 3–7.)

Plaintiff alleges that the conditions of confinement in administrative segregation were inhumane. (Dkt. No. 93 ¶ 49.)

Plaintiff alleges that on May 19, 2008, he was denied the right to contact his attorney. (Dkt. No. 93 ¶¶ 57–60.) Plaintiff alleges that when he protested, non-defendant officer Loiselle pepper-sprayed him in the face and Defendant Christopher LoCotta punched him in the head. (Dkt. No. 93 ¶ 62.) Plaintiff alleges that the officers returned him to his cell and subjected him to excessive force in

the presence of Defendant Tonya Shoales. (Dkt. No. 93 ¶ 65.)

Plaintiff alleges that Defendant Nurse Joanne Locke denied him adequate medical care after these incidents. (Dkt. No. 93 ¶¶ 78–79.)

Plaintiff filed the original complaint in this action on May 11, 2011. (Dkt. No. 1.) The operative pleading is the amended complaint. (Dkt. No. 93.) Defendants answered the amended complaint. (Dkt.Nos .104.) Defendants now move for summary judgment. (Dkt. No. 117.) Plaintiff has opposed the motion. (Dkt. No. 127.) Defendants have filed a reply. (Dkt. No. 133.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

**\*2** Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 & n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc. .,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve

all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968); *accord Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

**\*3** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally. *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

### III. ANALYSIS

#### A. Exhaustion of Administrative Remedies

Defendants argue that some or all of Plaintiff's claims are barred because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA").[FN3] (Dkt. No. 117–21 at 15–16.) Plaintiff argues that, to the extent he did not exhaust his administrative remedies, his failure to exhaust should be excused because Defendants thwarted his attempts to file grievances. (Dkt. No. 127–1 at 6–10.) Because I find that Plaintiff has raised a triable issue of fact, I recommend that the Court schedule this matter for an evidentiary hearing regarding the exhaustion of administrative remedies.

> FN3. Defendants do not appear to argue that Plaintiff failed to exhaust his adminis-

trative remedies regarding the May 10, 2008, incident. The Statement of Material Facts does not state that Plaintiff failed to exhaust his remedies regarding that incident. (Dkt. No. 117–20.) Defendants' memorandum of law states that "the plaintiff failed to exhaust his administrative remedies concerning all allegations in his Complaint, *except arguably for the May 10, 2008 alleged incident.*" (Dkt. No. 117–21 at 16. Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.) In the interest of completeness, however, I will address Plaintiff's grievance regarding that incident.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford,* 548 U.S. at 93.

The Chenango County Correctional Facility has a seven-part inmate grievance procedure. (Dkt.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

No. 117–9 at 25–26.[FN4]) First, the inmate must "attempt to reach a solution with the Corrections Officer assigned" to his housing area. *Id.* at 26. Second, the inmate may request an informal complaint form. *Id.* Third, the inmate may request a formal grievance form. *Id.* Fourth, the grievance is investigated and the Investigating Grievance Officer provides a written determination within five business days of receiving the complaint. *Id.* Fifth, the inmate may appeal to the Jail Administrator or his designee within two business days of receiving the Grievance Officer's decision. *Id.* Sixth, the Jail Administrator responds within five business days. *Id.* Seventh, the inmate may appeal to the State Commission of Corrections, which responds within forty-five days. *Id.*

> FN4. Citations to page numbers in the Inmate Rules and Regulations refer to the page numbers assigned by the Court's electronic filing system.

**\*4** As discussed above, in this action, Plaintiff complains of four separate incidents at the Chenango County Correctional Facility: (1) the alleged May 10, 2008, use of excessive force and the alleged failure to provide medical care afterward; (2) the alleged May 19, 2008, use of pepper spray and other excessive force; (3) the alleged conditions of confinement in his cell; and (4) the alleged May 19, 2008, denial of a phone call to his attorney. (Dkt. No. 93 ¶¶ 42–49, 57–60, 62.)

Regarding the first incident, the evidence submitted by Defendants shows that Plaintiff filed a grievance regarding the May 10, 2008, use of excessive force. (Dkt. No. 117–9 at 66–67.) Although the grievance itself does not mention medical care, the facility's investigation of the grievance included an inquiry into the medical care that Plaintiff received. *Id.* at 70. Plaintiff appealed this grievance through all of the applicable steps and received a decision from the State Commission of Corrections dated July 10, 2008. (Dkt. No. 117–9 at 65.) Thus, Plaintiff exhausted his administrative remedies regarding the alleged May 10, 2008, use of force and

denial of medical care.

Regarding the other incidents, however, Plaintiff did not complete the grievance process. His grievance file does not contain any decisions from the State Commission of Corrections regarding the pepper spray incident, his conditions of confinement, or the alleged denial of a phone call to his attorney. (Dkt. No. 117–9 at 59–97.) Therefore, Plaintiff failed to exhaust his administrative remedies regarding three of the incidents of which he complains in this action.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN5] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Id.* at 686 (citation omitted). Second, if those remedies were available:

> FN5. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011).

the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of nonexhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense.

*Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative proced-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ural requirements." *Id.* (citations and internal quotations omitted).

Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by pleading it in their answer. (Dkt. No. 104 ¶ 11; *Jones,* 549 U .S. at 216; *Alster v. Goord,* 745 F.Supp.2d 317, 332 (S.D.N.Y.2010).) However, Plaintiff has raised a triable issue that Defendants are estopped from asserting the exhaustion defense. *See Ziemba v. Wezner,* 366 F.3d 161, 162–64 (2d Cir.2004) (district court directed to consider whether defendants were estopped from asserting exhaustion defense where inmate alleged that he was beaten, threatened, denied grievance forms, and transferred to another prison). Plaintiff states in opposition to the motion for summary judgment that Defendant Shoales refused to give him a grievance form when he requested one after the pepper spray incident. (Dkt. No. 127–1 at 7.) In the same document he states that he was not allowed to personally file a grievance regarding his conditions of confinement. *Id.* He states in his verified complaint that when he asked for a grievance form after the alleged phone call incident, non-defendant Loiselle pepper sprayed him in the face and Defendant LoCotta punched him on the side of the head. (Dkt. No. 93 ¶ 62.) Therefore, I recommend that the Court schedule this matter for an evidentiary hearing on the issue of exhaustion of administrative remedies regarding the pepper spray incident, Plaintiff's conditions of confinement, and the phone call incident.

**B. Statute of Limitations**

**\*5** The operative complaint alleges that Defendants committed "assault and battery under State Law." (Dkt. No. 93 ¶¶ 83, 86.) Defendants argue that Plaintiff's state law claims for assault and battery must be dismissed because they are barred by the applicable statute of limitations. (Dkt. No. 117–21 at 10.) Defendants are correct. In New York, such claims are governed by a one-year statute of limitations. N.Y. C.P.L.R. 215(3) (McKinney 2013). Here, the original complaint was not filed

until three years after the alleged incidents at the Chenango County Correctional Facility. (Dkt. No. 1.) Indeed, Plaintiff concedes that the Court should dismiss his state law assault and battery claims. (Dkt. No. 127–1 at 5.[FN6])

> [FN6.] Citations to page numbers in Plaintiff's memorandum of law refer to the page numbers assigned by the Court's electronic filing system.

**C. Notice of Claim Requirements**

Defendants argue that any state law claims that Plaintiff's complaint asserts must be dismissed because Plaintiff's notice of claim was (a) untimely; and (b) insufficiently specific. (Dkt. No. 117–21 at 10–11.) I will address only Defendants' first argument, as it is dispositive.

Under New York law, a plaintiff asserting a tort claim against a county or its employees acting within the scope of their employment must serve a notice of claim on the municipality within ninety days of the claim arising. *Anderson v. Nassau Cnty. Dept. of Corr.,* 558 F.Supp.2d 283, 303 (E.D.N.Y.2008); *Houghton v. Cardone,* 295 F.Supp.2d 268, 280 (W.D.N.Y.2003). If a plaintiff fails to file a timely claim, the plaintiff's state law claims are time-barred. *Houghton,* 295 F.Supp.2d at 280.

Here, the events of which Plaintiff complains occurred in May 2008. (Dkt. No. 93.) Plaintiff signed his notice of claim on October 23, 2008. (Dkt. No. 117–4 at 3.) Thus, he did not timely serve his notice of claim. Plaintiff argues that Defendants should be estopped from asserting the notice of claim defense because they "afforded Plaintiff with misleading information on how to file[ ] the notice of claim." (Dkt. No. 127–1 at 6.) This Court cannot apply the doctrine of estoppel in this case. Although New York law allows state supreme and county courts to excuse late-filed notices of claim, the weight of authority holds that federal courts lack jurisdiction to grant extensions of time to file notices of claim or to deem late-filed notices of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

claim as timely. *Crippen v. Town of Hempstead,* No. 07–CV–3478 (JFB)(ARL), 2009 U.S. Dist. LEXIS 24820, at *53–55, 2009 WL 803117, at *17 (W.D.N.Y. Mar. 25, 2009) (collecting cases). Accordingly, Plaintiff's state law claims are barred because he did not timely serve a notice of claim. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's state law claims.

**D. Claims Against Defendant Friot**

The operative complaint asserts an excessive force claim against Defendant Sergeant Friot. (Dkt. No. 93 ¶¶ 8, 42–44, 47–48.) In their answer to the original complaint, Defendants asserted that "Sgt. Friot, upon information and belief, is deceased. He is not a properly named defendant." (Dkt. No. 23 ¶ 16.) It is not clear when Defendant Friot died. Defendant Friot was never served. In their motion for summary judgment, Defendants argue that all claims against Defendant Friot should be dismissed. (Dkt. No. 117–21 at 16 .) Defendants are correct. When a party dies prior to being served, the procedure set forth in Federal Rule of Civil Procedure 25 to substitute a "proper party" for the deceased party does not apply, the action against the deceased is a "nullity," and the deceased party should be dismissed with prejudice. *See Lacy v. Tyson,* No. 1:07–cv–00381–LJO–GSA–PC, 2012 U.S. Dist. LEXIS 134932, at * 3–7, 2012 WL 4343837, at * 2–3 (E.D.Cal. Sept.20, 2012) (collecting cases). [FN7] Therefore, I recommend that the Court dismiss the claims against Defendant Friot with prejudice.

> FN7. The Court will provide Plaintiff with a copy of all unpublished decisions cited in this Report–Recommendation in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

**E. Personal Involvement**

**\*6** Defendants argue that the claims against Defendants Parker, Loughren, Schult, Shoales, and Alemar should be dismissed for lack of personal involvement. (Dkt. No. 117–21 at 7–10.) Defendants

are correct regarding Defendants Parker and Loughren.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (per curiam); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted). [FN8]

> FN8. In *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal'* s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that *Colon* remains good law.

### 1. *Defendant Parker*

Defendant Parker's name appears in the caption of the operative complaint (Dkt. No. 93 at 1) and in the list of parties (*Id.* ¶ 17). However, the only mention of him in the body of the operative complaint is that he was present when pictures were taken of Plaintiff's injuries after the May 10, 2008, incident. *Id.* ¶ 54. Plaintiff concedes that any claim against Defendant Parker should be dismissed for lack of personal involvement. (Dkt. No. 127–1 at 15.) Therefore, I recommend that the Court grant Defendants' motion, dismiss the claims against Defendant Parker, and terminate him as a defendant in this action.

### 2. *Defendant Loughren*

The complaint alleges that Defendant Loughren "is the Sheriff of Chenango County and is responsible for operating and maintaining the order of Chenango County Correctional Facility." (Dkt. No. 93 ¶ 6.) The complaint does not contain any substantive allegations regarding Defendant Loughren. In opposition to Defendants' motion for summary judgment, Plaintiff argues that Defendant Loughren, as Sheriff, "was obliged to at leas[t] have construct[ive] knowledge" about the welfare and safety of each inmate at the Chenango County Correctional Facility. (Dkt. No. 127–1 at 13.) Plaintiff also argues that Defendant Loughren should have received reports about the incidents of May 10, 2008, and May 19, 2008, through his

"channel of communication." *Id.* Plaintiff argues that Defendant Loughren's alleged subsequent failure to adequately train, instruct, supervise, and control his subordinates constitutes gross negligence or recklessness. *Id.* at 14.

**\*7** Plaintiff's arguments do not establish Defendant Loughren's personal involvement. A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Similarly, "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002). Moreover, a supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see also Wright v. Genovese,* 694 F.Supp.2d 137, 161 (N.D.N.Y.2010). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendant Loughren for lack of personal involvement.

### 3. *Defendant Schult*

The complaint alleges that Defendant Schult "is employed as a correctional lieutenant at Chenango County Correctional Facility and is generally responsible for assisting in its day to day operations and executes its policies." (Dkt. No. 93 ¶ 7.) Plaintiff alleges that Defendant Schult placed him in administrative segregation. *Id.* ¶¶ 56, 66. Defendants' statement of material facts asserts that "Plaintiff has alleged that Lt. Schult ordered his ad-

ministrative segregation beginning on May 10, 2008. However, he was ordered to be moved to administrative segregation by Sgt. George Ryan." (Dkt. No. 117–20 ¶ 4.) However, Defendant Schult's affidavit states that "Sergeant George Ryan caused plaintiff to be moved to Administrative Segregation, *which was approved and reviewed by myself.*" (Dkt. No. 117–8 ¶ 5, emphasis added.) Defendant Schult's affidavit establishes that Defendant Schult was actively involved in the decision to place Plaintiff in administrative segregation. Thus, Defendant Schult has not demonstrated that he lacked personal involvement. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Defendant Schult for lack of personal involvement.

### 4. *Defendant Shoales*

The complaint alleges that Defendant Shoales "is employed as a correctional sergeant at Chenango County Correctional Facility and is generally responsible for the supervision of employees, detainees and executes the facility's policies." (Dkt. No. 93 ¶ 9.) Plaintiff alleges that Defendant Shoales granted him permission to place a legal call on May 19, 2008. *Id.* ¶ 57. In the verified complaint, Plaintiff alleges that Defendant Shoales was present when Defendant LoCotta hit Plaintiff numerous times in the head and body on May 19, 2008, but did nothing to prevent or stop the assault. *Id.* ¶¶ 65, 82. In her affidavit filed in support of the motion for summary judgment, Defendant Shoales states that "I was involved in the May 19, 2008 incident where the plaintiff was pepper-sprayed as a result of his failure to comply with the orders of corrections officers ... My only involvement was to order that plaintiff be decontaminated." (Dkt. No. 117–14 ¶ 11.) Defendant Shoales' affidavit establishes that she was personally involved in the May 19, 2008, incident. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Defendant Shoales for lack of personal involvement.

### 5. *Defendant Alemar*

**\*8** The complaint alleges that Defendant Alemar "is a correctional officer employed at the Chenango County Correctional Facility and is generally responsible for the supervision of detainees and executes the facility's policies." (Dkt. No. 93 ¶ 11.) Plaintiff alleges that he requested a grievance form from Defendant Alemar on May 10, 2008, at approximately 7:30 a.m. *Id.* ¶ 36. Defendant Alemar asked him why he wanted the form. *Id.* Plaintiff explained, was given a form, filled it out, and returned it to Defendant Alemar. *Id.* Plaintiff alleges that Defendant Alemar then falsely told his supervisor that Plaintiff had threatened to stab an officer, which led to Plaintiff being assaulted and placed into administrative segregation. *Id.* ¶¶ 56, 70. Plaintiff alleges that Defendant Alemar opened the cell door for the other officers when they used excessive force later that day. *Id.* ¶ 39. In an affidavit filed in support of the motion for summary judgment, Defendant Alemar provides his version of his conversation with Plaintiff regarding grievance forms, describes filing an inmate violation report accusing Plaintiff of making threats, intimidating staff members, and engaging in conduct disrupting the safety, security and good order of the facility, and states that he remained at the officer's station and did not follow the other defendants into Plaintiff's cell. (Dkt. No. 117–23 ¶¶ 9–10.) Defendant Alemar's affidavit establishes that he was personally involved in the May 10, 2008, incident. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Defendant Alemar for lack of personal involvement.

### F. Excessive Force

### 1. *May 10, 2008, Incident*

Defendants argue that they are entitled to summary judgment dismissing Plaintiff's excessive force claims regarding the May 10, 2008, incident. (Dkt. No. 117–21 at 14.) For the reasons discussed below, I find that Plaintiff has raised a triable issue of fact and therefore Defendants' motion for summary judgment should be denied.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).[FN9] "In determining whether the use of force was wanton and unnecessary," the court should evaluate "the need for application of force, relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* at 7 (citation and quotation marks omitted). Not:

> FN9. The legal standard applicable to pretrial detainees' allegations of excessive force is identical to the *Hudson* Eighth Amendment standard. *United States v. Walsh,* 194 F.3d 37, 47 (2d Cir.1999).

every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.
**\*9** *Id.* at 9 (citations and internal quotation marks omitted).

Defendants argue that they are entitled to summary judgment because "the plaintiff cannot establish that he sustained an injury of sufficient severity, worthy of Eighth Amendment protection." (Dkt. No. 117–21 at 14.) Defendants misstate the applicable standard. The "core judicial inquiry" in an excessive force case is "not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm ." *Wilkins v. Gaddy,* 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010) (per curiam) (punctuation and citations omitted). The degree of a prisoner's injury is relevant in some ways. For

instance, the extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Hudson,* 503 U.S. at 7 (citation and quotation marks omitted). The degree of injury suffered by a prisoner "may also provide some indication of the amount of force applied." *Wilkins,* 559 U.S. at 37. But "[i]njury and force ... are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without grievous injury." *Id.* at 38.

Here, Plaintiff alleges in his verified complaint that, without provocation, Defendants Ryan, Friot, Hackett, Chesebro, Mocato, Rotundo, and DeMun banged his head against his cell wall, placed him in manacle restraints, choked him, kicked him, beat him, and dragged him until he was in a state of semi-consciousness. (Dkt. No. 93 ¶¶ 38–48.) Defendants Ryan, Hackett, Chesebro, Mocato, Rotundo, and DeMun declare that they used appropriate force on Plaintiff to move him to administrative segregation based on their observations of his behavior and their belief that he had threatened to stab an officer. (Dkt. Nos. 117–12 ¶¶ 3–7, 117–15 ¶¶ 3–7, 117–16 ¶¶ 3–7, 117–17 ¶¶ 3–7, 117–18 ¶¶ 3–7, 117–19 ¶¶ 3–7.) The competing versions of what transpired do not establish that either party is entitled to judgment as a matter of law. Rather, these competing versions raise triable issues of fact for a jury to determine. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Plaintiff's excessive force claim regarding the May 10, 2008, incident.

2. *May 19, 2008, Incident*
Defendants argue that they are entitled to summary judgment dismissing Plaintiff's excessive force claim regarding the May 19, 2008, incident

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

because the:

> affidavit of C.O. LaCotta demonstrates that the aggressive conduct of the plaintiff resulted in C.O. Loiselle administering a ... one-second burst of oleoresin capsicum 'pepper spray', toward plaintiff. As set forth in plaintiff's complaint, he was ordered to decontamination by Sgt. Shoales. While plaintiff makes further allegations of alleged 'hitting' to his head and body, he suffered no injury.

**\*10** (Dkt. No. 117–21 at 15.) For the reasons discussed below, I find that Plaintiff has raised a triable issue of fact.

Plaintiff states in his verified complaint that on May 19, 2008, non-defendant Loiselle pepper sprayed him in the face and Defendant LoCotta punched him in the side of the head after Plaintiff requested a grievance form. (Dkt. No. 93 ¶ 62.) Plaintiff further alleges that Defendant LoCotta, without provocation, hit him "numerous times upon the head and body." *Id.* ¶ 65. Defendant LoCotta, conversely, declares that Loiselle used the pepper spray because Plaintiff "made an aggressive, sudden move from his bunk toward us" and that "[o]nly the appropriate level of force was used." (Dkt. No. 117–11 ¶¶ 11, 13.) The competing versions of what transpired do not establish that either party is entitled to judgment as a matter of law. Rather, these competing versions raise triable issues of fact for a jury to determine. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Plaintiff's excessive force claim regarding the May 19, 2008, incident.

**G. Equal Protection**

Read broadly, the complaint alleges that Defendants violated his right to equal protection by "allowing him to remain in administrative segregation without the minimum basic supplies afforded to other inmates housed on the unit with the same status." (Dkt. No. 93 ¶ 85.) In opposition to the motion for summary judgment, Plaintiff argues that he

"was intentionally treated differently from other similarly-situated individuals without any rational basis. Notably, [a]ll other inmates in Adseg were entitle[d] to their minimum standards, due process and were from that county and wasn't (sic) black and from Monticello." (Dkt. No. 127–1 at 21.) Defendants argue that they are entitled to summary judgment dismissing Plaintiff's equal protection claim because "the record is devoid of any evidence to create a question of fact" and because Plaintiff "fails to plead that similarly situated individuals were treated differently or that he is pleading a 'class of one' Equal Protection Claim." (Dkt. No. 117–21 at 12.)

The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. amend. XIV, § 1.* This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).* The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir.2005)* (quoting *LeClair v. Saunders, 627 F.2d 606, 609–10 (2d Cir.1980)).* Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment." *Id.* (citing *Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)).* Thus, a plaintiff asserting an equal protection claim must prove that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, FN10 acted out of malice, or acted irrationally and arbitrarily.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN10. The fundamental rights protected by the Equal Protection Clause, as identified by the United States Supreme Court, fall into six substantive categories: (1) the right to freedom of association; (2) the right to vote; (3) the right to interstate travel; (4) the right to fairness in the criminal process (which includes the right to counsel and the right of access to the courts); (5) the right to procedural due process; and (6) the right to privacy "which includes various forms of freedom of choice in matters relating to the individual's personal life" such as freedom of choice in marital decisions, child bearing, and child rearing. 2 Ronald D. Rotunda & John E. Nowak, *Treatise On Constitutional Law Substance and Procedure,* § 15.7 (4th ed.2010).

**\*11** Where a plaintiff asserting an equal protection cause of action alleges that he or she was treated differently from similarly situated individuals on the basis of race, proof of racially discriminatory animus or purpose is required. *Bussey v. Phillips,* 419 F.Supp.2d 569, 581 (S.D.N.Y.2006). Such intent can be shown in "several ways, including by identifying a law or policy that expressly classifies persons on the basis of race, a facially neutral law or policy that has been applied in an intentionally discriminatory manner, or a facially neutral statute or policy that has an adverse effect and is motivated by discriminatory animus." *Id.* Here, other than the bare allegation in his opposition papers that "[a]ll other inmates in Adseg were entitle[d] to their minimum standards, due process and were from that county and wasn't (sic) black and from Monticello," Plaintiff has not alleged or produced any evidence of racial animus. (Dkt. No. 127–1 at 21.) Therefore, Defendants are entitled to summary judgment on Plaintiff's equal protection claim to the extent that he argues that he was the victim of racial discrimination.

Plaintiff may also be asserting an equal protection claim on a "class of one" theory. (Dkt. No. 127–1 at 19.) To prove such a claim, a plaintiff must show that:

no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and [that] the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005) overruled on other grounds by *Appel v. Spiridon,* 531 F.3d 138 (2d Cir.2008). There must be an "extremely high" level of similarity between the plaintiff and the persons with whom he compares himself. *Neilson,* 409 F.3d at 104. Furthermore, class of one plaintiffs are required to prove "intentional disparate treatment, that is, [they must] demonstrate the decisionmakers were aware that there were other similarly-situated individuals who were treated differently." *Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 143 (2d Cir.2010) (quoting *Giordano v. City of New York,* 274 F.3d 740, 751 (2d Cir.2001) (internal quotes omitted). Here, Plaintiff has produced no such evidence. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's equal protection claims.

**H. Due Process**

Plaintiff alleges that Defendants violated his rights under the Fourteenth Amendment. (Dkt. No. 93 ¶ 86.) Read broadly, this can be construed as an allegation that Defendant Alemar violated Plaintiff's right to procedural due process by falsely reporting that Plaintiff threatened to stab a corrections officer, which resulted in Plaintiff being placed in administrative segregation. Defendants move for summary judgment of this claim. (Dkt. No. 117–21 at 12–13.) Because I find that Plaintiff was not deprived of a liberty interest, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the procedural due process claim.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*12** A prisoner's claim that a correctional officer filed a false misbehavior report may implicate the Fourteenth Amendment right to procedural due process. *Freeman v. Rideout,* 808 F.2d 949 (2d Cir.1986); *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988); *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995). The Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman,* 808 F.2d at 951. An inmate has a liberty interest in remaining free from a confinement or restraint where the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). "Post-*Sandin,* the decisions in the Second Circuit are unanimous that [disciplinary] confinement of 30 days or less" is not an atypical or significant hardship. *Gssime v. Burge,* No. 6:08–CV–6404 (MAT), 2013 U.S. Dist. LEXIS 94827, at \* 6–7, 2013 WL 3423816, at \* 2 (W.D.N.Y. July 8, 2013) (collecting cases). Here, Plaintiff was held in administrative segregation only from May 10, 2008, to May 31, 2008. (Dkt. No. 93 ¶ 66.) This confinement of less than thirty days does not implicate a liberty interest. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's due process claim.

## I. Retaliation

Plaintiff alleges that Defendants retaliated against him for filing a grievance by falsely reporting that he had threatened to stab an officer, assaulting him, denying him a legal phone call, and denying him medical care. (Dkt. No. 93 ¶¶ 72–73.) Defendants argue that the complaint fails to state a retaliation claim. (Dkt. No. 117–21 at 19–20.) Defendants are correct.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) . As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

**\*13** *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001) ).

Plaintiff alleges that Defendants retaliated against him for filing a grievance. (Dkt. No. 93 ¶ 72.) The filing of a grievance against prison officials is constitutionally protected conduct. *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Therefore, the complaint states a claim regarding the first element of Plaintiff's retaliation claim.

Plaintiff alleges that Defendants took adverse actions against him by falsely accusing him of threatening to stab an officer, assaulting him, denying him a legal phone call, and denying him medical care. (Dkt. No. 93 ¶ 73.) The Second Circuit defines " 'adverse action' objectively, as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superceded by* 320 F.3d 346, 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb.10, 2003)). The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Id.* The filing of a false misbehavior report is an adverse action for retaliation purposes. *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). In addition, an alleged use of excessive force "is retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Edwards v. McGrain,* No. 09–CV–582S, 2012 U.S. Dist. LEXIS 181981, at * 16, 2012 WL 6701826, at * 6 (W.D.N.Y. Dec.26, 2012) (Schroeder, Mag. J.). Therefore, Plaintiff has alleged facts plausibly suggesting the second element of his retaliation claim.

Regarding the third element, several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002)

(citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include the temporal proximity between the protected activity and the alleged retaliatory act and statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

**\*14** Here, the complaint adequately alleges the temporal proximity factor because Plaintiff alleges that Defendants made a false report, assaulted him, and denied him medical care the same day that Plaintiff filed a grievance. (Dkt. No. 93 ¶ 72.) The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 555 (2d Cir.2001)).

The complaint does not, however, allege any statements by any of the Defendants suggesting that they were motivated by a desire to punish Plaintiff for filing grievances. The complaint alleges, rather, that Defendants Ryan and Friot told Plaintiff that they were beating him and moving him to administrative segregation because they were "tired of you Sullivan County inmates" who "think you're gangsters." (Dkt. No. 93 ¶¶ 41, 48.)

The Second Circuit has held in the context of employment law that where "timing is the only basis for a claim of retaliation ... an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir.2001). The Second Circuit routinely cites to employment cases when discussing retaliation in the prison law context. *See e.g. Espinal,* 558 F.3d at 129 (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). Thus, it is appropriate to apply the *Slattery* rule here. Here, the only connection that Plaintiff can draw between his protected conduct and the alleged adverse actions is temporal proximity. Given the scrutiny and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

skepticism with which courts are required to view claims of retaliation, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's retaliation claims.

**J. Conditions of Confinement**

Plaintiff alleges that he was subjected to unconstitutional conditions of confinement when he was left "in a cold cell without the minimum basic supplies, e.g., blankets, sheets, soap or writing materials." (Dkt. No. 93 ¶ 49.) He testified to those same conditions, using almost precisely the same words and providing no more detail, at his deposition. (Dkt. No. 117–3 at 136:22–137:1.[FN11]) Defendants move for summary judgment of Plaintiff's conditions of confinement claim, arguing that these conditions do not rise to the level of a constitutional violation. (Dkt. No. 117–21 at 17–18.) Defendants are correct.

> FN11. Citations to page numbers in Plaintiff's deposition transcript refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

To establish a conditions of confinement claim, a plaintiff must prove both an objective and a subjective component. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To satisfy the objective component, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Id.* Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To satisfy the subjective component, the plaintiff must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

**\*15** Here, the conditions that Plaintiff cursorily described in his complaint and at his deposition are insufficient to raise a triable issue of fact. *See Davidson v. Murray,* 371 F.Supp.2d 361, 371–73 (W.D.N.Y.2005) (defendants' motion for summary judgment granted where plaintiff alleged simply that he was 'steadfastly and routinely denied' hygiene items such as toothpaste, soap, toilet tissue, and cleaning items over a three-year period but refused to provide any details of the deprivation). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's conditions of confinement claim.

**K. Failure to Intervene**

Read broadly, the complaint asserts failure to intervene claims against Defendants Shoales, Alemar, and Schult. (Dkt. No. 93 ¶¶ 39, 62–65, 84–85.) Defendants move for summary judgment dismissing these claims. (Dkt. No. 117–21 at 18–19.)

> Law enforcement officials can be held liable under § 1983 for not intervening in a situation where excessive force is being used by another officer. Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.

*Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008).

Regarding Defendant Shoales, the complaint alleges that she (1) inquired what had happened after the pepper spray incident; (2) ordered that Plaintiff be decontaminated; (3) supervised Defendant LoCotta and another officer as they escorted Plaintiff back to his cell; and (4) was present when Defendant LoCotta hit Plaintiff, who was still hand-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

cuffed, "numerous times upon the head and body." (Dkt. No. 93 ¶¶ 62–65.) Defendants argue that the failure to intervene claim against Defendant Shoales should be dismissed because "she was not present for the alleged attack." (Dkt. No. 117–21 at 18–19.) Defendants are correct regarding the pepper spray incident. However, Defendants have not addressed the allegation that Defendant Shoales was present while Defendant LoCotta used excessive force on Plaintiff. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing the failure to intervene claim against Defendant Shoales.

Regarding Defendant Alemar, the complaint alleges that he opened Plaintiff's cell door for the Defendants who allegedly used excessive force on Plaintiff on May 10, 2008. (Dkt. No. 93 ¶ 39.) Defendants argue that Defendant Alemar was not, in fact, present at Plaintiff's cell at the time of the alleged assault. (Dkt. No. 11–21 at 19.) Defendant Alemar declares that he remained at the officer's station and did not follow the other officers to Plaintiff's cell. (Dkt. No. 117–13 ¶ 10.) Plaintiff does not dispute that fact in his statement of material facts in opposition to the motion for summary judgment. (Dkt. No. 127 ¶ 27; Dkt. No. 117–20 ¶ 27.) The section of Plaintiff's memorandum of law in opposition to the motion for summary judgment discussing Defendant Alemar does not address the failure to intervene claim. (Dkt. No. 127–1 at 17–18.) The evidence before the Court does not establish that Defendant Alemar had a realistic opportunity to intervene and prevent the harm allegedly caused by the other officers on May 10, 2008. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the failure to intervene claim against Defendant Alemar.

**\*16** Regarding Defendant Schult, the complaint alleges that he:

> exercised deliberate indifference to plaintiff's health and safety when he intentionally failed to respond to plaintiff's complaint of being abused

physically ... by Chenango County Correctional Facility's employees. Defendant Schult's deliberate indifference to plaintiff's health and safety had further been openly demonstrated when he deliberately failed to investigate the allegations contained within plaintiff's complaint(s) of being assaulted by Correctional Officers and by allowing him to remain in administrative segregation without the minimum basic supplies afforded to other inmates housed on the unit with the same status.

(Dkt. No. 93 ¶¶ 84–85.) "[A]n allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002). "There is ... no constitutional right to an investigation by government officials." *Lewis v. Gallivan,* 315 F.Supp.2d 313, 317 (W.D.N.Y.2004) (quoting *Stone v. Dept. of Investigation,* 1992 U.S. Dist. LEXIS 1120, 1992 WL 25202 (S.D.N.Y. Feb.4, 1992) and *Gomez v. Whitney,* 757 F.2d 1005, 1006 (9th Cir.1985)) (granting defendant's motion for summary judgment dismissing prisoner's claim against inspector general for failure to investigate alleged assault). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendant Schult.

**L. Medical Care**

Plaintiff alleges that Defendant Locke violated his constitutional right to receive adequate medical care when she refused to fulfill's Plaintiff's requests for follow-up care at a hospital emergency room and refused to provide him with pain medication. (Dkt. No. 93 ¶¶ 78–79.) Plaintiff argues that Defendant Locke disregarded and failed to adequately treat injuries to his back, right knee, and left eye, which ultimately resulted in a permanent scar above his eye and degeneration to his knee. (Dkt. No. 127–1 at 24.) Defendants move for summary judgment of this claim, arguing that Plaintiff can estab-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

lish neither the objective nor the subjective prong of his medical care cause of action. (Dkt. No. 117–21 at 20–23.)

Prison officials must ensure that inmates receive adequate medical care. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). There are two elements to a prisoner's claim that prison officials violated his or her right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003) (citation omitted).

**\*17** Regarding the objective prong, a "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted), *accord Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. "Courts in this circuit have almost uniformly found ... knee injuries to be insufficient to ... support a deliberate indifference claim." *Johnson v. Wright,* 477 F.Supp.2d 572, 575–76 (W.D.N.Y.2007) (punctuation omitted)

(collecting cases). Similarly, the types of lacerations that Plaintiff describes do not rise to the level of a "serious medical condition." *See Rickett v. Orsino,* No. 10 Civ. 5152(CS)(PED), 2013 U.S. Dist. LEXIS 42544, at \* 61–64, 2013 WL 1176059, at \*17 (S.D.N.Y. Feb. 20, 2013) (collecting cases). Therefore, Plaintiff has not established the objective prong of his medical deliberate indifference claim and Defendants are entitled to summary judgment.

Even if Plaintiff could raise a triable issue of fact as to the objective prong, he could not raise a triable issue as to the subjective prong. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Id.* at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; see also Smith,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). Here, Defendant Locke has filed a declaration describing the care that she provided to Plaintiff im-

mediately after the incidents on May 10 and 19, 2008. (Dkt. No. 117–10.) Defendant Locke provided thorough treatment for the injuries that she observed. *Id.* She provided Motrin for Plaintiff's pain. *Id.* ¶¶ 7, 9. Other than his general allegations that Defendant Locke was deliberately indifferent, Plaintiff has not submitted any evidence raising a triable issue of fact. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of Plaintiff's medical deliberate indifference claim.

## M. Access to Courts

**\*18** Plaintiff alleges that Defendant LoCotta interfered with his right of access to the courts by not allowing him to complete an authorized phone call to his attorney. (Dkt. No. 93 ¶ 80.) Defendants move for summary judgment dismissing this cause of action, arguing that Plaintiff has failed to allege that he suffered any actual injury. (Dkt. No. 117–21 at 23–24.) Defendants are correct.

"A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821–23, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). To state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.). Here, Plaintiff has alleged no actual injury. (Dkt. No. 93.) Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's access to courts cause of action.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 117) be **GRANTED IN PART AND DENIED IN PART.** It is recommended that the Court (1) dismiss Plaintiff's state law claims as time-barred and for failure to timely serve a notice of claim; (2) dismiss all claims against deceased Defendant Friot with prejudice; (3) dismiss all claims against Defendant Parker for lack of personal involvement and terminate him from this action; (4) dismiss all claims against Defendant Loughren for lack of personal involvement and terminate him from this action; (5) dismiss Plaintiff's equal protection claim; (6) dismiss Plaintiff's procedural due process claim; (7) dismiss Plaintiff's retaliation claims; (8) dismiss Plaintiff's conditions of confinement claims; (9) dismiss the failure to intervene claims against Defendants Alemar and Schult; (10) dismiss the medical care claim against Defendant Locke and terminate her from this action; and (11) dismiss Plaintiff's access to courts claim. It is recommended that the Court deny the motion as to (1) the excessive force claims against Defendants Ryan, Hackett, Chesebro, Moscato, Rotundo, and DeMon regarding the May 10, 2008, incident; (2) the excessive force claim against Defendant LoCotta regarding the May 19, 2008, incident; and (3) the failure to intervene claim against Defendant Shoales; and it is further

**RECOMMENDED** that the Court schedule this matter for an evidentiary hearing on the issue of the exhaustion of administrative remedies regarding the alleged May 19, 2008, use of pepper spray, the alleged conditions of confinement, and the alleged May 19, 2008, phone call incident; and it is further

**\*19 ORDERED** that the Clerk correct the caption to list Defendant "Sgt. Shoale" as "Sgt. Tonya Shoales;" and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Crippen v. Town of Hempstead,* No. 07–CV–3478 (JFB)(ARL), 2009 U.S. Dist. LEXIS

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5466218 (N.D.N.Y.)
**(Cite as: 2013 WL 5466218 (N.D.N.Y.))**

24820, 2009 WL 803117 (W.D.N.Y. Mar. 25, 2009); *Edwards v. McGrain,* No. 09–CV–582S, 2012 U.S. Dist. LEXIS 181981, 2012 WL 6701826 (W.D.N.Y. Dec.26, 2012); *Gssime v. Burge,* No. 6:08–CV–6404 (MAT), 2013 U.S. Dist. LEXIS 94827, 2013 WL 3423816 (W.D.N.Y. July 8, 2013) ; *Lacy v. Tyson,* No. 1:07–cv–00381–LJO–GSA–PC, 2012 U.S. Dist. LEXIS 134932, 2012 WL 4343837 (E.D.Cal. Sept.20, 2012); and *Rickett v. Orsino,* No. 10 Civ. 5152(CS)(PED), 2013 U.S. Dist. LEXIS 42544, 2013 WL 1176059 (S .D.N.Y. Feb. 20, 2013).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAIL-URE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPEL-LATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2013.
Johnson v. Schiff
Slip Copy, 2013 WL 5466218 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))



**H** Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?*, SIGHTINGS, May 21, 1999, *available at* http://divi nity.uchicago.edu/sightings/archive_1999/sight ings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

*2 a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> [FN5.] While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> [FN6.] The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> **FN12.** Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> **FN13.** No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> **FN14.** In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

*7 As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at *2-*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122911 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky*, 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry*, Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry*, the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.](#) The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.](#) There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See [Flanagan,](#) 2002 WL 122921, at \*2*. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., [Tookes v. Artuz,](#) 00 Civ. 4969, [2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002)](#)* (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker*'s ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,*
520 U.S. 641, 647 (1997)). At the same time, "[p]rison
walls do not form a barrier separating prison inmates from
the protections of the Constitution." *Duamutef v. Hollins,*
297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With
respect to Tier III hearings such as the one at issue here,
the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written
notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present
evidence "when permitting him to do so would not be
unduly hazardous to institutional safety or correctional
goals";

(3) the inmate be judged by a fair and impartial hearing
officer;

(4) the disciplinary conviction be supported by some
evidence; and

(5) the inmate be provided with a written statement of fact
findings that support the disposition as well as the reasons
for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v.*
*McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal
citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the
aforementioned rights under *Wolff. See* Reply Brief, at 13.
They argue, however, that Samuels received all the
procedural safeguards due him. Before analyzing
defendants points in detail, the Court notes the paucity of
the record before it. While Samuels has provided nearly
fifty exhibits, defendants have provided only a two-page
affidavit by Inmate Grievance Program Director Thomas
G. Eagen dated March 13, 2002, attached to which is a
nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit,
*inter alia,* a transcript of the disciplinary hearing, a
transcript or audio recording of the confidential witness
statements, a written basis for the rejection of Samuels'
witnesses, or a copy of the documents that were
supposedly seized from Samuels' cell. While the Court is
cognizant of the fact that the instant motion is not one for
summary judgment, without these and other documents, it
is difficult for this Court fully to evaluate the merits of the
parties' arguments. More troubling is the fact that this is
apparently not the first time an inmate has been sentenced
to a special housing unit on the basis of evidence which
has not been preserved for judicial review. Indeed, in
*Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS
9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by
defendants, the court noted that on more than one
occasion, Selsky was forced to reverse his previous
decision denying an inmate's appeal because the "record
of [the disciplinary] hearing was incomplete and the
'confidential tape' was 'unavailable for judicial review.'
' *Id.* at *9 (citation omitted). On the occasion cited by the
*Cherry* court, the inmate's record was expunged, but only
after the plaintiff had served 125 days in a special housing
unit. *See id.* at *9.

**a. Witnesses**

**\*12** Samuels argues that his due process rights were
violated because he was not permitted to call Dr.
Peter-Raoul as a witness at his disciplinary hearing. *See*
Complaint, at 9; Ex. V, at 2. Defendants state, without
explanation, that "it is clear that the proffered testimony
would have been irrelevant and redundant." Motion Brief,
at 13. The Court agrees with defendants that the right of an
inmate to call witnesses in his defense is not limitless.
Nevertheless, prison authorities' failure to allow an inmate
to call a witness may be grounds for reversal, where the
authorities fail to justify their actions. *See Ayers v. Ryan,*
152 F.3d 77, 81 (2d Cir.1998). In this case, Dr.
Peter-Raoul was apparently the author of some or all of
the "subversive" materials and had close ties to the
theological seminary program at the prison. According to
Samuels, she also "assisted plaintiff with his course
syllabus and provided much of the material utilized"
therein. Complaint, at 9. She was therefore in a unique
position to explain the appropriateness and relevance of
the materials allegedly possessed by Samuels, who had in
fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

**b. Confidential Informant**

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient

evidence.

**c. Assistance Provided by the Employee Assistant**

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

**\*14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition*." Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Johnathan JOHNSON, Plaintiff,
v.
B. CONNOLLY, Doctor et al., Defendants.
**Civil Action No. 9:07-CV-1237 (TJM/DEP).**

March 15, 2010.

Johnathan Johnson, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State of New York, The Capitol, Christopher Hall, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Johnathan Johnson, a New York prison inmate and a prodigious litigant, has commenced this suit pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.[FN1] In his complaint, plaintiff asserts that prison officials at the Upstate Correctional Facility ("Upstate") were deliberately indifferent to his medical needs following his transfer into that facility, including by not providing him with medication previously prescribed for him at other prison facilities, and that his transfer into Upstate was in retaliation for his having engaged in protected activity. Plaintiff's complaint seeks both equitable relief, in the form of an unspecified permanent injunction, and recovery of compensatory and punitive damages.

FN1. In response to a request in the form complaint utilized by the plaintiff seeking information about prior lawsuits, Johnson identifies a single action brought in the New York Court of Claims in November of 2006 but states that he has not commenced any suits in federal court relating to his imprisonment. *See* Amended Complaint (Dkt. No 7) § 4. Despite this statement, which was given under penalty of perjury, the record discloses otherwise. In fact, in this district alone plaintiff has commenced some thirty other actions addressing various aspects of prison life while incarcerated.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint in its entirety. In their motion, defendants assert that the record does not support either of plaintiff's substantive claims and that they are, therefore, entitled to judgment dismissing those claims as a matter of law. Having carefully considered the record now before the court in light of defendants' motion and plaintiff's arguments in response, I recommend that the motion be granted with respect to all claims except plaintiff's retaliation cause of action against defendant Burge, as to which genuine issues of fact exist precluding summary judgment.

I. *BACKGROUND*[FN2]

FN2. In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

The plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Amended Complaint (Dkt. No. 7). At the times relevant to his claims in this action plaintiff was designated first to the Elmira

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Correctional Facility, located in Elmira, New York, and later following his transfer out of that prison on November 16, 2006, to Upstate, situated in Malone, New York.[FN3] It appears that at all relevant times plaintiff was designated to special housing unit ("SHU") disciplinary confinement.[FN4] *Id.*

> FN3. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

> FN4. The record reflects that plaintiff has been in SHU confinement since 1997 and is currently scheduled to remain there until 2028, a date extending beyond his current maximum prison release date. *See* Hall Aff. (Dkt. No. 68-5) Exh. A. (Transcript of Plaintiff's Deposition, held on January 22, 2009, hereainfter "Johnson Dep. Tr.") at pp. 20-21.

While confined at Elmira, on November 13, 2006 plaintiff apparently was the target of human feces thrown by another inmate in the SHU during plaintiff's scheduled shower period. Complaint (Dkt. No. 7) p. 5-B. That incident prompted the sending by plaintiff of a letter to defendant John Burge, the Superintendent at Elmira, requesting that the videotape footage of the incident be preserved for use in a future lawsuit.[FN5] *Id.*

> FN5. In response to his later requests for copies of the videotape, plaintiff was informed that due to a "recorder malfunction" it does not exist. *See* Johnson Aff. (Dkt. No. 69) Exh. A at p. 3.

Two days later, on November 15, 2006, the DOCS Classification and Movement Office, which as a general matter controls inmate facility assignments, received an electronic request that Johnson be transferred out of Elmira. Carvill Aff. (Dkt. No. 68-4) ¶¶ 4, 6, 11 and Exh. A; *see also* Burge Aff. (Dkt. No. 68-3) ¶¶ 9-10. The stated reason for the transfer request was that plaintiff had a

"severe problem at Elmira CF SHU." Carvill Aff. (Dkt. No. 68-4) ¶ 12 and Exh. A. As an explanation for that observation, the statement noted that plaintiff "ha[d] created a management problem in the SHU ... he is disruptive to other [inmates] in the unit ..." and made reference to the November 13, 2006 incident. *Id.* at ¶ 14 and Exh. A. The transfer request was processed by John Carvill, a Classification Analyst with the DOCS. Carvill Aff. (Dkt. No. 68-4) ¶¶ 1, 6, 11 and Exh. A. On recommendation of the SHU unit of the Classification and Movement Office, it was determined by defendant Carvill that the plaintiff should be transferred into Upstate. *Id.* at ¶¶ 9-14. When making that decision Carvill was unaware of plaintiff's contemplation of a lawsuit concerning the feces throwing incident at Elmira on November 13, 2006. *Id.* at ¶ 16.

**\*2** According to the plaintiff, Superintendent Burge, though not present for the throwing incident, spoke with the plaintiff about the transfer on November 15, 2006 from the catwalk adjacent to plaintiff's cell and stated "I'm getting rid of you." Amended Complaint (Dkt. No. 7) p. 5-C; Johnson Dep. Tr. pp. 82-86; Johnson Aff. (Dkt. No. 69) ¶ 12. Other than that statement, during his deposition plaintiff admitted that he has no evidence to support his allegation that Superintendent Burge initiated the transfer request or was otherwise a participant in the decision to place him in Upstate. *Id.* at pp. 89-90.

According to Superintendent Burge, the transfer of a prisoner is typically initiated by the inmate's guidance counselor, who sends a transfer request directly to the DOCS Classification and Movement Office in Albany. Burge Aff. (Dkt. No. 68-3) ¶ 9. Superintendent Burge denies any role in the transfer of Johnson to Upstate and specifically states that he did not ask plaintiff's guidance counselor at Elmira to initiate the transfer request. *Id.* at ¶¶ 11-14. While having no recollection of any conversation with plaintiff regarding the transfer, Superintendent Burge states that it is his practice never to discuss transfers with any inmates. *Id.* at ¶ 5.

Plaintiff was transferred into Upstate on November 16, 2006. *See* Smith Aff. (Dkt. No. 68-2) ¶ 11 and Exh. B. According to plaintiff's medical records, prior to his transfer he had been prescribed various medications including Lactase, a drug prescribed for lactose

intolerance; Nasacort, for nasal congestion; Naprosyn, a pain medication; Prilosec for a gastroenterlogical disorder; and Vitamin E lotion for a dry, irritated skin condition. *Id.* at ¶¶ 15-16. As an SHU prisoner at both Elmira and Upstate, by regulation plaintiff was allowed only a twenty-four hour supply of non-prescription items and a seven day supply of prescription medications. [FN6] *Id.* at ¶ 18 and Exh. B, 11/18/06 entry.

> FN6. As an SHU inmate, plaintiff similarly was not allowed to possess creams, lotions, or spray bottles. Smith Aff. (Dkt. No. 68-2) ¶ 19.

Under established protocol, upon his transfer plaintiff's prescription medications should have been packed in a white medication bag and transferred to the medical staff at Upstate. Smith Aff. (Dkt. No. 68-2) ¶ 12. This, unfortunately, did not occur upon plaintiff's transfer. *Id.* at ¶ 13 and Exh. A at p. 3. Instead, plaintiff's medications were packed along with his personal property, and consequently those medications were not received by medical staff at Upstate until December 5, 2006. *Id.* at ¶ 13 and Exhs. A, B.

Plaintiff's medical records reveal that on November 20, 2006, four days after his transfer into Upstate, a physician at the facility ordered a seven day supply of Lactase, Naprosyn, and Prilosec for the plaintiff. Smith Aff. (Dkt. No. 68-2) ¶ 20 and Exh. B, 11/18/06 entry. Plaintiff received those medications on November 21, 2006 and November 24, 2006. *Id.* at ¶ 21 and Exh. C. In the interim, over-the-counter medications were made available to the plaintiff, upon request, to substitute for any lacking prescription medications. *Id.* at ¶ 22. Plaintiff's medical records reveal that, in fact, he did request such non-prescription medication on November 17, 18, and 26, 2006, including Medicidin D for nasal congestion and Ibuprofen for pain. *Id.* at ¶ 22 and Exh. B, 11/18/60 and 11/26/06 entries. The records also reflect that nasal spray was ordered for the plaintiff on December 5, 2006, at the request of a facility nurse, upon her review of plaintiff's records and that on that same date a prison physician, Dr. Connolly, reordered Nasacort to be restarted for the plaintiff. *Id.* at ¶¶ 23-24, and Exh. B, 12/5/06 entry. Plaintiff's medical records also reveal that he was provided Lactaid tablets for his lactose intolerance and that he had daily access to Vitamin E lotion. *Id.* at ¶¶ 27-28 and Exh.

B, 11/18/06 and 11/26/06 entry.

## II. *PROCEDURAL HISTORY*

**\*3** Plaintiff commenced this action on February 15, 2007 and later filed an amended complaint on April 12, 2007, with approval of the court. [FN7] *See* Dkt. Nos. 1, 7. Named as defendants in plaintiff's complaint are B. Connolly, a prison physician at Upstate; C. Atkinson and K. Mulverhill, identified as nurses at that facility; M. Smith, a nurse administrator at Upstate; Elmira Superintendent Burge; Theresa Knapp-David, the DOCS Director of Classification and Movement; Lucien LeClaire, Jr., the acting DOCS Commissioner; N. Bezio, the Deputy Superintendent at Upstate; and Brian Fischer, the acting DOCS Commissioner. *Id.* Plaintiff's complaint asserts two causes of action, alleging that his transfer out of Elmira was in retaliation for his having engaged in protected activity in violation of his rights under the First Amendment and also that the defendants at Upstate were deliberately indifferent to his serious medical needs in violation of his right under the Eighth Amendment to be free from cruel and unusual punishment. *Id.*

> FN7. This action was initiated in the Western District of New York but was transferred to this district as a result of the issuance of an order by District Judge David Larrimer on October 17, 2007. *See* Dkt. No. 16.

Since commencement of the action plaintiff has twice sought preliminary injunctive relief, in both instances requesting that the defendants be directed to transfer him out of Upstate and into another facility for the safety of both Johnson and his family. Dkt. Nos. 21, 41. Those motions were denied by Senior District Judge Thomas J. McAvoy by decisions issued on January 30, 2008 and August 21, 2008, respectively. Dkt. Nos. 30, 48. Plaintiff appealed those denials to the United States Court of Appeals for the Second Circuit. By summary order issued on October 16, 2009, and reissued as a mandate on November 12, 2009, that court affirmed Judge McAvoy's first preliminary injunction denial and ordered the issuance of a briefing schedule with regard to the second. [FN8] *See* Dkt. No. 70.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN8. According to publically available information, that appeal remains pending, and was deemed ready as of the week of March 1, 2010. The pendency of that appeal, which addresses only plaintiff's request for interim injunctive relief, does not divest this court of jurisdiction to entertain and decide defendants' pending summary judgment motion. *Webb v. GAF Corp.,* 78 F.3d 53, 55 (2d Cir.1996)

On April 27, 2009, following joinder of issue and the close of discovery, defendants filed a motion for summary judgment seeking dismissal of both of plaintiff's causes of action. Dkt. No. 68. In their motion defendants argue that no reasonable factfinder could conclude either that the plaintiff's transfer out of Elmira was provoked by his contemplation of a suit regarding the November 13, 2006 incident, or that once at Upstate the medical personnel there were deliberately indifferent to his serious medical needs. *Id.* Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 69, which is now fully briefed and ripe for determination and has been referred to me for the issuance of report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Plaintiff's Failure To File A Local Rule 7.1(a)(3) Responsive Statement*

In support of their motion defendants properly filed with the court a statement of material facts alleged not to be in dispute, as required by Northern District of New York Local Rule 7.1(a)(3). That rule imposes a corresponding requirement upon a party who, like the plaintiff, opposes a summary judgment motion, providing that

**\*4** [t]he opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record

where the factual issue arises. The nonmovant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

In opposing defendants' motion plaintiff did not submit the responding statement contemplated under Local Rule 7.1(a)(3). The consequences of this failure are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g.,* *Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases) [FN9]; *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[FN10]

FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [\*Editor's Note: Attachments of Westlaw case copies deleted for online display.]

FN10. As to those facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

As a counterbalance to this often fatal deficiency, a court has broad discretion to overlook a party's failure to comply with its local rules. *The Travelers Indemnity Co. of Ill. v. Hunter Fan Co.,* No. 99 CIV 4863, 2002 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

109567, at *7 (S.D.N.Y. Jan. 28, 2002) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and that it is fairly clear from his submission which facts are disputed, though without minimizing the importance of Local Rule 7.1(a)(3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement of facts not in dispute.

B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

**\*5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Retaliatory Transfer Claim*

In their motion defendants contend no reasonable factfinder could conclude that plaintiff's transfer out of Elmira and into Upstate was motivated by his contemplation of a lawsuit regarding the November 13, 2006 incident. Defendants further maintain that even if his protected activity were a motivating factor in the decision, the defendants have shown, as a matter of law, that regardless of the influence of that motive they would have taken the same action toward the plaintiff in any event, thereby establishing a complete affirmative defense to plaintiff's retaliation claim.

When adverse action is taken by prison officials against an inmate and is motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

**\*6** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

In this instance, drawing all inferences in plaintiff's favor, the record now before the court sufficiently establishes the first two elements to avoid the entry of summary judgment dismissing this claim. Plaintiff's letter to Superintendent Burge on November 15, 2006, revealing his contemplation of a lawsuit regarding the feces throwing incident, could be viewed as activity protected under the First Amendment. *See Espinal v. Goord,* 558 F.3d 119, 128-29

(2d Cir.2009); *Benitez v. Locastro,* No. 9:04-CV0423, 2010 WL 419999, at *13 (N.D.N.Y. Jan. 29, 2010) (Mordue, C.J.). Similarly, given his allegation that at Upstate he was allegedly exposed to danger at the hands of known enemy inmates, plaintiff's transfer from one facility into another, even though he was placed in disciplinary SHU confinement at both facilities, could be found by a reasonable factfinder to represent an adverse action sufficient to support a retaliation cause of action. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998).

Consideration of the evidence related to the third prong of the retaliation test, addressing the question of motivation, brings squarely into focus a controverted fact. At the outset it should be noted that the fact the transfer occurred one day after plaintiff's letter threatening suit was sent gives rise to an inference of retaliatory motivation. *See Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (noting that temporal proximity of protected conduct and alleged retaliatory conduct may serve as circumstantial evidence of retaliation). In this instance, however, there is more. According to the plaintiff Superintendent Burge appeared outside of his SHU cell on November 15, 2006 and told him that he was "getting rid of" the plaintiff. Amended Complaint (Dkt. No. 7) at pp. 5-7; Johnson Aff. (Dkt. No. 69) ¶ 12. Notwithstanding defendant Burge's denial of having had that conversation, plaintiff's allegations raise a disputed issue of fact which must be resolved before the third element of the retaliation claim can be determined. *See id.* at 138-39.

**\*7** In their motion, defendants contend that even if plaintiff could establish a *prima facie* case of retaliation, they have successfully established, as a matter of law, that they would have taken the same steps irrespective of the retaliatory animus, thereby establishing a complete defense to plaintiff's retaliation claim. When construed in a light most favorable to the plaintiff, however, the facts reveal that there is a significant question as to whether the motivation offered by the defendants as having prompted the decision was pretextual. *See Gill v. Calescibetta,* No. 9:00-CV-1553, 2009 WL 890661, at * 3 (N.D.N.Y. mar. 31, 2009) (Suddaby, J. and Peebles, M.J.).

Given the existence of the disputed facts which must be resolved before plaintiff's retaliation claim and defendants' *Mount Healthy* defense can be analyzed, I recommend that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendants' motion for dismissal of plaintiff's retaliation claim be denied.[FN11]

FN11. As will be seen, several of the defendants named by plaintiff in connection with his retaliation cause of action, including Acting Commissioners LeClaire and Fischer, Director Theresa A. Knapp-David, and Deputy Superintendent Bezio, are nonetheless entitled to dismissal of plaintiff's retaliation claim against them based upon their lack of personal involvement in the alleged violation, *see* pp. 25-27, *post,* while others, including Dr. Connolly, Nurses Atkinson, Miles and Mulverhill and Nurse Administrator Smith, do not appear from the record to be linked to plaintiff's retaliation claim.

### D. *Deliberate Medical Indifference Claim*

Defendants' motion also challenges plaintiff's claim that upon his arrival at Upstate medical officials there were deliberately indifferent to his serious medical needs. In support of that motion defendants assert both that the record fails to establish that plaintiff suffers from a medical need of constitutional significance, and, in any event, medical officials at Upstate were not subjectively indifferent to any such need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of the protected afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976). The Eighth Amendment prohibits the imposition of punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-that is, the conditions alleged must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 & 298, 111 S.Ct. 2321, 2323-2324 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970); *Waldo,* 1998 WL 713809, at *2 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970).

### 1. *Serious Medical Need*

**\*8** In order to meet the objective prong of the governing Eighth Amendment test in a medical indifference case, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also arise where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance, 143 F.3d at 702* (citation omitted); *Lafave v. Clinton County, No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N .Y. Apr. 3, 2002)* (Sharpe, M.J.) (citation omitted).

From the record in this case no reasonable factfinder could conclude that any of the conditions giving rise to the prescription medications of which plaintiff was deprived over an exceedingly brief period while at Upstate qualifies as serious for constitutional purposes. The medications involved were directed toward such modest conditions as lactose intolerance, nasal congestion, ankle pain, a gastrointestinal condition, and dry or irritated skin. The record is devoid of any indication that these conditions presented situations of urgency or resulted in degeneration or extreme pain over the brief period involved. Indeed, according to his medical records, plaintiff was seen by medical staff seven times over a four week period following his transfer into Upstate, including on November 16, 17, 18, 26, and 28, 2006 as well as December 5 and December 18 of that year. Smith Aff. (Dkt. No. 68-2) ¶ 33 and Exh. B. None of the medical record entries associated with those examinations reveal evidence that would support a finding of the existence of a serious medical condition. Accordingly, I recommend dismissal of plaintiff's medical indifference claim based upon his failure to establish the existence of a serious medical condition.

### 2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment medical indifference cause of an action a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach, 103 F.Supp.2d at 546*. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer, 511 U.S. at 837, 114 S.Ct. at 1979; Leach, 103 F.Supp.2d at 546* (citing *Farmer, 511 U.S. at 837, 114 S.Ct. at 1979); Waldo, 1998 WL 713809, at *2* (same).

**\*9** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle, 429 U.S. at 105-06, 97 S.Ct. at 292; Chance, 143 F.3d at 703*. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle, 429 U.S. at 106, 97 S.Ct. at 292*. Thus, a physician who "delay [s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison, 219 F.3d at 139*. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance, 143 F.3d at 703*. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct constitutes deliberate indifference. *Harrison, 219 F.3d at 138; Kearsev v. Williams, 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005)*.

The record now before the court also fails to substantiate plaintiff's claims of subjective, deliberate indifference on the part of the defendants The failure of prison officials to provide him with his prescription drugs immediately upon his arrival at Upstate appears to have been the result of a mistake on the part of DOCS medical personnel at Elmira, who are not named in this complaint, in packing and forwarding those prescriptions along with plaintiff's personal belongings rather than following the established protocol of separately conveying them to the medical staff at Upstate. The record also reveals that at Upstate plaintiff was offered alternatives to the medications and that his prescriptions for most drugs were renewed shortly after his transfer into the facility. Neither plaintiff's complaint nor the record now before the court establishes a level of indifference on the part of any of the named defendants sufficient to support the subjective element of the deliberate indifference test. Accordingly, I recommend dismissal of that cause of action on this additional, independent basis.

### E. *Personal Involvement*

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

In their motion defendants also seek dismissal of plaintiff's claims against acting Commissioner's Fischer and LeClaire, defendant Knapp-David, and Superintendent Bezio on the basis that they lacked any personal involvement in the conduct giving rise to plaintiff's constitutional claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*10** The four defendants who are the subject of this portion of defendants' summary judgment motion occupy supervisory positions with the DOCS. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

In this instance plaintiff has adduced no evidence to show any permissible basis to find liability on the part of the four defendants in question. Accordingly, I recommend dismissal of plaintiff's claims against defendants Fischer,

LeClaire, Knapp-David and Bezio on this separate, independent ground.

*F. Qualified Immunity*

In their motion, defendants argue that even if plaintiff can establish a *prima facie* claim of medical indifference or retaliation, defendants should be shielded from liability based upon qualified immunity. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ----, 129 S.Ct. 808, 815 (2009).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ----, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[FN12] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[FN13] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." FN14 *Pearson,* 555 U.S. at ----, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

> FN12. In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

> FN13. In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

> FN14. Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* --- U.S. at ----, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

**\*11** For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ...

should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith,* 21 F.3d at 500 (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir.1995)).

In this instance the surviving claim of retaliation implicates legal principles that were firmly established in 2006, the time of the relevant events. Because there are disputed issues as to whether or not defendant Burge ordered a transfer of the plaintiff out of Elmira in retaliation for his protected activity, an action which could not be said to be objectively reasonable for a superintendent in his position, I recommend denial of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2628720 (N.D.N.Y.)
(Cite as: 2010 WL 2628720 (N.D.N.Y.))

defendants' motion for summary judgment based on qualified immunity, without prejudice.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint in this action alleges two discreet causes of action. The first, alleging that plaintiff was transferred out of Elmira and into Upstate at the direction pf defendant Burge in retaliation for his having threatened to commence a lawsuit regarding an incident at Elmira, gives rise to disputed issues of material fact that must be resolved before the questions of whether plaintiff has established the requisite nexus between his protected activity and the transfer, and whether defendants have carried their burden in establishing that they would have taken the same action regardless of the plaintiff's protected activity, can be decided. Turning to plaintiff's cause of action for deliberate medical indifference, because the record fails to establish that he suffers from a serious medical condition of constitutional proportions or that any of the defendants were deliberately indifferent to any such condition, summary judgment dismissing that claim is warranted.

**\*12** Addressing defendants' remaining arguments, I find that the record further fails to disclose any basis for finding that defendants LeClaire, Fischer, Knapp-David, or Bezio were personally involved in the constitutional violations alleged, and that plaintiff has not alleged participation on the part of Dr. Connolly, Nurses Atkinson, Miles and Mulverhill, and Nurse Administrator Smith in the conduct giving rise to plaintiff's surviving retaliation cause of action. Additionally, I conclude that at this juncture, it cannot be said that defendant Burge is protected by qualified immunity from plaintiff's retaliation claim. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 68) be GRANTED, in part, and that plaintiff's deliberate medical indifference cause of action and all claims against defendants Fischer, LeClaire, Knapp-David, Smith, Bezio, Connolly, Atkinson, Miles, and Mulverhill be DISMISSED, leaving only plaintiff's cause of action against defendant Burge for retaliation to be tried in this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.
Johnson v. Connolly
Slip Copy, 2010 WL 2628720 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.