IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JOHNATHAN JOHNSON,

                              Plaintiff,                    Civil Action No.
                                                           9:14-CV-0811 (GLS/DEP)

          v.

RICHARD ADAMS, *et al.*,

                              Defendants.

_____

APPEARANCES:                                               OF COUNSEL:

FOR PLAINTIFF:

JOHNATHAN JOHNSON, *Pro se*
89-A-1042
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN                                  DAVID J. SLEIGHT, ESQ.
New York State Attorney General                           Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Johnathan Johnson, a New York State prison inmate and experienced *pro se* litigant, has commenced this action against various individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983, alleging that the defendants have deprived him of his civil rights.[1] Plaintiff's claims center upon the alleged inadequacy of medical treatment provided to him by medical personnel at the facility in which he was confined at the relevant times.

Currently pending before the court are two motions brought by the three defendants who remain in the action, following earlier court rulings, seeking the entry of summary judgment dismissing plaintiff's claims against them. In their motions, those defendants argue that the record is devoid of evidence from which a reasonable factfinder could conclude that any of them denied plaintiff adequate medical care or otherwise violated his

_____

[1]  As a result of his persistent filing of baseless actions, plaintiff became subject to the "three strikes" provision of 28 U.S.C. § 1915(g), disqualifying him from being granted *in forma pauperis* status absent a showing of imminent danger of serious physical injury, as early as seven years ago. *See Johnson v. Connolly*, No. 9:07-CV-0158, 2008 WL 724167 (N.D.N.Y. Mar. 17, 2008).

constitutional rights. For the reasons set forth below, I recommend that the pending motions be granted.

I.   <u>BACKGROUND</u>[2]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 4. At the times relevant to his claims in this action, he was confined in the Upstate Correctional Facility ("Upstate"), located in Malone, New York.[3]  *Id.*

Plaintiff suffers from several diagnosed medical ailments, including a sinus condition caused by a broken nose, dry skin, allergies, and cardio obstructive pulmonary disease ("COPD"). Dkt. No. 22-5 at 19-20; *see also* Dkt. No. 4 at 2. Medical personnel at Upstate have provided plaintiff with regular medical treatment for these conditions, including by providing ointments for his skin condition, a Proventil inhaler for his COPD, gas relief medications, and other medications as needed. Dkt. No. 21-1 at 5, 30, 50, 51, 70. Plaintiff alleges that defendants Richard Adams and Patrick

───────────────

[2]      In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[3]      Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

Johnston, a medical doctor and physician's assistant employed at the facility, respectively, improperly directed prison medical personnel to stop providing these medications in April and June 2010, and continued to deny him medication through August 2012.[4] Dkt. No. 4 at 2-4. Plaintiff also contends that defendant David Rock, the superintendent at Upstate, is subject to supervisory liability for the conduct of defendants Adams and Johnston. *Id.* at 3-4.

According to Nancy Smith, a nurse administrator stationed at Upstate and a former defendant in this case, prison nurses administer medication to inmates at the facility seven days per week, three times daily, or as otherwise prescribed by the inmate's provider. Dkt. No. 21 at 2. When the on-duty nurse arrives at a housing unit, an announcement is made that medication rounds are beginning, and inmates who wish to receive treatment are directed to be at their cell doors with the lights on. *Id.* at 3. Any inmate not at his door with the lights on is deemed to have declined medication. *Id.* If an inmate is at his door, the nurse administering the medication is required to ask the inmate for his name and department

---

[4]      As a result of earlier decisions in the action, the relevant period at issue has been narrowed to February 2011 through August 2012. *See* Dkt. No. 39 at 31; Dkt. No. 42 at 10.

4

identification number ("DIN") to ensure that the proper medication goes to the correct inmate. *Id.* at 2; Dkt. No. 48-3 at 2-3. If an inmate does not comply with these requirements, medications are not dispensed to him. *Id.*

Pursuant to the policy at Upstate, certain medications may not be prescribed without periodic evaluation as to the medical necessity for continuing the medication. Dkt. No. 21 at 3; Dkt. No. 48-3 at 3. Accordingly, an inmate receiving these medications is regularly required to submit to a medical examination by a doctor or nurse practitioner in order to determine the continued need for medication. *Id.* If an inmate refuses to cooperate, his medications are discontinued. *Id.*

During the course of a deposition conducted in connection with a lawsuit earlier filed by Johnson, he acknowledged his awareness of the established procedures for receiving medication. Dkt. No. 22-5 at 46-47, 64-67. He further admitted to refusing to provide his name and DIN "every day," stating that he "would rather go through the pain" than give prison medical personnel his name. *Id.* at 46, 57-58. Plaintiff's medical records confirm this, demonstrating that, between February, 2011 and August, 2012, Johnson refused to comply with nurses' requests for his name and

DIN in 258 instances.[5] Dkt. Nos. 48-4, 48-5, 48-6. As a result of his non-compliance, prison staff did not dispense medications to plaintiff on those occasions. *Id.*

Plaintiff contends that he is "exempt" from the requirement that he state his name and DIN because he has been the only resident of his cell since he came to Upstate, and the medical personnel know who he is. Dkt. No. 22-5 at 46-47, 58, 62-63. He also argues that, because he has been diagnosed with COPD, a chronic condition that he alleges will not change, he should not be required to submit to an examination to verify the continuing need for any medications because "the medication speaks for itself." *Id.* at 37.

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on or about January 28, 2013 in New York State Supreme Court, Franklin County. Dkt. No. 4 at 5. Plaintiff's

---

[5]      In their motion papers, defendants have included a declaration from Dr. Vijaykumar Mandalaywala, a physician employed at Upstate. Dkt. No. 48-3. Attached as Exhibit A to the declaration of Dr. Mandalaywala are plaintiff's health records from February 1, 2011 through August 2012. Dkt. Nos. 48-4 and 48-5. Attached as Exhibit B to that declaration is a detailed chart reflecting each of plaintiff's encounters with medical personnel during that period, as reflected in plaintiff's health records. Dkt. No. 48-6. Dr. Mandalaywala states that he reviewed plaintiff's health records and that "on the 258 occasions that [plaintiff] was not seen and/or medication was not distributed it was because of plaintiff's refusal to follow the Upstate Medical Department's procedures regarding nurse sick call and the prescribing and distributing of medications." Dkt. No. 48-3 at 2.

complaint named as defendants the following seven Upstate employees or former employees: (1) Dr. Richard Adams, a physician; (2) Patrick Johnston, a physician's assistant; (3) David Rock, the superintendent of Upstate; (4) Nancy Smith, a nurse administrator; (5) George Waterson, a registered nurse; (6) Lester Wright, the DOCCS Deputy Commissioner and Chief Medical Officer; and (7) Heath Baker, a registered nurse. *Id.* at 1.

Relying on federal question jurisdiction, defendants Adams, Johnston, Baker, Wright, Waterson, and Smith removed the action to this court on July 3, 2014.[6] Dkt. No. 1. A subsequent motion brought by the plaintiff seeking an order remanding the action to state court, Dkt. No. 2, was denied by District Judge Gary L. Sharpe on December 15, 2014. Dkt. No. 14. In his decision, Judge Sharpe construed plaintiff's complaint as asserting (1) a deliberate indifference claim against defendants Adams and Johnston; (2) a retaliation claim against defendants Waterson, Baker and Smith; and (3) supervisory liability claims against defendants Wright and Smith. *Id.* at 2.

Following the close of discovery, defendants Adams, Johnston,

---

[6]     Defendant Rock did not join in the removal notice.

Baker, Wright, Waterson, and Smith filed a motion for summary judgment dismissing plaintiff's claims, arguing that the record evidence does not give rise to a genuine dispute of material fact regarding whether (1) defendants Adams and Johnston were deliberately indifferent to plaintiff's serious medical needs; (2) defendants Waterson, Baker, and Smith retaliated against plaintiff; or (3) defendants Wright and Smith were personally involved in the constitutional violations alleged.[7] *See generally* Dkt. No. 24. On February 24, 2016, I issued a report recommending that defendants' motion for summary judgment be denied with respect to plaintiff's deliberate medical indifference claims, asserted against defendants Adams and Johnston, regarding the medical treatment plaintiff received between February 2011 and August 2012, and with respect to plaintiff's supervisory claims asserted against defendant Rock. I further recommended that defendants' motion otherwise be granted, and that defendants Adams, Johnston, and Rock be permitted to file motions for summary judgment addressing the remaining claims asserted against them. Dkt. No. 39. On March 23, 2016, Judge Sharpe issued a decision and order adopting my recommendation in its entirety. Dkt. No. 42.

---

[7] Defendant Rock did not join in that motion for summary judgment.

Defendants Adams, Johnston and Rock have now moved for summary judgment dismissing plaintiff's remaining claims. Dkt. Nos. 43, 48. Those motions, which are now fully briefed, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.   Supervisory Liability Claim Against Defendant Rock

In his third cause of action, plaintiff alleges that as the superintendent at Upstate, defendant Rock bears responsibility for failing to remediate the denial by medical personnel at the facility of proper medical treatment for Johnson. Dkt. No. 4 at 3-4. In his motion, defendant Rock seeks dismissal of that claim against him based upon lack of personal involvement. Dkt. No. 43. Plaintiff responds by arguing that, by receiving plaintiff's grievances that placed him on notice of the claimed medical indifference and not taking action to address his complaints, defendant Rock is subject to supervisory liability for the medical staff's deliberate indifference to Johnson's serious medical needs. Dkt. No. 47 at 5.

1.   Standard Governing Supervisory Liability

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1997)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). It is well established that a

supervisor cannot be liable under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

  2. <u>Analysis</u>

  In his complaint, plaintiff alleges that despite being notified of the failure of medical personnel at Upstate to provide him with adequate medical treatment through the filing of grievances, defendant Rock failed to intervene, and specifically permitted the continued use of the medical protocol that required plaintiff to recite his name and DIN before receiving

medical treatment. Dkt. No. 4 at 4. Plaintiff makes no attempt to provide evidentiary support for his claim that defendant Rock is liable for failing to rectify the alleged harm arising from plaintiff not receiving his medication based on his refusal to follow protocol. Instead, he relies solely on unsupported statements that because he filed grievances while defendant Rock was the superintendent at Upstate, defendant Rock knew or should have known that plaintiff's constitutional rights were being violated, and defendant Rock's failure to act effectively ratified the continued use of the medical protocols in place at the facility.

It is well-established that a supervisory official's receipt of grievances or letters, coupled with a failure to respond, without more, is insufficient to establish his personal involvement in the constituted deprivations alleged under section 1983. *See Parks v. Smith*, No. 9:08-CV-0586, 2011 WL 4055415, at *14 (N.D.N.Y. Mar. 29, 2011) (McAvoy, J. *adopting report and recommendation by* Lowe, M.J.) (citing *Rivera v. Goord*, 119 F. Supp. 2d 327, 344-45 (S.D.N.Y. 2000) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that

official's personal involvement")).[8] Because plaintiff has not offered any record evidence showing anything more than that defendant Rock could have received grievances related to complaints about Johnson's medical treatment, no reasonable factfinder could conclude that defendant Rock was personally involved in any of the allegations giving rise to plaintiff's claims in this action.[9]

### C. Plaintiff's Deliberate Medical Indifference Claim

In his complaint, plaintiff asserts a deliberate medical indifference claim against defendants Adams and Johnston arising from allegations that they discontinued his ointment, inhaler, soap, and stomach medication during the period of February 2011 to August 2012.[10] Dkt. No. 4 at 3-4.

### 1. Legal Standard Governing Deliberate Medical Indifference Claims

The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing

---

[8]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[9]     I note, parenthetically, that plaintiff has failed to establish that the protocols in place at Upstate, including those related to sick call and dispensing of medications, are unconstitutional as applied to inmates, including Johnson.

[10]     As was previously noted, plaintiff's deliberate medical indifference claim regarding medical treatment received through January 2011 was previously dismissed by the court. *See* Dkt. No. 42.

society[,] or which involve the unnecessary and wanton infliction of pain[.]"
*Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quotation marks and
citations omitted)). While the Eighth Amendment "does not mandate
comfortable prisons, . . . neither does it permit inhumane ones[.]" *Farmer v.
Brennan*, 511 U.S. 825, 832 (1994) (quotation marks and citation omitted).
"These elementary principles establish the government's obligation to
provide medical care for those whom it is punishing by incarceration."
*Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n
the worst cases, . . . may actually produce physical torture or lingering
death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering
which no one suggests would serve any penological purpose." *Id.*
(quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth
Amendment rights through their deliberate indifference to his serious
medical needs must satisfy both objective and subjective requirements.
*Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F.
Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the
alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844;
*see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he
objective test asks whether the inadequacy in medical care is sufficiently

serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to

inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

      2.    <u>Analysis</u>

Turning first to the objective element of plaintiff's medical indifference claim, plaintiff alleges that he suffers from dry skin, sinus issues, and COPD. Dkt. No. 4 at 2. Plaintiff contends that these conditions constitute serious medical needs, and require medication for treatment. Dkt. No. 53-2 at 4-5; Dkt. No. 22-5 at 29; Dkt. No. 28 at 6. Plaintiff further alleges that defendants Adams and Johnston were deliberately indifferent to those serious medical needs between February 2011 and August 2012 because they abided by the terms of the prison policy that requires each inmate seeking medication to first provide his name and DIN to the administering

nurse, and, in doing so, wrongfully caused him to be denied medical treatment. Dkt. No. 4 at 2-4.

Notwithstanding these contentions, plaintiff's medical records between February 2011 and August 2012 clearly reflect that plaintiff was not in urgent need of any of the medications he contends were discontinued by defendants Adams and Johnston in light of the fact that several days would elapse between plaintiff being provided medications due to his own conduct. *See, e.g.*, Dkt. No. 48-3 at 2; Dkt. Nos. 48-4 and 49-5 (reflecting that, on 258 occasions between February 2011 and August 2012, plaintiff refused to provide medical staff his name and DIN and was not provided any medical treatment on those dates, and that plaintiff was provided treatment on 294 occasions during this same time period). It is clear from the record that any delay in plaintiff's receipt of medication was based upon his refusal to abide by reasonable and medically appropriate safeguards and protocols at Upstate governing sick call and receipt of medication. Any claim of urgency is belied by the simple fact that to receive the prescribed medication, plaintiff had only to state his name and identification number. Under these circumstances, plaintiff cannot now be heard to complain of

deliberate indifference to serious medical needs.[11]  *See, e.g., Scarbrough v. Thompson*, 10-cv-0901, 2012 WL 7761439, at *12 (N.D.N.Y. Dec. 12, 2012) (holding, where inmate plaintiff refused medical care from a nurse because he preferred to receive care from a different nurse, that "any alleged delay or interference in treatment was due to [inmate's] own actions" and could not subsequently "be transformed into an Eighth Amendment claim") (Hummel, M.J.), *adopted by* 2013 WL 1100680 (N.D.N.Y. Mar. 15, 2013) (McAvoy, J.); *Nelson v. Rodas*, 01-cv-7887, 2002 WL 31075804, at *15-*16 (S.D.N.Y. Sept. 17, 2002), *aff'd* 132 F.App'x.401 (2nd Cir. June 1, 2005); *Brown v. Selwin*, 250 F. Supp. 2d 299, 307-308 (S.D.N.Y. 1999) (no deliberate indifference when it was uncontroverted that plaintiff refused medical treatment on several occasions); *Ross v. Kelly*, 784 F. Supp. 35, 46-47 (W.D.N.Y.) (evidence failed to establish deliberate indifference to medical needs where plaintiff was largely to blame for many of the delays in his treatment due to his second-guessing of physician's advice and refusal of treatment), *aff'd* 970 F.2d 896 (2d Cir. 1992), *cert. denied* 506 U.S. 1040

_____

[11]     Plaintiff's alleged skin condition also does not qualify as a sufficiently serious medical need in the first instance. *See Reid v. Nassau Cty. Sheriff's Dep't*, No. 13-cv-1192, 2014 WL 4185195, at *20 (E.D.N.Y. Aug. 20, 2014) (dismissing claim for deliberate indifference to serious medical needs involving a persistent skin rash and infection, finding that neither condition constituted a "sufficiently serious" medical need); *see also Gonzales v. Wright*, No. 9:06-cv-1424, 2010 WL 681323, at *11 (N.D.N.Y. Feb. 23, 2010) (quotations omitted).

(1992); *Evering v. Rielly*, No. 98-CV-6718, 2001 WL 1150318, at *10 (S.D.N.Y. Sept. 28, 2001) ("[A]n inmate's refusal to accept medical treatment in no way signifies a deliberate indifference to serious medical needs.") (citing cases)).

Turning to the subjective element of plaintiff's remaining deliberate medical indifference claim, and construing the evidence in the light most favorable to plaintiff, the record fails to demonstrate that defendants Adams and Johnston acted with the requisite deliberate indifference to plaintiff's serious medical needs. Addressing first plaintiff's claims against defendant Patrick Johnston, the record reflects, as plaintiff acknowledged during his deposition, that Mr. Johnston did not work at Upstate after April 2010. *See* Dkt. No. 22-5 at 40-43. It is axiomatic that, as with any other type of civil rights violation, personal involvement in the conduct giving rise to a deliberate medical indifference claim is a prerequisite to a finding of liability. *Coffeey v. Hollenbeck*, 14-cv-0196, 2016 WL 770087, at *10 (N.D.N.Y. Jan. 27, 2016) (Hummel, M.J.) (recommending dismissal of medical indifference claims against two defendants where there was no evidence in the record "establishing that either defendant was personally involved in any decision related to Coffeey's medical care during his four-day confinement to the side room"), *adopted by* 2016 WL 796081 (N.D.N.Y. Feb. 22, 2016) (Hurd,

20

J.); *Soto v. Wright*, 11-cv-2289, 2012 WL 265962, at *5 (S.D.N.Y. Jan. 26, 2012) (noting, with respect to medical indifference claim, that personal involvement is "a prerequisite to liability" and recommending dismissal of claim based on failure to allege facts plausibly suggesting personal involvement of two nurses in facts giving rise to claim), *adopted by* 2012 WL 639166 (S.D.N.Y. Feb. 28, 2012). In this case, because it is clear that defendant Patrick Johnston did not participate in any of the alleged deprivations during the period between February 2011 and August 2012, plaintiff's claims against him are subject to dismissal on the basis of lack of personal involvement.

Turning to plaintiff's claims against defendant Adams, the record reflects that plaintiff received intensive treatment for his various medical conditions when he complied with the self-identification policy, and that defendant Adams, to the extent he was personally involved in the denial of plaintiff's treatment on a given occasion, had sound reason for doing so.[12] Moreover, there exists no evidence in the record showing that on an occasion when plaintiff refused to comply with the self-identification policy,

---

[12] As was previously noted, during the relevant period between February 2011 and August 2012, comprised of 547 days, plaintiff had a total of 552 encounters with medical personnel at Upstate. Dkt. No. 48-3 at 2.

defendant Adams nonetheless would have refused to treat him, or knew that he was in grave danger but still did not act.

In sum, the record evidence in this case fails to support a finding that plaintiff's claims against defendant Adams can meet either the objective or the subjective prong of the governing test. Objectively, plaintiff's evidence fails to establish that the deprivations complained of were sufficiently serious, involving conditions significantly affecting plaintiff's daily activities and causing chronic and substantial pain. Plaintiff also has failed to adduce evidence showing that he can meet the subjective element, in that the record now before the court fails to demonstrate that defendant Adams was actually aware of a substantial risk that, absent proper treatment, serious harm would occur to the plaintiff, and that he failed to act despite that knowledge.

For these reasons, I find that no reasonable factfinder could conclude, based on the evidence in the record, that defendant Adams and Johnston were deliberately indifferent to plaintiff's serious medical needs between February 2011 and August 2012, and therefore recommend that defendants' motion for summary judgment seeking dismissal of plaintiff's medical indifference claim against defendants Adams and Johnston be granted.

IV.  SUMMARY AND RECOMMENDATION

The claims remaining in this action include a cause of action against defendant Rock, the superintendent at Upstate, based exclusively upon his failure to intervene and rescind the policies implemented by medical staff at Upstate requiring inmates to follow certain protocols in order to obtain treatment and medication. The only evidence of defendant Rock's involvement comes in the form of plaintiff's speculation that because grievances filed by him addressing those concerns were presumably forwarded to defendant Rock he must have been aware of the deliberate indifference but failed to act. In light of this fact, and additionally because plaintiff failed to demonstrate that defendants Johnston and Adams were deliberately indifferent to his serious medical needs, I conclude that there is insufficient basis to hold defendant Rock liable in his supervisory capacity. Turning to plaintiff's remaining claims against defendants Patrick Johnston and Richard Adams, I conclude that those claims are subject to dismissal based upon lack of personal involvement, with respect to defendant Johnston, and because no reasonable factfinder could conclude that Adams was deliberately indifferent to plaintiff's serious medical needs.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motions for summary judgment (Dkt. No. 43; Dkt. No. 48) be GRANTED and that plaintiff's remaining claims, asserted against defendants Adams, Johnston, and Rock, be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    July 25, 2016
          Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph PARKS, Plaintiff,
v.
Joseph T. SMITH, et al., Defendants.
No. 9:08–CV–0586 (TJM/GHL).

March 29, 2011.
Joseph Parks, Wallkill, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Aaron M. Baldwin, Esq., of Counsel, Albany, NY, for Defendants.

### REPORT–RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Joseph Parks alleges that Defendants violated his right to exercise his religion when they disciplined him for attempting to mail a photograph of himself with his hands in what he characterizes as a prayer pose and Defendants characterize as a gang sign. Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 51.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who is now and was at all relevant times an inmate at Shawangunk Correctional Facility ("Shawangunk"), was raised as a Jehovah's Witness, but did not fully accept the religion until 2000 or 2001. (Dkt. No. 51–8 at 6:11.FN1) Thereafter, Plaintiff prayed five or six times per day. *Id.* at 22:6–11. Each time he prayed, Plaintiff placed his hands in a meditative hand position. *Id.*

at 17:17–18:5.) He assumed this hand position so that he could "make sure [he] went before [his] Father clean. Not just physically but mentally." *Id.* at 22:16–21. The hand position is not mandated for all Jehovah's Witnesses, but Plaintiff's own research and study led him to believe that he, personally, is required to use the hand position "[b]ecause where I am spiritually and what I know pertaining to the Bible as well as research. What you know holds you accountable." *Id.* at 24:11–17; 25:7–26:6. Plaintiff believes that he cannot pray without using the hand position. *Id.* at 12:13–13:13, 31:3–18.

> FN1. Page numbers refer to the page number assigned by the Court's electronic filing system.

On February 27, 2007, Plaintiff attempted to mail a letter and photograph to a personal ad service. (Dkt. No. 51–4 at 2 ¶ 6.) The photograph depicted Plaintiff, clad in a shirt and red pants, sitting on a chair. (Dkt. No. 51–6; Dkt. No. 51–8 at 16:14–18.) Plaintiff's feet were placed wide apart and his elbows were resting on his thighs. (Dkt. No. 51–6.) His hands were pressed together with his fingertips pointed downward and his thumbs meeting at the top to form a heart or diamond shape. *Id.* At his deposition, Plaintiff testified that he was not praying or meditating when the picture was taken. (Dkt. No. 51–8 at 28:14–16.) Rather, he "was just trying to relax and in the course of just trying to relax," he made the hand sign. *Id.* at 28:14–23. In the letter that accompanied the photograph, Plaintiff indicated that he wanted "to begin a good friendship" with "someone special" and hoped to "find my ideal woman who can complete me ... as I complete her." (Dkt. No. 51–5 at 7.) In the letter, Plaintiff referred to himself several times as a "spiritual" person, but did not mention that he is a Jehovah's Witness. (*Id.;* Dkt. No. 51–8 at 36:3–7.) At his deposition, Plaintiff testified that he included the photograph with the letter to "have a resemblance of me.... [t]o show what I looked like." (Dkt. No. 51–8 at 16:19–23.) In a declaration submitted in opposition to Defendants' motion for summary judgment, Plaintiff states that he "included the photo, not only to show what I look like but to attract someone who practices the same religion I do." (Dkt. No. 55 at 36.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

**\*2** The photograph was taken in the gym at Shawangunk, and DOCS personnel screened it before allowing Plaintiff to leave the gym with it. (Dkt. No. 51–8 at 15:4–23.) However, when Defendant Corrections Officer Kim Skwera, who was assigned to review outgoing inmate mail on February 27, 2007, saw the photograph, she "suspected that the photograph depicted [Plaintiff] making a gang sign with both his hands." (Dkt. No. 51–4 at 2 ¶¶ 6–7.) Based on this suspicion, Defendant Skwera "consulted with [Defendant] Senior Counselor Luis Franco, who had training in these matters and was one of the staff members who regularly reviewed incoming media and other materials to ensure that they do not contain any unauthorized gang material." *Id.* ¶ 8.

There is no written DOCS policy, procedure, or directive governing specifically how to identify gang insignia or materials. (Dkt. No. 51–3 at 3 ¶ 12.) Rather, staff members such as Defendant Franco receive training from the DOCS Central Intelligence/Special Investigations Unit. *Id.* ¶ 13. During this training, staff hear oral instruction and see examples of gang signs and symbols. *Id.* ¶ 15. The training includes "information on particular groups, such as 'The United Bloods Nation,' also known as 'The Bloods,' which is an unauthorized organization that is active and making an adverse impact within DOCS ." *Id.* at 4 ¶ 16. Staff learn that "The Bloods original color is RED ... Members' display of hand signs varies depending on the Set they belong to. The most common hand sign is indicated by making a circle with the thumb and index finger, touching at the finger's tip and extending the remainder of the fingers." *Id.* ¶ 17 (emphasis in original).

Based on this training, Defendant Franco concluded that the photograph depicted Plaintiff making a Bloods hand sign. *Id.* at 5 ¶ 22. He reached that conclusion because of the "manner in which the plaintiff is holding his hands together, facing downwards, in a heart or triangular shaped fashion with the fingers and thumbs touching" and because Plaintiff was wearing red pants in the picture. *Id.* at ¶¶ 23–24.

Accordingly, Defendant Skwera wrote a misbehavior report charging Plaintiff with, *inter alia,* violating DOCS

Rule 105.12. (Dkt. No. 51–4 at 2 ¶ 10.) That rule, which has since been repealed, stated that "an inmate shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or display, wear, possess, distribute or use unauthorized organizational insignia or materials." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2 (2004).

The disciplinary hearing regarding the misbehavior report was held on March 2 and 7, 2007. (Dkt. No. 51–5 at 3, 13.) Defendant Lt. G. Gardner served as the hearing officer. *Id.* at 3. Plaintiff alleges that Defendant Gardner "created a hostile environment, using intimidation tactics of taunting and facial gestures." (Dkt. No. 1 at 8 ¶ 16.)

**\*3** Plaintiff called Defendants Skwera and Franco as witnesses. (Dkt. No. 51–5 at 3.) Defendant Skwera testified that she did not speak to anyone other than Defendant Franco about the hand sign. *Id.* at 6. Defendant Franco testified that, based on his experience, Plaintiff's hand position was "clearly ... an unauthorized hand sign." *Id.* at 9. Plaintiff showed Defendant Franco pictures of several meditation hand signs and asked if he was familiar with them. *Id.* at 9–10. Defendant Franco testified that the "only religious ... group that comes close to that type of hand sign ... would be the Rastafarians.... [T]hat's the only one I'm familiar with. I am not familiar with ... meditation ... at all." *Id.* at 12.

Plaintiff told Defendant Gardner that he is a religious man, that there is a religious justification for the hand gesture, and that because he had "been trained for a period of time within my meditation ... I reacted when trying to get calm for the picture ." *Id.* at 12, 14.

Defendant Gardner found Plaintiff guilty of the unauthorized organizations and activities charge. *Id.* at 16. He stated that he relied on Defendant Skwera's report, Plaintiff's testimony that the hand sign was a form of meditation, Defendant Franco's testimony "verifying that the hand sign is that of an unauthorized organization known as the Bloods," and the photograph itself in reaching his decision. *Id.* at 17. He imposed a penalty of fifteen days' keeplock, thirty days' loss of packages and events, and fifteen days' loss of commissary and phone privileges. *Id.* He stated that the reason for his decision

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

was "to impress upon the inmate that unauthorized organizations or displays with the hand signs are prohibited." *Id.*

Plaintiff appealed Defendant Gardner's decision. (Dkt. No. 51–5 at 18.) In his appeal, he stated that the hand sign he made in the photograph was "an unconscious gesture that is relevant to my religious beliefs ... so to find me guilty is to infringe on my Constitutional rights that guarantee[ ] me freedom of religion, and freedom of speech and equal protection under the law." *Id.* at 40. Defendant John Maly, acting as Defendant Superintendent Joseph T. Smith's designee, affirmed the disposition on March 21, 2007. *Id.* at 18.

On March 12, 2007, Plaintiff filed a grievance with Defendant J. Krom, the facility's inmate grievance supervisor, alleging that Defendant Gardner was biased, had deprived Plaintiff of due process, and had deprived Plaintiff of the free exercise of his religion. (Dkt. No 1 at 9 ¶ 21.) Plaintiff also alleged that Defendant Smith allowed "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." *Id.* When Krom did not reply within three weeks, Plaintiff filed an appeal of his grievance with Defendant Smith. *Id.* ¶ 22. When Plaintiff did not receive a reply within four weeks, he appealed to Defendant Thomas G. Egan, the facility's inmate grievance director. *Id.* at 9–10 ¶ 23. Plaintiff did not receive a response. *Id.* at 10 ¶ 24.)

*4 Plaintiff filed the complaint in this action on June 4, 2008. (Dkt. No. 1.) Plaintiff's complaint asserted eight causes of action: (1) a First Amendment free exercise claim or, in the alternative, a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"); (2) a claim that Defendants "retaliated against Plaintiff due to him exercising his right to express his religious views"; (3) a claim under the Equal Protection Clause, claiming that Defendants deprived "Plaintiff[ ] of free exercise of religion, while allowing other religious groups free exercise of religion"; (4) a First Amendment freedom of expression claim; (5) a claim that Defendants violated the Due Process Clause by "refusing to provide [Plaintiff] with a tier hearing consistent with his

constitutionally protected rights"; (6) a claim that Defendants violated the Due Process Clause by failing to respond to his grievance; (7) a claim of racial discrimination; and (8) a claim that Defendants conspired to violate his constitutional rights. (Dkt. No. 1 at 11–12.) Plaintiff requests $1,000.00 for each day he was deprived of his right to practice his religion, the reversal of his disciplinary sentence, and costs. *Id.* at 13.

Defendants moved for judgment on the pleadings. (Dkt. No. 20.) As a result of that motion, the Court dismissed six of Plaintiff's claims. (Dkt. No. 30.) Plaintiff's sole remaining claims are that Defendants violated his religious rights under the First Amendment and RLUIPA and retaliated against him for exercising his religious rights. Defendants now move for summary judgment of those claims. (Dkt. No. 51.) Plaintiff has opposed the motion. (Dkt. No. 55.) Defendants have filed a reply. (Dkt. No. 56–2.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* The nonmoving party must do more than "rest upon the mere allegations ... of his pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

## B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

**\*5** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Id.; accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

### A. RLUIPA

Plaintiff claims that Defendants violated his rights under RLUIPA. (Dkt. No. 1 at 11.) RLUIPA provides that

**\*6** [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [FN3] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

FN3. An "institution" is, *inter alia,* "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1)(B)(ii) (2003).

42 U.S.C. § 2000cc–1(a).

Defendants argue that Plaintiff's RLUIPA claim should be dismissed because (1) Plaintiff was not disciplined for engaging in a "religious exercise"; (2) even if Plaintiff was engaged in a religious exercise, it was not substantially burdened by the misbehavior report and disciplinary sentence; (3) Defendants acted in furtherance of a compelling governmental interest and used the least

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

restrictive means of furthering that interest; and (4) RLUIPA does not authorize money damages. (Dkt. No. 51–10 at 6–13.)

1. *Whether Plaintiff Was Engaged in a Religious Exercise*

Defendants argue that they are entitled to judgment because Plaintiff has not raised a triable issue of fact that he was disciplined for engaging in a "religious exercise." (Dkt. No. 51–10 at 8–9.) I find that Plaintiff has raised a triable issue of fact on this issue.

Under RLUIPA, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Defendants argue that Plaintiff was not engaged in an "exercise" because "[P]laintiff admits that he was neither praying nor meditating in the photograph that gave rise to the misbehavior report." (Dkt. No. 51–10 at 8.)

The evidence shows that while Plaintiff was not actively praying or meditating in the photograph, he has maintained since the incident occurred that his hand gesture in the photograph was the result of his prayer practice. At his disciplinary hearing, he told Defendant Gardner that because he had "been trained for a period of time within my meditation," he "reacted" with the hand sign "when trying to get calm for the picture." (Dkt. No. 51–5 at 12, 14.) Plaintiff testified at his deposition that he "fell into [his] meditation gesture unconsciously" as he was "trying to relax for the picture." (Dkt. No. 51–8 at 29:7–11.) Defendants have not cited, nor can I find, any case law discussing whether such an unconscious manifestation of one's faith (which seems akin to the practice of some Catholics to reflexively cross themselves in moments of stress) is an "exercise" within the meaning of RLUIPA. Because the burden on a motion for summary judgment is on the moving party, and because I must view the facts in the light most favorable to Plaintiff, I therefore find that Defendants have not established as a matter of law that Plaintiff was not engaged in an "exercise" of religion.

Defendants argue that even if Plaintiff was engaged in an "exercise," it was not "religious" because (1) the Jehovah's Witness religion does not require adherents to

assume any special position when praying; and (2) the way Plaintiff is holding his hands in the photograph is different than the hand poses depicted in the book from which Plaintiff says he adopted the prayer practice. (Dkt. No. 51–10 at 8–9.)

**\*7** Courts analyzing RLUIPA claims use the First Amendment "sincerely held religious beliefs" standard to determine whether a plaintiff was engaged in a "religious" exercise. *See, e.g., Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007). Under that standard, a religious belief is "sincerely held" when the plaintiff subjectively and sincerely holds a particular belief that is religious in nature. *Ford v. McGinnis,* 352 F.3d 582, 590 (2d Cir.2003).

Courts have routinely expressed reticence about deciding, on summary judgment, whether or not an individual's beliefs are sincere. As the Second Circuit has noted, "the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs" because the "[s]incerity analysis is exceedingly amorphous, requiring the factfinder to delve into the claimant's most veiled motivations...." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984).

The fact that the prayer gesture employed by Plaintiff is not mandated by any central authority of the Jehovah's Witness faith is immaterial to the sincerity analysis. As the Supreme Court has noted:

Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses.... [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether [a party or another member of his faith] more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of the Indiana Empl. Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

624 (1981) (holding that one Jehovah's Witness's belief that his religion prevented him from working in area of factory that produced tank turrets was sincere, despite fact that another Jehovah's Witness believed that such work did not violate the faith).

Similarly, I cannot conclude as a matter of law that Plaintiff's conduct was not sincere because his hand position in the photograph did not perfectly match the pictures in the book from which he adopted the pose. As a matter of fact, of course, a reasonable juror could consider this issue and conclude that the imperfection of the hand pose is evidence that Plaintiff's assertion is insincere and that he was, in fact, making a gang sign. But a reasonable juror could also conclude that the imperfection of the hand pose supports Plaintiff's claim that he unconsciously assumed the position, honed from years of using it to pray five or six times per day, in order to relax. But as a matter of law, I cannot credit one interpretation over the other. The Supreme Court has cautioned that the "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit ... protection." *Thomas,* 450 U.S. at 714. Further, "[c]ourts should not undertake to dissect religious beliefs because the ... [plaintiff's] beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 715.

**\*8** Finally, I note that *Farid v. Smith,* 850 F.2d 917 (2d Cir.1988), cited by Defendants, is distinguishable. In that case the plaintiff "neither alleged nor submitted any proof that he sincerely h[eld] to any religious belief that mandates the use of Tarot cards ..." *Farid,* 850 F.2d at 926. Here, Plaintiff has maintained since before filing this lawsuit that the hand gesture in the photograph was religious in nature and has submitted voluminous declarations to that effect.

Therefore, I find that Plaintiff has raised a triable issue of fact that he was engaged in a "religious exercise."

2. *Substantial burden*

RLUIPA prohibits only government action that places a "substantial burden" on religious exercise. 42 U.S.C. § 2000cc–1(a). Defendants argue that even if Plaintiff was

disciplined for engaging in a religious exercise, that punishment did not place a "substantial burden" on Plaintiff. (Dkt. No. 51–10 at 9–11.) I find that Plaintiff has raised a triable issue of fact on this issue.

A prisoner's sincerely held religious belief is substantially burdened "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted).

Defendants argue that Plaintiff's religious exercise has not been substantially burdened because Plaintiff can still pray in the privacy of his living quarters or "in designated religious areas whenever feasible as determined by the Superintendent" and because "Plaintiff is allowed to use ... meditation poses ... while praying ...." (Dkt. No. 51–10 at 10.) Defendants cite Defendant Franco's declaration as support for the latter assertion. In the cited paragraph, Defendant Franco declares that "Plaintiff would be allowed to use those 'meditation poses' depicted in his Complaint while praying ..., *which poses are different from that unauthorized group symbol made by the plaintiff in the photograph* ...." (Dkt. No. 51–3 at 6 ¶ 33, emphasis added.) In other words, Defendants argue that Plaintiff's religious exercise has not been substantially burdened because he can still pray, but only if he does it in designated areas and only so long as he does not use the prayer gesture he unconsciously assumed on February 27, 2007. I cannot find as a matter of law that such restrictions do not place substantial pressure on Plaintiff to modify his behavior and to violate his beliefs. A reasonable juror could conclude that this pressure was substantial, and another reasonable juror could conclude that this pressure was not substantial. Therefore, Plaintiff has raised a triable issue of fact that Defendants substantially burdened his religious exercise.

3. *Least Restrictive Means of Furthering a Compelling Governmental Interest*

Under RLUIPA, government officials may substantially burden an inmate's religious exercise if they are motivated by a compelling governmental interest and use the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a). The burden of proving this element is on Defendants. *Redd v. Wright,* 597 F.3d 532,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

536 (2d Cir.2010) ("[T]he state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest.").

**\*9** Defendants argue that they were motivated by the compelling governmental interest of preventing gang activity and that their "zero tolerance" policy is the least restrictive means of furthering that interest. (Dkt. No. 51–10 at 11.) Defendant Franco's declaration discusses, at length, the security problems posed by gang activity within the DOCS system. Defendant Franco declares that "DOCS has seen an increase" in gang activity "in recent years that has compelled the Department to take steps to slow the growth of these groups and monitor them closely." (Dkt. No. 51–3 at 2 ¶ 5.) Defendant Franco declares that gangs:

> often use seemingly innocuous but covert means of identifying themselves and communicating with other members both within and outside correctional facilities. These include the use of code words, slang, hidden messages (sometimes contained in letters or newspaper classified advertisements), and signs, symbols, and insignia which can range from anything [from] wearing certain color clothing or jewelry, to tattoos, and the use of hand signs, symbols and gestures, whether in person or in photographs.

*Id.* ¶ 6.

"Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007). Courts must be sensitive to these interests and apply RLUIPA's "compelling interest" standard "with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources.' " *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). This, however, does not end the inquiry.

In *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009), the Second Circuit noted with approval that "[o]ther circuits have ... recognized that the state may not merely reference an interest in security ... in order to justify its actions...." Indeed, "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements." *Id.* at 416 (quoting 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA)). The Second Circuit also noted with approval that "[o]ther circuits ... have required that, for a state to demonstrate that its practice is the least restrictive means, it must show that it 'actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.' " *Id.* (quoting *Warsoldier v. Woodford,* 418 F.3d 989, 999 (9th Cir.2005)). As another district court has noted, *Jova* thus suggests that Defendants are required to present evidence of having considered less restrictive practices. *Forde v. Baird,* 720 F.Supp.2d 170, 180 (D.Conn.2010).

**\*10** Defendant Franco declares that an "absolute ban or 'zero tolerance policy' enforceable through the disciplinary system when rule violations occur for displaying, wearing, possessing, distributing or using unauthorized organizational insignia or materials is the only way that DOCS can meaningfully attempt to prevent and curtail unauthorized group activity in this regard in correctional facilities." (Dkt. No. 51–3 at 3 ¶ 9.) Otherwise, he states:

> it would be unduly burdensome on facility staff, if not impossible, to prevent the unlimited dissemination or use of unauthorized organizational insignia or materials throughout the correctional systems which would be highly dangerous. Without a zero tolerance policy, the prohibitions could also be applied ... inconsistently from one situation to another.

*Id.* ¶ 10.

Although this is a close question, I find that Defendant Franco's declaration adequately meets Defendants' burden of showing, as a matter of law, that they had a compelling interest and used the least

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

restrictive means to further that interest when they disciplined Plaintiff for attempting to mail a photograph of himself wearing red pants and making a hand gesture that resembled one used by the Bloods. If Plaintiff had been punished simply for making the hand sign, particularly in his cell or in some other area designated for inmate prayer, I would likely recommend that the Court deny Defendants' motion for summary judgment. However, Plaintiff was attempting to disseminate the photograph and, in DOCS' experience, gang members sometimes use hidden messages in newspaper classified advertisements to communicate. (Dkt. No. 51–3 at 2 ¶ 6.) Accordingly, applying the due deference I must give to prison administrators in establishing necessary procedures to maintain security, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's RLUIPA claim.

5. *Availability of Money Damages*

Defendants argue that even if Plaintiff had raised a triable issue of fact and could proceed to trial on his RLUIPA claim, he would be entitled only to injunctive relief. (Dkt. No. 51–10 at 13.) Defendants are correct.

RLUIPA allows prevailing plaintiffs to recover "appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). The United States Courts of Appeals are divided on the issue of whether "appropriate relief" includes money damages. *Compare Madison v. Commonwealth of Virginia,* 474 F.3d 118, 131–32 (4th Cir.2006) (money damages not available) *with Smith v. Allen,* 502 F.3d 1255, 1265 (11th Cir.2007) (money damages available). The Second Circuit has not resolved the issue. The consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506–09 (S.D.N.Y.2008). The issue is currently pending before the Supreme Court in *Sossamon v. Texas,* 560 F.3d 316 (5th Cir.2009), *cert. granted* –––U.S. ––––, 130 S.Ct. 3319, 176 L.Ed.2d 1218 (2010) (argued Nov. 2, 2010). In the event that the District Court concludes that Plaintiff has raised a triable issue of fact as to his RLUIPA claim and, at that time, the Supreme Court has not yet issued a decision in *Sossamon,* I would recommend that the Court allow only Plaintiff's RLUIPA claim for injunctive relief to proceed.

**B. Free Exercise Clause Claim**

**\*11** Plaintiff claims that Defendants violated his First Amendment right to freely exercise his religion. (Dkt. No. 1 at 11.) Defendants argue that they are entitled to summary judgment dismissing Plaintiff's claim, for the same reasons that they asserted regarding the RLUIPA claim. (Dkt. No. 51–10 at 6–13.) Defendants are correct.

Under the Free Exercise Clause of the First Amendment, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted).

To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens [FN4] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

FN4. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

Here, as discussed above, Defendants have established that they are entitled to judgment under the strict RLUIPA compelling interest standard. Accordingly, they are also entitled to judgment under the less stringent First Amendment standard. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claim under the Free Exercise Clause.

## C. Retaliation

Plaintiff claims that Defendants retaliated against him for exercising his right to freely exercise his religion. (Dkt. No. 1 at 11.)

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims

of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

**\*12** [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001)).

Defendants argue that Plaintiff's conduct was not protected because Plaintiff "was not praying or meditating in the photograph which led to the misbehavior report." (Dkt. No. 51–10 at 11–12.) As discussed above, Plaintiff has raised a triable issue of fact that he was engaged in a religious exercise in the photograph. Therefore, I find Defendants' argument regarding the first prong to be without merit.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Regarding the second prong, Defendants concede that "the misbehavior report constitutes adverse action ..." (Dkt. No. 51–10 at 11.)

Regarding the third prong:

[t]o satisfy the causal-connection prong of a retaliation claim, an inmate must show that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. The court may consider a number of factors when determining whether a causal connection exists, including (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.

*Vega v. Artus,* 610 F.Supp.2d 185, 207 (N.D.N.Y.2009) (citations and punctuation omitted) (Suddaby, J.).

Here, there is simply no evidence in the record from which a reasonable juror could conclude that Defendants were substantially motivated by Plaintiff's religion. Defendants Franco and Skwera have both filed declarations stating that they were not aware of Plaintiff's religion until they heard him testify at the disciplinary hearing. (Dkt. No. 51–3 at 5–6 ¶¶ 27–30; Dkt. No. 51–4 at 4–5 ¶¶ 21–25.) Although Defendant Gardner was aware of Plaintiff's faith when he found Plaintiff guilty of the disciplinary charge, there is no evidence in the record that he was substantially motivated by Plaintiff's religion to punish Plaintiff. Although the complaint characterizes Defendant Gardner's conduct at the hearing as "hostile" and "intimidating" (Dkt. No. 1 at 8 ¶ 16), nothing in the transcript indicates that Defendant Gardener said anything derogatory about Jehovah's Witnesses or people who use hand poses to pray. As for the other defendants, Plaintiff asserts that they must have known about his religion because, when he became a Jehovah's Witness, he filled out a form designating Jehovah's Witness as his religion. (Dkt. No. 51–8 at 6:2–20.) However, there is no evidence that any of the named defendants were aware of that form. Accordingly, I find that Plaintiff has not raised a triable

issue of fact that there was a causal connection between his protected conduct and the adverse action. Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's retaliation claim.

**D. Personal Involvement**

**\*13** Defendants argue that, even if Plaintiff had raised a triable issue as to any of his substantive claims, the claims against several Defendants should be dismissed for lack of personal involvement. (Dkt. No. 51–10 at 18–22.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN5]

FN5. In *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that *Colon* remains good law.

1. *Claims Against Defendant Smith*

Plaintiff claims that Defendant Smith violated his constitutional rights by (1) designating Plaintiff's appeal of the disciplinary decision to Defendant Maly, who then affirmed the decision (Dkt. No. 1 at 9 ¶¶ 19–20); (2) ignoring Plaintiff's grievance (Dkt. No. 1 at 9–10 ¶¶ 22–23); and (3) allowing "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Even if Plaintiff had raised a triable issue of fact as to his substantive claims, he has not raised a triable issue of fact that Defendant Smith was personally involved.

Regarding the appeal, the evidence shows that Defendant Smith personally took no action at all. Even if he had handled Plaintiff's appeal personally rather than designating the task to Defendant Maly, courts have held that "merely affirming the hearing determination is not a sufficient basis to impose liability." *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309, at *2–3 (W.D.N.Y. Dec.7, 2009).[FN6] Although the Second Circuit once held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allow the case to survive summary judgment [FN7], district courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Woodward,* 2009 WL 4730309, at *2–3. Here, there is no evidence that

Defendant Smith proactively participated in the review.

FN6. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN7. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

**\*14** A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement. *Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Thus, Defendant Smith's alleged failure to respond to Plaintiff's grievance does not constitute personal involvement.

Finally, Plaintiff has not produced any evidence of "a pattern of unchecked, unconstitutional conduct" at hearings, much less any that occurred "due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Therefore, Plaintiff has not raised a triable issue of fact that Defendant Smith was personally involved in any alleged constitutional violations.

2. *Claims Against Defendant Maly*

Plaintiff's only claim against Defendant Maly is that he affirmed the disciplinary conviction. (Dkt. No 1 at 9 ¶¶ 19–20.) As discussed above, such a claim is insufficient to establish personal involvement unless there is evidence that the defendant was proactively involved in the appeal. Here, there is no such evidence regarding Defendant Maly. Therefore, Plaintiff has not raised a triable issue of fact that Defendant Maly was personally involved in any alleged constitutional violations.

3. *Claims Against Defendants Krom and Egan*

Plaintiff's only claim against Defendants Krom and Egan is that they ignored his grievance. (Dkt. No. 1 at 9–10 ¶¶ 22–24.) As discussed above regarding Defendant

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Smith, this is insufficient to establish personal involvement. Therefore, Plaintiff has not raised a triable issue of fact that Defendants Krom and Egan were personally involved in any alleged constitutional violations.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk provide Plaintiff with a copy of *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309 (W.D.N.Y. Dec.7, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 51) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.

Parks v. Smith
Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)

(Cite as: 2011 WL 4055414 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph PARKS, Plaintiff,
v.
Joseph T. SMITH, et al., Defendants.
No. 9:08–CV–0586 (TJM/GHL).

Sept. 12, 2011.
Joseph Parks, Wallkill, NY, pro se.

Aaron M. Baldwin, New York State Attorney General, Albany, NY, for Defendant.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.
**I. INTRODUCTION**
    **\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. George H. Lowe, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S .C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In his March 29, 2011 Report–Recommendation, Magistrate Judge Lowe recommended that Defendants' motion for summary judgment (Dkt. No. 51) be granted. Plaintiff has filed objections to this recommendation.
**II. STANDARD OF REVIEW**

    When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey*, 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.*, 2009 WL 465645 at *2 (S.D.N.Y. Feb.25, 2009).[FN1] After reviewing the Report–Recommendation,

the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).
    FN1. The Southern District wrote in *Frankel:*

    The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings. *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report strictly for clear error. *See Pearson–Fraser v. Bell Atl.,* No. 01 Civ. 2343, 2003 W L 43367, at *1 (S.D.N.Y. Jan. 6, 2003); *Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992). Similarly, "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review." *Vega v. Artuz,* No. 97 Civ. 3775, 2002 W L 31174466, at *1 (S.D.N.Y. Sept.30, 2002).

    2009 W L 465645, at *2.

**III. DISCUSSION**

    Having reviewed *de novo* those portions of the Report–Recommendation that Plaintiff has lodged objections to, the Court determines to adopt the recommendations for the reasons stated in Magistrate Judge Lowe's thorough report.
**IV. CONCLUSION**

    Therefore, the Court **ADOPTS** the recommendations made by Magistrate Judge Lowe in their entirety. Accordingly, it is hereby **ORDERED** that Defendants' motion for summary judgment (Dkt. No. 51) is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)

(Cite as: 2011 WL 4055414 (N.D.N.Y.))

**GRANTED** and the remaining claims in this action are **DISMISSED.** The Clerk is instructed to enter judgment and close the file in this matter.

   **IT IS SO ORDERED.**

N.D.N.Y.,2011.

Parks v. Smith
Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2012 WL 4364511 (N.D.N.Y.)
**(Cite as: 2012 WL 4364511 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Lester Lee SCARBROUGH, Jr., Plaintiff,
v.
Jeffrey EVANS, OMH Social Worker, Upstate
Correctional Facility; Nancy Smith, Nurse
Administrator, Upstate Correctional Facility; and
Bezalel Wurzberger, MD Psych III, Upstate
Correctional Facility, Defendants.

No. 11–CV–131 (NAM/DRH).
May 17, 2012.

Lester Lee Scarbrough, Jr., Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Adrienne J. Kerwin, Esq.,
Assistant Attorney General, of Counsel, Albany,
NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER**
FN1

> FN1. This matter was referred to the
> undersigned for report and
> recommendation pursuant to 28 U.S.C. §
> 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate
Judge.

**\*1** Plaintiff pro se Lester Lee Scarbrough, Jr.
("Scarbrough"), an inmate in the custody of the
New York State Department of Corrections and
Community Supervision (DOCCS), brought this
action against three DOCCS employees FN2 at the
Upstate Correctional Facility alleging violations of
his Eighth Amendment rights. Compl. (Dkt. No. 1).
Defendants have moved to dismiss the action
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. Nos. 21, 27.
Scarbrough opposes the motion. Dkt. Nos. 26, 31.
For the reasons which follow, it is recommended

that defendants' motion be granted and it is ordered
that Scarbrough be granted leave to file an amended
complaint.

> FN2. The complaint was previously
> dismissed as to five other defendants. Dkt.
> No. 8.

**I. Background**

The facts are related herein in the light most
favorable to Scarbrough as the nonmoving party.
*See* subsection II(A) *infra* .

At all times relevant here, Scarbrough was
confined at Upstate in a Special Housing Unit
(SHU).FN3 Compl. at ¶ 15. As best can be
discerned from the complaint, Scarbrough suffered
from a variety of mental conditions, including
Attention Deficit Disorder (ADD), Attention
Deficit Hyperactivity Disorder (ADHD), and
hallucinations. *Id.* at ¶ 22. Scarbrough had been
treated for mental conditions, as well as numerous
physical afflictions, since childhood. *Id.* at ¶¶ 16,
18, 19, 23, 46–50

> FN3. SHUs exist in all maximum and
> certain medium security facilities. The
> units "consist of single-occupancy cells
> grouped so as to provide separation from
> the general population ...." N .Y.
> Comp.Codes R. & Regs. tit. 7, § 300.2(b).
> Inmates are confined in a SHU as
> discipline, pending resolution of
> misconduct charges, for administrative or
> security reasons, or in other circumstances
> as required. *Id.* at pt. 301. Scarbrough was
> held in a double-occupancy cell. Compl. at
> ¶ 15. "Upstate is a maximum security
> prison comprised exclusively of special
> housing unit ('SHU') cells in which
> inmates are confined, generally though not
> always for disciplinary reasons, for
> twenty-three hours each day." *Caldwell v.
> Gertmann,* No. 9:09–CV–580 (DNH/DEP),

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4364511 (N.D.N.Y.)
**(Cite as: 2012 WL 4364511 (N.D.N.Y.))**

2012 WL 1119869, at *1 n. 3 (N.D.N.Y. Mar. 2, 2012) (citation omitted).

Defendants administered medications to Scarbrough for his mental conditions which caused certain adverse side effects. Compl. at ¶ 19. Defendants failed to research Scarbrough's medical history back to treatment he received in childhood and, if they had, defendants would have known not to administer such medication to Scarbrough. Id. at ¶¶ 16–18, 47, 50. The adverse side effects included suicidal ideations, rapid heart beat, fits of anger, and lapses of memory. Id. at ¶ 19. Defendants placed Scarbrough in a double cell with dangerous inmates rather than alone in a single cell, which led cellmates to assault Scarbrough when he exhibited the psychotic side effects of his medication. Id. at ¶¶ 22, 31, 42. Scarborough further states that in 2009 and 2010, unidentified officials used excessive force against him when they extracted Scarbrough from his cell. Id. at ¶¶ 24, 29–30, 35. This action followed.

## II. Discussion

Scarborough asserts three causes of action in his complaint. The first alleges that defendants deprived Scarbrough of his Eighth Amendment right to be free from cruel and unusual punishment when they administered medications for his mental condition without researching his treatment history and exacerbating his condition. Compl. at ¶ 53. The second alleges that defendants were deliberately indifferent to Scarbrough's serious medical needs in violation of the Eighth Amendment when they placed him in a cell with violent inmates who assaulted Scarbrough when Scarbrough displayed symptoms of his mental condition. Id. at ¶ 54. The third alleges that defendant Jeffrey Smith and another DOCCS employee denied Scarbrough food during the 3:00–11:00 shift on a day when Scarbrough was confined to the infirmary in violation of the Eighth Amendment. Id. at ¶ 55. In addition, liberally construing the complaint and considering all possible claims which its allegations could conceivably support, Scarbrough may be

deemed to have alleged claims for (1) defendants' failure to protect Scarbrough from assaults by other inmates, see id. at ¶¶ 22, 31, 42, 54; (2) retaliation in violation of the First Amendment for terminating treatment of Scarbrough's mental condition after he complained about the medications he was administered, see id. at ¶ 20; and (3) the use of excessive force by corrections officers when they forcibly extracted Scarbrough from his cell on or about December 31, 2009, see id. at ¶ 24.

**\*2** The three remaining defendants seek dismissal of the medical care claims explicitly asserted by Scarbrough on the grounds that they fail to state claims, defendants are entitled to qualified immunity, and the Eleventh Amendment bars recovery against the defendants in their official capacities. Defs. Mem. of Law (Dkt. No. 21–1) at 4–13.

### A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (citing Twombly, 550 U.S. at 556 (explaining that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) . As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest. .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by pro se litigants" ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

**\*3** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

### B. Scarbrough's Claims
### 1. Deliberate Indifference to Medical Needs

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v.. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

" 'Because society does not expect that prisoners will have unqualified access to healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner

"to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976).

Thus, disagreements over medications, diagnostic techniques (e.g ., the need for x-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence, amounting to medical malpractice, but not the Eighth Amendment.

**\*4** *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (citing *Estelle,* 429 U.S. at 107); *see also Chance,* 143 F.3d at 703 (holding that "[m]ere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

#### a. Medication

In his first cause of action, Scarbrough alleges that defendants, not identified by name, administered medication "[without] checking out his documented mental health (childhood) history in which psychiatric medication had an adverse effect on plaintiff's mental health by temporarily worsening his condition ...." Compl. at ¶ 53. Assuming Scarbrough's allegations to be true, the failure to investigate a patient's medical history may constitute negligence or carelessness, but it does not rise to the level of deliberate indifference. *See Key v. Brewington–Carr,* No. Civ.A. 98–152–GMS, 2000 WL 1346688, at \*20 (D.Del. Sept. 6, 2000) (citing *Ruvalcaba v. City of Los Angeles,* 167 F.3d 514, 525 (9th Cir.1999) (explaining that the failure to take a full medical

history which led to a misdiagnosis was only negligent) and *Steele v. Choi,,* 82 F.3d 175, 179 (7th Cir.1996) (holding that although careless, a failure to investigate all of the possible causes of a patient's symptoms amounted only to negligence)). As to the adverse effects of medication, the mere fact that the medication failed to have its intended effect or that Scarbrough questioned or disagreed with the particular medication is also insufficient to state a claim for deliberate indifference. *See Demata v. New York State Correctional Dep't of Health Servs.,* 198 F.3d 233, \*3 (2d Cir.1999); *Chance,* 143 F.3d at 702 Accordingly, defendants' motion as to this claim should be granted.

#### b. Double Cell

In his second cause of action, Scarbrough alleges that defendants, again unnamed, were deliberately indifferent to his mental condition when they placed him a double cell with violent inmates who assaulted Scarbrough when he exhibited the symptoms of his mental condition. Compl. at ¶ 54. As noted, a claim of deliberate indifference must by supported by evidence that the defendant was aware of a risk to the inmate's health and disregarded that risk. *See Chance,* 143 F.3d at 702. Here, Scarbrough has failed to allege facts from which it could be found that any defendant was aware that Scarbrough was at risk of assault by other inmates, that Scarbrough would display conduct reasonably likely to incite his cellmate to assault him, or that the medication and treatment administered to Scarbrough would cause Scarbrough to act in a way which reasonably would cause his cellmate to assault him. Accordingly, defendants' motion as to this claim should also be granted.

#### c. Denial of Food

**\*5** In his third cause of action, Scarbrough alleges that defendant Smith and another DOCCS employee deprived Scarbrough of a meal during the 3:00–11:00 shift while Scarbrough was confined to the infirmary. Compl. at ¶ 55. Assuming this allegation to be true for purposes of this motion, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

denial of a single meal is insufficient to state a claim for relief. *See Kearney v. Goord,* No. 09–CV–679, 2011 WL 1260076, at *6 (W.D.N.Y. March 4, 2011) (holding that the denial of several meals is de minimis); *Lunney v.. Brureton,* No. 04–CV–2438, 2007 WL 1544629. at *21 (S.D.N.Y. May 29, 2007) (holding that isolated or sporadic denial of privileges such as recreation do not suffice to state a claim of actionable retaliation, while routine denial of showers and recreation survived a motion to dismiss retaliation claim) (Report—Recommendation), *adopted by* 2007 WL 2050301 (S.D.N.Y. July 18, 2007)). Therefore, defendants' motion as to this claim against defendant Smith should also be granted.

## 2. Failure to Protect

As noted, Scarbrough's complaint contains allegations which, liberally construed, could support other causes of action not explicitly pleaded in his complaint. A pro se action should not be dismissed without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim may be asserted. *Parrino v. Sun Gard Availability Services, L.P.,* No. CV 11–3315, 2012 WL 826946, at *4 (E.D.N.Y. Feb. 16, 2012) (citing *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999)); *Wilson v. Woodbourne Correctional Facility,* No. 9:11–CV–1088 (DNH/ATB), 2012 WL 1377615, at *6 (N.D.N.Y. Mar. 21, 2012).

The first of those unpleaded claims asserts that unnamed defendants placed Scarbrough in a double cell with unnamed violent inmates who assaulted Scarbrough. Compl. at ¶¶ 22, 31, 42, 54; *see also Farmer v. Brennan,* 511 F.3d 825, 828 (1994). It is unclear from the complaint which individuals Scarbrough contends were responsible for his placement in a double cell, whether those individuals possessed knowledge that Scarbrough was at risk of assault, or if and when any such individuals ignored such a risk. Accordingly, Scarbrough should be afforded an opportunity to amend his complaint to plead such a cause of

action.

## 3. Retaliation

Scarbrough's second unpleaded cause of action appears to assert that unnamed defendants terminated Scarbrough's medical treatment when he complained about that treatment in violation of Scarbrough's First Amendment right to seek the redress of grievances. Compl. at ¶ 20 (alleging that DOCCS employees "remov[ed] plaintiff from the OMH case load after his complaints of adverse effects, and discontinu[ed] treatment altogether, 7–17–2009 ...."). A claim of retaliation requires sufficient allegations that an inmate engaged in activity protected by the First Amendment, such as making complaints or filing grievances, and that such protected activity was a substantial or motivating factor in the decision of named defendants to terminate medical treatment. *See Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Scarbrough should be afforded an opportunity to amend his complaint to plead such a cause of action.

## 4. Excessive Force

**\*6** Finally, Scarbrough alleges that unnamed individuals used excessive and unreasonable force against him when they forcibly extracted him from his cell on or about December 31, 2009. Compl. at ¶ 24. The use of excessive force against an inmate is barred by the Eighth Amendment prohibition against cruel and unusual punishment. *See Hudson,* 503 U.S. at 7; *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) ("The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."). Scarbrough should be afforded an opportunity to amend his complaint to plead such a cause of action.

## C. Qualified Immunity

As to the medical care claims, defendants also seek dismissal in the alternative on the ground of qualified immunity. Qualified immunity generally

Not Reported in F.Supp.2d, 2012 WL 4364511 (N.D.N.Y.)
**(Cite as: 2012 WL 4364511 (N.D.N.Y.))**

protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights ... immunity might still be available as a bar to ... suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached as to Scarbrough's medical care claims because, as discussed *supra,* accepting all of Scarbrough's allegations as true, he has not shown that any of these defendants violated his constitutional rights.

Accordingly, defendants' motion on this ground should be granted in the alternative as to all three defendants on Scarbrough's medical care claims.

### D. Eleventh Amendment

It appears that Scarbrough has sued the defendants in both their individual and official capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the

Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

**\*7** A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (*citing Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, Scarbrough seeks monetary damages against defendants in their official capacity for acts occurring within the scope of their duties. Thus, the Eleventh Amendment bar applies and serves to prohibit Scarbrough's claim for monetary damages against defendants in their official capacities.

Accordingly, it is recommended in the alternative that defendants' motion be granted on this ground.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 21) be **GRANTED** as to all three remaining defendants and the three Eighth Amendment health care claims asserted in Scarbrough's complaint; and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4364511 (N.D.N.Y.)
**(Cite as: 2012 WL 4364511 (N.D.N.Y.))**

**IT IS ORDERED** that within thirty days of the filing of a decision by the district court on this report-recommendation, Scarbrough is granted leave to file an amended complaint asserting claims for (1) failure to protect in violation of the Eighth Amendment, (2) retaliation in violation of the First Amendment, and (3) the use of excessive force in violation of the Eighth Amendment.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**IT IS SO ORDERED.**

N.D.N.Y.,2012.
Scarbrough v. Evans
Not Reported in F.Supp.2d, 2012 WL 4364511 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4350792 (N.D.N.Y.)
**(Cite as: 2012 WL 4350792 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Lester Lee SCARBROUGH, Jr., Plaintiff,
v.
Jeffrey EVANS, Omh Social Worker, Upstate
Correctional Facility; Nancy Smith, Nurse
Administrator, Upstate Correctional Facility; and
Bezalel Wurzberger, MD Psych III, Upstate
Correctional Facility, Defendants.

No. 9:11–CV–131 (NAM/CFH).
Sept. 24, 2012.

Lester Lee Scarbrough, Jr., pro se.

Hon. Eric T. Schneiderman, Attorney General of
the State of New York, Adrienne J. Kerwin, Esq.,
Assistant New York State Attorney, Albany, NY,
for Defendants.

**MEMORANDUM–DECISION AND ORDER**
Hon. NORMAN A. MORDUE, District Judge.

**\*1** In this *pro se* action pursuant to 42 U.S.C. §
1983, plaintiff claims that his constitutional rights
were violated while he was an inmate in the
custody of New York Department of Corrections
and Community Services. On initial screening
pursuant to 28 U.S.C. §§ 1915(e), 1915A, this
Court dismissed a number of defendants and claims
(Dkt. No. 8). Thereafter, defendants moved (Dkt.
No. 21) to dismiss all remaining claims. Upon
referral pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c), United States Magistrate Judge
David R. Homer issued a Report–Recommendation
and Order (Dkt. No. 34) recommending that
defendants' motion to dismiss be granted as to all
three remaining defendants, Nancy Smith, Jeffrey
Evans, and Bezalel Wurzberger, and that the claims
asserted in the complaint be dismissed. Magistrate
Judge Homer gave plaintiff leave to file an
amended complaint asserting claims for (1) failure

to protect defendant from assaults by other inmates,
(2) retaliation by terminating plaintiff's medical
treatment after he complained about the
medications he was given, and (3) use of excessive
force during a cell extraction.

Plaintiff then filed an amended complaint (Dkt.
No. 36). The defendants move (Dkt. No. 40) to
dismiss the amended complaint. Plaintiff submits
opposition (Dkt. No. 42) to the motion. Plaintiff
also submits a "Motion to Amend and
Supplemental Pleadings" (Dkt. No. 43).

The Court first reviews the
Report–Recommendation and Order (Dkt. No. 34)
addressing the motion (Dkt. No. 21) to dismiss the
initial complaint. Plaintiff has not filed an
objection. Certain sections of plaintiff's opposition
(Dkt. No. 42) to the motion to dismiss the amended
complaint may arguably be viewed as objections to
Magistrate Judge Homer's dismissal
recommendations. Thus, in deference to plaintiff's
*pro se* status, the Court reviews the
ReportRecommendation and Order *de novo.* Upon
such review, construing this *pro se* pleading most
liberally in plaintiff's favor to raise the strongest
arguments that it suggests, *see Triestman v. Fed.
Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006)
, and considering all plaintiff's submissions in this
action (including his opposition to the motion to
dismiss the amended complaint), the Court accepts
the Report–Recommendation and Order in its
entirety and grants the motion (Dkt. No. 21) to
dismiss the initial complaint.

The Court next considers defendants' motion
(Dkt. No. 40) to dismiss the amended complaint
(Dkt. No. 36). The Court agrees with defendants
that the amended complaint fails to state causes of
action for failure to protect, retaliation, use of
excessive force, or any other claim against
defendants. In his opposition to the motion (Dkt.
No. 42), plaintiff makes additional factual
allegations, none of which state a claim against

these defendants. At most, plaintiff's allegations, construed most liberally in his favor to raise the strongest arguments that they suggest, amount to disagreement with the way defendants Jeffrey Evans and Bezalel Wurzberger handled his mental health issues. These allegations do not support a plausible claim for failure to protect defendant from assaults by other inmates. *See generally Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (stating that to survive a dismissal motion, a complaint must set forth "enough facts to state a claim to relief that is plausible on its face."). Nor does plaintiff state a plausible claim for retaliation. Plaintiff's allegations regarding the cell extraction do not mention any of the three defendants. Plaintiff states no claim against Nancy Smith. Nothing in plaintiff's submissions suggests that, if given another opportunity to amend, plaintiff would be able to state viable claims against these defendants. Accordingly, the motion (Dkt. No. 40) to dismiss is granted.

**\*2** Finally, the Court reviews plaintiff's "Motion to Amend and Supplemental Pleadings" (Dkt. No. 43). Plaintiff asks the Court "to issue an order to sequence the filing of all the lawsuits and the letters trying to combine everything for a settlement." Because the instant action is dismissed, there is no basis for such relief. To the extent that this submission may be read as a motion for leave to file a second amended complaint or supplemental pleading, the motion is denied without prejudice, because none of the allegations pertain to the defendants or causes of action in this action.

In view of the dismissal of this action, defendants' motion to stay (Dkt. No. 47) and plaintiff's motion for preliminary injunctive relief (Dkt. No. 38) are denied. It is therefore

ORDERED that the Report–Recommendation and Order of United States Magistrate Judge David R. Homer (Dkt. No. 34) is accepted; and it is further

ORDERED that the motion (Dkt. No. 21) is

granted; and it is further ORDERED that the motion (Dkt. No. 38) is denied; and it is further

ORDERED that the motion (Dkt. No. 40) is granted; and it is further

ORDERED that the amended complaint (Dkt. No. 36) is dismissed; and it is further

ORDERED that the motion (Dkt. No. 43) is denied; to the extent that it is intended as a motion for leave to file a second amended complaint or supplemental pleading, denial is without prejudice; and it is further

ORDERED that the motion (Dkt. No. 47) is denied; and it is further

ORDERED that the action is dismissed in its entirety on the merits; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this Memorandum–Decision and Order upon all parties in accordance with the Local Rules of the Northern District of New York and upon plaintiff by certified mail, return receipt requested.

IT IS SO ORDERED.

N.D.N.Y.,2012.
Scarbrough v. Evans
Not Reported in F.Supp.2d, 2012 WL 4350792 (N.D.N.Y.)

END OF DOCUMENT


Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Jeffrey NELSON, Plaintiff
v.
Byron RODAS, et al., Defendants.
**No. 01CIV7887RCCAJP.**

Sept. 17, 2002.

Prison defendants moved for summary judgment on prisoner's civil rights claims. In issuing his report and recommendation, United States Magistrate Judge Peck, held that: (1) prisoner did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements with respect to non-medical claims; (2) if a prisoner's § 1983 complaint contains exhausted and unexhausted claims, district court may address the merits of the exhausted claims and dismiss only those that are unexhausted; and (3) prisoner failed to establish that prison defendants demonstrated deliberate indifference serious medical and dental conditions.

Motion granted as to exhausted claims; unexhausted claims dismissed.

West Headnotes

**[1] Civil Rights 78** ⬦ **1319**

78 Civil Rights
   78III Federal Remedies in General
     78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
      78k1319 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
   (Formerly 78k209)
Prisoner's complaint letter to Commissioner of New York

State Department of Correctional Services (DOCS) with respect to non-medical claims did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements in prisoner's civil rights action. 42 U.S.C. § 1997e(a).

**[2] Civil Rights 78** ⬦ **1311**

78 Civil Rights
   78III Federal Remedies in General
     78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
      78k1311 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
   (Formerly 78k194)
Prisoner asserting civil rights claims did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements with respect to non-medical claims by filing appeals from various disciplinary hearing dispositions. 42 U.S.C. § 1997e(a).

**[3] Civil Rights 78** ⬦ **1311**

78 Civil Rights
   78III Federal Remedies in General
     78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
      78k1311 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
   (Formerly 78k194)
If a prisoner's § 1983 complaint contains exhausted and unexhausted claims, district court may address the merits of the exhausted claims and dismiss only those that are unexhausted under Prison Litigation Reform Act (PLRA). 42 U.S.C. § 1983; 42 U.S.C. § 1997e(a).

**[4] Civil Rights 78** ⬦ **1420**

78 Civil Rights
   78III Federal Remedies in General
     78k1416 Weight and Sufficiency of Evidence
      78k1420 k. Criminal Law Enforcement; Prisons.
Most Cited Cases

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

(Formerly 78k242(5))

Prisoner failed to establish that prison defendants demonstrated deliberate indifference to serious medical and dental conditions regarding an abnormal growth of tissue-cells within his chest, a defective back, and worn-out amalgams fillings that caused him a perpetual headache; prisoner offered no evidence to support his claims other than conclusory allegations and refused to accept dental treatment. U.S.C.A. Const.Amend. 8; 42 U.S.C. § 1983.

[5] Conspiracy 91 ☞ 18

91 Conspiracy
    91I Civil Liability
        91I(B) Actions
            91k18 k. Pleading. Most Cited Cases

Prisoner's conclusory allegations did not state conspiracy claim under § 1985(3); additionally, conspiracy claim was not stated since prisoner failed to allege that defendants conspired against him because of any racial or class-based, invidious discriminatory animus. 42 U.S.C. § 1985(3).

REPORT AND RECOMMENDATION

PECK, Magistrate J.

**\*1** Pro se plaintiff Jeffrey Nelson, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, alleging that numerous Green Haven Correctional Facility employees violated his constitutional rights, and asserting claims for: (1) deliberate indifference to serious medical needs; (2) conspiracy; (3) retaliation; (4) deliberate indifference to serious harm; (5) excessive force; and (6) denial of due process. (Dkt. No. 2: Compl.; Dkt. No. 40: Am. Compl.) Nelson demands compensatory damages of $1.329 billion and punitive damages of an additional $1.329 billion. (Am. Compl. at 36-37.) After the conclusion of discovery, defendants moved for summary judgment under Fed.R.Civ.P. 56, or, in the alternative, to dismiss the amended complaint under Fed R. Civ. P. 12(b)(6).

For the reasons set forth below, (1) defendants' summary judgment motion should be GRANTED as to Nelson's claims against defendants Rodas, Koenigsmann and Licerio for deliberate indifference to serious medical needs and conspiracy; and (2) Nelson's remaining claims should be DISMISSED WITHOUT PREJUDICE for failure to exhaust administrative remedies.

PROCEDURAL BACKGROUND

At all times relevant to this action (October 2000 through May 2001), Nelson was an inmate under DOCS custody at Green Haven Correctional Facility (Dkt. No. 40: Am. Compl. at 3-6, 15-21; Dkt. No. 46: Defs. Br. at 2; Dkt. No. 48: Defs. 56.1 Stmt. ¶ 1),[FN1] and defendants were employed by DOCS at Green Haven.[FN2]

    FN1. On November 19, 2001, Nelson was transferred to Clinton Correctional Facility. (Am. Compl. at 1-2.)

    FN2. Defendants include: physician's assistant Byron Rodas, Medical Director Carl Koenigsmann, dentist Edward Licerio, corrections counselors Joseph Joseph and Jim Temple, Superintendent Charles Greiner, Deputy Superintendents Jeff McKoy and Gayle Haponik, Corrections Officers Tracy Kohler, Barry Barizone, Jim Lawyer, James Weckesser, "Kordougber," Alvin Thomas and Charles Butenhoff, Sergeant John Ross, Lieutenant Michael Nagy, education supervisor Frank Meeuwisse, and an unknown "John Doe." (Am. Compl. at iii.)

    Nelson's original complaint also named Commissioner Goord and Attorney General Spitzer as defendants. (Compl.) On Nelson's consent at the February 6, 2002 conference, his claims against those defendants were dismissed with prejudice. (Dkt. No. 33: 2/8/02 Order .)

Nelson commenced this action by filing a complaint dated

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

July 18, 2001, received by this Court's Pro Se Office on July 25, 2001 and filed as of August 23, 2001. (Dkt. No. 2: Compl.) The Court directed Nelson to amend his complaint to provide additional facts supporting the allegations in his complaint. (Dkt. No. 32: 2/6/02 Memo Endorsed Order.) On March 8, 2002, Nelson's amended complaint was filed. (Dkt. No. 40: Am. Compl.)

Nelson's claims in the amended complaint can be divided into two categories. The first category involves claims against defendants Byron Rodas, Dr. Carl Koenigsmann and Edward Licerio for deliberate indifference to Nelson's serious medical (and dental) needs and conspiracy relating thereto (hereafter, On "Medical Claims"). (Am. Compl. at 3-14; Dkt. No. 52: Nelson 4/30/02 Aff. ¶¶ 4-14; Dkt. No. 53: Nelson Br. ¶¶ 5-8.) The second category involves claims against the remaining sixteen defendants for excessive force, deliberate indifference to serious harm, denial of due process,[FN3] retaliation, and conspiracy relating to a variety of incidents at Green Haven, including, *inter alia,* physical attacks by corrections officers and fellow inmates, and various disciplinary measures levied against Nelson (hereafter, the "Non-Medical Claims"). (Am. Compl. at 15-35; Nelson 4/30/02 Aff. ¶¶ 15-33; Nelson Br. ¶¶ 9-12.)[FN4]

FN3. While Nelson's amended complaint does not expressly reference the Due Process Clause, his allegations, construed liberally, appear to claim a denial of due process in various disciplinary proceedings. (Am. Compl. at 15-21.) *See, e.g., LaBounty v. Kinkhabwala,* No. 99-0329, 2 Fed. Appx. 197, 200-01, 2001 WL 99819 at *2-3 (2d Cir.2001) (reversing dismissal of procedural due process claim arising out of prisoner's disciplinary hearing).

FN4. Nelson's submissions are not a model of clarity, often rendering his claims difficult to understand. In one particularly bizarre passage, Nelson appears to confuse this Court with NASA Mission Control:

Therefore the Magistrate Judge residing is a scientist in the Laws of Land of the United States in the Southern Jurisdiction, District Court of New York State whom adheres and give fair elevation to the United States Constitution and the laws subsequently thereof. As in the near future the constitution and the Laws of the Land of the United States will be firmly establish in the United States Space Society. As the United States NASA-"NATIONAL AERONAUTICS AND SPACE ADMINISTRATION" path the way by advancing the technology for adequate comfortable living condition in such atmosphere.

(Dkt. No. 41: Nelson 2/22/02 Aff. ¶ 5.)

At the close of discovery, defendants moved for summary judgment, or, in the alternative, to dismiss the amended complaint. (Dkt.Nos.45-49, 54.)[FN5]

FN5. The Court's ability to decide the summary judgment motion was seriously hampered by the failure of the Assistant Attorney General on this case to take plaintiff Nelson's deposition. The Assistant Attorney General tried to "pull a fast one" by submitting a proposed order for the taking of Nelson's deposition (an order is needed to depose an incarcerated party) *after* the discovery cut-off date, which the Court accordingly denied. (*See* Dkt. No. 39: 3/11/02 Memo Endorsed Order; *see also* Dkt. No. 43: 3/20/02 Memo Endorsed Order, again denying request to depose Nelson, noting that "[t]he Court is not amused by defense counsel's conduct.")

ANALYSIS

I. NELSON'S NON-MEDICAL CLAIMS SHOULD BE DISMISSED WITHOUT *PREJUDICE FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES*

**\*2** Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996 ("PLRA"), a prisoner must exhaust administrative remedies before bringing suit in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

federal court under federal law:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) This provision requires complete exhaustion in accordance with the administrative procedures within the New York State Department of Correctional Services ("DOCS"). Exhaustion is required even when a prisoner seeks a remedy that cannot be awarded by such administrative procedures. *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 1825, 149 L.Ed.2d 958 (2001). The Supreme Court this past term made clear that there are no exceptions to the PLRA's exhaustion requirement:

> [W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

*Porter v. Nussle,* 122 S.Ct. at 992; *accord, e.g., Feaster v. United States Bureau of Prisons,* No. 00-0118, 37 Fed. Appx. 15, 16, 2002 WL 970941 at *1 (2d Cir. May 10, 2002) (applying *Porter v.. Nussle* holding to require exhaustion of prisoner's due process and retaliation claims).[FN6] Dismissal of an action for failure to comply with the PLRA is without prejudice. *E.g., Morales v. Mackalm,* 278 F.3d 126, 128, 131 (2d Cir.2002) (per curiam) (Second Circuit "clarif[ies] that if a district court dismisses a prisoner's complaint for failure to exhaust administrative remedies, it should do so without prejudice.").

> FN6. Prior to the Supreme Court's decision in *Porter v. Nussle,* the Second Circuit had ruled that claims like Nelson's which applied only to the plaintiff, such as "particular instances of assault or excessive force," did not relate to general "prison conditions" and thus were not subject to the PLRA's exhaustion requirement. *Nussle v. Willette,* 224 F.3d 95, 106 (2d

Cir.2000), *rev'd, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In *Porter v. Nussle,* the Supreme Court reversed, declaring that claims of every sort relating to prison life-including claims for excessive force against an individual inmate-had to be exhausted before an action could be commenced in this Court pursuant to 42 U.S.C. § 1983. *Porter v. Nussle,* 122 S.Ct. at 988; *see also Lawrence v. Goord,* 238 F.3d 182, 185 (2d Cir.2001) (retaliation claims need not be exhausted), *vacated,* 535 U.S. 901, 122 S.Ct. 1200, 152 L.Ed.2d 139 (2002).

DOCS has a well-established inmate grievance procedure ("IGP"):

> It consists of three levels. The first is the filing of a complaint with the facility's Inmate Grievance Review Committee. The second is an appeal to the facility superintendent. The final level is an appeal to the DOCS Central Office Review Committee in Albany.... A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure.

*Hemphill v. New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002); *see also, e.g., Perez v. Blot,* 195 F.Supp.2d 539, 542-43 (S.D.N.Y.2002); *Cruz v. Jordan,* 80 F.Supp.2d 109, 117-18 (S.D.N.Y.1999); *Vasquez v. Artuz,* 97 Civ. 8427, 1999 WL 440631 at *5 (S.D.N.Y. June 28, 1999) (Peck, M.J.); N.Y. Correct. Law §§ 138-39 (McKinney's 2002); Official Compilation of Codes, Rules & Regulations of the State of New York ("NYCRR") Title 7, § 701.1 *et seq.*.

Nelson did not exhaust DOCS' grievance procedures with respect to any of the Non-Medical Claims.[FN7] Nelson concedes that he did not follow the formal grievance procedure with respect to his excessive force claim, but rather appealed directly to DOCS Commissioner Glenn Goord in a letter dated March 10, 2001. (Dkt. No. 52: Nelson 4/30/02 Aff. Ex. 1: 3/10/01 Nelson Letter to Goord; *see* Dkt. No. 50: 3/11/02 Hearing Tr. at 22; Dkt. No. 53: Nelson Br. at 9-11; Am. Compl. at iv; *see also* Dkt. No. 47: Gould Aff. Ex. B: Egan 3/25/02 Aff.) Nelson argues that, in light of correction officers' violent attacks

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

and retaliatory behavior, he had "no other resource or remedy at the facility other than to file his complaint(s) ... directly to" Commissioner Goord. (Nelson Br. at 9; 3/11/02 Hearing Tr. at 22; Nelson 4/30/02 Aff. Ex. 1: 3/10/01 Nelson Letter to Goord.) According to Nelson, his situation qualified as an "emergency" under the IGP, thus allowing an appeal directly to Commissioner Goord in lieu of ordinary exhaustion. (Nelson Br. at 9-10.)

FN7. Defendants originally asserted that only Nelson's excessive force claim was unexhausted, (Dkt. No. 46: Defs. Br. at 34-38; Dkt. No. 54: Defs. Reply Br. at 6-10), effectively ignoring Nelson's apparent failure to exhaust the remaining Non-Medical Claims. Rather than *sua sponte* dismissing such claims for lack of exhaustion, the Court gave Nelson an "opportunity to be heard" on the exhaustion issue (Dkt. No. 57: 8/5/02 Order), as required by *Neal v. Goord,* 267 F.3d 116, 123-24 (2d Cir.2001). Nelson, however, did not respond.

**\*3** Nelson is mistaken. DOCS grievance procedure establishes an expedited grievance procedure in cases of alleged staff "harassment" of an inmate, defined as "employee misconduct meant to annoy, intimidate, or harm an inmate." 7 NYCRR § 701.11(a). That procedure is as follows:

(b) Procedure.

(1) An inmate who feels that s(he) has been the victim of employee misconduct or harassment should first *report such occurrences to the immediate supervisor of that employee.* This does not preclude submission of a formal grievance.

(2) All allegations of employee misconduct shall be given a grievance calendar number and recorded in sequence. All documents submitted with the allegation must be *forwarded to the superintendent* by close of business that day.

(3) The superintendent or his designee shall promptly

determine whether the grievance, if true, would represent a bona fide case of harassment as defined in subdivision (a) of this section. If not, then it shall be returned to the IGRC for normal processing.

7 NYCRR § 701.11(b) (emphasis added). Nelson did not follow this procedure when he wrote to Commissioner Goord.FN8

FN8. The IGP also provides for other "emergency situations" as follows:

(a) Definition. An emergency shall include, but is not limited to, a situation, action, or condition in which an inmate or an employee's health, safety, or welfare is in serious threat or danger. The IGP supervisor will determine if a grievance falls within this category.

(b) The IGP supervisor shall refer any grievance of an emergency nature directly to the appropriate response level with the authority to ensure an immediate or expeditious, meaningful response.

7 NYCRR § 701.9. The "IGP supervisor" is a prison employee at Green Haven, *see* 7 NYCRR §§ 701.4(a)(2), 701.4(b)(2)(i), 701.4(d), and is not Commissioner Goord. Nelson thus has no basis to argue that the IGP's exhaustion procedure can be circumvented by the "emergency situation" procedure contained in 7 NYCRR § 701.9, which simply requires the IGP supervisor to direct a grievance to an "appropriate response level" in the event of an emergency.

[1] Courts have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements. *See, e.g. Saunders v. Goord,* 98 Civ. 8501, 2002 WL 1751341 at \*3 (S.D.N.Y. July 29, 2002) ("It is well established that '[p]laintiffs may not bypass this procedure by sending letters directly to the Superintendent.' "); *Byas v. State,* 99

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

Civ. 1673, 2002 WL 1586963 at *2 (S.D.N.Y. July 17, 2002) ("Prisoners may not bypass this procedure [in 7 NYCRR § 701.11(b) ] by sending letters directly to the Superintendent.") (citing cases); *Nunez v. Goord,* 99 Civ. 4640, 2002 WL 1162905 at *1 (S.D.N.Y. June 3, 2002) (inmate's letter to prison Superintendent in lieu of filing grievance failed to exhaust excessive force claim); *Hemphill v. New York,* 198 F.Supp.2d at 548-49 (same; letter to Superintendent does not satisfy 7 NYCRR § 701.11 procedures either); *Mills v. Garvin,* 99 Civ. 6032, 2001 WL 286784 at *3 (S.D.N.Y. Mar.2, 2001) (inmate's letters to prison officials were insufficient to exhaust his administrative remedies; "letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA."); *Noguera v. Hasty,* 99 Civ. 8786, 2000 WL 1011563 at *12 n. 23 (S.D.N.Y. July 21, 2000) (Peck, M.J.) ("The Court notes that simple letter complaints to the Commissioner of the New York State Department of Correctional Services about excessive force and medical indifference appear quite common, and such complaints are not normally sufficient to serve as a proxy for following and exhausting proper administrative remedies.") (citing cases), *report & rec. adopted in part,* 2001 WL 243535 (S.D.N.Y. Mar.12, 2001) (Wood, D.J.); *Beatty v. Goord,* 98 Civ. 2136, 2000 WL 288358 *4-5 (S.D.N.Y. Mar.16, 2000) (complaint dismissed without prejudice for failure to exhaust where inmate sent letters to prison medical director, Superintendent and Commissioner rather than following IGP); *Adams v. Galletta,* 96 Civ. 3750, 1999 WL 959368 at *3 (S.D.N.Y. Oct.19, 1999) (letter to warden insufficient to exhaust administrative remedies); *Salahuddin v. Mead,* 95 Civ. 8581, 1997 WL 357980 at *4 (S.D.N.Y. June 26, 1997) (letter to Superintendent and Commissioner insufficient to exhaust), *rev'd on other grounds,* 174 F.3d 271 (2d Cir.1999).[FN9]

FN9. Contrary to the *dicta* in *Perez v. Blot,* 195 F.Supp.2d 539, 544-46 (S.D.N.Y.2002), this Court construes *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001), as holding merely that a grievance through informal channels satisfies the exhaustion requirement *if* the prisoner thereby obtained a favorable resolution of his grievance.

**\*4** [2] Nelson also appears to claim that he satisfied the exhaustion requirement by filing appeals from various disciplinary hearing dispositions. (Dkt. No. 40: Am. Compl. at iv: "Chronology-Exhaustion of Administrative Remedies.") However, "[e]xhausting appeals of a disciplinary hearing determination does not constitute exhausting administrative remedies for [the inmate's] grievance, even if the underlying facts are the same." *Benjamin v. Goord,* 02 Civ. 1703, 2002 WL 1586880 at *2 (S.D.N.Y. July 17, 2002); *accord, e.g., Byas v. State,* 2002 WL 1586963 at *3 & n. 3 (inmate's claim unexhausted despite "the two letters he sent to Sing Sing Superintendent Greiner within days of the incident and ... his appeal of the disciplinary hearing determination;" "the fact that plaintiff appealed his disciplinary finding does not relieve him of the obligation to file a grievance"); *Cherry v. Selsky,* 99 Civ. 4636, 2000 WL 943436 at *1, 7 (S.D.N.Y. July 7, 2000) (exhaustion of grievance procedure necessary even though inmate appealed disciplinary charges).

Nelson asserts several other exhaustion arguments that border on the frivolous. He argues that the exhaustion requirement is satisfied if the inmate's complaint has been "reviewed at the highest levels of the agency." (Nelson Br. at 10, citing *Noguera,* 2000 WL 1011563 at *10-11.) While this may be true, Nelson has not submitted any evidence that his complaints were, "in fact," investigated at that level. Nelson also argues that a grievance procedure is essentially unavailable if the inmate does not know the identities of the relevant prison officials. (Nelson Br. at 11.) Whether or not this could ever be a factor, here Nelson has had no difficulty identifying his alleged attackers. (*See* Am. Compl. at 15-21.)

Finally, Nelson argues that "an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief' ' or because exhaustion would otherwise be futile. (Nelson Br. at 10-11, quoting *McCarthy v. Madigan,* 503 U.S. 140, 147, 112 S.Ct. 1081, 1088, 117 L.Ed.2d 291 (1992).) The Supreme Court, however, has made clear that *McCarthy* was superseded by the PLRA: "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." *Booth v. Churner,* 532 U.S. at 739-41 & n. 6, 121 S.Ct. at 1824-25 & n. 6 ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"); *see also, e.g., Saunders v. Goord,* 2002 WL 1751341 at *3 (rejecting plaintiff's argument that corrections officers interfered with his ability to file

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

administrative grievances, stating that "there is no general futility exception [to] the exhaustion requirement under the PLRA.").

In short, Nelson's Non-Medical Claims have not been administratively exhausted, and therefore should be dismissed without prejudice.[FN10]

FN10. In a March 25, 2002, letter to the Court, Assistant Attorney General Anthony Gould represented that:

In light of the Court's concern [expressed at the March 11, 2002 conference] that a dismissal of this action on exhaustion grounds might leave plaintiff without a remedy for his excessive force claim, Deputy DOCS Commissioner Anthony Annucci has indicated that, given the particular facts and circumstances of this case, plaintiff herein will be permitted to file a late grievance as to the alleged excessive force incident in March 2001, and that the grievance will be addressed on its merits without reference to the late date of its filing.

(Dkt. No. 58.) By letter dated September 16, 2002, the State declined to extend that position to all the unexhausted claims. (Dkt. No. 63: 9/16/02 Letter to Court from Assistant Attorney General Rebecca Ann Durden.) The Court strongly suggests to Nelson that he file all grievances within fourteen days of this Report & Recommendation. See 7 N.Y.C.R.R. § 701.7(a)(1). The Court need not decide now what the effect would be on a future suit if DOCS denies Nelson's grievance as untimely. The Court reiterates its concern, however, that while DOCS' requirement that grievances be brought within fourteen days may serve valid institutional purposes, it may be too short a "statute of limitations" period to the extent exhaustion of grievance procedures is a PLRA prerequisite to a § 1983 lawsuit. The Court's concern is especially great for suits, such as Nelson's, brought during the period before the

Supreme Court clarified the exhaustion requirement. The Court further notes that 7 N.Y.C.R.R. § 701.7(a) provides for "exceptions" to the fourteen day limit "based on mitigating circumstances" and gives as an example of such a circumstance "referrals back to the IGP by the courts." DOCS would be well-advised to carefully decide whether to grant an "exception" in this case.

Defendants argue, however, that "pursuant to the PLRA's requirement that 'no action' may be brought until administrative remedies are exhausted, 42 U.S.C. § 1997e(a)," Nelson's failure to exhaust his excessive force claims requires the Court to dismiss Nelson's *entire* complaint. (Defs. Br. at 38.) Defendants offer no case law or analysis to support this proposition (*id.*), despite this Court's specific instructions to defense counsel to address the issue. (*See* Dkt. No. 50: 3/11/02 Conf. Tr. at 23-26.)

**\*5** [3] The issue thus is whether the PLRA compels a rule of "total exhaustion"-whether a district court must dismiss a prisoner's entire § 1983 action if some but not all claims are administratively unexhausted, or if the Court may dismiss only those claims that are unexhausted while ruling on the exhausted claims. The decisions are divided on the issue. Some require "total exhaustion." *See, e.g., Julian-Bey v. Crowley,* No. 00-2313, 24 Fed. Appx. 393, 395, 2001 WL 1555950 at \*2 (6th Cir. Dec.3, 2001) (dismissing "mixed" complaint; rejecting argument that "the exhaustion of at least one claim is sufficient to prevent dismissal"); *Graves v. Norris,* 218 F.3d 884, 885 (8th Cir.2000) ("When multiple prison condition claims have been joined, as in this case, the plain language of § 1997e(a) requires that all available prison grievance remedies must be exhausted as to all of the claims."); *Taylor v. Clarke,* No. C 99-4190, 2002 WL 535421 at \*2 (N.D.Cal. Apr.3, 2002) ("An action containing both exhausted and unexhausted [§ 1983] claims at the time of filing should be dismissed without prejudice."); *Rivera v. Whitman,* 161 F.Supp.2d 337, 339-43 (D.N.J.2001) (plain language of § 1997e(a), as well as the legislative intent and policy interests behind it, compel a "total exhaustion" rule).[FN11] Other decisions, however, do not. *See, e.g., McElhaney v. Elo,* No. 98-2173, 230 F.3d 1358 (table), 2000 WL 1477498 at \*3 (6th Cir. Sept.25, 2000) ("If a [§ 1983] complaint contains exhausted and unexhausted claims, the district court may address the merits of the

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

exhausted claims and dismiss only those that are unexhausted."); *Riley v. Richards,* No. 99-1327, 210 F.3d 372 (table), 2000 WL 332013 at *2 (6th Cir. Mar.23, 2000) (same); *Hartsfield v. Vider,* 199 F.3d 305, 309 (6th Cir.1999) (same); *Johnson v. True,* 125 F.Supp.2d 186, 188 (W.D.Va.2000) ( "total exhaustion" rule contradicts congressional intent and policy), *appeal dismissed,* 32 Fed. Appx. 692 (4th Cir.2002); *Cooper v. Garcia,* 55 F.Supp.2d 1090, 1094-95 (S.D.Cal.1999) (same); *Jenkins v. Toombs,* 32 F.Supp.2d 955, 958-59 (W.D.Mich.1999) (same).

FN11. *See also, e.g., Lira v. Director of Corr. of State of Calif.,* No. C 00-905, 2002 WL 1034043 at *3 (N.D.Cal. May 17, 2002); *Thorp v. Kepoo,* 100 F.Supp.2d 1258, 1263 (D.Haw.2000); *Keenan v. Twommey,* No. 1:97-cv-549, 1999 U.S. Dist. LEXIS 11829 at *2-17 (W.D.Mich. July 29, 1999), *aff'd,* 229 F.3d 1152 (6th Cir.2000); *Abenth v. Palmer,* No. C 96-3938, 1997 WL 255332 at *1 (N.D.Cal. Apr.28, 1997).

The Second Circuit has not addressed the issue, and the few district court decisions in this Circuit also are split. *Compare Saunders v. Goord,* 2002 WL 1751341 at *3 (dismissing inmate complaint containing some unexhausted claims, citing "the plain language of 42 U.S.C. § 1997e(a)"), *with Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450 at *1 (S.D.N.Y. Jan.3, 2002) (dismissing unexhausted claims while ruling on merits of exhausted claims, without discussing why court could do so).

The Court need not try to predict what the Second Circuit (and eventually the Supreme Court) will do, nor take its own position in this general debate. At least on the particular facts of this case, the Court believes it appropriate to address the merits of the exhausted Medical Claims while dismissing the Non-Medical Claims without prejudice.FN12

FN12. The alleged acts about which Nelson complains in his Non-Medical Claims took place from October 2000 through May 2001 (Dkt. No. 40: Am. Compl. at 15-21), and Nelson thus may have relied on the Second Circuit's August 24,

2000 decision in *Nussle v. Willette,* 224 F.3d 95, 106 (2d Cir.2000), *rev'd, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), in which the Second Circuit held that the PLRA's exhaustion requirements did not apply to excessive force claims. Inmates who relied on the Second Circuit's *Nussle* decision would have a good argument after dismissal of such a suit that DOCS' time limits for grievances should be extended for a reasonable time after the dismissal order. *See, e.g., Peoples v. Beldock,* No. 01-CV-6326, 2002 WL 1750742 at *2 (W.D.N.Y. July 10, 2002) (complaint dismissed without prejudice for failure to exhaust despite fact that Second Circuit's *Nussle* decision governed at the time complaint was filed; "Should plaintiff choose to file a new grievance, he can thus attempt to show that the intervening change in the law occasioned by [the Supreme Court's decision in] *Nussle* constitutes 'mitigating circumstances' that would justify an exception to the time limit imposed by the [DOCS grievance] regulations. 7 N.Y.C.R.R. § 701.7(a)(1)."); *Hemphill v. New York,* 198 F.Supp.2d 546, 550 (S.D.N.Y.2002) ("Since reliance on the Second Circuit's interpretation [in *Nussle* ] of the PLRA would be the only possible factor that might augur in favor of non-retroactive application of the Supreme Court's [*Porter v. Nussle* ] decision, there is no equitable basis to evade the firm rule of retroactivity" where Second Circuit decision in *Nussle* came long after plaintiff failed to file a grievance).

**\*6** Discovery in this case was completed at the time of the Supreme Court's February 26, 2002 *Porter v. Nussle* decision. (*See* Dkt. No. 18: Rule 16 Scheduling Order, setting a 2/27/02 discovery cut-off date.) The parties and the Court expended a great deal of resources before *Porter v. Nussle* changed the governing law in the Second Circuit. That alone does not preclude retroactive application of *Porter v. Nussle* to pending cases. Here, however, it is significant that the Medical and Non-Medical Claims are easily separated, since they involve discrete parties and acts. (*Compare* Am. Compl. at 3-14 *with id.* at 15-35.) Even under these facts, the Court could dismiss the entire action without prejudice. But I see no reason why the Court cannot exercise its discretion in these particular

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

circumstances to dismiss without prejudice the separable Non-Medical Claims while reaching the merits (or rather, lack thereof) of the fully exhausted Medical Claims.

Accordingly, I recommend that only the Non-Medical Claims be dismissed without prejudice as unexhausted, and that the separable exhausted Medical Claims be adjudicated on the merits.

II. SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS WITH RESPECT TO NELSON'S CLAIMS OF DELIBERATE INDIFFERENCE TO *SERIOUS MEDICAL NEEDS AND CONSPIRACY RELATING THERETO*

A. *Factual Background Regarding Nelson's Medical Claims*

Shortly after Nelson was transferred to Green Haven on October 11, 2000 (Dkt. No. 48: Defs. 56.1 Stmt. ¶ 11; Dkt. No. 40: Am. Compl. ¶ 8), he submitted a letter dated October 16, 2000 to Green Haven's "Health Services Director," stating:

May I please be seen by an Medical Doctor. I am requesting a full check up for an blood test for hormone poison, level of mercury poison, problems with my back as i am in need of defecating my back start's stiffen with pressur.

And my left knee have a tore tigament. As i walk up the stair's my knee give out.

May I please be seen and treated by an Independent Medical Doctor.

(Dkt. No. 47: Gould Aff. Ex. 1; FN13 *see* Am. Compl. at 3; Defs. 56.1 Stmt. ¶ 11.) Two days later, on October 18, 2000, Nelson was interviewed by defendant Byron Rodas, a Green Haven physician's assistant. (Am. Compl. at 3; Dkt. No. 52: Nelson 4/30/02 Aff. ¶ 5; Defs. 56.1 Stmt. ¶¶ 7, 9, 12.) Nelson alleges that while he "was explaining his

medical condition, ... Rodas became very defensive saying 'I'm the doctor here and I determine what examination and treatment you require, and from what i see here there is nothing wrong with you.' The interview was terminated and plaintiff was not physically examine [d]." (Am. Compl. at 3; *see* Nelson 4/30/02 Aff. ¶ 5.)

FN13. Where both parties submitted the same document, the Court refers to only a single cite for the exhibit.

Nelson wrote a second letter, dated October 23, 2000, to defendant Dr. Carl Koenigsmann, Green Haven's Medical Director, complaining about Rodas' conduct, claiming that he was suffering from "hormone poison, mercury poison," muscle spasms in his back, and torn ligaments in his knee, and requesting a full examination by an "Independent Outside Medical Doctor" as well as a blood test and a "CAT scan." (Gould Aff. Ex. 2; Am. Compl. at 4.) FN14 Dr. Koenigsmann responded to Nelson's October 16 and 23, 2000 letters by memorandum dated November 1, 2000, stating: "This will acknowledge receipt of your letter regarding treatment issues and/or issues with your Primary Care Provider ["PCP"]. A copy of your letter has been forwarded to your Primary Care Provider for response. The PCP's response and your medical folder will be reviewed." (Gould Aff. Ex. 3; *see* Am. Compl. at 4; Defs. 56.1 Stmt. ¶ 13.)

FN14. Nelson also requested "tomography" (Gould Aff. Ex. 2)-an apparently redundant request for a "CAT scan" ("Computerized Axial *Tomography* "). *See Dorland's Illustrated Medical Dictionary,* 295, 1847-48 (29th ed.2000).

*7 Nelson alleges that on October 24, 2000, he was examined by defendant Edward Licerio, a Green Haven dentist, who allegedly advised Nelson that at a "follow-up appointment," Nelson's "worn-out amalgams fillings" that were causing Nelson's "headache and memory-loss" would be removed. (Am. Compl. at 4; Nelson 4/30/02 Aff. ¶ 6; *see* Defs. 56.1 Stmt. ¶¶ 7, 9.) Nelson allegedly explained to Licerio that as Nelson was eating, the "silver spoon ...came in contact with the worn-out fillings, causing plaintiff to receive an electric-charge." (Am. Compl. at 4.)

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

Nelson claims that at a November 14, 2000 follow-up appointment, Licerio refused to remove the fillings, "giving plaintiff no logical reason" for the refusal. (Am. Compl. at 4-5; Nelson 4/30/02 Aff. ¶ 6.) Licerio also requested Nelson to "sign some medical document(s)," which Nelson refused because he allegedly did not understand the handwriting. (Am. Compl. at 5.)

Nelson's Dental Treatment Records, signed by Licerio, state in relevant part:

Oct 26 2000 Place on [illegible] & filling list

Nov 14 2000 Doesn't want any dental filling done on him, he wants me to take out all his silver fillings in his mouth his request has been denied, he refused to sign the refusal slip.

(Nelson 2/22/02 Aff. Ex. 8.)

Nelson claims that "Licerio was deliberately indifferent to plaintiff serious medical needs by his reckless and complete denial to treat plaintiff for the worn-out filling within his teeth." (Am. Compl. at 6.)

Nelson references a November 19, 1998 report by Dr. Elizabeth Gaary:

Bilateral mammography was performed in the craniocaudad and mediolateral oblique projections. There are no prior studies available for comparison.

There are no clustered irregular microcalcifications. There is no evidence of skin thickening or nipple retraction. There are no lymph nodes visualized. Bilateral right greater than left gynecomastia is noted.[FN15]

FN15. "Gynecomastia" is "excessive growth of the male mammary glands, in some cases including development to the stage at which milk is produced, usually associated with metabolic derangements that lead to estrogen accumulation, testosterone deficiency, and hyperprolactinemia. A mild form may develop transiently during normal puberty." *Dorland's Illustrated Medical Dictionary* (29th ed.2000).

Clinical correlation recommended. If there is a palpable abnormality, ultrasound may be of help for further evaluation.

IMPRESSION: Bilateral gynecomastia right greater than left. If there is a palpable abnormality, ultrasound may be of help for further evaluation.

(Nelson 2/22/02 Aff. Ex. 6; *see* Am. Compl. at 6; Nelson 4/30/02 Aff. ¶ 8.) Based on this report, Nelson claims that Rodas and Dr. Koenigsmann knew of and were deliberately indifferent to Nelson's serious medical needs, presumably regarding the gynecomastia, in denying Nelson access to a doctor for diagnosis and treatment. (Am. Compl. at 6; Nelson 4/30/02 Aff. ¶ 9.)

Based on the above allegations, Nelson charges Rodas, Dr. Koenigsmann, and Licerio with "conspiracy." (Am. Compl. at 10-11; Nelson 4/30/02 Aff. ¶¶ 12-14.)

Nelson filed an "Inmate Grievance Complaint" dated November 21, 2000, in which he requested to be examined by an independent outside medical doctor, a "TOMOGRAPHY, and CAT-SCAN for detail viewing of my back and knee, a blood test to identifie certain poison, and to be treated by an out-side dentist who is knowledgeable in removing worn-out toxic amalgams fillings." (Gould Aff. Ex. 4; *see* Am. Compl. at iv; Defs. 56.1 Stmt. ¶ 14.)

**\*8** On December 6, 2000, Dr. Koenigsmann responded by memo to an inquiry from the facility grievance coordinator:

I have reviewed the medical record as it relates to this grievance. I have also referred it to the Dental

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

Department for evaluation. The investigation reveals that the patient has had evaluations for his back and knee pains in the past including x rays. The decision to proceed with additional studies or specialty referrals is best determined by the Primary Provider. At his time, based on prior examination and results of prior work up, the Primary Provider does not feel these needs exist. Regarding the follow up of the laboratory work performed, the results are available on the medical record and have been reviewed by the Primary Provider. I will request a follow up appointment with the Provider to review the laboratory results.

Pertaining to [Nelson's] claim that a Dental provider had recommended the removal of the patient's amalgam fillings, this is incorrect. The Dental provider responded that [Nelson] requested the removal of the amalgam fillings. Currently there are no generally accepted Dental recommendations for the removal of amalgam fillings nor restrictions on the use of amalgam fillings.

(Gould Aff. Ex. 5; *see* Defs. 56.1 Stmt. ¶ 15.)

The Inmate Grievance Resolution Committee held a hearing on January 2, 2001, and denied Nelson's complaint. (Gould Aff. Ex. 6, first page; Defs. 56.1 Stmt. ¶¶ 16-17.) Nelson appealed to Superintendent Greiner (Gould Aff. Ex. 6, last page; Defs. 56.1 Stmt. ¶ 17), who denied the grievance in a statement dated January 10, 2001:

Grievant would like a check up from an outside doctor, including such tests as a CAT scan and blood work. He also would like to have work done by an outside Dentist.

The investigation indicates that X-rays have been completed for knee & back pain. Your primary provider feels that further studies are not indicated at this time.

Your primary provider should set up an appointment with you to review results of the lab work. There was no indication that your amalgam fillings need to be removed and this is generally not recommended. There are also no restrictions on using said filling. The use of an outside dentist[ ] is not indicated.

Grievance is denied.

(Gould Aff. Ex. 7; *see* Defs. 56.1 Stmt. ¶ 17.)

Nelson appealed Superintendent Greiner's decision to the Central Office Review Committee ("CORC"), noting the additional complaint that he had mistakenly been provided with "hemorrhoidal ointment" instead of appropriate medicine for his back pain. (Gould Aff. Ex. 7; Defs. 56.1 Stmt. ¶¶ 17-18.) The CORC issued a unanimous report dated February 21, 2001:

Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of the Division of Health Services, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated.

**\*9** CORC notes that the grievant has been examined by the doctor and received appropriate medical treatment. CORC also notes that the doctor determined that there was no medical need for the additional tests requested by the grievant. Contrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by the employee referenced in this instant complaint.

CORC asserts that, consistent with Health Services Policy Manual Item # 1.21-Health Care Referrals, the Facility Health Services Directors (FHSD) have the sole responsibility for providing treatment to the inmates under their care. The FHSDs have the responsibility of determining what outside health referrals are needed by the target population. Outside specialists may only make recommendations for treatment; however, the implementation of those recommendations is at the discretion of the FHSDs, based on their professional judgment.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

(Gould Aff. Ex. 8; *see* Defs. 56.1 Stmt. ¶ 19.)

B. *Summary Judgment Standards in [Section 1983]( ) Cases*
FN16

> **FN16.** For additional cases authored by this Judge discussing the summary judgment standards in [Section 1983]( ) cases, in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g.,* [*Walker v. Pataro*, 99 Civ. 4607, 2002 WL 664040 at *4-5 (S.D.N.Y. Apr.23, 2002)]( ) (Peck, M.J.); [*Espinal v. Goord*, 00 Civ. 2242, 2001 WL 476070 at *5-7 (S.D.N.Y. May 7, 2001)]( )(Peck, M.J.); [*Fulmore v. Mamis*, 00 Civ. 2831, 2001 WL 417119 at *5 (S.D.N.Y. Apr.23, 2001)]( ) (Peck, M.J.); [*Freeman v. Strack*, 99 Civ. 9878, 2000 WL 1459782 at *4 (S.D.N.Y. Sept.29, 2000)]( ) (Peck, M.J.); [*Culp v. Koenigsmann*, 99 Civ. 9557, 2000 WL 995495 at *4 (S.D.N.Y. July 19, 2000)]( ) (Peck, M.J.); [*Carbonell v. Goord*, 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000)]( ) (Peck, M.J.); [*Greenfield v. City of New York*, 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb.3, 2000)]( ) (Peck, M.J.); [*Salahuddin v. Coughlin*, 999 F.Supp. 526, 534 (S.D.N.Y.1998)]( ) (Rakoff, D.J. & Peck, M.J.); [*Watson v. McGinnis*, 981 F.Supp. 815, 817 (S.D.N.Y.1997)]( ) (Kaplan, D.J. & Peck, M.J.).

[Rule 56(c) of the Federal Rules of Civil Procedure]( ) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [Fed.R.Civ.P. 56(c)]( ); *see also, e.g.,* [*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)]( ); [*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986)]( ); [*Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir.1991)]( ).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment-here, defendants. *See, e.g.,* [*Adickes v. S.H. Kress & Co.*, 398]( ) [U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)]( ); [*Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir.1994)]( ); [*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994)]( ). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g.,* [*Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552-53]( ).

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." [*Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)]( ). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." [Fed.R.Civ.P. 56(e)]( ); *accord, e.g .,* [*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. at 1356]( ).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." [*Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513]( ); *see also, e.g.,* [*Chambers v. TRM*, 43 F.3d at 36]( ); [*Gallo v. Prudential*, 22 F.3d at 1223]( ). The Court draws all inferences in favor of the nonmoving party-here, Nelson-only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g.,* [*Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.)]( ), *cert. denied,* [484 U.S. 977, 108 S.Ct. 489 (1987)]( ). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." [*Chambers v. TRM*, 43 F.3d at 37]( ).

**\*10** In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g.,* [*Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987)]( ); [*Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986)]( ), *cert. denied,* [480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)]( ). To evaluate a fact's materiality, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment [,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11-12.

"The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" such as Nelson and that "pro se parties are to be given special latitude on summary judgment motions." *Salahuddin v. Coughlin,* 999 F.Supp. at 535 (citations & internal quotations omitted); *see also, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' "). Moreover, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See, e.g., Trammell v. Coombe,* No. 97-2622, 201 F.3d 432 (table), 1999 WL 1295856 at *2 (2d Cir. Dec.23, 1999); *McPherson v. Coombe,* 174 F.3d 276, 280-81 (2d Cir.1999) (" '[t]he failure of a district court to apprise *pro se* litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal.' ") (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Defendants' notice of motion duly advised Nelson of the nature of a summary judgment motion and the consequences of failing to appropriately respond. (*See* Dkt. No. 45: Notice of Motion for Summary Judgment; Dkt. No. 49: 3/25/02 Notice to Pro Se Litigant Opposing Motion for Summ. Judgment Per Local Civil Rule 56.2.)

"Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct.28, 1999) (citing cases); *see also, e.g., Smith v. Planas,* 975 F.Supp. 303, 305 n. 2 (S.D.N.Y.1997).

Because Nelson has verified his Amended Complaint (Dkt. No. 40: Am. Compl.; Dkt. No. 41: Nelson 2/22/02 Aff. In Supp. of Am. Compl. ¶ 2), this Court will accept for purposes of this motion all admissible facts set forth in the Amended Complaint that are based on Nelson's personal knowledge and about which Nelson is competent to testify. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes ... provided that it meets the other requirements for an affidavit under Rule 56(e) ... requiring affidavits to be made on personal knowledge, to set forth facts that would be admissible in evidence, and to demonstrate the affiant's competency to testify to the matters in the affidavit ..."); *accord, e.g., Davidson v. Bennis,* No. 96-2999, 152 F.3d 917 (table), 1998 WL 391112 at *1 (2nd Cir. May 20, 1998) (pro se prisoner's verified complaint was "treat[ed] as an affidavit for summary judgment purposes"); *Johnson v. Doe,* 00 Civ. 3920, 2001 WL 314618 at *1 (S.D.N.Y. Mar.30, 2001) ("Although a verified complaint may serve as an affidavit for summary judgment purposes, [citing *Colon* ], mere verification does not transform rhetoric, conclusions, and other non-admissible statements into admissible evidence.").

C. Applicable Law Regarding Claims of Deliberate Indifference to Serious Medical *Needs* [FN17]

FN17. For additional cases authored by this Judge discussing the governing standard in medical indifference claims, in language substantially similar to that in this entire section of this Report and Recommendation, *see Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *7-10 (S.D.N.Y. May 7, 2001)(Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *7-8 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *5-6 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *6-7 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *5-6 (S.D.N.Y. June 13, 2000) (Peck, M.J.).

**\*11** To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

federal statutory right and that the deprivation occurred under color of state law. *See* 42 U .S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55, 101 L.Ed.2d 40 (1988). "Section 1983" itself, however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *E.g.,* *Hudson v. McMillan,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000, 117 L.Ed.2d 156 (1992); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104-05, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976).

To establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. *See, e.g., Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993); *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291. The deliberate indifference test applies to dental as well as medical claims. *Chance v. Armstrong,* 143 F.3d 698, 702-03 (2d Cir.1998) (citing cases).

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "Objectively, the alleged deprivation must be 'sufficiently serious .' " *Id.; see also, e.g., Hudson v. McMillian,* 503 U.S. at 9, 112 S.Ct. at 1000 ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious' "). " 'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....' " *Dean v. Coughlin,* 804 F.2d

207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (citation omitted); *see also, e.g., Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability.' "). Thus, Eighth Amendment protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702; [FN18] *accord, e.g., Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ").

FN18. The Second Circuit in *Chance v. Armstrong* identified several factors that are relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " 143 F.3d at 702. The Second Circuit in that case stated that a medical condition could be serious where the prisoner alleged that he "suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly." *Id.* at 703.

**\*12** "Subjectively, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d at 553. "The required state of mind, equivalent to criminal recklessness, is that the official " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " ' *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994))); *see also, e.g., LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir.1998) ("To succeed in showing deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

indifference, [plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger.").

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291 (fn.omitted); *accord, e.g., Kaminsky v. Rosenblum,* 929 F.2d 922, 926 (2d Cir.1991) ("Cruel and unusual punishment may consist of prison officials delaying an inmate access to needed medical care.").[FN19] However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. at 105-06, 97 S.Ct. at 292; *accord, e.g., Burton v. New York State Dep't of Corrections,* 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. March 2, 1994) (Sotomayor, D.J.). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292.[FN20] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292; *accord, e.g., Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. New York State Dep't of Corrections,* 1994 WL 97164 at *2. An act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, *i.e.,* an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d at 553); *Harrison v. Barkley,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.... This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady.... [But] [c]onsciously disregarding an inmate's legitimate medical needs is not 'mere medical malpractice.' "); *Hathaway v. Coughlin,* 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

FN19. *See, e.g., Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (delay for more than two years in removing broken pins from prisoner's hip despite nearly fifty complaints of pain), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious inmate for three days); *Archer v. Dutcher,* 733 F.2d 14, 15-17 (2d Cir.1984) (denying summary judgment where plaintiff "identifie[d] intentional efforts on the part of defendants to delay her access to medical care at a time [when] she was in extreme pain"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974).

FN20. *Accord, e.g., Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. New York State Dep't of Correctional Servs.,* No. 95-CV-1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr.10, 1998) (Pooler, D .J.).

*13 "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d at 703; *accord, e.g ., Hathaway v. Coughlin,* 37 F.3d at 70 (Jacobs, C.J., dissenting) (" 'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.' "); *Culp v. Koenigsmann,* 2000 WL 995495 at *7 ("Mere disagreements with the quality of medical care, however, do not state an Eighth Amendment claim."); *see also, e.g., Troy v. Kuhlmann,* 96 Civ. 7190, 1999 WL 825622 at *6 (S.D.N.Y. Oct.15, 1999) ("a prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim"); *Brown v. Selwin,* 98 Civ. 3008, 1999 WL 756404 at *6 (S.D.N.Y. Sept.24, 1999) (citing cases); *Negron v. Macomber,* 95 Civ. 4151, 1999 WL 608777 at *6 (S.D.N.Y. Aug.11, 1999); *Espinal v. Coughlin,* 98 Civ. 2579, 1999 WL 387435 at *3 (S.D.N.Y. June 14,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

1999).[FN21]

> FN21. Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment:

> Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a "life-threatening and fast-degenerating" condition for three days; or delayed major surgery for over two years. No such circumstances are present here. At no point was [plaintiff's] condition "fast-degenerating" or "life-threatening," and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in *Hathaway.* That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.

> *Demata v. New York State Correctional Dep't of Health Servs.,* No. 99-0066, 198 F.3d 233 (table), 1999 WL 753142 at *2 (2d Cir. Sept.17, 1999) (citations omitted) (summary judgment for defendants where plaintiff complained of knee injury in February 1994 and surgery not performed until March 1997); *accord, e.g., Freeman v. Strack,* 2000 WL 1459782 at *9 (no Eighth Amendment claim against nurse who scheduled inmate with appendicitis requiring appendectomy for appointment two hours later rather than seeing inmate immediately where "[t]here was nothing in [the inmate]'s medical history which would have put [the nurse] on notice that [plaintiff] was suffering from the onset of appendicitis ... and there is no evidence that [the officer] gave [the nurse] any reason to believe that there was an emergency on hand"); *Culp v. Koenigsmann,* 2000 WL 995495 at *7-8 (rejecting claim based on fact

that one doctor recommended arthroscopic surgery for knee injury in April 1999, while another doctor concluded that surgery was not warranted until more conservative measures like physical therapy had been tried and failed).

D. *Nelson's Medical Indifference Claims Should Be Dismissed*

[4] Nelson asserts that defendants demonstrated deliberate indifference to the following three "serious medical conditions":

> (i) ... an abnormal growth of tissue-cells within plaintiff chest that serve no physiological function.

> (ii) The worn-out amalgams fillings thats causing plaintiff perpetual headache especially when awaking in the morning, and chewing certain food, and

> (iii) plaintiff defective back-as plaintiff in need of having to defecate his back muscle stiffen with pressure.

(Dkt. No. 40: Am. Compl. at 5; *see* Dkt. No. 52: Nelson 4/30/02 Aff. ¶ 11.)

Nelson offers no evidence to support his claims other than the conclusory allegations in his verified complaint. (Am. Compl. at 3-14; *see also* Nelson 4/30/02 Aff. ¶¶ 4-14.) Unfortunately, defendants fail to fill the gap: through attorney neglect they did not depose Nelson (*see* fn.5 above) and have submitted no admissible evidence on this motion other than copies of Nelson's complaint letters, the State's written responses, and the records pertaining to Nelson's grievance procedure, largely consisting of rank hearsay. (Dkt. No. 47: Gould Aff. Exs. 1-8; *see also* Dkt. No. 46: Defs. Br. at 6-14.) Indeed, defense counsel has not bothered to submit copies of Nelson's medical records.[FN22] The Assistant Attorney General's performance in this case did little to help the Court, or his clients. The Court thus is left guessing as to Nelson's course of medical treatment or lack thereof.[FN23]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

FN22. Nelson submitted copies of his cryptic dental treatment records from Green Haven. (Dkt. No. 41: Nelson 2/22/02 Aff. Ex. 8.)

FN23. Although defendants submitted a statement pursuant to Rule 56.1 (Dkt. No. 48), it largely fails to cite supporting admissible evidence. *See* S.D.N.Y. Local Civil Rule 56.1(d) ("Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible ....").

Nevertheless, Nelson has the burden on this motion. While a plaintiff alleging medical indifference in a Section 1983 action is not required to produce "expert medical testimony," *Hathaway v. Coughlin,* 37 F.3d 63, 68 (2d Cir.1994), Nelson "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that '[his] version of the events is not wholly fanciful.' " *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (§ 1983 action) (quoting *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998)). And although Nelson, as a pro se litigant, is granted a certain degree of leeway, the superficial allegations of his amended complaint fail to satisfy the stringent requirements of an Eighth Amendment claim, for the following reasons.

**\*14** Nelson's first grievance relates to "an abnormal growth of tissue-cells within plaintiff chest that serve no physiological function." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) This apparently refers to a November 19, 1998 report by Dr. Elizabeth Gaary which noted that Nelson's "bilateral right ... gynecomastia" was "greater" than his left gynecomastia. (*See* pages 16-17 above.) Nelson, however, entirely fails to allege how this gynecomastia is " 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *see also* cases cited at pages 25-26 above. His allegations thus fail to satisfy the pleading standard for a medical indifference claim, much less the standard for opposing a summary judgment motion.

Second, Nelson complains of indifference to his "defective back-as plaintiff in need of having to defecate his back muscle stiffen with pressure." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) Nelson elsewhere referred to this problem as "muscle spasm[s]" in his back. (Nelson 2/22/02 Aff. Ex. 4: 10/23/00 Nelson Letter to Koenigsmann.) This claim should be rejected, both because there is no evidence that Nelson's alleged back problems were sufficiently serious to qualify as an Eighth Amendment violation, and because Nelson's claim concerns not the absence of help, but the choice of a certain course of treatment.

Severe back pain, especially if lasting an extended period of time, can amount to a "serious medical need" under the Eighth Amendment.[FN24] Here, however, Nelson merely alleges "back spasms," without describing the intensity or duration of the pain. That is insufficient to survive a summary judgment motion, even under the most liberal standard. *See, e.g., Tobias v. County of Putnam,* 191 F.Supp.2d 364, 379 (S.D.N.Y.2002) ("we do not believe that [plaintiff's] injuries caused him such extreme pain as to meet his burden. He does not allege in his complaint that he suffered extreme pain, but rather just vague 'physical injury.' "); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at \*3 (S.D.N.Y. July 27, 1995) (§ 1983 medical indifference claim dismissed because "there is nothing in the record to suggest that plaintiff's back pain was severe or excruciating"); *Sassower v. City of White Plains,* 89 Civ. 1267, 1995 WL 222206 at \*8 (S.D.N.Y. Apr.13, 1995) (granting defendants summary judgment because, *inter alia,* "Plaintiff does not even attest that she experienced a life threatening condition, nor that she suffered from extreme pain or the threat of death or degeneration. In fact, according to Plaintiffs affidavits, she suffered simply from 'stress and strain.' ").[FN25] While Nelson's pleading might survive a motion to dismiss, more is required to survive summary judgment, even from a pro se plaintiff.

FN24. *See, e.g., Hathaway v. Coughlin,* 37 F.3d at 67 (finding plaintiff with degenerative hip condition who experienced great pain over an extended period of time and had difficulty walking had "serious medical needs"); *Ramos v. Artuz,* 00 Civ. 0149, 2001 WL 840131 at \*11 (S.D.N.Y. July 25, 2001) (claim of chronic back pain survived motion to dismiss); *Cole v. Artuz,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

97 Civ. 0977, 2000 WL 760749 at *5 (S.D.N.Y. June 12, 2000) (claim relating to chronic back injury survived motion to dismiss); *Bryant v. Artuz,* 96 Civ. 3274, 1998 WL 24360 at *2 (S.D.N.Y. Jan.23, 1998) (prisoner's allegation of severe back pain following disc surgery was held to be sufficiently serious medical condition to survive a motion for summary judgment); *Gill v. Gilder,* 95 Civ. 7933, 1996 WL 103837 at *5 (S.D.N.Y. Mar.8, 1996) (denying defendants' motion to dismiss where plaintiff had alleged that a back problem caused him "severe pain"); *cf., Solomon v. Moore,* 97 Civ. 0201, 2000 WL 385521 at *2-3 (S.D.N.Y. Apr.14, 2000) (back pain did not rise to level of violation: "These alleged problems [including back pain] taken together are clearly 'conditions which many people suffer from and function despite on a day-to-day basis and the fact that a sufferer is incarcerated does not elevate every perceived lack of treatment to the level of cruel and unusual punishment.' ").

FN25. *See also, e.g., Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *8 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.) ("At no point was [plaintiff's] condition 'fast-degenerating' or 'life-threatening,' and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in *Hathaway* [*v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ]. That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.").

In addition, Nelson's complaint seems to be, not that the prison authorities failed to treat his back pain, but that they refused Nelson's request for a CAT scan and for a consultation with an outside physician. (*See* pages 15, 17-18, 29-31 above.) Nelson's complaints thus amount to no more than a disagreement about the proper course of treatment that cannot form the basis of an Eighth Amendment claim:

**\*15** [T]he question whether an X-ray or additional

diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court ....

*Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 293, 50 L.Ed.2d 251 (1976); *accord, e.g., Randle v. Mesrobian,* No. 98-1590, 165 F.3d 32 (table), 1998 WL 551941 at *3 (7th Cir. Aug.27, 1998) ("inmates have no automatic right to consult with outside physicians") (citing cases); *Austin v. Rhode Island Dep't of Corr.,* No. 00-104, 2001 WL 1136101 at *5 (D.R.I. Aug.24, 2001) (refusal of prisoner's request to be examined by outside physician did not state a § 1983 claim); *Fulmore v. Mamis,* 2001 WL 417119 at *8-9 & n. 26 (Physician's failure to order CAT scan or orthopedic shoes, and refusal to refill prisoner's inhaler medication on certain occasions reflected, "at most, ... a difference in opinion as to [prisoner's] medical treatment rather than any deliberate indifference to [prisoner's] medical needs," citing cases); *Wicks v. Qualtere,* 95-CV-426, 1997 WL 176338 at *3 (N.D.N.Y. Apr.4, 1997) (Pooler, D.J.) (refusal to order X-ray did not state a claim).FN26

FN26. *See, e.g., Kelley v. Lutz,* No. 95-16003 87 F.3d 1320 (table), 1996 WL 341299 at *1 (9th Cir. June 19, 1996) (prison doctor's denial of inmate's request for CAT scan did not constitute deliberate indifference where inmate had been seen by several specialists and x-rays did not reveal any abnormality); *Vento v. Lord,* 96 Civ. 6169, 1997 WL 431140 at *5 (S.D.N.Y. July 31, 1997) (Sotomayor, D.J.) ("plaintiff's [denied] x-ray request and claim that without new x-rays her physical therapy is ineffective fails to state a claim of deliberate indifference"); *Sharp v. Jeanty,* 93 Civ. 0220, 1993 WL 498095 at *2 (S.D.N.Y. Nov.30, 1993) (Leval, D.J .) (dismissing complaint where prisoner's knee was x-rayed but he was not given an orthroscan, because plaintiff's medical "records indicate[d] an extensive and ongoing course of medical treatment" of his injury, and many of his allegations amounted to "second-guessing the treatments of his health care providers", and explaining that " '[a] prisoner's disagreement

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

with his prescribed treatment does not afford a basis for relief under § 1983." '); *see also, e.g., Burley v. O.D.O.C.,* No. CV-99-1462, 2000 WL 1060658 at *4-5 (D.Or. July 11, 2000) (granting defendants summary judgment on Eighth Amendment claim where "[p]laintiff disputes that the lumbar/sacral spine x-ray shows that nothing is wrong with his head, neck, and back" and "believes that only an 'MRI' or 'Cat Scan' can confirm his injuries in those areas"); *Lewis v. Herbert,* No. Civ. A. 96-2933, 1996 WL 663874 at *4 (E.D.Pa. Nov.14, 1996) ("[E]ven if Defendant's decision not to ... order an X-Ray or Cat Scan ... amounted to medical malpractice, a tort is not transformed into a constitutional violation simply because the victim is a prisoner."); *Coppage v. Mann,* 906 F.Supp. 1025, 1038-39 (E.D.Va.1995) (rejecting plaintiff's argument that prison doctor was deliberately indifferent when he ordered two diagnostic tests which were less effective than an MRI; "The case law draws a clear distinction between situations in which the physician provides no medical care, which may amount to deliberate indifference, and those in which the physician provides merely substandard care, which amounts at most to negligence."); *Trejo v. Gomez,* No. C-93-0360, 1995 WL 429247 at *3 (N.D.Cal. July 13, 1995) (rejecting claim that prison doctor's failure to order CAT scan or MRI for inmate complaining of neck, back and shoulder pain constituted deliberate indifference); *Johnson v. Department of Corr.,* 92 Civ. 7716, 1995 WL 121295 at *3 (S.D.N.Y. Mar.21, 1995) (summary judgment for defendants where inmate suffering from hip condition who was examined and treated on numerous occasions complained he should have received an MRI; "the Eighth Amendment does not mandate the use of any particular medical technology or course of treatment"); *Wilkerson v. Marshall,* No. C 94-0009, 1994 WL 564650 at *1-4 (N.D.Cal. Oct.3, 1994) (rejecting inmate's claim that prison doctor's failure to order an MRI constituted deliberate indifference); *Lopez v. Medical Dep't,* Civ. A. No. 90-5287, 1990 WL 174361 at *1 (E.D.Pa. Nov.6, 1990) (prison medical staff's refusal to "take x-rays, perform a CAT scan and administer other medical tests" did not give rise to Eighth Amendment claim).

Nelson's claim regarding his allegedly torn knee ligament suffers from the same deficiencies, and should therefore be dismissed as well. (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) His isolated assertion that "As i walk up the stair's my knee give out" fails to make out a claim. *See, e.g., Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450 at *4 (S.D.N.Y. Jan.3, 2002) (plaintiff's claim relating to "an exacerbated injury to his knee" was "at most an allegation of negligence or disagreement with a course of treatment which does not rise to the deliberate indifference standard").

Finally, Nelson claims an Eighth Amendment violation based on indifference to his "worn-out amalgams fillings thats causing plaintiff perpetual headache especially when awaking in the morning, and chewing certain food(s)." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) In contrast to his other medical indifference claims, Nelson's dental indifference claim at least minimally alleges the nature and severity of his pain, which allegations might be sufficient to state a claim. *Cf. Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (Denying summary judgment: "District courts in this Circuit have ruled that a one-year delay in treating a cavity can evidence deliberate indifference on the part of prison officials.... It follows that (1) outright refusal of any treatment for a degenerative condition that tends to cause acute infection *and* pain if left untreated and (2) imposition of a seriously unreasonable condition on such treatment, both constitute deliberate indifference on the part of prison officials."); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (Denying motion to dismiss where prisoner "alleged that he has been in 'great pain' for at least six months, that he has been unable to chew properly, ... that he has choked on his food," and that he has lost "one and possibly three of his teeth," "all because of [the prison doctors'] actions."); *Ramos v. O'Connell,* 28 F.Supp.2d 796, 802 (W.D.N.Y.1998) (summary judgment denied where prisoner alleged that his tooth pain was so "unbearable" that "he was unable to chew food properly, and that the denial of dental treatment caused the infected tooth to abscess"); *Dennis v. Milicevic,* 97 Civ. 7147, 1998 WL 474200 at *3 (S.D.N.Y. Aug.13, 1998) (severe chronic headache following operation raised issue of material fact

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

"of whether a sufficiently serious [medical] condition existed"). But here, again, Nelson's complaint appears to be not that his dental problems were not treated, but that they were not treated to his liking-namely, by taking out all of the silver (amalgam) fillings in his mouth that were allegedly causing his headaches and memory loss. (Am. Compl. at 4-5; Nelson 4/30/02 Aff. ¶ 6; Nelson 2/22/02 Aff. Ex. 8: Dental Treatment Record.) [FN27] Such a disagreement over the proper course of treatment cannot support an Eighth Amendment Claim, especially where plaintiff offers no evidence as to the efficacy of the requested alternative treatment.

> FN27. The November 14, 2000 entry in his Dental Treatment Record states: "Doesn't want any dental filling done on him, he wants me to take out all his silver fillings in his mouth his request has been denied, he refused to sign the refusal slip." (Nelson 2/22/02 Aff. Ex. 8; *see* page 16 above.)

**\*16** Indeed, Nelson's refusal to accept dental treatment (*see* Nelson 2/22/02 Aff. Ex. 8: Dental Treatment Record) effectively rebuts his claim of deliberate indifference to serious medical needs. *See, e.g., Brown v. Selwin,* 98 Civ. 3008, 1999 WL 756404 at \*6-7 (S.D.N.Y. Sept.24, 1999) (finding no deliberate indifference when it was "uncontroverted that [plaintiff] refused medical treatment on several occasions"); *Ross v. Kelly,* 784 F.Supp. 35, 46-47 (W.D.N.Y.) (evidence failed to establish deliberate indifference to medical needs where plaintiff was largely to blame for many of the delays in his treatment due to his second-guessing of physician's advice and refusal of treatment), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992).

E. *Nelson's Conspiracy Claims Under §§ 1983 and 1985 Should Be Dismissed*

[5] Nelson alleges that defendants Rodas, Koenigsmann, and Licerio conspired to deny him adequate medical care in violation of 42 U.S.C. §§ 1983 and 1985. (Dkt. No. 40: Am. Compl. at 3-14; Dkt. No. 52: Nelson 4/30/02 Aff. ¶¶ 4-14.) "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). [FN28] "To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). Further, the § 1985 conspiracy must also be motivated by " 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." ' *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993).

> FN28. *Accord, e.g., Espinal v. Goord,* 00 Civ. 2292, 2001 WL 476070 at \*10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Sundwall v. Leuba,* No. Civ. A. 300CV1309, 2001 WL 58834 at \*8 (D.Conn. Jan.23, 2001), *aff'd,* 28 Fed. Appx. 11 (2d Cir.2001); *Cipolla v. County of Rensselaer,* 129 F.Supp.2d 436, 449 (N.D.N.Y.), *aff'd,* 20 Fed. Appx. 84 (2d Cir.2001); *Santiago v. City of New York,* 98 Civ. 6543, 2000 WL 1532950 at \*8 (S.D.N.Y. Oct.17, 2000).

Nelson's conspiracy allegations are entirely conclusory, and should therefore be dismissed. *See, e.g., Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (affirming summary judgment dismissing conspiracy claim based only on conclusory allegations); *Rivera v. Goord,* 119 F.Supp.2d 327, 345 (S.D.N.Y.2000) (Plaintiff "alleges no specific facts that would indicate the existence of any kind of conspiracy against him. The mere use of the word 'conspiracy,' without more, does not state a claim under § 1985."). Further, Nelson's § 1985 conspiracy claim should be dismissed for the additional reason that he failed to allege that defendants conspired against him because of any racial or class-based, invidious discriminatory animus. *See, e.g., Brown v. City of Oneonta,* 221 F.3d 329, 341 (2d Cir.2000); *Moore v. Gardner,* 199 F.Supp.2d 17, 24 (W.D.N.Y.2002).

CONCLUSION

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)
(Cite as: 2002 WL 31075804 (S.D.N.Y.))

**\*17** For the reasons set forth above, defendants should be granted summary judgment dismissing Nelson's medical claims, and Nelson's remaining claims should be dismissed without prejudice for failure to exhaust administrative remedies.

FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard C. Casey, 500 Pearl Street, Room 1950, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Casey. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2002.
Nelson v. Rodas
Not Reported in F.Supp.2d, 2002 WL 31075804 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2001 WL 1150318
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Danielle EVERING, Plaintiff,
v.
Lieutenant RIELLY et al., Defendants.

No. 98 CIV. 6718.
|
Sept. 28, 2001.

**Attorneys and Law Firms**

Danielle Evering, pro se, Bedford Hills Correctional Facility,
Bedford.

Marisa Longo, Assistant Attorney General of the State of
New York, New York.

MEMORANDUM AND ORDER

BATTS, District J.

**\*1** Danielle Evering ("Plaintiff"), proceeding *pro se,*
commenced this action pursuant to 42 U.S.C. § 1983.
Plaintiff alleges that Lieutenant Richard Rielly ("Lt.Rielly"),
Sergeant Dominick Crisafulli ("Sgt.Crisafulli") and
Correction Officers Steven Schurmann ("C.O.Schurmann"),
James Johnson ("C.O.Johnson"), John MacEsker
("C.O.MacEsker"), Joseph Gentile ("C.O.Gentile") and Eric
Ford ("C.O.Ford") of the Bedford Hills Correctional Facility
("Bedford Hills") (collectively the "Defendants") violated
certain rights guaranteed to her under the Eighth Amendment
of the Constitution. Specifically, Plaintiff claims that the
Defendants subjected her to cruel and unusual punishment
through the use of excessive force. Plaintiff also claims
that certain officers at Bedford Hills exhibited a deliberate
indifference to her serious medical needs.

Defendants move for Summary Judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure. In their Motion
for Summary Judgment, Defendants argue that Plaintiff
has failed to establish an Eighth Amendment violation. In
addition, Defendants assert they are entitled to qualified
immunity and that the Eleventh Amendment bars the claims
Plaintiff seeks to raise here. For the following reasons,

Defendants' motion is DENIED in part and GRANTED in
part.

I. BACKGROUND

A. Plaintiff's Background

Plaintiff is an inmate currently incarcerated at the Bedford
Hills Correctional Facility. (Defs.' 56.1 Stmt. ¶ 8.) In 1993,
Plaintiff pled guilty to a Violation of Probation and Robbery
in the First Degree. (Defs.' 56.1 Stmt. ¶ 10.) She received
concurrent prison terms of 1 ½ to 3 years and 4 ½ to 9 years
for these convictions. (Defs.' 56.1 Stmt. ¶ 11.) During her
incarceration, Plaintiff has been disciplined over 100 times
for various incidents, some of which include fighting with
other inmates and correctional officers. (Defs.' 56.1 Stmt. ¶
14.) During the times relevant to the claims that Plaintiff
alleges in her Complaint, she resided in the Special Housing
Unit at Bedford Hills ("SHU"). (Defs.' 56.1 Stmt. ¶ 18.) The
Plaintiff was placed in the SHU as a result of a disciplinary
hearing finding that she had violated various prison rules. (*Id.*)

B. "The Shower Incident"

On the morning of June 29, 1998 Plaintiff awoke to loud
banging on her cell door by Correction Officer R.A. Brown
("C.O.Brown"), the officer responsible for escorting Plaintiff
to the shower that morning. (Pl.'s Opp'n to Brown ¶ 4;
Pl.'s Opp'n to Crisafulli ¶ 4.)[1] Defendants claim that
C.O. Brown asked Sgt. Crisafulli to be present during
this trip to the shower. (Defs.' 56.1 Stmt. ¶ 16 .) C.O.
Brown apparently requested Crisafulli's presence due to
a confrontation[2] between the Plaintiff and C.O. Brown
which occurred the previous day. (Defs.' 56.1 Stmt. ¶ 17.)
Plaintiff, however, disputes the timing of the request for
Sgt. Crisafulli's presence. Plaintiff claims that Sgt. Brown
summoned Crisafulli only after Plaintiff complained to C.O.
Brown about the noise and C.O. Brown handcuffed Plaintiff
to her cell. (Pl.'s Opp'n to Brown ¶ 4; Pl.'s Opp'n to Crisafulli
¶ 4.)

**\*2** Upon exiting her cell, Plaintiff complained about
C.O. Brown's behavior to Sgt. Crisafulli. The Parties,
however, dispute the manner that the Plaintiff exited her
cell. Defendants claim that Plaintiff "yell[ed], scream[ed],
wav[ed] her arms in an aggressive manner and threaten[ed]
C.O. Brown." (Defs.' 56.1 Stmt ¶ 19.) Plaintiff claims that
Sgt. Crisafulli responded to Plaintiff's complaints in a much
louder tone of voice than that used by the Plaintiff. (Pl.'s

Opp'n to Crisafuli ¶ 5.) Plaintiff also disputes the Defendants' characterization of her behavior since, as Plaintiff alleges, she was handcuffed, and incapable of waving her arms in an aggressive manner. (Pl.'s Opp'n to Brown ¶ 5.)

Sgt. Crisafuli ordered Plaintiff to stop complaining and suggested that they revisit the subject during rounds. (Defs.' 56.1 Stmt. ¶ 20.) Apparently, Crisafuli's suggestion that Plaintiff revisit her complaints during rounds did not convince Plaintiff to desist—she continued to yell in Crisafuli's face. (Defs.' 56.1 Stmt. 21.) Defendants claim that while walking down the corridor, Plaintiff turned to address Sgt. Crisafuli directly. (*Id.*) Plaintiff's abrupt turn was construed as an attempted "head butt." (Defs.' 56.1 Stmt. ¶ 22.) At this point Plaintiff told Crisafuli that he did not "have the last fucking word in here," and that she was "tired [of Crisafuli] acting like the [ ] officers are always right." (Pl.'s Opp'n to Brown at ¶ 6.) Sgt. Crisafuli asserts that once the Plaintiff stopped and confronted him, he stepped back from Plaintiff and placed his right hand on her left shoulder to keep her away from him. (Defs.' 56.1 Stmt. ¶ 24.) Plaintiff, however, claims that Sgt. Crisafuli argued with her on their way to the shower. (Pl.'s Opp'n to Crisafuli ¶ 6.) Plaintiff agrees that she turned to face Sgt. Crisafuli, (*id.*), but states that she did not attempt to "head butt" him. Instead, she claims that Crisafuli almost walked into her once she stopped to face him. (Pl.'s Opp'n to Crisafuli ¶ 6.) Then, according to Plaintiff, Crisafuli stopped suddenly and pushed Plaintiff forcefully with both hands into a door. (*Id.*) Sgt. Crisafuli then directed Plaintiff enter the shower area. (Defs.' 56.1 Stmt. ¶ 25.) After C .O. Ford placed Plaintiff in the shower she threatened him.[3] (Ford Aff. ¶ 5.) Once plaintiff was locked in the shower she stated that she would not leave until she could see a superior officer. (Pl.'s Opp'n to Crisafuli ¶ 7; Defs.' 56.1 Stmt. ¶ 27.) Sgt. Crisafuli claims he told her that she would be unable to take a shower until she calmed down. (Crisafuli Aff. ¶ 7.) Plaintiff, however, alleges she was never told her shower was contingent upon a change in her behavior. (Pl.'s Opp'n to Crisafuli ¶ 7.) Rather, according to Plaintiff, she was locked in the shower and all of the officers exited the corridor without uttering a word. (Pl.'s Opp'n to Crisafuli ¶ 7.) Her pleas to remove the handcuffs were apparently ignored.[4] (*Id.*) Sgt. Crisafuli asserts that he contacted Lt. Rielly and Lt. Tiberia for assistance. (Defs.' 56.1 Stmt. ¶ 29.)

**\*3** While in the shower, Plaintiff attempted to hang herself by tying a shower curtain around her neck. (Pl.'s Opp'n to Crisafuli ¶ 8; Defs.' 56.1 Stmt. ¶ 30.) Sgt. Crisafuli ordered C.O. Schurmann to cut the shower curtain down. (Pl.'s Opp'n

to Crisafuli ¶ 8; Defs.' 56.1 Stmt. ¶ 31.) A few minutes later, Plaintiff attempted to tie the shower curtain around her neck a second time. (Defs.' 56.1 Stmt. ¶ 33.) Once again C.O. Schurmann cut the shower curtain. (Crisafuli Aff. ¶ 8.) However, before C.O. Schurmann left the shower Plaintiff claims that he punched her in the head. (Pl.'s Opp'n to Crisafuli ¶ 8.)[5] Upon Lt. Tiberia's instructions and based on Plaintiff's suicide attempts, Sgt. Crisafuli ordered the shower door to be opened. (Defs.' 56.1 Stmt. ¶ 34.) Sgt. Crisafuli accompanied by C.O. Schurmann, C.O. Ford and C.O. Johnson went to the shower. (Pl.'s Opp'n to Crisafuli ¶ 9; Defs.' 56.1 Stmt. ¶ 35.) C.O. Ford opened the door and asked Plaintiff to exit. (Pl.'s Opp'n to Crisafuli ¶ 9; Defs.' 56.1 Stmt. ¶ 36.) After several refusals, C.O.s Johnson, Ford and Schurmann entered the shower to bring Plaintiff out. (Pl.'s Opp'n to Crisafuli ¶ 9–10; Defs.' 56.1 Stmt. ¶ 37.) Plaintiff then alleges that her feet were swept from under her causing her to fall to the floor. (Pl.'s Opp'n to Crisafuli ¶ 9.) Plaintiff resisted the officers' grip as they tried to usher her out of out the shower. (*Id.*) C.O.s Schurmann, Ford and Johnson carried Plaintiff back to her cell. (Pl.'s Opp'n to Crisafuli ¶ 10.) Sgt. Crisafuli followed. (*Id.*)

Plaintiff states that while the officers carried her back to her cell, one of the officers kicked her in the back. (Pl.'s Opp'n to Crisafuli ¶ 11.) After Plaintiff was placed in her cell, she attempted to leave her cell three times before the officers were able to exit her cell and close the door. (Defs.' 56.1 Stmt. ¶ 44.) Plaintiff claims she was not attempting to leave, but rather was in a paranoid state and did not want the cell door locked. (Pl.'s Opp'n to Schurmann ¶ 12.) During her last alleged attempt to leave the cell, she grabbed onto C.O. Schurmann who pulled free of her grip and attempted to calm her down. (Pl.'s Opp'n to Schurmann ¶ 13–14; Defs.' 56.1 Stmt. ¶ 47.) Plaintiff asserts that when C.O. Schurmann shut the door he used his legs and knees to push Plaintiff back into her cell. (Pl.'s Opp'n to Schurmann ¶ 14.) In the course of keeping Plaintiff in her cell, Plaintiff alleges that C.O. Schurmann kicked her in the vagina. (*Id.*) Shortly thereafter, a nurse arrived in the SHU. (Pl.'s Opp'n to Crisafuli ¶ 14; Defs.' 56.1 Stmt. ¶ 50–1.) Sgt. Crisafuli, responding to Plaintiff's complaints that she was kicked in the groin, requested that the nurse examine Plaintiff. (*Id.*) Plaintiff contends that the security staff as a whole decided that the cell door would not be reopened given the difficulty the officers had just encountered in closing the Plaintiff's cell door. (Pl.'s Opp'n to Crisafuli ¶ 14.) Defendants on the other hand, argue that Plaintiff refused the nurse access to her cell. (Defs.' 56.1 Stmt. ¶ 52.) According to the Plaintiff, she complained to

the nurse who arrived at her cell that she had been kicked in the groin area. (Pl.'s Opp'n Crisafulli ¶ 14.) Sgt. Crisafulli ordered a corrections officer to take pictures of the Plaintiff in her cell. (Pl.'s Opp'n to Crisafulli ¶ 15; Defs.' 56.1 Stmt. ¶ 53.) Although Plaintiff attempted to obstruct the camera's view a corrections officer managed to take two pictures of the Plaintiff standing by her cell door. [6] (Pl.'s Opp'n to Crisafulli ¶ 15; Defs.' 56.1 Stmt. ¶ 54–5.) After the pictures were taken Sgt. Crisafulli recommended that "mechanical restraints" be placed on the plaintiff before the nurse entered Plaintiff's cell. (Pl.'s Opp'n to Crisafulli ¶ 16.) However, despite the decision to allow the nurse to enter Plaintiff's cell, Plaintiff refused to see the nurse, and remained steadfast in her decision. (Pl.'s Opp'n to Crisafulli ¶ 16; Crisafulli Aff. ¶ 16)

**\*4** As a result of the alleged forced used by various correction officers, Plaintiff sustained bruises to her arms, a knot on her back and soreness and redness around her vaginal area. (Pl.'s Opp'n to Schurmann ¶ 17.)

Subsequently, Sgt. Crisafulli, C.O. Schurmann, and C.O. Ford filed separate misbehavior reports against the Plaintiff for violating various New York State Department of Correctional Services ("NYSDOCS") Rules and Regulations. Following separate disciplinary hearings on the reports Plaintiff was found to have in fact violated the rules and regulations enumerated in the misbehavior reports. (Pl .'s Opp'n to Crisafulli ¶ 17; Pl.'s Opp'n to Schurmann ¶ 16; Pl.'s Opp'n to Ford ¶ 11; Defs.' 56.1 Stmt. ¶ 56–61.)

**C. "Feed Slot Incident"**

On July 2, 1998 Plaintiff contends that since her various pleas to staff for mental health attention were ignored, (Pl.'s Opp'n to Rielly ¶ 4), she tied a blanket to the feed slot of her cell to prevent it from closing. This enabled Plaintiff to more readily attract staff's attention. (Id.) Lt. Rielly arrived at the SHU and was informed that Plaintiff refused to close the feed slot of her cell door. (Id.; Defs.' 56.1 Stmt. ¶ 62.) After being told to close her feed slot Plaintiff refused and renewed her request for mental health attention. (Pl.'s Opp'n to Rielly ¶ 5.) Plaintiff positioned her arms out of the slot to protest the staff's neglect of her requests. [7] Lt. Rielly ordered Correction Officers Middleton and Virella to place her arms back in the cell. (Pl.'s Opp'n to Rielly ¶ 6; Defs.' 56.1 Stmt. ¶ 67.) Unsuccessful in their attempt, Lt. Rielly then cut the blanket off the slot with a Swiss Army Knife. The Parties dispute whether Rielly's use of his knife injured the Plaintiff. Defendants claim that the blanket was removed without any

injury to the Plaintiff. (Defs.' 56.1 Stmt. ¶¶ 68–9; Rielly Aff. ¶ 7.) Plaintiff alleges Lt. Rielly cut her face. (Pl.'s Opp'n to Rielly ¶ 7.) [8] Subsequently, C.O.s Gentile and MacEsker were summoned to the SHU to assist in a second attempt to place Plaintiff's arms inside her cell. (Pl.'s Opp'n to Rielly ¶ 8; Defs.' 56.1 Stmt. ¶ 71.) Defendants assert that after Plaintiff ignored Gentile's order to place her arms in her cell, Gentile held Plaintiff's left forearm while MacEsker applied "the bent wrist come along" to Plaintiff's right arm, a move approved by the NYSDOCS. [9] (Defs.' 56.1 Stmt. ¶¶ 74–75.) Plaintiff maintains that C.O.s Gentile and MacEsker punched and kicked her arms in order to get them inside the cell. (Pl.'s Opp'n to Rielly ¶ 9.) Plaintiff also claims that C.O. Gentile never "communicated with [Plaintiff] verba[ly] through the entire incident." (Id.) Furthermore, Plaintiff alleges that C.O. MacEsker twisted her right arm to its snapping point, and placed it under strenuous pressure by bouncing his weight on it until the pain became unbearable. (Id.) Plaintiff then backed away from the slot and it was closed. (Id.) Plaintiff sustained bruises to her forearms due to the officers' force. (Id.)

**\*5** A nurse arrived in the SHU to examine the Plaintiff. (Defs.' 56.1 Stmt. ¶ 76.) Defendants contend Plaintiff refused to be seen by her, placing a sanitary napkin over the plexiglass portion of the gate. (Defs.' 56.1 Stmt. ¶ 77.) Plaintiff asserts that since she was denied the opportunity to have a full examination, she ignored the nurse and the officers. According to Plaintiff, the nurse only wanted "to look" at Plaintiff, not examine her. (Pl.'s Opp'n to Rielly ¶ 10.) One of the officers was able to displace the sanitary napkin and the nurse observed Plaintiff standing against the wall of her cell. (Defs.' 56.1 Stmt. ¶¶ 78–9.) The nurse observed nothing to suggest that Plaintiff was in need of further medical attention. (Defs.' Notice of Motion Ex. B, Doc. # 0000027 (stating that Plaintiff did not seem to be in any distress, and did not behave in "any manner suggesting the need for medical attention").)

As noted above, Plaintiff allegedly sustained a cut on her left arm from Lt. Rielly's knife and bruises to her forearm from alleged punches and kicks from C.O.s Gentile and MacEsker. (Pl.'s Opp'n to Rielly ¶ 7; Pl.'s Opp'n to MacEsker ¶ 8.) After this incident Plaintiff was again charged with various violations of NYSDOCS Rules and Regulations. (Defs.' 56.1 Stmt. ¶ 81–6.) Of the violations charged, Plaintiff was found to have (1) interfered with an employee, (2) refused to obey a direct order, (3) created a disturbance, and (4) stole, destroyed or damaged property of another. (Defs.' 56.1 Stmt. ¶¶ 84, 86.)

Plaintiff was found not guilty of the violent conduct and threat charges. (Longo Decl. Ex. C.)

## II. DISCUSSION

The Court's role on a motion for summary judgment is not to resolve disputed issues of fact, but to determine whether there are any genuine issues for trial. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (stating that summary judgment requires that there be "no genuine issue of material fact"); *Corselli v. Coughlin,* 842 F.2d 23, 25 (2d Cir.1988) (holding that summary judgment was inappropriate when there were "obvious factual conflicts in the record").

In assessing whether summary judgment should be granted, the Court must "resolv[e] ambiguities and draw[ ] reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986). "Viewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991) If the nonmovant's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (citations omitted). A party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight,* 804 F.2d at 12.

**\*6** However, since Plaintiff is proceeding *pro se* she is entitled to special latitude. *See McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (stating that courts "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest' ") (quoting *Burgos v. Hopkins,* 14 F .3d 787, 790 (2d Cir.1994)).

## A. Eighth Amendment Claims

To state a claim under § 1983, Plaintiff must establish that (1) the conduct in question deprived her of rights, privileges, or immunities secured by the Constitution or laws of the United States, and (2) the conduct complained of was committed by a person acting under color of state law. *See Santiago v. Campisi,* 91 F.Supp.2d 665, 672 (S.D.N.Y.2000) (citing

*Gomez v. Toledo,* 446 U.S. 635, 640 (1980)). Here, Plaintiff alleges Defendants violated her Eighth Amendment rights. Specifically, Plaintiff contends Bedford Hills Correctional Officers used excessive force during both The Shower Incident and The Feed Slot Incident. Plaintiff also argues that the correctional officers demonstrated a deliberate indifference to her medical needs after both of these incidents by not allowing her a full medical examination.

### 1. Excessive Force

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," including the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976). " '[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." ' *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999) (quoting *Helling v. McKinney,* 509 U.S. 25, 32 (1993)). To establish an excessive force claim under the Eighth Amendment, a plaintiff must satisfy both an objective and a subjective component. *Hudson v. McMillian,* 503 U.S. 1, 8–9 (1992).

### a. Objective Component

To satisfy the objective component, the injury actually inflicted must be sufficiently serious to warrant Eighth Amendment protection. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). The Eighth Amendment "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. 9–10 (internal quotataions omitted). Defendants argue that the injuries Plaintiff complains to have sustained are *de minimis.* In addition, Defendants argue that the Plaintiff's claim is defective since the complained of physical contact did not cause her serious pain or significant injury. (Defs.' Mem. Law at 13.)

Resolving all ambiguities and drawing reasonable inferences against the Defendants, the Court finds that the injuries Plaintiff sustained from each incident were not *de minimis* as a matter of law. As a result of both incidents, Plaintiff claims to have suffered bruises, a knot in her back, soreness and redness in her vaginal area and a knife wound on her right arm. As an initial matter, an excessive force claim does not, as Defendants contend, require that a plaintiff suffer serious pain or significant injury. *See Griffin v. Crippen,* 193 F.3d 89, 92 (2d Cir.1999) (stating that a plaintiff "need not prove

'significant injury' to make out an excessive force claim and, thus, the fact that [a plaintiff] suffered only minor injuries does not warrant dismissal"); *see also Hudson,* 503 U.S. at 9 (stating that Eighth Amendment may be violated "whether or not significant injury is evident"). Injuries like those which the Plaintiff complains are regarded as more than *de minimis* and have survived motions for summary judgment. *See, e.g., Griffin,* 193 F.3d at 92 (finding a bruised shin and swelling over the left knee were not *de minimis* as a matter of law); *Miner v. Ramsey,* No. 99 Civ. 11661, 2001 WL 540746, at *3 (S.D.N.Y. May 22, 2001) (denying summary judgment where plaintiff allegedly sustained bruised and swollen wrist after officer slammed plaintiff into a van); *Crawford v. Braun,* No. 99 Civ. 5851, 2001 WL 127306, at *4 (S.D.N.Y. Feb. 9, 2001) (denying summary judgment where plaintiff sustained discoloration of forehead from an alleged blow to the face and swollen wrists from the use of extremely tight handcuffs; plaintiff also alleged he was subjected to force on his arms which he characterized as an attempt to break them); *Davis v. Patrick,* No. 92 Civ. 0548, 2000 WL 1154065, at *2–3 (S.D.N.Y. Aug. 14, 2000) (denying summary judgment where plaintiff alleged he sustained bruises, claw marks, and a blood line on his left arm, and bruises on his neck even though when he was examined the injuries were no longer visible); *Carter v. Kiernan,* No. 98 Civ. 2664, 2000 WL 760303, at *4–5 (S.D.N.Y. June 12, 2000) (maintaining a swollen ankle, bruised knee, cuts on the wrist and forehead, lumps on the jaw, forearms, and elbow, as well as tenderness of the scalp were more than *de minimis,* and summary judgment was inappropriate). Accordingly, this Court finds that the Plaintiff's injuries allegedly sustained as a result of each incident are not *de minimis* as a matter of law. Whether Plaintiff's injuries were sufficiently serious as to satisfy the objective element of Plaintiff's excessive force claims is for the jury to decide. [10]

### b. Subjective Component

**\*7** To satisfy the subjective component the inmate must show that the prison officials involved "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994). In a case involving the alleged use of excessive force by prison officials, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7. "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between

that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response." ' *Id.* at 8 (quoting *Whitley v. Albers,* 475 U.S. 312, 321 (1986)).

Where conflicts exist in the record regarding the degree and justification for the use of force, dismissal is inappropriate. *See, e.g., Griffin,* 193 F.3d at 91 (concluding dismissal inappropriate because there were genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him); *Davidson,* 32 F.3d at 30 (finding material questions of fact remained as to whether the proffered justification for the force used made it necessary for defendants to shackle plaintiff so tightly as to cause severe pain and permanent injury); *Moore v. Ortiz,* No. 93 Civ. 2626, 1998 WL 226195, at *2 (S.D.N.Y. May 4, 1998) (denying summary judgment due to material disputes regarding defendants' claim that they were acting in a manner to protect themselves when plaintiff lunged at them in a threatening manner, while plaintiff denied lunging at defendants and claims he obeyed orders); *Ortiz v. Pearson,* 88 F.Supp.2d 151, 160 (S.D.N.Y.2000) (finding conflicting evidence in the record as to whether the defendants acted with a malicious and sadistic intent or whether they were simply applying force in a good-faith effort to maintain discipline, which is more appropriately resolved by a jury). As in the cases cited above, disputed issues of material fact remain concerning the amount of force used during both incidents, and the manner with which that force was exercised, i.e. whether the force was applied in good-faith or maliciously and sadistically.

### i. Shower Incident

During the Shower Incident, Plaintiff claims Bedford Hills Correctional Officers pushed her into a door, punched her in the face, swept her feet causing her to fall to the floor, and kicked her in the back and vaginal area. Defendants however, deny Plaintiff's claims of force and assert that they acted in good-faith in order to prevent Plaintiff from harming herself and further disrupting order in the SHU. (Defs.' Mem. Law at 19.) While Plaintiff admits that she was agitated and argued with C.O. Brown and Sgt. Crisafulli she denies acting in a threatening manner. (Plaintiff's Opp'n to Brown ¶ 5.) Further, Plaintiff denies attempting to head butt Sgt. Crisafulli. (Plaintiff's Opp'n to Crisafulli ¶ 6.) Thus, crediting the Plaintiff's story, the push into the door would not appear to be force applied in good-faith to restore order. A reasonable jury could find that the push was delivered with

frustration and with the purpose of injuring the Plaintiff. The alleged punch in the face delivered to the Plaintiff in the shower is disputed by the Defendants. Even if the Plaintiff was acting in an uncooperative manner from her suicidal episode, a reasonable jury could find that a blow to the face was delivered maliciously and sadistically. Of the many possible ways to use force in order to control a suicidal inmate, an alleged punch in the face is too peculiar and cannot, as a matter of law, be said to fit within the good-faith safety harbor of the Eighth Amendment's subjective component. Finally, the facts and circumstances surrounding the alleged leg sweep and the kicks to the Plaintiff's back and groin area are sufficiently unclear for this Court to make any determination, at this time, whether this use of force was justified. The issue raised is whether the alleged forced used by the correctional officers against the Plaintiff was warranted in light of Plaintiff's suicide attempts and alleged refusals to comply with the officers' requests to exit the shower and stay in her cell. This is a factual determination that must be resolved by a jury.

### ii. Feed Slot Incident

**\*8** Disputed issues of material fact likewise make summary judgment inappropriate with respect to the Feed Slot Incident. Resolving factual disputes in the light most favorable to the nonmoving party, Plaintiff did not threaten any officers on the day her pleas for a mental health evaluation were ignored. Since, according to Plaintiff, "an inmate must go to extremes before such requests are even acknowledged," (Pl.'s Opp'n to Rielly ¶ 4), she tied a blanket to her feed slot. The space created by the blanket allowed Plaintiff to continue her protest by waving her arms outside the cell. In the course of placing Plaintiff's arms back in her cell, Defendants allegedly cut her arm with a knife, punched and kicked her arms and bent her right arm to its breaking point. Defendants deny the allegations of punching and kicking her arms and claim they used the "bent wrist come along" maneuver that is approved by the NYSDOCS.

Again, there are genuine issues of material facts as to whether the Defendants acted with a sufficiently culpable state of mind. If fact finders credit the Plaintiff's version of The Feed Slot Incident, there appears to be little justification for the amount of the force used against the Plaintiff. Further, it is not unreasonable to construe Rielly's statement " 'You don't want to move your arm? I bet you [sic] move them now[.']", if made, as suggesting that he maliciously and sadistically wielded the knife so to injure the Plaintiff. Also, Plaintiff's averment that C.O. Gentile never verbally ordered

Plaintiff to desist from her allegedly disruptive activities, but rather punched and kicked Plaintiff's arms along with C.O. MacEsker also creates a genuine issue of material fact as to whether Gentile and MacEsker acted maliciously.

In sum, Defendants have failed to establish as a matter of law that Plaintiff's injuries are not serious enough to trigger Eighth Amendment protection, nor, have Defendants demonstrated that the circumstances surrounding Plaintiff's claims establish that Defendants acted in good-faith as a matter of law. Accordingly, Defendants' motion for Summary Judgment on Plaintiff's excessive force claims is DENIED.

### 2. Deliberate Indifference to Medical Needs

"An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met ." *West v. Atkins,* 487 U.S. 42, 54 (1988) (citing *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)). "In light of this, the [Supreme] Court held that the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated." *West,* 487 U.S. at 54. To establish an unconstitutional denial of medical care, a prisoner must prove a deliberate indifference to serious medical needs. *Estelle,* 429 U.S. at 104; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Deliberate indifference to medical needs, like an excessive force claim, also requires that a plaintiff satisfy an objective and a subjective component. *Hathaway v. Coughlin,* 37 F .3d 63, 66 (2d Cir.1994)." To satisfy the objective prong, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)." To be sufficiently serious the deprivation must contemplate " 'a condition of urgency, one that may produce death, degeneration or extreme pain." ' *Hathaway,* 37 F.3d at 66 (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). "A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (internal quotations omitted). The subjective prong requires that the plaintiff demonstrate the official acted with a sufficiently culpable state of mind. *Wilson,* 501 U.S. at 298. "The required state of mind, equivalent to criminal recklessness, is that the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

a. Seriousness of the Deprivation

**\*9** It is well established that more than minor discomfort or injury is required in order for a plaintiff to demonstrate a serious medical need. *Compare Sonds v. St. Barnabas Hosp. Correctional Health Servs.,* No. 00 Civ. 4968, 2001 WL 664402 (S.D.N.Y. May 21, 2001)* ("cut finger, even where skin is 'ripped off,' ... does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief"); *Henderson v. Doe,* No. 98 Civ. 5011, 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (broken finger does not rise to sufficient level of urgency); *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999) (foot condition involving a fracture fragment, bone cyst and degenerative arthritis not sufficiently serious) *with Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (asserting that suffering "great pain" for six months from abscessed teeth where plaintiff could not chew properly and choked on his food, arose to the level of sufficiently serious condition); *Hathaway,* 37 F.3d at 67 (finding that plaintiff had serious medical needs where his degenerative hip condition required surgery prior to incarceration and produced extreme pain that led to registered complaints on almost seventy occasions).

The severity of Plaintiff's alleged injuries do not warrant Eighth Amendment protection under a deliberate indifference theory. Unlike the excessive force standard, deliberate indifference requires injuries that demonstrate urgency leading to death, degeneration or extreme pain. *Hathaway,* 37 F.3d at 66. In this case, Plaintiff complains of soreness and redness to her vaginal area, bruises, a knot on her back and a cut on her right forearm. These injuries simply do not satisfy the objective component of a deliberate indifference claim. Rather, they are superficial injuries that require time to heal. Indeed, there is little that can be done to assist the healing of a bruise or a knot in the back. The same is true for an injury marked by soreness or redness. As for the knife wound, nothing in the record suggests that it caused Plaintiff extreme pain. Further, and as discussed in greater detail *infra,* after each incident Plaintiff refused to cooperate with the nurse who arrived at her cell door. Plaintiff's refusal to cooperate with the nurse belies any claim of extreme pain or degeneration sufficient to satisfy the objective prong of a medical indifference claim.

Accordingly, the Court finds that Defendants are entitled to summary judgment on Plaintiff's deliberate indifference to medical needs claim. Nevertheless, even assuming *arguendo* that Plaintiff's injuries are sufficiently serious, Plaintiff

still fails to demonstrate that the Defendants acted with a sufficiently culpable state of mind. Even when drawing every inference in favor of Plaintiff, her allegations of deliberate indifference are legally insufficient.

b. Deliberate Indifference

Deliberate indifference requires that the official knows of and disregards an excessive risk to inmate health or safety. *Hemmings,* 134 F.3d at 108. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.* "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66; *see also Farmer,* 511 U.S. at 836 ("[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

**\*10** Where the treatment provided is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation. *Chance,* 143 F.3d at 703; *see also Reyes v. Turner,* No. 93 Civ. 8951, 1996 WL 93728, at *9 (S.D.N.Y. Mar. 5, 1996) ("Plaintiff's preference for an examination by a physician does not sustain a claim for denial of medical assistance. 'There is no right to the medical treatment of one's choice if the prescribed treatment is based upon applicable medical standards." ' (quoting *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988))). Furthermore, an inmate's refusal to accept medical treatment in no way signifies a deliberate indifference to serious medical needs. *See Ruffin v. Deperio,* 97 F.Supp.2d 346, 355 (W .D.N.Y.2000) (citing *Brown v. Selwin,* No. 98 Civ. 3008, 1999 WL 756404, at *6 (S.D.N.Y. Sept. 24, 1999) (finding no deliberate indifference when it was uncontroverted that plaintiff refused medical treatment on several occasions); *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (plaintiff's removal from special diet did not constitute deliberate indifference where plaintiff refused to eat the meals provided to him); *Ross v. Kelly,* 784 F.Supp. 25, 46–47 (W.D.N.Y.1992) (no deliberate indifference where plaintiff to blame for delays in treatment in part due to refusal of treatment).

i. The Shower Incident

Immediately after the Shower Incident, a nurse was available to Plaintiff, thereby negating any notion of outright denial or delay in providing medical attention. Rather than showing

deliberate indifference, the nurse's availability demonstrates that Defendants attended to Plaintiff with "sufficient speed." See *Simmons v. Artuz,* No. 94 Civ. 6777, 1996 WL 233504, at *4 (S.D.N.Y. May 8, 1996) (plaintiff's injuries were treated with "sufficient speed" when he was injured in the morning and treated by an evening-duty nurse). Drawing every inference in favor of Plaintiff and assuming the officers would not allow the nurse access to the cell at first, Plaintiff verbally articulated her concerns about the kick to her groin area. However, once the decision was made to allow the nurse to enter the cell once "mechanical restraints" were in place, Plaintiff refused to see the nurse despite attempts to persuade her otherwise. (Pl.'s Opp'n to Crisafulli 16; Crisafulli Aff. 16.) Here, Plaintiff was not denied medical treatment, and no Defendant exhibited deliberate indifference to her medical needs. A nurse was available to the Plaintiff soon after she was taken back to her cell. Given Plaintiff's refusal to cooperate with the prison officials, coupled with her admitted refusal to allow the nurse to enter her cell, this Court GRANTS Defendants' Summary Judgment Motion on Plaintiff's deliberate indifference claim arising out of the Shower Incident.

ii. The Feed Slot Incident
Similarly, Plaintiff was not denied medical care after the Feed Slot Incident. Although a nurse arrived in the SHU to examine Plaintiff, Plaintiff refused to cooperate. (Defs.' 56.1 Stmt. ¶ 76; Defs.' Notice of Motion Ex. B.) Instead, Plaintiff placed a sanitary napkin over the plexiglass portion of the door to obstruct the nurse's view. (Pl.'s Opp'n to Rielly ¶ 10.) According to Plaintiff, she refused to cooperate because the nurse would not provide her with a full examination. (Pl.'s Opp'n to Rielly ¶ 10–11.) Nevertheless, one of the officers was able to displace the sanitary napkin and the nurse observed Plaintiff standing against the wall of her cell. The nurse observed nothing to suggest that Plaintiff was in need of further medical attention. (Defs.' Notice of Motion Ex. B, Doc # 0000027.) Communication between a prospective patient and her treating physician or nurse is necessary to the effective treatment of a patient's ailments. Having failed to communicate anything to the nurse, Plaintiff may not argue that the prison officials she names as Defendants in this action somehow exhibited deliberate indifference to her medical needs. Since the Plaintiff was not denied medical care, but rather refused to cooperate with the nurse provided, Plaintiff did not suffer deliberate indifference to her medical needs.

**\*11** Accordingly, Plaintiff's fails to meet the objective prong of the deliberate indifference standard—as her injuries

are insufficient to rise to the level of a serious medical condition. Furthermore, considering medical attention was available to Plaintiff after both incidents, there is no evidence that Defendants demonstrated a sufficiently culpable state of mind to deprive or delay Plaintiff medical treatment. Thus, Defendants are therefore GRANTED summary judgment on both of Plaintiff's medical indifference claims.

B. Qualified Immunity
Although Plaintiff has sufficiently established a viable Eighth Amendment claim based on excessive force, Defendants contend they are nonetheless entitled to qualified immunity. Public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *Weyant v. Okst,* 101 F.3d 845, 857 (2d Cir.1996). The availability of the defense depends on whether a "reasonable officer could have believed" his action "to be lawful, in light of clearly established law and the information he possessed." *Anderson v. Creighton,* 483 U.S. 635, 441 (1987).

At the time of the complained of incidents, the legal principles governing the use of excessive force and deliberate indifference to serious medical needs were well established. Whether the conduct of the officers was reasonable in light of Eighth Amendment jurisprudence depends upon whose story the jury credits. Since genuine issues of material facts exist as to the Plaintiff's excessive force claims, the officers' qualified immunity cannot be resolved as a matter of law. *Compare Weyant,* 101 F.3d at 858 (finding facts sharply in dispute and that the matter of qualified immunity could not be resolved as a matter of law); *with Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995) (asserting that when the factual record is not in serious dispute, the ultimate legal determination of qualified immunity is a question of law left for the court to decide); *and Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990) ("Once disputed factual issues are resolved, the application of qualified immunity is ... ultimately a question of law for the court to decide.") Accordingly, this Court rejects Defendants' contention that on this record, they are entitled to qualified immunity.

C. Eleventh Amendment
Under the Eleventh Amendment, federal courts generally lack jurisdiction over suits brought by a private party against a state, unless the state has consented to suit or Congress has expressly abrogated the state's immunity. *See Board of*

*Trustees v. Garrett,* 121 S.Ct. 955, 962 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."). Where state officials, rather than the state, are named defendants, the Eleventh Amendment will still bar the suit if "the state is the real, substantial party in interest." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984). Therefore, suits for money damages brought against state officials in their official capacities are barred by the Eleventh Amendment. *See Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir.1997); *see also Kostok v. Thomas,* 105 F .3d 65, 69 (2d Cir.1997). Nonetheless, it is well settled that the Eleventh Amendment does not bar suits against state officials in their individual capacities. *Hafer v. Melo,* 502 U.S. 21, 31 (1991); *Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993).

**\*12** Defendants argue to the extent that Plaintiff names them in their official capacities and seeks damages from Department of Correctional Services officials, the Court is without jurisdiction to hear the claim. (Defs.' Mem. Law at 24.) While the Defendants are correct in this assertion, Plaintiff's failure to specify that her claims are asserted against the state officials in their individual capacities does not justify an outright dismissal. *Belli v. Supple,* No. 98 Civ. 0772, 1999 WL 461002, at \*2 (S.D.N.Y. July 7, 1999) (citing *Oliver Schools Inc. v. Foley,* 930 F.2d 248, 252 (2d Cir.1991)).

Since Plaintiff is a *pro se* litigant the Court interprets her pleadings to raise the strongest arguments they suggest. *McPherson v. Coombe,* 174 F.3d at 279. Upon a liberal reading of Plaintiff's Complaint and other pleadings, this Court finds that Plaintiff intended to assert claims against Defendants in their individual capacity. Plaintiff's use of the Defendants' official titles in her pleadings is not enough to show that she intended to sue them only in their official capacities. *George v. Lorenzo,* No. 98 Civ. 0769, 1999 WL 397473, at \*2 (S.D.N.Y. June 15, 1999). Accordingly, to the extent Plaintiff seeks to sue Defendants in their official capacities, those claims are DISMISSED. The claims against the Defendants in their individual capacities survive.

### III. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is DENIED in part and GRANTED in part. Genuine issues of material fact remain as to Plaintiff's excessive force claims. Plaintiff, however, fails to state a claim of deliberate indifference to her serious medical needs. These claims are therefore dismissed. There can be no resolution of the qualified immunity defense since genuine issues of material fact are in dispute. Finally, this Court rejects Defendant's Eleventh Amendment argument and retains subject matter jurisdiction of Plaintiff's claims.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 1150318

---

Footnotes

1     Plaintiff submitted Opposition Statements to Defendants' Affidavits in lieu of a statement pursuant to Local Rule 56.1. These statements shall be cited as "Pl.'s Opp'n to _____ ¶ ___." The Court accepts Plaintiff's Opposition Statements as her 56.1 Statement and shall decide this motion as it is clear Plaintiff understood the nature and consequences of summary judgment. *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 621 (2d Cir.1999).

2     C.O. Brown claims that Plaintiff threatened her on June 28, 1998. (Brown Aff. ¶ 4; Crisafulli Aff. ¶ 4.) Plaintiff disputes this fact, and points out that no "deprivation order" or other report was filed in connection with this alleged threat. (Pl.'s Opp'n to Brown ¶ 4; Pl.'s Opp'n to Crisafulli ¶ 4.)

3     Apparently C.O. Ford observed Plaintiff being escorted to the shower. The record is unclear at what point C.O. Ford joined C.O. Brown and Crisafiulli in accompanying Plaintiff to the shower.

4     The Plaintiff claims that during much of the shower incident, if not its entirety, she was handcuffed. Defendants do not make or directly respond to this claim. However, both parties agree that Plaintiff did attempt to hang herself while in the shower. The Court does not make any finding with respect to whether the Plaintiff was in fact wearing handcuffs, and at what time if any said handcuffs were removed. To be sure, while in the shower Plaintiff told C.O. Ford "I'm not leaving the shower and giving up cuffs." (Ford Aff. ¶ 6.) It is unclear what Plaintiff meant by this statement. However, Plaintiff clearly asserts that she was in handcuffs while in the shower and that these handcuffs were not removed. (Pl.'s Opp'n to Ford ¶ 6.)

5     Although it is unclear what happened after C.O. Schurmann cut Plaintiff down a second time, it appears as if Schurmann exited the shower and locked the door. The Court draws this inference from the fact that (1) Schurmann cut the curtain to prevent the second suicide attempt, (Crisafulli Aff. ¶ 8), (2) Lt. Tiberia ordered Crisafulli to have Plaintiff removed from

the shower, (*id.*), and (3) in response, Crisafulli ordered Schurmann, Johnson, and Ford to accompany him to the shower to remove the Plaintiff, (Defs.' 56.1 Stmt. ¶ 35).

6    Unfortunately, neither party has seen fit to attach copies of the photographs to their motion papers.

7    Defendants claim that Plaintiff also threatened to douse staff with feces if the officers did not step away from her cell, thereby creating a hazardous situation in the corridor. (Defs.' 56.1 Stmt. ¶¶ 64, 66.) Plaintiff denies making any threats at all. (Pl.'s Opp'n to Rielly ¶¶ 5–6.)

8    Plaintiff states that once Rielly saw Middleton and Virella having difficulty with the Plaintiff "he produced a Swiss Army Knife, (Approx[imately] 4 inches long) which is not the standard knife thats [sic] permitted in the facility, [sic] prior to using it to cut the material he stated 'You don't want to move your arm? I bet you [sic] move them now [.']][H]e then began cutting at the fabric, and in the course of his actions he cut me on my left arm. When I noticed the cut I stated that I wanted to see medical. Furthermore, Lt. Rielly coached his officers and told them to say the wound I had on my arm was a self inflicted burn that I reopened, which is not true." (Pl.'s Opp'n to Rielly ¶ 7.)

9    Defendants have offered no explanation of what "the bent wrist come along" entails.

10   The Defendants also argue that since the Plaintiff's injuries are *de minimis* the Plaintiff has failed to state a claim for mental or emotional injury. Pursuant to 42 U.S.C. § 1997e(e) "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." However, since Plaintiff has sustained injuries that are more than *de minimis* she has satisfied the physical injury requirement of 42 U.S.C. § 1997e(e). *See Cole v. Artuz,* No. 97 Civ. 0977, 2000 WL 76749, at *4 n. 2 (S.D.N.Y. June 12, 2000) (stating that the 1997e(e) standard is essentially the same as the standard under the Eighth Amendment, and recognizing that the determination regarding the sufficiently of harm under the Eighth Amendment resolves any argument pursuant to 1997e(e) concerning the physical injury requirement (citing *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir.1997)); *see also Warren v.. Westchester County Jail,* 106 F.Supp.2d 559, 570 (S.D.N.Y.2000) (dismissing claim for emotional distress where the plaintiff's injuries were *de minimis* ).

---

**End of Document**                                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 770087
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gene M. Coffeey, Plaintiff,

v.

N. Hollenbeck; et al., Defendants.

No. 9:14–CV–196 (DNH/CFH)
|
Signed 01/27/2016

**Attorneys and Law Firms**

GENE M. COFFEEY, Plaintiff Pro Se, 34611, CNYPC,
P.O. Box 300, Marcy, New York 13403.

COLLEEN D. GALLIGAN, ESQ., Assistant Attorney
General, HON. ERIC T. SCHNEIDERMAN, Attorney
General for the State of New York, Attorney for
Defendants, The Capitol, Albany, New York 12224-0341.

**REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE
JUDGE

**\*1** Plaintiff Gene M. Coffeey ("Coffeey" or "Plaintiff"),
a resident of Central New York Psychiatric Center
("CNYPC") who was, at all relevant times, in the custody
of the New York State Office of Mental Health ("OMH"),
brings this action pursuant to 42 U.S.C. § 1983. Dkt.
No. 1 ("Compl."). Presently before the undersigned is
defendants' motion for summary judgment pursuant to
Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 56.
Dkt. No. 24. Coffeey did not oppose the motion. For
the following reasons, it is recommended that defendants'
motion be granted.

## I. FAILURE TO RESPOND

Coffeey failed to submit any opposition papers to
defendants' motion for summary judgment. Coffeey
requested an extension of time to file his response to
the present motion. Dkt. No. 31. Despite the Court
granting two extensions, Coffeey has not submitted an

opposition to defendants' motion for summary judgment.
Dkt. Nos. 32, 36. Coffeey was notified of the consequences
of failing to respond to a summary judgment motion. [2]
Dkt. No. 27. Given this notice and the two extensions for
Coffeey to file opposition papers, it is readily apparent
that Coffeey was adequately apprised of the pendency of
the motion and the consequences of failing to respond.
"Where a non-movant fails to adequately oppose a
properly supported factual assertion made in a motion
for summary judgment, a district court has no duty to
perform an independent review of the record to find proof
of a factual dispute, even if that non-movant is proceeding
*pro se*." *Jackson v. Onondaga County,* 549 F.Supp.2d 204,
209 (N.D.N.Y.2008) (footnotes omitted). [3]

## II. BACKGROUND

In support of the motion, defendants filed a Statement of
Material Facts. [4] To the extent that the "facts" asserted by
defendants are supported by the record, the undersigned
will consider them in the context of the within motion. The
facts recited are for the relevant time period as referenced
in the complaint.

### A. Facts

**\*2** The facts are related herein in the light most favorable
to Coffeey as the nonmoving party. *See* subsection III(A)
*infra.* At the time of the incidents described in the
complaint, Coffeey was confined at CNYPC. Dkt. No.
24–1 (Statement of Material Facts) ¶ 1.

### 1. Coffeey's Confinement from May
### 28, 2013 through June 10, 2013

On May 28, 2013, at approximately 5:36 a.m., Coffeey
was observed skipping his turn for the shower. Dkt. No.
25 (Exhibit A to the Affirmation of Colleen D. Galligan
("Galligan Aff.")) at 8. [5] When he was confronted by
staff, Coffeey became loud and argumentative. *Id.* On
the same day, the Treatment Team Leader issued a "Loss of
Privileges" report indicating that Coffeey would be last on
the Unit Shower List, effective May 29, 2013. Dkt. No.
25–1 (Galligan Aff. Exh. A) at 48.

On May 30, 2013, at approximately 8:20 a.m., a Secure Care Treatment Aide ("SCTA") observed Coffeey become "verbally and physically assaultive once he was told about the restriction" imposed by the Treatment Team. Dkt. No. 25 at 20. Coffeey was "pointing and swinging his ... closed fist." [6] *Id.* The SCTA "dropped the red phone" and plaintiff was directed to the "side room." *Id.* Plaintiff received medication and breakfast without further incident. *Id.*

On May 30, 2013, at 12:15 p.m., due to Coffeey's "threatening and impulsive behavior," a physician completed a "Physician Order Form—Constant Observation." [7] Dkt. No. 25–1 at 50–51. The Order would remain in effect until May 31, 2013 at 12:15 p.m. *Id.* The Order restricted Coffeey to "finger food" and removed him from off-ward activity. [8] *Id.* Coffeey was ordered to eat and sleep in the side room and was not permitted to use any sheets, pillow cases, razors or pens. *Id.* at 50. The CNYPC Constant Observation Policy mandates that the "prescriber[,]" "must [reassess] the patient/resident at least every 24 hours, and write[ ] a new order ... to extend Constant Observation." Dkt. No. 26 (Exhibit A to the Declaration of Anthony Gonzalez ("Gonzalez Decl.")) at 55.

On May 30, 2013, at approximately 2:06 p.m., plaintiff began "yelling" and "swearing" at an SCTA and insisted on eating in the dining room. Dkt. No. 25 at 22. Coffeey was "loud and argumentative" as he returned to his room. [9] *Id.* Later that evening, Coffeey told a nurse, "I feel like hurting myself." Dkt. No. 26–1 (Exhibit A to the Declaration of Nicholas Hollenbeck ("Hollenbeck Decl.")) at 5. Dr. Kaskiw was notified, spoke with Coffeey and prescribed medication. [10] *Id.*

On May 31, 2013, Coffeey was observed "mumbl[ing] indiscernibly, pac[ing] in the sideroom[,]" and "glar[ing] at [the] nurse." Dkt. No. 25 at 34. On May 31, 2013, due to plaintiff's "threatening and impulsive behavior," a physician renewed the Observation Order. Dkt. No. 25–1 [11] at 53–54. The Order imposed the same restrictions as the prior Order and remained in effect until June 1, 2013 at 12:15 p.m. *Id.* at 53.

**\*3** On June 1, 2013, Coffeey required numerous prompts to wake for medication, ignored staff's requests and was argumentative. Dkt. No. 25 at 43. On June 1, 2013,

due to plaintiff's "threatening and impulsive behavior," a physician renewed the Observation Order. Dkt. No. 25–1 [12] at 55–56. The Order imposed the same restrictions as the prior Orders and remained in effect until June 2, 2013 at 12:15 p.m. *Id.* When Coffeey was advised of the decision, he cursed at staff. Dkt. No. 25 at 43.

On June 2, 2013, Coffeey was upset because he slept in the side room. Dkt. No. 25 at 44. Coffeey became argumentative when staff explained the Constant Observation Order. *Id.* Due to plaintiff's "threatening and impulsive behavior," a physician renewed the Observation Order. Dkt. No. 25–1 [13] at 57–58. The Order imposed the same restrictions as the prior Orders and remained in effect until June 3, 2013 at 12:15 p.m. *Id.*

On June 3, 2013, due to plaintiff's "impulsive" behavior, a physician renewed the Constant Observation Order. Dkt. No. 25–1 [14] at 59–60. The Order imposed the same restrictions as the prior Orders and remained in effect until June 4, 2013 at 12:15 p.m. *Id.*

On June 3, 2013, at approximately 1:00 p.m., Coffeey was evaluated by a physician. [15] Dkt. No. 25 at 3–5. The physician discontinued the Constant Observation Order. *Id.* at 4. However, due to Coffeey's "threatening and daring" behavior, the physician placed Coffeey in the Motivation on Deck ("MOD") Unit and alternate sleep on Ward 504. [16] Dkt. No. 25–1 at 47. Coffeey refused to complete his behavioral chain analysis ("BCA") and refused to sign the MOD placement form. *Id.*

On June 4, 2013, at 10:03 p.m., defendant SCTA Nicholas S. Hollenbeck ("Hollenbeck") was on duty in Ward 405 and observed plaintiff consume his dinner, shower and use the bathroom. Dkt. No. 25 at 69. Hollenbeck prepared a Progress Note indicating that, "[r]esident remains on ward 504." *Id.* Coffeey was asked whether he wished to utilize the day room and Coffeey declined. *Id.* Coffeey was given a pen to complete his BCA. *Id.*

On June 7, 2013, June 8, 2013 and June 10, 2013 Coffeey was confined to Wards 405 and 504. Dkt. No. 25–1 at 1–21; Dkt. No. 26 at 12–17.

### 2. Correspondence with Mental Hygiene Legal Services and Investigation

On June 7, 2013, Megan E. Dorr ("Dorr"), Esq., Senior Attorney at Mental Hygiene Legal Services, sent a letter to defendant Anthony Gonzalez ("Gonzalez"), Director of Risk Management at CNYPC. Dkt. No. 24–4 (Declaration of Anthony Gonzalez) ¶¶ 1–2; Dkt. No. 26 at 24. Dorr conveyed Coffeey's concerns regarding his confinement to the side room from May 29, 2013 through June 3, 2013 without sheets, blankets, pens or paper. Dkt. No. 26 at 24. Coffeey also claimed that he was not permitted to call his family, receive mail or correspond with his family or counsel. *Id.* Coffeey further asserted that he was not seen by a physician during this time frame and that he was unable to complete his BCA because he was not provided with any assistance. *Id.* Dorr asked Gonzalez to investigate the matter. *Id.* Dorr did not identify any staff member. *Id.*

**\*4** Gonzalez treated the letter as a complaint and assigned Tad Adams ("Adams"), a Risk Management Specialist, to review the allegations and formulate a response.[17] Gonzalez Decl. ¶¶ 13–14. Adams reviewed Coffeey's treatment record including progress notes from his treatment team. Dkt. No. 26 at 18. Adams concluded that the decision to confine Coffeey to constant observation and temporary restrictions was reassessed daily by a physician in accordance with CNYPC policy. *Id.* at 19. On June 12, 2013, Adams responded to Dorr and annexed a copy of his Patient Complaint Summary. *Id.* at 18–19, 23. Adams advised Dorr that Coffeey was offered assistance with completing his BCA in a group setting on Wednesday evenings. *Id.* at 23. In this clinician-facilitated group, Coffey was afforded time to work on the BCA with staff assistance. *Id.*

On June 12, 2013, Gonzalez received a second letter from Dorr, dated June 11, 2013. Dkt. No. 26 at 4–5. Dorr indicated that Coffeey "fear[ed] for his safety" because he reported the alleged abuse to risk management. *Id.* at 4. Specifically, Coffeey reported to Dorr that, on two occasions, Hollenbeck removed food from Coffeey's tray. *Id.* Coffeey claimed that Hollenbeck unwrapped Coffeey's hamburger and bit a piece before offering it to Coffeey, ate Coffeey's sandwich, and removed his milk. *Id.* Coffeey alleged that Hollenbeck threatened him with returning Coffeey to ward 504, and physical assault, if he

reported the incidents. *Id.* Dorr requested an investigation and suggested that Gonzalez "take steps to protect" Coffeey from potential retaliation by staff members and to separate Coffeey from Hollenbeck. *Id.* Gonzalez assigned the matter to Valerie Nester ("Nester"), a Risk Management Specialist, for review.[18] Gonzalez Decl. ¶ 18.

On June 12, 2013, Nester interviewed Coffeey. Dkt. No. 26 at 1–2. Coffeey executed a written statement related to the incidents with Hollenbeck. *Id.* at 6–8. Coffeey claimed that he was sent to Ward 504 on June 3, 2013 at 12:30 p.m. *Id.* at 6. Coffeey was on Ward 504 until June 6, 2013. *Id.* Coffeey asserts that on June 7, 2013, Hollenbeck ate his food and on June 8, 2013, Hollenbeck took a bite out of Coffeey's hamburger and gave his drink to another aide. *Id.* at 6–7. Coffeey stated that on June 10, 2013, Hollenbeck threatened him and told him not to tell anyone, "what went on up on 504." *Id.* at 7. Hollenbeck warned that Coffeey should "remember what [Hollenbeck] did to [him] last time [Coffeey was] on 401." *Id.* Coffeey alleged that Hollenbeck then "slammed" his head into a window screen and put his hands around Coffeey's neck. *Id.* at 7–8. Coffeey reported that there were no staff or resident witnesses to these occurrences. *Id.* at 8.

On June 19, 2013, Nester interviewed SCTA David Paulson ("Paulson"). Dkt. No. 26 at 1. Paulson executed a written statement indicating that he was working on Ward 504 on June 7, 2013 and June 8, 2013. *Id.* at 9. Paulson did not see anyone eat Coffeey's food or threaten Coffeey. *Id.* Paulson did not see Hollenbeck put his hands on Coffeey. *Id.*

On June 20, 2013, Nester interviewed Hollenbeck. Dkt. No. 26 at 1. Hollenbeck executed a written statement and asserted that he was not working on Ward 504 on June 7, 2013, June 8, 2013 or June 10, 2013. *Id.* at 10. Hollenbeck further claimed that he was not working on Ward 405 on June 10, 2013. *Id.* Hollenbeck conceded that he worked on Ward 504 for "a few shifts but [he] can't remember the exact dates." *Id.* Hollenbeck stated that he did not eat Coffeey's food, threaten Coffeey, or put his hands on Coffeey. *Id.*

On June 27, 2013, Nester interviewed SCTA Dan Wiginton ("Wiginton"). Dkt. No. 26 at 1. Wiginton executed a written statement stating that he was on Ward 504 for one shift when Coffeey was present. *Id.* at 11.

Wiginton indicated that he "might have been working with SCTA Hollenbeck[.]" *Id.* Wiginton did not see Hollenbeck take Coffeey's food, threaten Coffeey or put his hands on Coffeey. *Id.*

**\*5** On June 27, 2013, after interviewing witnesses and reviewing all pertinent documentation, Nester issued a report and concluded that there was no evidence to support Coffeey's contentions. Dkt. No. 26 at 2. On July 3, 2013, Gonzalez responded to Dorr advising that an investigation into Coffeey's complaint was completed and that the summary was available for her review, upon request. *Id.* at 3.

On August 30, 2013, Gonzalez received a letter from Dorr dated August 29, 2013. Gonzalez Decl. ¶ 26; Dkt. No. 26 at 21. Dorr expressed concern that Gonzalez "unilaterally downgraded" Coffeey's allegations without explanation. Dkt. No. 26 at 21. Dorr stated that Gonzalez did not follow procedures set forth in the OMH Manual for Special Investigations that required Gonzalez to consider the allegations "reasonably reliable[.]" *Id.*

On September 20, 2013, Gonzalez responded to Dorr stating that "each case is addressed on an individual basis and may not require the same level of investigation and analysis." Dkt. No. 26 at 20. Based upon the conclusions of two investigations conducted, Gonzalez determined that there was no evidence of neglect or abuse and that a special investigation was not warranted. Gonzalez Decl. ¶ 28.

### B. Procedural History

On February 26, 2014, Coffeey filed his complaint in this action. Dkt. No. 1. Upon review of Coffeey's complaint, the Court directed defendants to respond to the allegations in the complaint. Dkt. No. 8. On April 1, 2015, defendants filed the within motion pursuant to Fed.R.Civ.P. 56 seeking summary judgment and dismissal of Coffeey's complaint. Dkt. No. 24. Coffeey did not oppose the motion.

### III. DISCUSSION [19]

In the complaint, Coffeey alleges that he was subjected to Fourteenth Amendment violations related to his conditions of confinement, food tampering, medical treatment and the use of excessive force. *See generally* Compl.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it is supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. Fed R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223–24 (2d Cir. 1994).

**\*6** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest,"... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we

should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

*Id.* (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. Fourteenth Amendment

The rights of an involuntarily committed individual should be evaluated under the standard applied to claims brought by pretrial detainees. *Buthy v. Comm'r of Office of Mental Health of N.Y. State,* 818 F.2d 1046, 1051 (2d Cir. 1987) (applying the levels of protection afforded pretrial detainees under the due process clause to persons confined due to an acquittal by reason of insanity or to their incompetence to stand trial). The standards when evaluating deliberate indifference to a person in custody are identical whether under the Eighth or Fourteenth Amendment. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir. 2009) ("[Deliberate indifference] claims ... should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199–200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... [including] food, clothing, shelter, medical care, and reasonable safety ....") (citations omitted). Accordingly, cases analyzed under the Eighth Amendment provide guidance in analyzing cases considered under the Fourteenth Amendment. As Coffeey was civilly committed during the relevant time period, his claims are more appropriately brought under the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment.

### 1. Conditions of Confinement

Coffeey contends that he was subjected to unconstitutional conditions of confinement when he was placed in a "side room" from May 29, 2013 through June 3, 2013 without sheets, blankets, pens, paper, or phone and mail privileges. Dkt. No. 1 at 4.

"The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (citations omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective and a subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir. 1996). Thus, "a prisoner may prevail only where he proves both an objective element–that the prison officials' transgression was sufficiently serious–and a subjective element–that the officials acted, or omitted to act, with a sufficiently culpable state of mind...." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted). The objective prong can be satisfied by conditions of confinement which, in combination may constitute an Eighth Amendment violation, "when each would not do so alone," such as "when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets." *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (quoting *Wilson v. Seiter,* 501 U.S. 294, 304 (1991)). However, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (quoting *Wilson,* 501 U.S. at 305).

### a. Confinement Pursuant to Constant Observation Order

**\*7** Coffeey's treatment team made the decision to confine him to the "side room" for four days due to Coffeey's abusive, threatening and impulsive behavior. Dkt. No. 26–1 at 4–5; Dkt. No. 26 at 37–52. The decision to renew the Order confining Coffeey to "constant observation" was made after Coffeey continued to display this behavior and threatened to harm himself. *Id.* The uncontroverted evidence before the undersigned establishes that Coffeey was monitored and reassessed daily, in accordance with CNYPC policy. Dkt. No. 25 at 7, 15–19, 25–26, 28–56; Dkt. No. 26–1 at 4–10, 13, 16–18, 25, 31. Based upon the record and Coffeey's documented behavior, his four day confinement in the "side room" did not

amount to a constitutional violation. *See McMillian v. Cty. of Onondaga,* No. 13–CV–1124 (TJM/ATB), 2015 WL 1403459, at *17 (N.D.N.Y. Mar. 26, 2015) (finding no constitutional violation as the plaintiff's behavior warranted "extra observation" and contemporaneous records established that the plaintiff was supervised during his restricted confinement).

With respect to the conditions imposed during Coffeey's side room confinement, i.e., the deprivation of sheets, blankets, pens, pencils and a loss of mail and phone privileges, (Compl. at 4), while the conditions may have been unpleasant, Coffeey has failed to present any evidence establishing that the conditions posed a threat to his health or safety. *See Inesti v. Hogan,* No. 11 Civ. 2596(PAC)(AJP), 2013 WL 791540, at *25 (S.D.N.Y. Mar. 5, 2013) (holding that the plaintiff's constitutional rights were not violated when he was ordered to wear only a "smock" because he was "out of control") (citing *Borges v. McGinnis,* No. 03–CV–6375, 2007 WL 1232227 at *6 (W.D.N.Y. Apr. 26, 2007) (keeping inmate clothed only in paper gown and paper slippers with a thin mattress and no blanket in a room with an open window for three days did not meet the objective element of an Eighth Amendment violation where "plaintiff [did] not allege that he suffered anything more than frustration and discomfort")); *see Ahlers v. Nowicki,* No. 9:12–CV–0539 (DNH/RFT), 2014 WL 1056935, at *5 (N.D.N.Y. Mar. 18, 2014) (concluding that the claim by CNYPC resident that he was "forced to sleep on dirty sheets for four nights" was a minimal deprivation, at best). Coffeey's allegation that he was denied pens, paper, mail and phone privileges are not deprivations that "violate the contemporary standards of decency." *See Mills v. Luplow,* No. 04–CV–00005(A)(M), 2009 WL 2606240, at *10 (W.D.N.Y. Mar. 31, 2009) (holding that a six day deprivation of law library services, recreation, television and access to grievance protocols did not violate the Eighth Amendment).

Even assuming that Coffeey established that his conditions of confinement were objectively inhumane, summary judgment is nonetheless warranted based upon the lack of any evidence that would permit a rational jury to conclude that Hollenbeck or Gonzalez were responsible or personally involved in the alleged unconstitutional conditions. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)).

Conspicuously absent from Dorr's letter are the names or any identifying features of any individuals responsible for Coffeey's conditions of confinement in the side room. Moreover, the record is void of any evidence establishing that Hollenbeck or Gonzalez were responsible or involved in the decision to confine Coffeey to the side room or the restrictions imposed during that confinement. Hollenbeck asserts that he did not have any contact with Coffeey until June 4, 2013. Hollenbeck Decl. (Dkt. No. 24–5) ¶ 21. Coffeey has not come forward with any admissible evidence to suggest otherwise. Similarly, Gonzalez avers that he was not personally involved in any incident involving Coffeey's confinement and had no knowledge of the confinement until after the Constant Observation Order was discontinued. Gonzalez Decl. ¶¶ 29–30. Coffeey has failed to present any admissible evidence establishing what personal involvement Gonzalez had with respect to his confinement in the side room. [20] The progress records and daily logs contain names of various nurses, doctors, social workers and SCTAs who were involved in Coffeey's treatment. None of these individuals are defendants herein.

**\*8** Accordingly, the undersigned recommends that defendants' motion for summary judgment on this ground be granted.

### 2. Food Tampering

Coffeey asserts that on June 7, 2013 and June 8, 2013, Hollenbeck took food off of his tray, took bites out of his food and returned the food to Coffeey and directed him to "eat it[.]" Dkt. No. 1 at 4.

The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir. 1983) (citation omitted); *Brown v. Eagen,* No. 9:08–CV–0009 (TJM/DRH), 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (citations omitted); *Midalgo v. Bass,* No. 9:03–CV–1128 (NAM/RFT), 2006 WL 2795332, at *11 (N.D.N.Y. Sept. 26, 2006) (citations omitted). "Depriving an inmate of food or

serving him contaminated food may constitute a violation of the Eighth Amendment." *Moncrieffe v. Witbeck,* No. 97–CV–253 (NAM), 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (citing *Robles,* 725 F.2d at 15) (additional citations omitted). Allegations of food tampering alone do not suffice to establish an Eighth Amendment violation; in addition, a plaintiff must allege that he suffered a "distinct and palpable injury[.]" *M.F. v. Reish,* No. 95 CIV. 4904(SAS), 1996 WL 345953, at *4 (S.D.N.Y. June 21, 1996) (dismissing food tampering claims where plaintiffs allege numerous incidents of food tampering by defendants, but no allegations that they were actually harmed by such food) (quotation marks omitted) (citing *Warth v. Seldin,* 422 U.S. 490, 501 (1975)).

Here, Coffey does not specifically allege where the alleged food tampering occurred. The evidence establishes that Coffey was confined in Wards 405 and 504 during the relevant time period. Dkt. No. 26 at 12–17. In his statement to Nester, Hollenbeck claimed that he was not working on Ward 504 on June 7, 2013 and June 8, 2013. [21] *Id.* at 10. The progress notes and daily logs from June 7, 2013 and June 8, 2013, related to Coffey, lack any reference to Hollenbeck. *See* Dkt. No. 25 at 6; Dkt. No. 25–1 at 2–12. Even assuming that a triable issue of fact exists as to whether Hollenbeck was on duty on June 7, 2013 and June 8, 2013 on the ward where Coffey was present, Coffey has failed to present any evidence that he suffered from a "distinct and palpable injury" as a result of the alleged food tampering. Coffey's food tampering claims against Hollenbeck fail to rise to a level of constitutional significance and are therefore subject to dismissal. Accordingly, the undersigned recommends that defendants' motion for summary judgment on this ground be granted. *See Harris v. Ashlaw,* No. 9:07–CV–0358 (LEK/DEP), 2007 WL 4324106, at *5 (N.D.N.Y. Dec. 5, 2007) (dismissing the plaintiff's food tampering claim as the plaintiff failed to allege that he was served nutritionally inadequate food or that his food was served in a manner presenting danger to his health or well being).

### 3. Deliberate Indifference to Medical Needs

**\*9** Coffey alleges that while he was confined for four days in the "side room[,]" he was not seen "regularly" by a doctor. *See* Compl. at 9.

An Eighth Amendment claim for medical indifference, has two necessary components, one objective and the other subjective. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996). Deprivation of medical treatment is "sufficiently serious" if the injury is one where there is, "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)). " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir. 2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no bright-line rule to determine whether a medical condition is sufficiently serious, the Second Circuit has identified several factors that are highly relevant to the inquiry such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir. 2003) (citing and quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (internal citation omitted)).

Under the subjective element, a prison official acts with a culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66 (citation omitted). To assert a claim for deliberate indifference, an inmate must allege that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702. "[M]ere disagreement over proper treatment does not create a constitutional claim ..." as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section

1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

In this case, even assuming that Coffeey's mental condition was a "serious medical condition" sufficient to establish the objective element of the Eighth Amendment analysis, Coffeey's conclusory allegation that "he did not see a doctor regularly," is not supported by admissible proof. Coffeey does not present any evidence that he requested and was denied medical treatment. Indeed, the record belies Coffey's claim and establishes that Coffeey was treated by physicians and nursing staff, and continually monitored by SCTAs during his four day confinement in the side room. Dkt. Nos. 25 at 7, 15–19, 25–26, 28–57; Dkt. No. 26 at 39–51; Dkt. No. 26–1 at 2–10, 13, 16–18, 25, 31. During an examination by Dr. Elizabeth Farnum on June 3, 2013, Coffeey complained that he did not see a doctor but when he was asked why he needed to be seen, Coffeey stated that he did not request a doctor and that he was not experiencing any problems. Dkt. No. 26–1 at 21. Coffeey's "dissatisfaction" with his level of care and course of treatment does not support a finding of deliberate indifference. *See Soto v. Wright,* No. 11 Civ. 2289, 2013 WL 474291, at *5 (S.D.N.Y. Feb. 1, 2013) (citations omitted).

**\*10** Moreover, Coffeey does not present any evidence from which a reasonable fact finder could conclude that defendants acted with a "sufficiently culpable mental state." *Salahuddin* v. *Goord,* 467 F.3d 263, 282 (2d Cir. 2006) (citation omitted). Coffeey does not identify any physician, health care provider or any other individual responsible for any delay or deprivation of medical treatment. There is no evidentiary support for any medical indifference claim against Hollenbeck and Gonzalez. The record lacks any evidence establishing that either defendant was personally involved in any decision related to Coffeey's medical care during his four-day confinement to the side room.[22] Accordingly, the undersigned recommends that defendants' motion for summary judgment on this ground be granted.

### 4. Excessive Force

Coffeey claims that on June 10, 2013, Hollenbeck slammed his head into a window screen and put his hands on Coffeey's throat.[23] *See* Dkt. No. 26 at 7–8.

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson,* 503 U.S. at 9–10. The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir. 2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation *per se* [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 F.3d at 21 (internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344

F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

**\*11**  In this case, Coffeey fails to satisfy either prong of the analysis. In viewing the facts in the light most favorable to Coffeey, the evidence fails to establish that he suffered any injury as a result of the alleged altercation with Hollenbeck. Indeed, Coffeey does not plead that he sustained any injury as a result of the alleged altercation. The progress notes and daily logs for June 10, 2013 do not contain any reference to any injury that Coffeey allegedly sustained and there is no medical record of any assault. Dkt. No. 25–1 at 15–17, 19–21; Dkt. No. 26 at 15.

With respect to the subjective prong, the credible evidence fails to establish that Hollenbeck acted with a culpable state of mind. Hollenbeck asserts that he did not work on Ward 405 on June 10, 2013 and denies that the incident occurred at any time. [24] Hollenbeck Decl. ¶¶ 23–26, 28. Even assuming that Hollenbeck was present on the day in question, the record lacks any evidentiary support for Coffeey's general accusations. The progress notes and daily logs for June 10, 2013 do not contain any reference to any assault or incident involving Hollenbeck. Dkt No. 25–1 at 15–17, 19–22; Dkt. No. 26 at 15. Coffeey concedes that there were no witnesses to the alleged occurrence. Dkt. No. 26 at 8. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Ketzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998) (citing *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998)). In viewing the record in a light most favorable to Coffeey, the lack of evidence with respect to Hollenbeck's conduct, coupled with the absence of any injury, fails to present a triable issue of fact for a jury to resolve. Accordingly, the undersigned recommends that defendants' motion for summary judgment on this ground be granted. *See Phelps v. Szubinski,* 577 F.Supp.2d 650, 663 (E.D.N.Y.2008) (granting summary judgment on excessive force claim where the plaintiff failed to establish that he sustained a physical injury as a result of the officer's conduct); *see also Patterson v. City of N.Y.,* No. 14–cv–5330 (PKC), 2015 WL 8362702, at \*5 (S.D.N.Y. Dec. 8, 2015) ("Because the defendants have come forward with evidence that they were not in the vicinity of [the plaintiff] at the time that he allegedly was subjected to excessive force, and because [the plaintiff] raises only conclusory arguments in opposition, [the plaintiff] has failed to satisfy his burden to oppose summary judgment."); *Applegate v. Annucci,* No. 9:02–CV–0276 (LEK/DEP), 2008 WL 2725087, at \*18 (N.D.N.Y. July 10, 2008) (awarding summary judgment on excessive force claim where the plaintiff failed to file any response to the defendant's motion and the record lacked any evidence from which a reasonable juror could conclude that the defendant used excessive force).

### C. Verbal Threats

Coffeey claims that Hollenbeck threatened to "take [Coffeey] out in a body bag." *See* Dkt. No. 1 at 4. To the extent Coffeey attempted to allege a potential Fourteenth Amendment claim against Hollenbeck for making verbal threats, such a claim must fail. A claim of threats and harassment alone, without allegations of accompanied injury or use of force, is insufficient to state an Eighth Amendment claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir. 1996) (per curiam) ("The claim that a prison guard called [the plaintiff] names also did not allege any appreciable injury and was properly dismissed."); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983." (internal quotation marks and citations omitted)). Because the undersigned has recommended dismissal of Coffeey's excessive force allegation against Hollenbeck, Coffeey's potential claim based on verbal threats against Hollenbeck cannot survive.

**\*12**  Accordingly, it is recommended that Coffeey's claim based on verbal threats be dismissed and summary judgment awarded to defendants on this ground.

### D. Supervisory Liability

Supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation[;]

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;]

(3) the defendant created a policy or custom under which 25 unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;]

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord*, 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Also, it is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus*, 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing *Ortiz–Rodriguez v. N. Y. State Dep't of Corr. Servs.*, 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)).

Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003); *see Elek v. Inc. Vill. of Monroe*, 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability").

Here, construing the complaint liberally, Coffeey alleges that Dorr notified Gonzalez of constitutional violations and that Gonzalez failed to remedy the alleged violations. Compl. at 4, 9–13. Coffeey does not allege, nor does the record support the conclusion that Gonzalez directly participated in any alleged constitutional violations. Gonzalez concedes that he received Dorr's letters and referred Dorr's concerns to staff members. Gonzalez Decl. ¶¶ 13–14, 17–18. Gonzalez's responses to Dorr denying

Coffeey's accusations are insufficient to establish personal involvement in any incident. *See Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). Gonzalez's actions do not equate to "personal involvement" in any alleged violations. *See Vega,* 610 F.Supp.2d at 198 (finding that a supervisor is not "personally involved" because he delegated investigation of an incident to a subordinate).

**\*13** Moreover, as discussed *supra,* Coffeey failed to raise an issue of material fact with respect to his Fourteenth Amendment claims. Accordingly, the undersigned recommends that defendants' motion for summary judgment and dismissal of Coffeey's supervisory claims against Gonzalez be granted.

### E. Qualified Immunity

Defendants argue that even if Coffeey's claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd* 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir. 1991) ( citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir. 1990)) (additional citation omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Pearson v. Callahan,* 555 U.S. 223, 232 (2009). Only if there is a constitutional violation does a court proceed to determine whether constitutional rights were clearly established at the time of the alleged violation. *Id.* at 236.

Here, the second prong of the inquiry need not be addressed with respect to Coffeey's claims because, as discussed *supra,* it has not been shown that defendants violated Coffeey's constitutional rights. Accordingly, in the alternative, it is recommended that defendant's motion on this ground be granted.

## IV. CONCLUSION

For the reasons stated above, it is hereby:

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 24) be GRANTED in all respects as to all claims and defendants; and it is further

**ORDERED** that the Clerk serve a copy of this Report–Recommendation and Order on the parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL**

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir. 1989); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2016 WL 770087

### Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Defendants' "Notice of Motion" indicated that, "[a] copy of the United States District Court, Northern District of New York 'Notification of the Consequences of Failing to Respond to a Summary Judgment Motion' is annexed hereto." Dkt. No. 24 at 1. No such notice was annexed to defendants' motion. The Court notified the plaintiff of the consequences of failing to oppose the motion. Dkt. No. 27.

3    Coffeey's complaint is not verified and does not have the "force and effect of an affidavit." *See Tafari v. Brown,* No. 9:10–CV–1065 (GTS/DRH), 2012 WL 1098447, at *6 n.8 (N.D.N.Y. Mar. 30, 2012).

4    Local Rule 7.1(a)(3) states:

     Summary Judgment Motions

     Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

     The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

     N.D.N.Y. L.R. 7.1(a)(3).

5    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

6    The aide who observed the incident and the aide involved in the incident with Coffeey are not defendants in this action.

7    The physician is not a defendant in this action.

8    Off-ward activity included the Activity Center and/or Treatment Mall. Dkt. No. 25–1 at 51.

9    The SCTA and staff involved in this incident are not defendants in this action.

10    The nurse and Dr. Kaskiw are not defendants in this action.

11    The physician who issued the Order is not a defendant in this action.

12    The physician who issued the Order is not a defendant in this action.

13    The physician who issued the Order is not a defendant in this action.

14    The physician who issued the Order is not a defendant in this action.

15    The physician is not a defendant herein.

16    According to CNYPC policy, a resident is placed in the MOD Unit when he provides assurances to staff that he is able to interact with residents and staff without posing a threat to security, but the resident has not maintained behavioral control for a sufficient duration and presents as unwilling to control other antisocial behaviors. Dkt. No. 24–7 (Hollenbeck Decl. Exh. C) at 3.

17    Adams is not a defendant in this action.

18    Nester is not a defendant in this action.

19    All unpublished opinions cited to by the undersigned in this Report–Recommendation are, unless otherwise noted, attached to this Report–Recommendation.

20    To the extent that Coffeey's Cir. asserting a supervisory claim against Gonzalez, that claim is discussed *infra*.

21    In Hollenbeck's June 20, 2013 signed statement, Hollenbeck stated, "I was not working Ward 504 on June 7th, 8[th] or 10[th], nor was I working 405 on 6/10. I did work on Ward 504 for a few shifts, I can't remember the exact dates." Dkt. No. 26 at 10. In Hollenbeck's Declaration submitted in support of the within motion, Hollenbeck avers, "I was not working on the ward on June 7, 2013, June 8, 2013 or June 10, 2013." Hollenbeck Decl. ¶ 26. To the extent that Hollenbeck's statements in his Declaration are inconsistent or contradictory to the written statement he signed in June 2013, the Court will rely upon the statements made in June 2013. *See Yevstifeev v. Steve,* 860 F.Supp.2d 217, 221 (W.D.N.Y.2012) ( "[T]he Court rejects plaintiffs' attempts to raise new issues of fact by submitting affidavits which contradict their deposition testimony and prior written statements, because 'factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial.' " (internal quotation marks and citations omitted)).

22    To the extent that Coffeey's complaint could be construed as asserting a supervisory claim against Gonzalez, that claim is discussed *infra*.

23    The Court notes that this allegation is contained in a statement, signed by Coffeey, and dated June 12, 2013, submitted by defendants as an exhibit to the affirmation of Colleen Galligan, counsel for defendants. Dkt. No. 26 at 7–8. Coffeey did not raise an allegation of excessive force in his complaint. The Court notes that there is caselaw in this Circuit declining to address claims that are not properly raised in the complaint or other submissions by the plaintiff. *See Wright v. Goord,* 554 F.3d 255, 267 (2d Cir. 2009) (stating that the plaintiff could not add a cause of action by "simply appending [the] claim to his second amended complaint"); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 358 n.17 (N.D.N.Y.2010) (declining to address verbal abuse where the allegation was contained in a grievance, but not raised in the plaintiff's amended complaint or at his deposition). Nonetheless, the Court will address this claim based on the evidence before it.

24    *See* n.21, *supra*.

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by COFFEEY v. HOLLENBECK, 2nd Cir., March 23, 2016

2016 WL 796081
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gene M. Coffeey, Plaintiff,
v.
Hollenbeck, et al., Defendant.

9:14-CV-196
|
Signed 02/22/2016

**Attorneys and Law Firms**

GENE M. COFFEEY, Plaintiff, Pro Se, 34611, CNY PC, PO Box 300, Marcy, NY 13403.

COLLEEN D. GALLIGAN, ESQ., Ass't Attorney General, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, Attorneys for Defendant, The Capitol, Albany, NY 12224.

**<u>DECISION and ORDER</u>**

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Gene M. Coffeey brought this civil rights action pursuant to 42 U.S.C. § 1983. On January 27, 2016, the Honorable Christian F. Hummel, United States Magistrate Judge, advised by Report-Recommendation that defendants' motion for summary judgment be granted, and the complaint be dismissed in its entirety. See ECF No. 24. Plaintiff submitted a response in which he broadly objected to the Report-Recommendation and requested appellate review of the instant matter. See ECF No. 40. This has been construed as an objection to the substance of the entirety of the Report-Recommendation, giving rise to a de novo review.

Based upon this de novo review of the Report-Recommendation, the Report-Recommendation is accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Defendants' motion for summary judgment is **GRANTED**, and the complaint is **DISMISSED IN ITS ENTIRETY**; and

2. The Clerk serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

The Clerk of the Court shall enter judgment and close this case.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 796081

2012 WL 265962
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Pedro SOTO, Plaintiff,
v.
Dr. Lester WRIGHT et al., Defendants.

No. 11 Civ. 2289(PAC)(JLC).
|
Jan. 26, 2012.

*REPORT AND RECOMMENDATION*

JAMES L. COTT, United States Magistrate Judge.

**\*1 To the Honorable Paul A, Crotty, United States District Judge:**

Plaintiff Pedro Soto ("Soto"), an inmate in New York State custody, has brought this action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights arising from the alleged indifference to his serious medical needs on September 14, 2009 while he was incarcerated at Sing Sing Correctional Facility ("Sing Sing"). Proceeding *pro se,* he has sued Lester Wright, M.D. ("Dr.Wright"), retired deputy commissioner and chief medical officer of the New York State Department of Correctional Services ("DOCS"), Elizabeth Hamawy, R.N. ("Nurse Hamawy"), and Suzette Camper, R.N. ("Nurse Camper") (collectively "Defendants"), alleging that, in addition to the September 14, 2009 claim, Nurse Hamawy denied his request for a medical pass in January, 2010 in retaliation for a grievance he had filed against her as a result of the September 14, 2009 incident, that Dr. Wright did not respond personally to a letter he wrote him in June, 2010, and that he did not see a cardiologist four times in 2010,

Defendants have moved to dismiss the complaint, in part, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that (1) Soto has failed to allege the personal involvement of Dr. Wright in any constitutional violation; (2) Dr. Wright is entitled to qualified immunity; and (3) Soto has failed to allege the personal involvement of Nurse Hamawy and Nurse Camper in his claim regarding the 2010 cardiologist visits. For the reasons that follow, I recommend that the motion

be granted, and the complaint dismissed in its) entirety against Dr. Wright.

**I. *Background***

A. *Soto's Allegations*

1. *The September 14, 2009 Claim*
The following facts are taken from the complaint that Soto filed on March 81, 2011 ("Compl.") (Doc. No. 2), and are accepted as true for purposes of this motion. On September 14, 2009, Soto alleges that he went to "sick call," located at the Sing Sing gym, bebause he was experiencing "pressure in his chest." Compl. ¶¶ 1, 2. He alleges that when he saw Nurse Hamawy at that time, he complained to her about his condition but she told him he would have to wait to see the doctor "like everybody else." [1] Compl. ¶¶ 2. When Soto explained that, unlike other inmates, he had a pacemaker and a heart problem, he contends that she continued to put him off and he subsequently left the area without incident. *Id.* [2]

Soto then went to an "emergency sick call" where he explained to Nurse Camper about his condition but, according to Soto, she too failed to assist him, providing him only with medication for gas and refusing to arrange for him to see a doctor. *Id.* ¶¶ 4, 5. After both Nurses Hamawy and Camper allegedly refused to render "any meaningful medical assistance[,]" *id.* ¶ 6, Soto alleges that it was not until three days later that he was able to see a doctor, who prescribed high blood pressure medication to him. *Id.* ¶ 7.

2. *The Cardiologist Referral Claim*
**\*2** In addition to his claims about the events of September 14, 2009, Soto alleges that he filed a separate grievance on June 11, 2010 concerning the fact that his cardiologist had stated that his pacemaker should be reviewed at least four times per year and the last time he had seen a cardiologist was on January 5, 2010. *Id.* ¶ 16, Following the submission of the grievance, Soto claims that he received a letter advising him that he would be evaluated by a cardiologist in the near future. *Id.* ¶ 19.

3. *The Claim Against Dr. Wright*
Soto also alleges that on June 12, 2010, he sent a letter to Dr. Wright requesting him to "intervene in the problem

he was having at Sing Sing[,]" but Dr. Wright did not respond. *Id.* ¶ 20. Instead, his letter to Dr. Wright was answered on August 6, 2010 by Ernest Martone, Regional Health Services Administrator, who, Soto acknowledges, was asked to respond to his letter by Dr. Wright. *Id.* ¶ 25. Soto alleges further that Martone's response, two months after the letter was sent, was inadequate because he failed to inform Soto when he would see a cardiologist. *Id.*

### B. *Procedural History*

On July 14, 2011, Nurses Camper and Hamawy filed an answer to the complaint, responding to the allegations related to the September 14, 2009 claim, as well as with respect to the retaliation claim against Nurse Hamawy. Answer dated July 14, 2011, ¶ 1 (Doc. No. 12). In lieu of an answer, Dr. Wright moved to dismiss the complaint in its entirety as against him, arguing that it failed to allege his personal involvement in any constitutional violation, and that even if the Court were to find sufficient allegations of personal involvement, he was entitled to qualified immunity. Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, In Part, dated July 14, 2011 ("Def.Mem."), at 4–10 (Doc. No. 14). In addition, Nurses Hamawy and Camper have moved to dismiss the complaint, in part, to the extent that it fails to allege their personal involvement with respect to his cardiologist referral claim. Def. Mem. at 11. Soto filed opposition papers on August 25, 2011, Plaintiff's Memorandum of Law in Opposition of [sic] Defendants' [Rule 12(b)](#) Motion to Dismiss ("Pl.Opp.") (Doc, No. 19), and Defendants filed reply papers on November 10, 2011 ("Def.Reply") (Doc. No. 21). [3]

## II. *Discussion*

### A. *Applicable Legal Standards*

Defendants have moved to dismiss Soto's complaint for "failure to state a claim upon which relief can be granted." [Fed.R.Civ.P. 12(b)(6)](#). In considering a 12(b)(6) ilnotion, a court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in the plaintiffs favor. *See, e.g., [Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am., Sec. LLC,](#) 568 F.3d 374, 381 (2d Cir., 2009).* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *[Ashcroft v. Iqbal,](#) 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)* (quoting *[Bell Atl.](#)*

*[Corp. v. Twombly,](#) 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *[Iqbal,](#) 129 S.Ct. at 1949* (citation omitted). Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" are not enough to survive a motion to dismiss. *[Twombly,](#) 550 U.S. at 555.*

**\*3** Complaints prepared by *pro se* litigants are held "to less stringent standards than formal pleadings drafted by lawyers." *[Peay v. Ajello,](#) 470 F.3d 65, 67 (2d Cir.2006)* (citations and quotation marks omitted). Because Soto filed his pleadings *pro se,* the Court must liberally construe them and interpret his complaint "to raise the strongest arguments it suggests." *[Abbas v. Dixon,](#) 480 F.3d 636₅ 639 (2d Cir.2007)* (citation omitted). However, the Court need not accept as true "conclusions of law or unwarranted deductions of fact[.]" *See, e.g., [First Nationwide Bank v. Gelt Funding Corp.,](#) 27 F.3d 763, 771 (2d Cir.1994)* (citation and quotation omitted). In addition, the fact that Soto is proceeding *pro se* "does not exempt [him] from compliance with relevant rules of procedural and substantive law[.]" *[Traeuth v. Zuck,](#) 710 F.2d 90, 95 (2d Cir.1983)* (citation and quotation marks omitted).

When deciding a 12(b)(6) motion to dismiss, "the district court is normally required to look only to the allegations on the face of the complaint." *[Roth v. Jennings,](#) 489 F.3d 499, 509 (2d Cir.2007).* However, the court may also rely upon "documents attached to thje complaint as exhibits[ ] and documents incorporated by reference in the complaint." *[DiFolco v. MSNBC Cable L.L.C.,](#) 622 F.3d 104, 111 (2d Cir.2010)* (citations omitted). The court can also consider "matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *[Chambers v. Time Warner, Inc.,](#) 282 F.3d 147, 153 (2d Cir.2002)* (citation and quotation marks omitted).

### B. *Soto Has Failed to Allege the Personal Involvement of Dr. Wright ih any Constitutional Violation*

It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [§ 1983](#)." *[Shomo v. City of New York,](#) 579 F.3d 176, 184 (2d Cir.2009)* (citation and internal quotation marks omitted). Therefore, a

complaint that fails to allege how a specific defendant violated the law or injured the plaintiff should be dismissed. *See, e.g., Hemmines v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998). Because a defendant's conduct must be a proximate cause of the alleged Section 1983 violation, "the doctrine of respondeat superior ... does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity[,]" and a showing of personal responsibility is required. *Henry v. Davis,* No. 10 Civ. 7575(PAC)(JLC), 2011 WL 3295986, at *3 (S.D.N.Y. Aug. 1, 2011) (internal quotation marks and citations omitted). The Second Circuit has described five ways in which a supervisory official may be involved in actions that caused the deprivation of constitutional rights:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*4** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted). [4]

Soto has failed to allege sufficient facts to demonstrate that Dr. Wright was personally involved in any constitutional violation. Soto does not allege any direct participation by Dr. Wright in the alleged violations, that any policies he promulgated allowed the continuance of constitutional violations, nor that he was negligent in his supervision of his subordinates. The complaint alleges only that Dr. Wright's personal involvement was limited to the receipt of a single letter from Soto, which he referred to a subordinate for a response. This is insufficient to state a constitutional claim against Dr.

Wright. In virtually identical circumstances, the Second Circuit recently affirmed the dismissal of a similar claim against Dr. Wright. In *Gbris v. Breslin,* the record had shown that Dr. Wright's personal involvement "was limited to the receipt of two letters from [plaintiff], which he promptly referred to other individuals for investigation and response." 402 F. App'x 582, 584 (2d Cir.2010) (summary order). The Circuit concluded that on that record plaintiff had "failed to establish the requisite personal involvement on Dr. Wright's part." *Id. See also Melecio v. Fischer,* Nos. 9:10–CV–289 (FJS/RFT), 9:10–CV–470 (FJS/RFT), 2011 WL 6987299, at *10 (N.D.N.Y. Sept.27, 2011) (granting Rule 12(b)(6) motion and finding that "a defendant's receipt of, and responses to, letters or complaints alone is insufficient to find the requisite personal involvement") (citing *Goris* ). In a similar case also involving Dr. Wright, the Court concluded that the delegation of a letter or complaint "to a subordinate does not establish that he was personally involved in a constitutional deprivation." *Gonzalez v. Sarreck,* No. 08 Civ. 3661(RWS), 2011 WL 5051341, at *15 (S.D.N.Y. Oct.24, 2011). [5]

Furthermore, there is no allegation that Dr. Wright actually became aware of Soto's claims of deliberate indifference to his medical needs. As the district court in *Gorts* observed, the law does not require Dr. Wright "to personally review, investigate and respond to every one of the thousands of letters dealt with by his staff." *Goris v. Breslin,* No. 04–CV–5666 (KAM)(LB), 2009 WL 1955607, at *7 (E.D.N.Y. July 6, 2009) (citation omitted); *aff'd,* 402 F. App'x 582 (2d Cir.2010). Finally, "[b]oth the Court of Appeals and numerous district courts in this Circuit have held that receipt of letters or grievances is insufficient to impute personal involvement." *Gonzalez,* 2011 WL 5051341, at *14 (citing cases). For these reasons, the claim against Dr. Wright should be dismissed.

## C. *Dr. Wright is Also Entitled to Qualified Immunity*

In light of the recommendation to dismiss the complaint against Dr. Wright because he lacks personal involvement, the Court need not reach the question of qualified immunity. *See, e.g., Gonzalez,* 2011 WL 5051341, at *21 (immunity issues moot in light of other grounds for dismissal). Even if Dr. Wright's conduct had been properly alleged to have stated a claim for a constitutional violation, however, he would be entitled to qualified immunity. "Qualified immunity shields federal and state

officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* ––– U.S. ––––, ––––, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). An official's conduct "violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that 'every reasonable official would have understood that what he is doing violates that right.' " *Id.* at 2083 (alterations in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The inquiry turns on) "the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.' " *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 822, 172 L.Ed.2d 565 (2009) (citations and internal quotation marks omitted).

**\*5** Dr. Wright is entitled to qualified immunity because no clearly established law prohibited his referral of Soto's letter to his subordinate for a response. To the contrary, if anything the law is established that nothing prohibited him from doing so. Moreover, Dr. Wright is entitled to qualified immunity on the basis that it was objectively reasonable for him to rely on the medical treatment prescribed to Soto by the doctors at Sing Sing. *See, e.g., Graham v. Wri* ght No. 01 Civ. 9613(NRB), 2003 WL 22126764, at \* 1 (S.D.N.Y. Sept. 12, 2003) ("It is well established that supervisory officials are 'generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning tjhe proper course of treatment.") (citation omitted). [6]

D. *Soto Has Failed to Allege the Personal Involvement of Nurses Hamawy and Camper in the Cardiologist Referral Claim*

Soto has alleged that between January and June, 2010, he did not receive tie review of his pacemaker that his cardiologist had recommended. Instead, he contends that he was seen by a cardiologist in January, 2010, and then not again until July, 2010. Complaint, ¶¶ 16, 22. Liberally construing his complaint, Soto appears to be alleging a claim of medical indifference to his medical needs based on the failure to arrange for these cardiologist appointments. However, he has not alleged any personal involvement of either Nurse Hamawy or Nurse Camper related to this claim, a prerequisite to liability as discussed above. He does not even allege that they knew of this supposed requirement. Accordingly, this claim should be dismissed as well.

### III. *Conclusion*

For the foregoing reasons, I recommend that the Court dismiss the complaint in its entirety against Dr. Wright, and in part against Nurses Hamawy and Camper, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [7]

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Crotty. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 72. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Warner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010). If Soto does not have access to cases cited herein that are reported on Westlaw, he should request copies from Defendants. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009).

### All Citations

Not Reported in F.Supp.2d, 2012 WL 265962

Footnotes

1    Soto refers to Nurse Hamawy as Nurse Hemingway in his Complaint (Compl.¶ 2), but both he and counsel for Defendants refer to her as Nurse Hamawy in their motion papers.

2    Soto also alleges that Nurse Hamawy denied his request for a medical pass in January 2010 in retaliation for a grievance he had filed against her regarding the September 14, 2009 incident. Compl. ¶¶ 12, 13.

3    Although it does not appear on the docket, Soto submitted a "reply" memorandum in further opposition to the motion dated November 22, 2011. Soto may have thought he was required to file a further opposition, but he was not given permission to file what is a "sur-reply" memorandum of law, and accordingly I recommend that the Court not consider it since sur-replies are not permitted in federal court. *See, e.g., Kapiti v. Kelly,* No. 07 Civ. 3782(RMB) (KNF), 2008 WL 754686, at *1 n. 1 (S.D.N.Y. Mar. 12, 2008) ("Allowing parties to submit surreplies is not a regular practice that courts follow, because such a procedure has the potential for placing a court in the position of refereeing an endless volley of briefs") (citation and quotations omitted). In any event, even if the Court were to consider the memorandum, it does not appear to present any arguments that were not previously made in Soto's earlier opposition.

4    Several lower courts have considered what impact, if any, *Iqbal* has had on the so-called *Colon* factors enumerated above, *see, e.g., Gonzalez v. Sarreck,* No. 08 Civ. 3661(RWS), among others, 2011 WL 5051341, at *14 n. 3 (S.D.N.Y. Oct.24, 2011) (dismissing Dr. Wright, for lack of personal involvement) (collecting cases), but the Second Circuit has not yet squarely addressed the issue. Because Soto has failed to meet any of the five factors here, it is not necessary for this Court to weigh in on the issue.

5    Even if Dr. Wright had ignored Soto's letter, rather than delegating it to a subordinate for a response, it appears that there would still be no liability under section 1983. *See, e.g., Honig v. Bloomberg,* No. 08 Civ. 0541(DAB), 2008 WL 8181103, at *5 (S.D.N.Y. Dec.8, 2008) ("courts have repeatedly found that 'the allegation that a supervisory official ignored a ... letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983.") (citations omitted). "The general rule is that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violation." *Id.* (citation omitted).

6    The plaintiff in *Graham* also sued Dr. Wright, but because he did not allege that he had been personally treated by Dr. Wright, no claim could be sustained. *Id.* at *2.

7    Once the motion is resolved, I will schedule a pre-trial conference with the parties to set a discovery schedule.

---

**End of Document**              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 639166
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Pedro SOTO, Plaintiff,
v.
Dr. Lester WRIGHT et al., Defendants.

No. 11 Civ. 2289(PAC)(JLC).
|
Feb. 28, 2012.

*ORDER ADOPTING R & R*

Honorable PAUL A. CROTTY, District Judge.

**\*1** On March 31, 2011, *pro se* plaintiff Pedro Soto ("Soto") filed this 42 U.S.C. § 1983 action against Dr. Lester Wright ("Dr.Wright"), retired Deputy Commissioner and Chief Medical Director of the New York State Department of Correctional Services, Elizabeth Hamawy, R.N. ("Nurse Hamawy"),[1] and Suzette Camper, R.N. ("Nurse Camper") (collectively, the "Defendants"). Soto claims that his constitutional rights were violated: (1) on September 14, 2009, when Defendants were deliberately indifferent to Soto's medical needs; (2) in January 2010, when Nurse Hamawy denied Soto's request for a medical pass in retaliation for a grievance he filed against her as a result of the September 14, 2009 incident; (3) in or around June 2010, when Dr. Wright failed to personally respond to a letter Soto wrote him; and (4) when Defendants failed to ensure that Soto would see a cardiologist four times in 2010.

On April 13, 2011, this Court referred the matter to Magistrate Judge James L. Cott for general pretrial matters and dispositive motions. On July 14, 2011, the Defendants moved to dismiss the complaint in part, pursuant to Fed.R.Civ.P. 12(b)(6), on the grounds that: (1) Soto failed to allege that Dr. Wright was personally involved in any constitutional violation; (2) Dr. Wright is entitled to qualified immunity; and (3) Soto failed to allege that Nurses Hamawy and Camper were personally involved in his claim regarding the 2010 cardiologist visit. On the same day, Nurses Hamawy and Camper filed

an answer to Soto's complaint, which addresses Soto's deliberate indifference and retaliation claims.

On January 26, 2012, Magistrate Judge Cott issued a Report and Recommendation ("R & R") recommending that the Court grant Defendants' motion in its entirety, and, therefore, dismiss all claims against Dr. Wright. Soto has not filed objections to the R & R.

For the reasons that follow, the Court adopts Magistrate Judge Cott's R & R in its entirety and GRANTS Defendants' motion to dismiss.

**BACKGROUND**

**I. Facts**[2]

A. *The September 14, 2009 Claim*
On September 14, 2009, Soto went to "sick call," located in the Sing Sing gym, because he was experiencing "pressure in his chest." He saw Nurse Hamawy and complained to her about his condition. Nurse Hamawy told him that he would have to wait to see the doctor 'like everybody else." Soto explained to Nurse Hamawy that, unlike the other patients, he had a pacemaker and had a heart problem. Nurse Hamawy continued to put Soto off, and he left the area without incident.

Later that day, Soto went to an "emergency sick call" where he saw Nurse Camper, and again explained his condition. Nurse Camper failed to assist him, providing him only with medication for gas and refusing to arrange for him to see a doctor.

Three days later, on September 17, 2009, Soto saw a doctor, who prescribed him high blood pressure medication. On September 24, 2009, Soto saw a heart specialist, who reported that Soto had a minor heart attack on September 13, 2009.

B. *The Cardiologist Referral Claim*
**\*2** On June 11, 2010, Soto filed a grievance concerning the fact that his cardiologist had stated that his pacemaker should be reviewed at least four times per year and the last time he had seen a cardiologist was on January 5, 2010. Soto was thereafter told that he would be evaluated by a cardiologist in the near future.

C. *Soto's Claim Against Dr. Wright*
On June 12, 2010, Soto sent a letter to Dr. Wright, requesting that he "intervene in the problem he was having at Sing Sing." On August 6, 2010, Ernest Martone, the Regional Health Services Administrator, responded to Soto's letter, noting that Dr. Wright has asked Mr. Martone to respond. Soto claims that Mr. Martone's response, which he received two months after he sent his letter, was inadequate because he failed to inform Soto when he would see a cardiologist.

## II. Magistrate Judge Cott's Report and Recommendation

A. *Dr. Wright's Personal Involvement*
Magistrate Judge Cott recommended that the Court dismiss Soto's claims against Dr. Wright because Soto failed to allege that Dr. Wright was personally involved in any constitutional violation.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Shomo v. City of New York,* 579 F.3d 176, 184 (2d Cir.2009). A supervisory official may be involved in actions that cause the deprivation of constitutional rights in five ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendants created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [3]

Soto's sole allegation against Dr. Wright was that he received a single letter from Soto, and asked Mr. Martone to respond. Magistrate Judge Cott determined that this allegation was insufficient to state a claim against Dr. Wright under any of the five factors above. (R & R 7–8 (citing cases).) Notably, the Second Circuit, in *Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir.2010), recently affirmed the dismissal of a similar case against Dr. Wright, where Dr. Wright's personal involvement was "limited to the receipt of two letters from [plaintiff], which he promptly referred to other individuals for investigation and response."

B. *Qualified Immunity*
Magistrate Judge Cott determined that even if Soto had alleged Dr. Wright's personal involvement, Soto's claims against Dr. Wright would still fail because Dr. Wright is entitled to qualified immunity. Based on this alternative ground, Magistrate Judge Cott again recommended that the Court dismiss Soto's claims against Dr. Wright. (R & R 8–9.)

**\*3** "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* ___ U.S. ___, ___, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Magistrate Judge Cott determined that Dr. Wright is entitled to qualified immunity "because no clearly established law prohibited his referral of Soto's letter to his subordinate for a response," and he was "entitled to rely on the medical treatment prescribed to Soto by the doctors at Sing Sing." (R & R 9 (citing *Graham v. Wright,* No. 01 Civ. 9613(NRB), 2003 WL 22126764, at *1 (S.D.N.Y. Sept.12, 2003) ("It is well established that supervisory officials are 'generally entitled to delegate medical responsibility to facility medical staffs and are entitled to rely on the opinion of medical staff concerning the proper course of treatment.") (citation omitted)).)

C. *Personal Involvement of Nurses Hamawy and Camper*
Finally, Magistrate Judge Cott recommended that the Court dismiss Soto's claims against Nurses Hamawy and Camper regarding the 2010 cardiologist visit. (R

& R 10.) Magistrate Judge Cott construed Soto to be alleging a claim of medical indifference to his medical needs for failing to arrange a cardiologist appointment between January 2010 and July 2010. (*Id.*) Soto, however, does not allege that either Nurse Hamawy or Nurse Camper was personally involved in this alleged constitutional violation. Accordingly, Magistrate Judge Cott recommended that the Court dismiss this claim.

In sum, Magistrate Judge Cott recommended that Soto's complaint be dismissed in its entirety against Dr. Wright, and in part against Nurses Hamawy and Camper.

## DISCUSSION

### I. The Report and Recommendation

In reviewing a report and recommendation, a court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C). Where a party makes a timely written objection, the district court must review the contested issues *de novo. Greene v. WCI Holdings Corp.,* 956 F.Supp. 509, 513 (S.D.N.Y.1997). "The district court may adopt those portions of the report to which no timely objection has been made, so long as there is no clear error on the face of the record." *Feehan v. Feehan,* No. 09 Civ. 7016, 2011 WL 497776 at *1 (S.D.N.Y. Feb.10, 2011). Soto has not filed timely objections to the R & R.

The Court has reviewed the R & R for clear error and finds none. Accordingly, the Court adopts Magistrate Judge Cott's R & R in its entirety.

## CONCLUSION

The Clerk of Court is directed to terminate this motion (Dkt. No. 13), and terminate Defendant Dr. Lester Wright from this action. This Court's reference to Magistrate Judge Cott for general pre-trial matters and dispositive motions remains in effect. Pursuant to 28 U.S.C § 1915(a), I find that any appeal from this order would not be taken in good faith.

**\*4** SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 639166

Footnotes

1    While Soto refers to Nurse Hamawy as "Nurse Hemingway" in his Complaint, both he and counsel for Defendants refer to her as Nurse Hamawy in their motion papers.

2    The facts are taken from the R & R and the complaint. The Court recites only those facts pertinent to this motion.

3    As Magistrate Judge Cott noted, while several courts have considered the impact of *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) on the *Colon* factors, the Court need undertake such an analysis here because Soto fails to meet any of the five factors.

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2628720
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Johnathan JOHNSON, Plaintiff,

v.

B. CONNOLLY, Doctor et al., Defendants.

Civil Action No. 9:07–CV–1237 (TJM/DEP).

|

March 15, 2010.

**Attorneys and Law Firms**

Johnathan Johnson, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State
of New York, The Capitol, Christopher Hall, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

***1** Plaintiff Johnathan Johnson, a New York prison inmate
and a prodigious litigant, has commenced this suit pursuant
to 42 U.S.C. § 1983 alleging deprivation of his civil rights. [1]
In his complaint, plaintiff asserts that prison officials at the
Upstate Correctional Facility ("Upstate") were deliberately
indifferent to his medical needs following his transfer into
that facility, including by not providing him with medication
previously prescribed for him at other prison facilities, and
that his transfer into Upstate was in retaliation for his
having engaged in protected activity. Plaintiff's complaint
seeks both equitable relief, in the form of an unspecified
permanent injunction, and recovery of compensatory and
punitive damages.

Currently pending before the court is defendants' motion for
summary judgment seeking dismissal of plaintiff's complaint
in its entirety. In their motion, defendants assert that the
record does not support either of plaintiff's substantive claims
and that they are, therefore, entitled to judgment dismissing
those claims as a matter of law. Having carefully considered
the record now before the court in light of defendants'
motion and plaintiff's arguments in response, I recommend
that the motion be granted with respect to all claims except
plaintiff's retaliation cause of action against defendant Burge,
as to which genuine issues of fact exist precluding summary
judgment.

I. *BACKGROUND* [2]

The plaintiff is a prison inmate entrusted to the care and
custody of the New York State Department of Correctional
Services ("DOCS"). *See generally* Amended Complaint (Dkt.
No. 7). At the times relevant to his claims in this action
plaintiff was designated first to the Elmira Correctional
Facility, located in Elmira, New York, and later following
his transfer out of that prison on November 16, 2006, to
Upstate, situated in Malone, New York. [3] It appears that at
all relevant times plaintiff was designated to special housing
unit ("SHU") disciplinary confinement. [4] *Id.*

While confined at Elmira, on November 13, 2006 plaintiff
apparently was the target of human feces thrown by another
inmate in the SHU during plaintiff's scheduled shower period.
Complaint (Dkt. No. 7) p. 5–B. That incident prompted the
sending by plaintiff of a letter to defendant John Burge,
the Superintendent at Elmira, requesting that the videotape
footage of the incident be preserved for use in a future
lawsuit. [5] *Id.*

Two days later, on November 15, 2006, the DOCS
Classification and Movement Office, which as a general
matter controls inmate facility assignments, received an
electronic request that Johnson be transferred out of Elmira.
Carvill Aff. (Dkt. No. 68–4) ¶¶ 4, 6, 11 and Exh. A; *see also*
Burge Aff. (Dkt. No. 68–3) ¶¶ 9–10. The stated reason for
the transfer request was that plaintiff had a "severe problem
at Elmira CF SHU." Carvill Aff. (Dkt. No. 68–4) ¶ 12 and
Exh. A. As an explanation for that observation, the statement
noted that plaintiff "ha[d] created a management problem in
the SHU ... he is disruptive to other [inmates] in the unit ..."
and made reference to the November 13, 2006 incident. *Id.*
at ¶ 14 and Exh. A. The transfer request was processed by John
Carvill, a Classification Analyst with the DOCS. Carvill Aff.
(Dkt. No. 68–4) ¶¶ 1, 6, 11 and Exh. A. On recommendation
of the SHU unit of the Classification and Movement Office, it
was determined by defendant Carvill that the plaintiff should
be transferred into Upstate. *Id.* at ¶¶ 9–14. When making that
decision Carvill was unaware of plaintiff's contemplation of

a lawsuit concerning the feces throwing incident at Elmira on November 13, 2006. *Id.* at ¶ 16.

**\*2** According to the plaintiff, Superintendent Burge, though not present for the throwing incident, spoke with the plaintiff about the transfer on November 15, 2006 from the catwalk adjacent to plaintiff's cell and stated "I'm getting rid of you." Amended Complaint (Dkt. No. 7) p. 5–C; Johnson Dep. Tr. pp. 82–86; Johnson Aff. (Dkt. No. 69) ¶ 12. Other than that statement, during his deposition plaintiff admitted that he has no evidence to support his allegation that Superintendent Burge initiated the transfer request or was otherwise a participant in the decision to place him in Upstate. *Id.* at pp. 89–90.

According to Superintendent Burge, the transfer of a prisoner is typically initiated by the inmate's guidance counselor, who sends a transfer request directly to the DOCS Classification and Movement Office in Albany. Burge Aff. (Dkt. No. 68–3) ¶ 9. Superintendent Burge denies any role in the transfer of Johnson to Upstate and specifically states that he did not ask plaintiff's guidance counselor at Elmira to initiate the transfer request. *Id.* at ¶¶ 11–14. While having no recollection of any conversation with plaintiff regarding the transfer, Superintendent Burge states that it is his practice never to discuss transfers with any inmates. *Id.* at ¶ 5.

Plaintiff was transferred into Upstate on November 16, 2006. *See* Smith Aff. (Dkt. No. 68–2) ¶ 11 and Exh. B. According to plaintiff's medical records, prior to his transfer he had been prescribed various medications including Lactase, a drug prescribed for lactose intolerance; Nasacort, for nasal congestion; Naprosyn, a pain medication; Prilosec for a gastroenterological disorder; and Vitamin E lotion for a dry, irritated skin condition. *Id.* at ¶¶ 15–16. As an SHU prisoner at both Elmira and Upstate, by regulation plaintiff was allowed only a twenty-four hour supply of non-prescription items and a seven day supply of prescription medications. [6] *Id.* at ¶ 18 and Exh. B, 11/18/06 entry.

Under established protocol, upon his transfer plaintiff's prescription medications should have been packed in a white medication bag and transferred to the medical staff at Upstate. Smith Aff. (Dkt. No. 68–2) ¶ 12. This, unfortunately, did not occur upon plaintiff's transfer. *Id.* at ¶ 13 and Exh. A at p. 3. Instead, plaintiff's medications were packed along with his personal property, and consequently those medications were not received by medical staff at Upstate until December 5, 2006. *Id.* at ¶ 13 and Exhs. A, B.

Plaintiff's medical records reveal that on November 20, 2006, four days after his transfer into Upstate, a physician at the facility ordered a seven day supply of Lactase, Naprosyn, and Prilosec for the plaintiff. Smith Aff. (Dkt. No. 68–2) ¶ 20 and Exh. B, 11/18/06 entry. Plaintiff received those medications on November 21, 2006 and November 24, 2006. *Id.* at ¶ 21 and Exh. C. In the interim, over-the-counter medications were made available to the plaintiff, upon request, to substitute for any lacking prescription medications. *Id.* at ¶ 22. Plaintiff's medical records reveal that, in fact, he did request such non-prescription medication on November 17, 18, and 26, 2006, including Medicidin D for nasal congestion and Ibuprofen for pain. *Id. at* ¶ 22 and Exh. B, 11/18/60 and 11/26/06 entries. The records also reflect that nasal spray was ordered for the plaintiff on December 5, 2006, at the request of a facility nurse, upon her review of plaintiff's records and that on that same date a prison physician, Dr. Connolly, reordered Nasacort to be restarted for the plaintiff. *Id.* at ¶¶ 23–24, and Exh. B, 12/5/06 entry. Plaintiff's medical records also reveal that he was provided Lactaid tablets for his lactose intolerance and that he had daily access to Vitamin E lotion. *Id. at* ¶¶ 27–28 and Exh. B, 11/18/06 and 11/26/06 entry.

## II. *PROCEDURAL HISTORY*

**\*3** Plaintiff commenced this action on February 15, 2007 and later filed an amended complaint on April 12, 2007, with approval of the court. [7] *See* Dkt. Nos. 1, 7. Named as defendants in plaintiff's complaint are B. Connolly, a prison physician at Upstate; C. Atkinson and K. Mulverhill, identified as nurses at that facility; M. Smith, a nurse administrator at Upstate; Elmira Superintendent Burge; Theresa Knapp–David, the DOCS Director of Classification and Movement; Lucien LeClaire, Jr., the acting DOCS Commissioner; N. Bezio, the Deputy Superintendent at Upstate; and Brian Fischer, the acting DOCS Commissioner. *Id.* Plaintiff's complaint asserts two causes of action, alleging that his transfer out of Elmira was in retaliation for his having engaged in protected activity in violation of his rights under the First Amendment and also that the defendants at Upstate were deliberately indifferent to his serious medical needs in violation of his right under the Eighth Amendment to be free from cruel and unusual punishment. *Id.*

Since commencement of the action plaintiff has twice sought preliminary injunctive relief, in both instances requesting that the defendants be directed to transfer him out of Upstate and into another facility for the safety of both Johnson and

his family. Dkt. Nos. 21, 41. Those motions were denied by Senior District Judge Thomas J. McAvoy by decisions issued on January 30, 2008 and August 21, 2008, respectively. Dkt. Nos. 30, 48. Plaintiff appealed those denials to the United States Court of Appeals for the Second Circuit. By summary order issued on October 16, 2009, and reissued as a mandate on November 12, 2009, that court affirmed Judge McAvoy's first preliminary injunction denial and ordered the issuance of a briefing schedule with regard to the second.[8] *See* Dkt. No. 70.

On April 27, 2009, following joinder of issue and the close of discovery, defendants filed a motion for summary judgment seeking dismissal of both of plaintiff's causes of action. Dkt. No. 68. In their motion defendants argue that no reasonable factfinder could conclude either that the plaintiff's transfer out of Elmira was provoked by his contemplation of a suit regarding the November 13, 2006 incident, or that once at Upstate the medical personnel there were deliberately indifferent to his serious medical needs. *Id.* Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 69, which is now fully briefed and ripe for determination and has been referred to me for the issuance of report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Plaintiff's Failure To File A Local Rule 7.1(a)(3) Responsive Statement*

In support of their motion defendants properly filed with the court a statement of material facts alleged not to be in dispute, as required by Northern District of New York Local Rule 7.1(a)(3). That rule imposes a corresponding requirement upon a party who, like the plaintiff, opposes a summary judgment motion, providing that

> **\*4** [t]he opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/ or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The nonmovant's response may also set

forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

In opposing defendants' motion plaintiff did not submit the responding statement contemplated under Local Rule 7.1(a)(3). The consequences of this failure are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (Aug. 22, 2000)* (McCurn, S.J.) (listing cases)[9]*; see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[10]

As a counterbalance to this often fatal deficiency, a court has broad discretion to overlook a party's failure to comply with its local rules. *The Travelers Indemnity Co. of Ill. v. Hunter Fan Co.,* No. 99 CIV 4863, 2002 WL 109567, at *7 (S.D.N.Y. Jan. 28, 2002)* (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and that it is fairly clear from his submission which facts are disputed, though without minimizing the importance of Local Rule 7.1(a)(3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement of facts not in dispute.

#### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477

U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

**\*5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Retaliatory Transfer Claim*

In their motion defendants contend no reasonable factfinder could conclude that plaintiff's transfer out of Elmira and into Upstate was motivated by his contemplation of a lawsuit regarding the November 13, 2006 incident. Defendants

further maintain that even if his protected activity were a motivating factor in the decision, the defendants have shown, as a matter of law, that regardless of the influence of that motive they would have taken the same action toward the plaintiff in any event, thereby establishing a complete affirmative defense to plaintiff's retaliation claim.

When adverse action is taken by prison officials against an inmate and is motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

**\*6** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific,

are alleged in only conclusory fashion and not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

In this instance, drawing all inferences in plaintiff's favor, the record now before the court sufficiently establishes the first two elements to avoid the entry of summary judgment dismissing this claim. Plaintiff's letter to Superintendent Burge on November 15, 2006, revealing his contemplation of a lawsuit regarding the feces throwing incident, could be viewed as activity protected under the First Amendment. *See Espinal v. Goord,* 558 F.3d 119, 128–29 (2d Cir.2009); *Benitez v. Locastro,* No. 9:04–CV0423, 2010 WL 419999, at *13 (N.D.N.Y. Jan. 29, 2010) (Mordue, C.J.). Similarly, given his allegation that at Upstate he was allegedly exposed to danger at the hands of known enemy inmates, plaintiff's transfer from one facility into another, even though he was placed in disciplinary SHU confinement at both facilities, could be found by a reasonable factfinder to represent an adverse action sufficient to support a retaliation cause of action. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998).

Consideration of the evidence related to the third prong of the retaliation test, addressing the question of motivation, brings squarely into focus a controverted fact. At the outset it should be noted that the fact the transfer occurred one day after plaintiff's letter threatening suit was sent gives rise to an inference of retaliatory motivation. *See Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (noting that temporal proximity of protected conduct and alleged retaliatory conduct may serve as circumstantial evidence of retaliation). In this instance, however, there is more. According to the plaintiff Superintendent Burge appeared outside of his SHU cell on November 15, 2006 and told him that he was "getting rid of" the plaintiff. Amended Complaint (Dkt. No. 7) at pp. 5–7; Johnson Aff. (Dkt. No. 69) ¶ 12. Notwithstanding defendant Burge's denial of having had that conversation, plaintiff's allegations raise a disputed issue of fact which must be resolved before the third element of the retaliation claim can be determined. *See id.* at 138–39.

 **\*7** In their motion, defendants contend that even if plaintiff could establish a *prima facie* case of retaliation, they have successfully established, as a matter of law, that they would have taken the same steps irrespective of the retaliatory animus, thereby establishing a complete defense to plaintiff's retaliation claim. When construed in a light most favorable

to the plaintiff, however, the facts reveal that there is a significant question as to whether the motivation offered by the defendants as having prompted the decision was pretextual. *See Gill v. Calescibetta,* No. 9:00–CV–1553, 2009 WL 890661, at * 3 (N.D.N.Y. mar. 31, 2009) (Suddaby, J. and Peebles, M.J.).

Given the existence of the disputed facts which must be resolved before plaintiff's retaliation claim and defendants' *Mount Healthy* defense can be analyzed, I recommend that defendants' motion for dismissal of plaintiff's retaliation claim be denied. [11]

#### D. *Deliberate Medical Indifference Claim*
Defendants' motion also challenges plaintiff's claim that upon his arrival at Upstate medical officials there were deliberately indifferent to his serious medical needs. In support of that motion defendants assert both that the record fails to establish that plaintiff suffers from a medical need of constitutional significance, and, in any event, medical officials at Upstate were not subjectively indifferent to any such need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of the protected afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976). The Eighth Amendment prohibits the imposition of punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—that is, the conditions alleged must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 & 298, 111 S.Ct.

2321, 2323–2324 (1991)); *Waldo v. Goord,* No. 97–CV– 1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (*citing Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970); *Waldo,* 1998 WL 713809, at *2 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1970).

1. *Serious Medical Need*

**\*8** In order to meet the objective prong of the governing Eighth Amendment test in a medical indifference case, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also arise where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N .Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

From the record in this case no reasonable factfinder could conclude that any of the conditions giving rise to the prescription medications of which plaintiff was deprived over an exceedingly brief period while at Upstate qualifies as serious for constitutional purposes. The medications involved were directed toward such modest conditions as lactose intolerance, nasal congestion, ankle pain, a gastrointestinal

condition, and dry or irritated skin. The record is devoid of any indication that these conditions presented situations of urgency or resulted in degeneration or extreme pain over the brief period involved. Indeed, according to his medical records, plaintiff was seen by medical staff seven times over a four week period following his transfer into Upstate, including on November 16, 17, 18, 26, and 28, 2006 as well as December 5 and December 18 of that year. Smith Aff. (Dkt. No. 68–2) ¶ 33 and Exh. B. None of the medical record entries associated with those examinations reveal evidence that would support a finding of the existence of a serious medical condition. Accordingly, I recommend dismissal of plaintiff's medical indifference claim based upon his failure to establish the existence of a serious medical condition.

2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment medical indifference cause of an action a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Leach,* 103 F.Supp.2d at 546. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

**\*9** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Thus, a physician who "delay [s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138; *Kearsey v. Williams,* 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005).

The record now before the court also fails to substantiate plaintiff's claims of subjective, deliberate indifference on the part of the defendants The failure of prison officials to provide him with his prescription drugs immediately upon his arrival at Upstate appears to have been the result of a mistake on the part of DOCS medical personnel at Elmira, who are not named in this complaint, in packing and forwarding those prescriptions along with plaintiff's personal belongings rather than following the established protocol of separately conveying them to the medical staff at Upstate. The record also reveals that at Upstate plaintiff was offered alternatives to the medications and that his prescriptions for most drugs were renewed shortly after his transfer into the facility. Neither plaintiff's complaint nor the record now before the court establishes a level of indifference on the part of any of the named defendants sufficient to support the subjective element of the deliberate indifference test. Accordingly, I recommend dismissal of that cause of action on this additional, independent basis.

### E. *Personal Involvement*

In their motion defendants also seek dismissal of plaintiff's claims against acting Commissioner's Fischer and LeClaire, defendant Knapp–David, and Superintendent Bezio on the basis that they lacked any personal involvement in the conduct giving rise to plaintiff's constitutional claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*10** The four defendants who are the subject of this portion of defendants' summary judgment motion occupy supervisory positions with the DOCS. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that

individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

In this instance plaintiff has adduced no evidence to show any permissible basis to find liability on the part of the four defendants in question. Accordingly, I recommend dismissal of plaintiff's claims against defendants Fischer, LeClaire, Knapp–David and Bezio on this separate, independent ground.

### F. *Qualified Immunity*

In their motion, defendants argue that even if plaintiff can establish a *prima facie* claim of medical indifference or retaliation, defendants should be shielded from liability based upon qualified immunity. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ––––, 129 S.Ct. 808, 815 (2009).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ––––, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable

to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[12] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall– On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[13] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[14] *Pearson,* 555 U.S. at ——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

 **\*11**  For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3)

whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith,* 21 F.3d at 500 (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

In this instance the surviving claim of retaliation implicates legal principles that were firmly established in 2006, the time of the relevant events. Because there are disputed issues as to whether or not defendant Burge ordered a transfer of the plaintiff out of Elmira in retaliation for his protected activity, an action which could not be said to be objectively reasonable for a superintendent in his position, I recommend denial of defendants' motion for summary judgment based on qualified immunity, without prejudice.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint in this action alleges two discreet causes of action. The first, alleging that plaintiff was transferred out of Elmira and into Upstate at the direction pf defendant Burge in retaliation for his having threatened to commence a lawsuit regarding an incident at Elmira, gives rise to disputed issues of material fact that must be resolved before the questions of whether plaintiff has established the requisite nexus between his protected activity and the transfer, and whether defendants have carried their burden in establishing that they would have taken the same action regardless of the plaintiff's protected activity, can be decided. Turning to plaintiff's cause of action for deliberate medical indifference, because the record fails to establish that he suffers from a serious medical condition of constitutional proportions or that any of the defendants were deliberately indifferent to any such condition, summary judgment dismissing that claim is warranted.

 **\*12**  Addressing defendants' remaining arguments, I find that the record further fails to disclose any basis for finding that defendants LeClaire, Fischer, Knapp–David, or Bezio were personally involved in the constitutional violations alleged,

and that plaintiff has not alleged participation on the part of Dr. Connolly, Nurses Atkinson, Miles and Mulverhill, and Nurse Administrator Smith in the conduct giving rise to plaintiff's surviving retaliation cause of action. Additionally, I conclude that at this juncture, it cannot be said that defendant Burge is protected by qualified immunity from plaintiff's retaliation claim. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 68) be GRANTED, in part, and that plaintiff's deliberate medical indifference cause of action and all claims against defendants Fischer, LeClaire, Knapp–David, Smith, Bezio, Connolly, Atkinson, Miles, and Mulverhill be DISMISSED, leaving only plaintiff's cause of action against defendant Burge for retaliation to be tried in this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 2628720

---

Footnotes

1   In response to a request in the form complaint utilized by the plaintiff seeking information about prior lawsuits, Johnson identifies a single action brought in the New York Court of Claims in November of 2006 but states that he has not commenced any suits in federal court relating to his imprisonment. *See* Amended Complaint (Dkt. No 7) § 4. Despite this statement, which was given under penalty of perjury, the record discloses otherwise. In fact, in this district alone plaintiff has commenced some thirty other actions addressing various aspects of prison life while incarcerated.

2   In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

3   Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

4   The record reflects that plaintiff has been in SHU confinement since 1997 and is currently scheduled to remain there until 2028, a date extending beyond his current maximum prison release date. *See* Hall Aff. (Dkt. No. 68–5) Exh. A. (Transcript of Plaintiff's Deposition, held on January 22, 2009, hereainfter "Johnson Dep. Tr.") at pp. 20–21.

5   In response to his later requests for copies of the videotape, plaintiff was informed that due to a "recorder malfunction" it does not exist. *See* Johnson Aff. (Dkt. No. 69) Exh. A at p. 3.

6   As an SHU inmate, plaintiff similarly was not allowed to possess creams, lotions, or spray bottles. Smith Aff. (Dkt. No. 68–2) ¶ 19.

7   This action was initiated in the Western District of New York but was transferred to this district as a result of the issuance of an order by District Judge David Larrimer on October 17, 2007. *See* Dkt. No. 16.

8   According to publically available information, that appeal remains pending, and was deemed ready as of the week of March 1, 2010. The pendency of that appeal, which addresses only plaintiff's request for interim injunctive relief, does not divest this court of jurisdiction to entertain and decide defendants' pending summary judgment motion. *Webb v. GAF Corp.,* 78 F.3d 53, 55 (2d Cir.1996)

9   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [*Editor's Note: Attachments of Westlaw case copies deleted for online display.*]

10  As to those facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

11  As will be seen, several of the defendants named by plaintiff in connection with his retaliation cause of action, including Acting Commissioners LeClaire and Fischer, Director Theresa A. Knapp–David, and Deputy Superintendent Bezio, are nonetheless entitled to dismissal of plaintiff's retaliation claim against them based upon their lack of personal involvement

in the alleged violation, *see* pp. 25–27, *post,* while others, including Dr. Connolly, Nurses Atkinson, Miles and Mulverhill and Nurse Administrator Smith, do not appear from the record to be linked to plaintiff's retaliation claim.

**12**    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

**13**    In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

**14**    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at ——, 129 S.Ct. at 815 (quoting *Hunter v.. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

---


Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the
Green Haven Correctional Facility,[FN1] prison officials
searched his cell and confiscated a number of documents
which were deemed to be "subversive" and contraband.
Samuels claims that the materials, including theological
textbook excerpts, were of a Christian nature and were
used in a course he taught in the prison through the New
York Theological Seminary. Samuels' alleged possession
of these documents led to a misbehavior report and a
subsequent disciplinary hearing, for which Samuels was
sentenced to 180 days in keeplock and 180 days' loss of
packages, commissary privileges, and telephone use.
Samuels also alleges that instead of being punished as per
his disciplinary hearing, he was sentenced to a more
severe punishment, 180 days in a special housing unit
which entailed Samuels' being locked in his cell for
twenty-three hours per day. On the basis of the allegedly
unlawful sanctions to which he was subjected, Samuels
has filed the instant action pursuant to 42 U.S.C. § 1983
alleging violations of, *inter alia,* his First Amendment and
due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action
pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue
that they enjoy qualified immunity barring this suit. For
the reasons set forth below, defendants' motion is granted
in part and denied in part.

FN1. Defendants repeatedly state that the events
giving rise to this action arose while Samuels
was incarcerated at the Great Meadow
Correctional Facility. Samuels states that the
events in question happened at the Green Haven
Correctional Facility. Moreover, Samuels'
evidence, including the Inmate Disciplinary
Report (Exhibit H), the Disciplinary Hearing
Record Sheet (Exhibit O), and the
Superintendent Hearing Disposition Report
(Exhibit P) all note the Green Haven
Correctional Facility. In light of the above, the
Court determines that defendants' position that
the events occurred at Great Meadow is
incorrect. The Green Haven Correctional Facility
is located in Dutchess County in the Southern
District, while Great Meadow is located in
Washington County in the Northern District.
Defendants make no argument regarding the
Court's jurisdiction with respect to the location of
the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set
forth below are gleaned from Samuels'
submissions, because on a FED. R. CIV. P.
12(b)(1) or (6) motion, the adjudicating court
must assume as true factual allegations made in
the complaint. Defendants concede this fact. *See*
Defendants' Memorandum of Law in Support of
their Motion to Dismiss the Complaint, at 4. It
should also be noted that Samuels brings this
action *pro se.* As such, it is sometimes difficult to
understand fully his contentions. Accordingly,
the Court reads the (sometimes confusing)
factual allegations in the light most favorable to
Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> [FN5.] While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> [FN6.] The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report. [FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf. [FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999. [FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre, [FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> **FN12.** Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> **FN13.** No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> **FN14.** In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122911 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at \*2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.] The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.] There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

### 4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

### 5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

### B. Due Process

### 1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at *22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' *Walker,* at *21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at *21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at *21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at *22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

**a. Witnesses**

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

>  FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.' " *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient

evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See* *Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see* *Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

e. Timeliness of the Hearing

**\*14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior*. *See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition*." Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2014 WL 4185195
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Dwayne M. REID, et al., Plaintiffs,

v.

NASSAU COUNTY SHERIFF'S
DEPARTMENT, et al., Defendants.

No. 13–CV–1192 (SJF)(SIL).
|
Signed Aug. 20, 2014.

**Attorneys and Law Firms**

Pablo A. Fernandez, Sara Kaye Schwartz, Thomas Lai, Mineola, NY, John J. Doody, Suzanne Emily Aribakan, Lewis Brisbois Bisgaard & Smith, LLP, New York, NY, for Defendants.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**\*1** Pursuant to a February 13, 2012 order entered in *Anderson, et al. v. Sposato, et al.,* 11–CV–5663 (SJF) (WDW) ("the *Anderson* case"), over one hundred (100) separate *pro se* complaints brought pursuant to 42 U.S.C. § 1983 ("Section 1983") challenging the prison conditions allegedly existing at the Nassau County Correctional Center ("NCCC") were consolidated. By Order dated February 11, 2013, the Court entered a scheduling order ("the Scheduling Order") governing discovery, motion practice and the trial in the *Anderson* case. This consolidated action consists of eighteen (18) [1] *pro se* plaintiffs who filed complaints in this Court against the Nassau County Sheriff's Department ("NCSD") [2]; Michael Sposato ("Sheriff Sposato"), individually and in his official capacity as Sheriff of Nassau County; "John Doe," Superintendent of the NCCC ("the Superintendent") [3]; and/or the County of Nassau ("the County") [4], near or after the expiration of several discovery deadlines set forth in the Scheduling Order. On or about June 11, 2013, three (3) of the consolidated plaintiffs [5], Henrius Jovany ("Jovany"), Abigail Torres ("A.Torres") and Guillermo Torres ("G.Torres"), jointly filed an amended complaint ("the amended complaint"), *inter alia,* naming "John Doe # 1" and "John Doe # 2," individually and in their official capacity as "County Cooks" for the NCCC (collectively, "the County Cooks"), and Armor Correctional Health Service of New York, Inc. ("Armor"), as additional defendants. Like the complaints in the *Anderson* case, the fifteen (15) remaining complaints and the amended complaint in this consolidated action are brought pursuant to, *inter alia,* Section 1983 and challenge similar prison conditions allegedly existing at the NCCC.

Pending before the Court are: (1) separate motions by defendants NCSD, Sheriff Sposato, the Superintendent, the County and the "County Cooks" (collectively, "the County defendants") to dismiss (a) the complaints of, *inter alia,* Reid, Christian Delosrios ("Delosrios"), Fernando Cazares ("Cazares") and Montavious Jackson ("Jackson") and (b) the amended complaint of Jovany, A. Torres and G. Torres [6] pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief [7]; and (2) Armor's motion to dismiss the amended complaint as against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. None of the consolidated plaintiffs has filed any opposition to Armor's motion and only A. Torres and G. Torres have opposed the County defendants' motion. For the reasons set forth below, the County defendants' and Armor's motions are granted in part.

I. The Complaints

A. Reid's Complaint
The statement of claim in Reid's complaint reads as follows:

> "Unsanitary conditions, abestos [sic], black mole [sic] all over the jail, toilets flush bodily waste into one toilet from another, the guard [sic] fail to give us proper cleaning supplies for the cell, infested with bed bugs, rodent and lack of medical attention. Cells are very cold. I have a rash on the bottom of my left foot that I have caught in here in Sept. I've been going to medical but it's still on my foot (rash)."

**\*2** (Complaint ["Compl."], ¶ IV). For injuries, Reid claims that he has "a rash on the bottom of [his] left foot" and that he received medical attention, "but not the proper attention because the rash is still there and it's getting worser [sic]." (Compl., ¶ IV(A)). For relief, Reid seeks "heat, cleaning supplies to clean unsanitary cells, medial [sic] treatment for all injuries herein, injunction [sic] relief and monetary damages" in an unspecified amount. (Compl., ¶ V).

B. Delosrios's Complaint

Delosrios contends that he has been incarcerated in the E2B housing unit of the NCCC since "[o]n or about March 9, 2013" and has been subjected to "an extremely filthy cell and housing unit that consisted of chipped peeling paint on walls, flooring, that included human feces encrusted on walls and toilet bowl," which caused him "to become very sick and infected on his buttocks from toilet not being clean." (Compl., ¶ IV). Delosrios also contends: (1) that the "housing unit correction officer John Doe" refused his request for cleaning supplies "to sanitize the cell and walls[;]" (2) that he "he has been bitten by numerous 'bed-bugs' and roaches that have caused * * * red marks on [his] neck, back and legs[;]" (3) that there "are [sic] active infestation of mice along with their 'mice feces' all around in [his] cell and running around on unit[;]" (4) that he and the other inmates "are being served * * * unhealthy and unsanitary foods that is [sic] clearly infested with insects and mice droppings;" (5) that he "made a formal complaint to Defendants, and Defendants 'choose [sic] not to investigate these complaints and ignore [sic] to correct these problems of conditions[;]" (6) that when he showed "the housing correction officer the dropping of mice feces," the officer "stated 'its [sic] more protein to eat[;]' " and (7) that "after complaints were made no correction [sic] action or remedy" was given. (Compl., ¶ IV).

Delosrios claims that due to the unsanitary and inadequate food, he suffers from "severe migraine headaches, * * * dizzy spells, * * * [and] stomach ache and pains" throughout the day. (Compl., ¶ IV). For injuries, Delosrios claims that he sustained an infection on his body, a fever, a severe migraine headache and stomachache and pains, for which he received medical treatment "consist [ing] of blue pills." (Compl., ¶ IV(A)). Delosrios seeks "injunctive relief and monetary [d]amages in the amount of $20 million dollar [sic] in compensatory

[d]amages, and $20 million dollars in punitive damages * * *." (Compl., ¶ V).

C. Cazares's Complaint

Like Delosrios, Cazares contends: (1) that he has been "subjected to an unsanitary housing unit on E2–B for over 6½ months * * * [,]" insofar as "the cell are [sic] extremely [sic] with chipped peeling paint, [and] encrusted dried fecal matters [sic] on the walls, ceiling and flooring[,]" (Compl. ¶ IV); (2) that the "housing unit correction officer John Doe" refused his request for cleaning supplies "to sanitize the walls and flooring and toilet bowl as well as the cell sink[,]" (id.); (3) that his cell and the housing unit are infested with bed bugs, roaches and mice, but defendants "refuse to set traps" and denied his request to be moved to another housing unit, (id.); (4) that he has "been bitten by bed-bugs and cockroaches that have cause [sic] him to become infected and marks on [his] body[,]" (id.); (5) that the food at the NCCC is "unappetizing," "unwholesome," "poorly prepared," "often infested with insects that you can 'see' upon eaten [sic]," "unsanitary to consume [and] being served under conditions that present immediate danger to [his] health as well as other inmates [sic] health[;]" and (6) that he "made 'complaints' too [sic] Defendants, however, Defendants choose [sic] to ignore, correct these problems * * *." (Compl., ¶ IV). (Id.) Cazares claims that due to the unsanitary food, he has "become very sick and weak throughout the day that consisted of severe migraine headaches and dizzy spells and stomach ache and pain from being underfed of proper food." (Compl., ¶ IV). In addition, Cazares alleges: (1) that "during the winter months, [he] is suffering from chills at night, because the cell are [sic] extremly [sic] cold" and his request to "correction office[r] John Doe" for an extra blanket was denied, as a result of which he "became very sick with fever for weeks that require[d] medical attention[,]" (id.); and (2) that "Correction Officer John Doe," bang the cell door on [his] foot intentionally, that caused [him] to fracture his foot,' do [sic] to the Correction Officer banging the cell door's [sic] daily as a means of waking inmates up and are banged throughout the day to count inmates, instead of using their P.A. system, which the banging is loud and violent." (Id.)

**\*3** For injuries, Cazares claims that he sustained an "[i]nfection on his [a]rms, and [b]ack, [s]evere headaches, dizzy spells and stomach ache and pains" and that medical treatment "was delayed for two-weeks, and thereafter received." (Compl., ¶ IV(A)). Cazares seeks "[i]njunctive

relief and [m]onetary [d]amages in the amount of $20 million dollars jointly and severally for [c]ompensatory damages, and $20 million dollars in punitive [d]amages * * *." (Compl., ¶ V).

**D. Jackson's Complaint**
Like Delosrios and Cazares, Jackson contends: (1) that since on or about August 3, 2012, he has been "subjected to unsanitary conditions at [NCCC] that have caused [him] to become infected from the unsanitary cell[,]" (Compl., ¶ IV); (2) that he "is housed on E2 B housing unit that is extremely dirty with chipped peeling paint on walls, and walls is [sic] clearly encrusted with urine and human feces and toilet not working properly[,]" (Id.); (3) that defendants "refuse to supply any cleaning supplies to sanitize [his] cell [,]" (id.); (4) that his cell is infested with insects and roaches and "active mice * * * running around during the night," which leave "numerous mice feces inside [his] drinking cup[,]" (id.); (5) that the insects and roaches have bitten him on his neck and legs, causing "an infection on [his] neck and red marks on [his] legs[,]" but defendants failed to remedy or correct the problem after he "filed a complaint," (id.); and (6) that he suffers from "severe migraine headaches from being underfed of proper food that is unsanitary to eat because the Defendants [sic] is subjected to unsanitary and unwholesome foods that is infested with insects and roaches along with mice dropping [sic], that have caused [him] to become very weak throughout the day from not eating * * *." (Id.) In addition, Jackson alleges that "[d]uring the night time [he] was bitten by a mice [sic], when [he] 'reached' into his [c]ommissary bag, to grab some cookies[,]" as a result of which he "received medical treatment that consist [sic] of a shot with a needle." (Id.) According to Jackson, he "made a formal complaint to Defendants about this matter, and Defendants refuse [sic] to investigate * * *." (Id.)

For injuries, Jackson claims that he sustained an "[i]nfection on his [l]egs and [a]rms, [b]itten by mice on fingers, treatment received was a shot with a needle, and treatment of pills." (Compl ., ¶ IV(A)). Jackson seeks "injunctive relief and [m]oney [d]amages in the amount of $20 million dollars, in [c]ompensatory [d]amages, and $20 million dollars in punitive [d]amages * * *." (Compl., IV).

**E. Amended Complaint**

Jovany "has been detained [in the NCCC] since May of 2011." (Amended Complaint ["Amend. Compl."], ¶ 9). G. Torres "has been detained in the NCCC since November of 2012" and was "awaiting sentence" at the time that the amended complaint was filed. (Amend.Compl., ¶ 11). A. Torres "has been detained in the NCCC since March, 2013." (Amend.Compl., ¶ 12).

*4 In their amended complaint, Jovany, A. Torres and G. Torres allege, *inter alia,* that inmates at the NCCC, including themselves: (1) "are subjected to inhumane conditions that have pose [sic] unreasonable and substantial risk to * * * [their] health[,]" (Amend.Compl., ¶ 1); (2) "are force [sic] to live in the amidst [sic] of filth, overflowing backups of sewage of stilled water in showers, cells with chipped peeling paint, dried human fecal matters and foods encrusted on walls, ceiling, poor ventilation, inadequate cleaning supplies, insect and rodent populations, sinks and toilets in cells[ ] don't work properly, cells that are too cold, poorly prepared, unsanitary and unwholesome meals, water leaking ceilings, [i]nadequate medical treatment, * * * [and][c]ooks not following illness inmates [sic] and plaintiffs [sic] diet meals[ ] or State provided nutritionally [sic] guidelines [,]" (id.); (3) "lack access to Safe Foods, proper medical diets, as well as basic necessities such are [s]anitary and properly [f]unctioning sinks, toilets, and showers, rodents, and insects invade * * * [their] living areas and [c]ontaminate [their] foods[,]" (Amend.Compl., ¶ 2); (4) "sleep in freezing cells" in the winter and "attempt to fight off the cold cells with a single worn blanket[,]" (id.); (5) are housed in "unsanitary" cells with toilets and "poor ventilation," (Amend.Compl., ¶ 21); (6) "are force [sic] to live in [s]qualid unhygienic and hazardous living conditions that pose a substantial and ongoing risk to [their] physical and mental health[,]" (id.); (7) "are subjected to cells with [a] chipped peeling paint on walls believed to obtain [sic] led [sic], * * * [b] walls * * * encrusted with human feces stains, [c] toilet and sinks * * *[that] are very out-dated[ ] and don't work properly, * * * [d] toilet seats [that] have accrued filth over time, as a result of the frequent waste, [which] has caused [them] to suffer from rashes on their buttocks, and infections[,] * * * [e] no ventilation[,] * * * [f] air-ducts [that] are clogged with rust and mold, and * * * [g] windows [that] are 'sealed shut[,]' " (id.); (8) "are subjected to numerous [c]lockroaches [c]rawling everywhere, including biting [them] on their 'arms and faces' at night, causing [them] infections on their bodies[,]" (Amend.Compl., ¶ 22); (9) "have to deal with

active infestation of mice's [sic], that run around during the night[ ] * * * [and] eat [their] foods [sic] purchase[d] from [the] [c]ommissary[,]" (Amend.Compl., ¶ 23); (10) "have numerous mice feces[ ] inside the only drinking cup that are giving to them[,] * * * [which] 'obsord' [sic] the mices [sic] feces that carry disease and harmful parasites or even hepatitis to add more serious conditions to [their] health[,]" (*id.*); (11) are "being served unhealthy, unsanitary foods * * * infested with insects and mice droppings[,]" (Amend. Compl., ¶ 24; *see also id.,* ¶ 35); (12) "are being underfed, and the food quanitity [sic] and quality * * * has [sic] been 400[c]alories each day, below the nationally recommended based 2000[c]alories diet allowance for [them] * * *, [which] has subjected [them] to contract severe migraines [sic] headaches, dizzy spells, and during the night time, stomach ache and pains[,]" (*id.*); (13) "are subjected to showers, that are [c]over [sic] in black mole [sic], mildew, stilled water of sewage backups on the flooring shower drains, that are frequently clogged and subjected [them] to contract severe fungal infection [sic] on their feets [sic] [,]" (Amend.Compl., ¶ 25); and (14) "live in very cold temperature in cells, during the winter months * * *[,]" as a result of which they " 'must' wear all of their County issuing [sic] clothing, a pair of socks on their hands and a towel wrap [sic] around [their] faces, to protect from the cold[,]" which "disrupts * * * [their] sleeping patterns" and causes them "stress [,]" (Amend.Compl., ¶ 27). In addition, A. Torres alleges that due to her age, she "is housed in NCCC, similar to an 'SHU unit,' that include [sic] being subjected in the 'woman unit,' to human waste in the showers, constant intense noise, resulting from deranged screaming inmates and noxious odors throughout the day ." (Amend.Compl., ¶ 33).

**\*5** Jovany, A. Torres and G. Torres allege that the County defendants: (1) "have known about the appalling un-[s]anitary [sic] [c]onditions and [p]oor medical treatment in the NCCC after numerous [c]omplaints from plaintiffs as well as other-inmates [sic] including State Official's [sic], but * * * have failed to make reasonable efforts to remedy these * * * conditions[,]" (Amend. Compl., ¶ 5; *see id.,* ¶ 51 ["These complaints were brought to the attention of Sposato from Plaintiff's as well as other inmates, who [sic] Sposato refused to take any action to correct the situation."]; *id.,* ¶ 52 ["The County of Nassau and Sposato knew of the unsanitary conditions, showed disregard for the health, welfare or human rights of plaintiffs as well as other inmates, and was aware

of the type of treatment the plaintiffs [sic] and other inmates were receiving at the NCCC."] ); (2) have ignored their "numerous complaints about the conditions of the showers * * * and have not fixed the showers * * * [,]" (Amend.Compl., ¶ 25); (3) have "refused or ignored their requests for adequate cleaning supplies "to remove the mold" on the showers, (Amend.Compl., ¶ 26), and "to try to remove the human encrusted [f]eces on walls in cells and clean the toilets in cells, including mold * * *[,]" (Amend.Compl., ¶ 28), and "instead, hand [them] a bar of soap called Corcraft, an ineffective cleaning solutions [sic][,]" (Amend.Compl., ¶ 26), "without any gloves * * * and an old rag[,]" (Amend.Compl., ¶ 28); (4) have not provided Jovany with "his proper vegetarian diet meals, prescribe [sic] by Doctor's [sic][,]" (Amend.Compl., ¶ 35), "intentionally serve [him] 'meats' inside of his meals throughout the day [,]" (*id.*), and have provided "no remedy" to him despite his "numerous grievances," (*id.*); (5) have "a history of sanitation problems in the NCCC [,]" (Amend.Compl., ¶ 37); and (6) "either ratified these acts or condoned them to such a degree, that they became part of the policy, custom, practice, and procedures of the County and Sposato, * * * [which] violated the plaintiffs [sic] herein mentioned rights of the Constitutional [sic] [,]" (Amend.Compl., ¶ 53). Jovany, A. Torres and G. Torres allege that Armor, *inter alia:* (1) "is failing to follow its own policies, * * * ignores signs of mental illness * * * [,] and fail[s] to treat [their] illness related issues[,]" (Amend.Compl., ¶ 29); (2) has engaged in a "repeated and systemic failure in the provision of health care service to [them] and other inmates in NCCC, with very serious mental disorders, including such basic inadequacies as failure to take a complete medical history, failure to keep adequate records, failure to see [them] * * * suffering from seeming mental crises, failure to diagnose medical conditions of inmates, failure to prescribe proper medication, and significant delay in providing any medical treatment service to [them] * * * *[,]" (*id.*); (3) "for over a 'year and present' * * * has failed to take any measurement [sic] to investigate or treat [Jovany's] medical problem [i.e., an "infection on his head"], that have [sic] caused [him] a serious head infection, that requires surgery[,]" (Amend.Compl., ¶ 31) (emphasis omitted); (4) has taken "no action" on Jovany's "numerous sick call request[s]" or the grievance he filed "toward this matter[,]" (*id.*); (5) has ignored A. Torres's "signs of mental illness," "sick call request slips" and complaints "about serious medical problems in the form of mental disorders and not receiving her prescribed medication for months"

and "fail[ed] to treat [her] properly[,]" as a result of which she "is suffering from significant mental problems without proper medical care[,]" (Amend.Compl., ¶ 33); and (6) has refused to "look into" G. Torres's complaints of "serious knee pains, that consisted of a swollen knee, and shoulder pain," or examine his knee or shoulder, as a result of which he has been subjected "to severe 'swollen knee' and shoulder pains * * * [,]" (Amend.Compl., ¶ 34).

**\*6** Jovany, A. Torres and G. Torres allege that they and other inmates at the NCCC "suffer from [c]hronic ailments, including persistent and recurring digestive issues, mental issues, stomach pains, skin and head infections, rashes, severe migrain [sic] headaches and dizzy spells and * * * are at current and ongoing risk of suffering from more serious ailments in the future [,]" as a result of the "poor conditions and health care[ ] at the NCCC." (Amend. Compl., ¶ 3; *see also id,* ¶ 13 ["Plaintiffs * * * as well as other inmates * * * suffered intestinal illness, skin rashes, infection on their heads, infections on their buttocks, fungal infections, headaches, poor medical care, unsanitary foods, improper health food diets for medically ill plaintiffs and mental disordered [sic]."]; *id.,* ¶ 35 ["Defendants * * * have subjected [Jovany] to be underfed, that have caused [him], severe migraine headaches, and dizzy spells, including stomach ache and pains during the night throughout each day and present * * *."] ). The amended complaint asserts two (2) causes of action pursuant to Section 1983 for violations of Jovany's, A. Torres's and G. Torres's due process rights under the Fourteenth Amendment to the United States Constitution and right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution (first and second causes of action, respectively), as well as state law claims for violations of their due process rights under the New York State Constitution (third cause of action) and for "negligence and ministerial negligence" (fourth cause of action). (Amend.Compl., ¶¶ 54–61). Jovany, A. Torres and G. Torres seek, *inter alia:* (1) injunctive relief "in the form of an appropriate remedial order to improve the [c]onditions in the NCCC, to meet minium [sic] Constitutionally acceptable [s]tandards," (Amend.Compl., ¶ 5), and "enjoin [ing] [d]efendants, and their successors, from subjecting [them] and other inmates in the NCCC to unsanitary, unhealthy, and unsafe conditions, and requir [ing] that a remedy be formulated, subject to Court's approval and modification, if necessary, to end the inhumane conditions described

herein at the NCCC[,]" (Amend. Compl. at 22–23); (2) judgment declaring that "subjecting [them] to the conditions described [in the amended complaint] violates the Eighth and Fourteenth Amendments to the United States Constitution and the Due Process Clause of the New York State Constitution, [and constitutes] negligence and ministerial negligence, which directly and proximately caused the violating [sic] under New York State laws[,]" (Amend. Compl. at 22); and (3) "money damages to redress Defendants [sic] violations of [their] rights under the Eighth and Fourteenth Amendments to the United States Constitution and the Due Process Clause of the New York State Constitution." (Amend. Compl., ¶ 5; *see also id.,* ¶ 14 ["Plaintiffs * * * sues [sic] for injunctive relief, declaratory relief, [c]ompensatory damages and punitive damages."]; at 23 [seeking an award of compensatory damages, punitive damages and "damages for the denials of [their] right to be free from cruel and unusual punishment and right to due process."] ).

## II. Discussion

### A. Standard of Review

**\*7** The standard of review on a motion made pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868.

The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting

*Twombly,* 550 U.S. at 557, 127 S.Ct. 1955, 167 L.Ed.2d 929). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. 544, 127 S.Ct. at 1959, 167 L.Ed.2d 929.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Services, Inc. v. 7 World Trade Co., L.P.,* 737 F.3d 166, 176 (2d Cir.2013); *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937, 173 L.Ed.2d 868. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868. "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.; see also Ruston v. Town Board for Town of Skaneateles,* 610 F.3d 55, 59 (2d Cir.2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120–1 (2d Cir.2010); *see also Matson v. Board of Education of City School District of New York,* 631 F.3d 57, 63 (2d Cir.2011) ( "While a complaint need not contain detailed factual allegations, it requires more than an unadorned, the defendant-unlawfully-harmed-me accusation." (internal quotations and citation omitted)). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937, 173 L.Ed.2d 868.

**\*8** The Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. *Chambers v. Time*

*Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002); *see also, ASARCO LLC v. Goodwin,* 756 F.3d 191, 2014 WL 2870117, at \* 5 (2d Cir. June 25, 2014).

B. Section 1983 Claims
The County defendants contend that the consolidated plaintiffs "must identify the specific constitutional rights allegedly infringed upon \* \* \* [and,] "[a]ccordingly, [they] have not pleaded allegations sufficient to constitute claims under Section 1983." (County Defendants' Memorandum of Law in Support of Motion pursuant to Fed. Civ. P. Rule 12(b) regarding, *inter alia,* Reid, Delosrios, Cazares and Jackson ["County Mem. I"], at 9; County Defendants' Memorandum of Law in Support of Motion pursuant to Fed. Civ. P. Rule 12(b) regarding, *inter alia,* Jovany, A. Torres and G. Torres ["County Mem. II"], at 8–9).

Section 1983 of Title 42 of the United States Code provides, in relevant part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010) (citing *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)); *see also Rehberg v. Faulk,* ⸺ U.S. ⸺, 132 S.Ct. 1497, 1501–02, 182 L.Ed.2d 593 (2012).

Prison officials have a duty, imposed under either the Eighth Amendment with respect to convicted prisoners or the Due Process Clauses of the Fifth and Fourteenth Amendments with respect to pretrial detainees in federal custody and state custody, respectively, [8] to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to] take reasonable measures to guarantee the safety of the inmates." *Farmer v.*

*Brennan,* 511 U.S. 825, 832–33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotations and citations omitted). Contrary to the County defendants' contention, the consolidated plaintiffs' allegations that the acts and/or omissions of the County defendants, acting under color of state law, deprived them of their rights, *inter alia,* to receive adequate food, shelter and medical care under the Eighth and Fourteenth Amendments to the United States Constitution are, thus, sufficient to state a plausible claim under Section 1983. Accordingly, the branches of the County defendants' motions seeking dismissal of the consolidated plaintiffs' Section 1983 claims for failure to "identify the specific constitutional rights allegedly infringed upon," (County Mem. I at 9; County Mem. II at 8), are denied.

1. Reid's Claims Against the NCSD

**\*9** "Under New York law, 'departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued.' " *Dudek v. Nassau County Sheriffs Department,* 991 F.Supp.2d 402, 410 (E.D.N.Y.2013) (quoting *Davis v. Lynbrook Police Department,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002)); *see also Burbar v. Incorporated Village of Garden City,* 961 F.Supp.2d 462, 471 (E.D.N.Y.2013); *Robischung–Walsh v. Nassau County Police Dep't,* 699 F.Supp.2d 563, 565 (E.D.N.Y.2010), *aff'd,* 421 F. App'x 38 (2d Cir.2011). Since the NCSD is an administrative arm of the County, *see, e.g. Dudek,* 991 F.Supp.2d at 410 (dismissing claims against the NCSD); *Varricchio v. County of Nassau,* 702 F.Supp.2d 40, 50 (E.D.N.Y.2010) (accord), it lacks the capacity to be sued. Accordingly, the branch of the County defendants' motion seeking dismissal of Reid's claims against the NCSD is granted and Reid's claims against the NCSD are dismissed in their entirety with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. However, since Reid is proceeding *pro se,* and all of the other consolidated plaintiffs herein have named the County as a defendant, Reid's Section 1983 claims against the NCSD will be construed as being brought against the County.

2. Municipal Liability

The County defendants contend, *inter alia:* (1) that "[a]bsent allegations that a Nassau County policy led to the Consolidated Plaintiffs' alleged injuries, the

Consolidated Plaintiffs' suit against the County must be dismissed for want of a substantial § 1983 claim," (County Mem. I at 11); (2) that none of the allegations of deliberate indifference in the amended complaint "rise to the level required to withstand a motion to dismiss; they are mere 'naked assertions' devoid of 'further factual enhancement[,]' " (County Mem. II at 23 (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955, 167 L.Ed.2d 929)); (3) that Jovany's, A. Torres's and G. Torres's allegations of deliberate indifference are "specious" and "fall flat because they attempt to establish [it] 'solely from evidence of the occurrence of the incident in question * * * [but] [a] plaintiff cannot prevail on a § 1983 claim against a municipality without introducing other evidence[,]' " (*id.* at 23–24 (quoting *Fiacco v. City of Rensselaer, N.Y.,* 783 F.2d 319, 328 (2d Cir.1986)); (4) that Jovany, A. Torres and G. Torres "fail to allege that Nassau County's incarceration system is 'contrary to the practice of most' other municipalities or that it is 'particularly dangerous because it presented an unusually high risk that constitutional rights would be violated[,]' * * * [which] is a key part of demonstrating deliberate indifference[,]" (*id.* at 24) [9]; and (5) that Jovany, A. Torres and G. Torres "do not show that better supervision or more supervision at NCCC would have prevented or would prevent further violations[,]" (*id.*).

**\*10** "[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012), *cert. denied,* ––– U.S. ––––, 134 S.Ct. 125, 187 L.Ed.2d 255 (2013); *see also Matusick v. Erie Co. Water Authority,* ––– F.3d ––––, 2014 WL 700718 (2d Cir. Feb.25, 2014) (accord). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Jones,* 691 F.3d at 80; *see also Connick v. Thompson,* ––– U.S. ––––, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (holding that under Section 1983, governmental bodies are not vicariously liable for their employees' actions); *Los Angeles County, California v. Humphries,* 562 U.S. 29, 131 S.Ct. 447, 452, 178 L.Ed.2d 460 (2010) ("[A] municipality cannot be held liable solely for the acts of others, *e.g.,* solely because it employs a tortfeasor." (emphasis in original) (quotations and citation omitted)); *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To prevail on a Section 1983 claim against a municipal entity,

a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008); *see also Connick,* ——U.S. ——, 131 S.Ct. at 1359, 179 L.Ed.2d 417 ("Plaintiffs who seek to impose liability on local governments under Section 1983 must prove that 'action pursuant to official municipal policy' caused their injury." (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018, 56 L.Ed.2d 611)); *Humphries,* 562 U.S. 29, 131 S.Ct. at 452, 178 L.Ed.2d 460 ("[A] municipality may be held liable when execution of a government's *policy or custom* ... inflicts the injury." (emphasis in original) (quotations and citation omitted)). "A municipal policy may be pronounced or tacit and reflected in either action or inaction." *Cash v. County of Erie,* 654 F.3d 324, 333 (2d Cir.2011). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick,* —— U.S. ——131 S.Ct. at 1359.

In addition, municipal liability can be established "by showing that a policymaking official ordered or ratified the employee's actions—either expressly or tacitly." *Jones,* 691 F.3d at 81. "Thus, a plaintiff can prevail against a municipality by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them." *Id.; see also Amnesty America v. Town of W. Hartford,* 361 F.3d 113, 126 (2d Cir.2004) (accord). To establish such deliberate indifference, "a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." *Jones,* 691 F.3d at 81. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick,* —— U.S. ——, 131 S.Ct. at 1360, 179 L.Ed.2d 417 (quotations and citation omitted). "[D]eliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent." *Jones,* 691 F.3d at 81; *see also Cash,* 654 F.3d at 334.

**\*11** To state a claim for municipal liability under Section 1983, a plaintiff must allege more than that a municipal policy or custom exists. *Zahra v. Town of Southold,* 48

F.3d 674, 685 (2d Cir.1995) ("[T]he mere assertion that a municipality has * * * a custom or policy is insufficient [to withstand dismissal] in the absence of allegations of fact tending to support, at least circumstantially, such an inference * * *." (quotations, alterations and citation omitted)); *see also Zherka v. City of New York,* 459 F. App'x 10, 12 (2d Cir. Jan.19, 2012) (summary order) (accord). "Rather, a plaintiff must allege facts tending to support, at least circumstantially, an inference that such a policy or custom exists." *Santos v. New York City,* 847 F.Supp.2d 573, 576 (S.D.N.Y. 20121; *see also Triano v. Town of Harrison, N.Y.,* 895 F.Supp.2d 526, 535 (S.D.N.Y.2012) (accord).

Contrary to the County defendants' contention, the complaints at issue on this motion, and particularly the amended complaint, allege sufficient facts from which it may reasonably be inferred that a municipal policy or custom existed. Specifically, the consolidated plaintiffs' allegations that Sheriff Sposato, a policymaking official, was aware of the challenged conditions at the NCCC but failed to remedy them and/or chose to ignore them, plausibly states a claim of deliberate indifference to the consolidated plaintiffs' constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution. Contrary to the County defendants' contentions, the consolidated plaintiffs were not required to "introduc[e] other evidence" or "show" anything additional in their pleadings in order to withstand a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Accordingly, the branches of the County defendants' motions seeking dismissal of the consolidated plaintiffs' Section 1983 claims against the County, and as construed to be against the County with respect to Reid, are denied.

3. Claims against Sheriff Sposato and the Superintendent
The County defendants contend, *inter alia,* that the consolidated plaintiffs' claims against Sheriff Sposato and the Superintendent must be dismissed because, (1) insofar as they are sued in their official capacity, they do not have a legal identity separate and apart from the County; and, (2) insofar as they are sued in their individual capacity, the consolidated plaintiffs do not allege their personal involvement in the constitutional violations of which they complain. [10]

a. Official Capacity Claims

"[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity [of which an officer is an agent]." *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). "It is *not* a suit against the official personally, for the real party in interest is the entity." *Id.* (emphasis in original). "Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official-capacity claims as redundant." *Phillips v. County of Orange,* 894 F.Supp.2d 345, 384 n. 35 (S.D.N.Y.2012) (citing cases); *see, e.g. Canzoneri v. Incorporated Village of Rockville Centre,* 986 F.Supp.2d 194, 205 (E.D.N.Y.2013) (dismissing official capacity claims against individual officers "because they are duplicative of the *Monell* claims against the [municipality]."); *Field Day, LLC v. County of Suffolk,* 799 F.Supp.2d 205, 214 (E.D.N.Y.2011) (dismissing official capacity claim because, *inter alia,* the real party in interest was the County and it was a named party to the action); *Schubert v. City of Rye,* 775 F.Supp.2d 689, 699–700 (S.D.N.Y.2011) (dismissing official capacity claims as redundant). Accordingly, the branches of the County defendants' motions seeking dismissal of the consolidated plaintiffs' Section 1983 claims against Sheriff Sposato and the Superintendent in their official capacity are granted and the consolidated plaintiffs' Section 1983 claims against Sheriff Sposato and the Superintendent are dismissed in their entirety with prejudice as redundant to their claims against the County. [11]

**b. Individual Capacity Claims**

**\*12** A Section 1983 claim must allege the personal involvement of any individual defendant in the purported constitutional deprivation. *See Spavone v. New York State Department of Correctional Services,* 719 F.3d 127, 135 (2d Cir.2013) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995))); *Grullon,* 720 F.3d at 138–39 ("[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation.") "Personal involvement" may be established by evidence of direct participation in the challenged conduct, or by evidence of a supervisory official's "(1) failure to take corrective action after learning of a subordinate's

unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut v. State Univ. of New York,* 352 F.3d 733, 753 (2d Cir.2003); *see also Grullon,* 720 F.3d at 139; *Back v. Hastings on Hudson Union Free School District,* 365 F.3d 107, 127 (2d Cir.2004). "The fact that [a defendant] was in a high position of authority is an insufficient basis for the imposition of personal liability." *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989) (quotations and citation omitted); *see also Back,* 365 F.3d at 127; *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). A complaint based upon a violation under Section 1983 that does not allege facts establishing the personal involvement of an individual defendant fails as a matter of law. *See Costello v. City of Burlington,* 632 F.3d 41, 48–9 (2d Cir.2011).

The allegations in the complaints, and particularly the amended complaint, at issue on this motion, are sufficient to state a plausible claim of supervisory liability on the part of Sheriff Sposato in his individual capacity. Specifically, the consolidated plaintiffs' allegations, *inter alia,* that Sheriff Sposato knew about the challenged conditions at the NCCC that violated their constitutional rights, but failed to act to remedy or correct those conditions, are sufficient at the pleadings stage to state a plausible Section 1983 claim against Sheriff Sposato in his individual capacity. Accordingly, the branches of the County defendants' motions seeking dismissal of the consolidated plaintiffs' Section 1983 claims against Sheriff Sposato in his individual capacity are denied.

However, Reid has not alleged the direct participation of the Superintendent in any of the wrongdoing alleged in his complaint, nor any basis upon which to find the Superintendent liable in a supervisory capacity. Accordingly, the branch of the County defendants' motion seeking dismissal of Reid's Section 1983 claims against the Superintendent in his individual capacity is granted and Reid's Section 1983 claims against the Superintendent in his individual capacity are dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. [12]

**4. Conditions of Confinement Claims**

**\*13** While "[t]he Constitution does not mandate comfortable prisons, \* \* \* neither does it permit inhumane ones \* \* \*." *Farmer,* 511 U.S. at 832, 114 S.Ct. 1970, 128 L.Ed.2d 811. Prison officials violate the Eighth Amendment, or Due Process Clause of the Fourteenth Amendment, only when; (1) "the deprivation alleged [is], objectively, sufficiently serious, \* \* \* [i.e.,] a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities," *id.,* 511 U.S. 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (quotations and citations omitted); and (2) the officials acted, or failed to act, with "a sufficiently culpable state of mind \* \* \* [i.e.,] [with] deliberate indifference to inmate health or safety \* \* \*." *Id.* (quotations and citations omitted); *see also Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013).

a. Objective Element

"[T]here is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012) (quotations, alterations and citation omitted); *see also Walker,* 717 F.3d at 125 (accord). "[E]xtreme deprivations are required to make out a conditions-of-confinement claim[ ][b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quotations and citation omitted); *see also Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (accord). As noted above, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates \* \* \*." *Farmer,* 511 U.S. at 832–33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (quotations and citations omitted); *see also Walker,* 717 F.3d at 125 ("To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health. \* \* \* Thus, prison officials violate the Constitution when they deprive an inmate of his basic human needs such as food, clothing, medical care, and safe and sanitary living conditions." (quotations and citations omitted)); *Jabbar,* 683 F.3d at 57 ("[P]risoners may not be deprived of their basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to their future health." (quotations and citations omitted)).

"Moreover, conditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " *Walker,* 717 F.3d at 125 (quoting *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). "Nothing so amorphous as 'overall conditions' can rise to the level of [a constitutional violation] when no specific deprivation of a single human need exists." *Wilson,* 501 U.S. at 305, 111 S.Ct. 2321, 115 L.Ed.2d 271.

**\*14** The County defendants contend, *inter alia:* (1) that the consolidated plaintiffs allege "nothing more than incidents that are insufficiently continuous or chronic to withstand [their] motion to dismiss[,]" (County Mem. I at 21); (2) that "[w]hile the Second Circuit has been mum on the matter of heating at the Circuit's prisons, considerable authority from sister circuits helps demonstrate that Consolidated Plaintiffs' allegations here are meritless," (*id.* at 24); and (3) that the consolidated plaintiffs cannot satisfy their burden of showing that "the conditions were objectively serious as to deny the minimal civilized measure of life's necessities." (*Id.; see also* County Mem. II at 12 ["Plaintiffs here are denied of" none of the basic human needs, including shelter, food and plumbing] ).[13] In addition, the County defendants cite to cases in which courts have dismissed prisoners' Eighth or Fourteenth Amendment claims based upon their *de minimis* injuries, such as a skin rash.

The complaints and amended complaint at issue on the County defendants' motions plausibly allege that the conditions of confinement at the NCCC deprived the consolidated plaintiffs "of the minimal civilized measure of life's necessities and subjected [them] to unreasonable health and safety risks." *Walker,* 717 F.3d at 126. In *Walker,* the Second Circuit found that the plaintiff had plausibly alleged a violation of his constitutional rights based upon his allegations, *inter alia,*

> "that for approximately twenty-eight months, he was confined in a cell with five other men, with inadequate space and ventilation, stifling heat in the summer and freezing cold in the winter, unsanitary conditions, including

urine and feces splattered on the floor, [and] insufficient cleaning supplies * * * ."

717 F.3d at 126; *see also Grullon,* 720 F.3d at 142 ("Allegations of deliberate indifference to serious threats to the well-being or safety of a person in custody, such as unhealthy extremes in temperature * * * or unhealthy air conditions in * * * cell[s] * * * have been held sufficient to withstand a motion to dismiss for failure to state a claim on which relief can be granted."); *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (holding that a constitutional violation "may be established by proof that the inmate was subjected to for a prolonged period to bitter cold" and that "prison officials knowingly * * * allow[ed] an area to remain filled with sewage and excrement for days on end."); *Mitchell v. Keane,* 175 F.3d 1008, 1999 WL 159896, at *2 (2d Cir. Mar.17, 1999) (summary order) (finding that an allegation that "sewage [was] dripping through the ceiling * * * might qualify as a deprivation of 'the minimal civilized measure of life's necessities'that is, a 'sufficiently serious' deprivation to satisfy the 'objective component' of an Eighth Amendment challenge to conditions of confinement.") In addition, the Second Circuit and district courts in this Circuit have held that, within the prison context, the following allegations, *inter alia,* may all may rise to the level of a constitutional violation: (1) a "failure to provide prisoners with toiletries and other hygienic materials[,]" *Walker,* 717 F.3d at 127; *Solomon v. Nassau County,* 759 F.Supp.2d 251, 258 (E.D.N.Y.2011); (2) "rodent infestation," *Gaston,* 249 F.3d at 166; *Solomon,* 759 F.Supp.2d at 258; (3) continuous or "chronic exposure to human waste," *Florio v. Canty,* 954 F.Supp.2d 227, 234, 235 (S.D.N.Y.2013); *Solomon,* 759 F.Supp.2d at 258; and (4) "unwilling exposure to an unreasonably high concentration of airborne asbestos particles," i.e., friable asbestos, *Pack v. Artuz,* 348 F.Supp.2d 63, 79 (S.D.N.Y.2004); *see also LaBounty v. Coughlin,* 137 F.3d 68, 72 (2d Cir.1998); *Pratt v. City of New York,* 929 F.Supp.2d 314, 320 (S.D.N.Y.2013); *Jackson v. Goord,* 664 F.Supp.2d 307, 320 (S.D.N.Y.2009).[14] "However, conditions that are temporary or occasional * * * have been found not to constitute a sufficiently serious deprivation to sustain a Section 1983 deliberate indifference claim." *Solomon,* 759 F.Supp.2d at 258 (citing cases); *see also Florio,* 954 F.Supp.2d at 234.

*15 Moreover, while the failure to issue an inmate a blanket, itself, may not constitute a constitutional deprivation, the failure to issue a blanket combined with a low cell temperature may rise to the level of a constitutional violation. *See, e.g. Wilson,* 501 U.S. at 305, 111 S.Ct. 2321, 115 L.Ed.2d 271 ("*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercisefor example, a low cell temperature at night combined with a failure to issue blankets." (emphasis in original)). Similarly, while the denial of cleaning supplies, itself, may not constitute a constitutional deprivation, *see, e.g. Dolberry v. Levine,* 567 F.Supp.2d 413, 417 (W.D.N.Y.2008) (holding that the plaintiff's allegation, *inter alia,* that prison officials denied him cleaning supplies for several weeks did not give rise to a constitutional violation); *Davidson v. Murray,* 371 F.Supp.2d 361, 371 (W.D.N.Y.2005) (holding that "occasional or temporary deprivations of personal hygiene items," such as toothpaste, soap, toilet tissue and "cell cleaning items," did not rise to the level of a constitutional violation), when combined with chronic or prolonged unsanitary conditions, such as the presence of bodily waste on the walls, floors and/or ceilings of the cells, the denial of adequate cleaning supplies may rise to the level of a constitutional deprivation. *See, e.g. Walker,* 717 F.3d at 127 ("Availability of hygienic materials is particularly important in the context of otherwise unsanitary living conditions.")

With respect to food, the Constitution "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (quotations and citation omitted); *see also Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002). Allegations that a prisoner was served food contaminated or "tainted" by foreign objects, e.g., rocks, glass, human waste, soap, metal pins, staples, etc., are sufficient to plead a constitutional violation, *see, e.g. Robles,* 725 F.2d at 16; *Varricchio,* 702 F.Supp.2d at 56, as are allegations that prison officials deprived a prisoner of a nutritionally adequate diet for a prolonged period of time.[15] *See Phelps,* 308 F.3d at 186.

The consolidated plaintiffs make much of the same allegations about the ventilation, temperature, unsanitary conditions and insufficient cleaning supplies available to them at the NCCC as the plaintiff alleged in *Walker,* which the Second Circuit found sufficient to state a plausible claim for a deprivation of his constitutional rights, and also allege, *inter alia,* that their cells and/or housing units are infested with insects and rodents, that they are exposed to asbestos, black mold and human waste on a chronic basis, and/or that they are served food contaminated with feces and other foreign objects or below the nationally recommended dietary allowance. In addition, Jovany alleges that the "County Cooks" have "intentionally served [him] 'meats' inside of his meals" in violation of his religious beliefs [16]. Accordingly, the allegations in the complaints and amended complaint at issue on this motion are sufficient to satisfy the objective element of a Section 1983 conditions of confinement claim, i.e., to state a plausible claim that the consolidated plaintiffs were denied "the minimal civilized measure of life's necessities," *Farmer,* 511 U.S. 832, 114 S.Ct. 1970, 128 L.Ed.2d 811, in violation of their Eighth and/or Fourteenth Amendment rights.

**\*16** Moreover, the nature or extent of the consolidated plaintiffs' injuries does not warrant dismissal of their claims, particularly since they seek, *inter alia,* injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm by correcting the challenged conditions at the NCCC. "[O]ne does not have to await the consummation of threatened injury to obtain preventative relief." *Farmer,* 511 U.S. at 845, 114 S.Ct. 1970, 128 L.Ed.2d 811 (quotations and citation omitted). Prisoners alleging due process violations, or violations of other substantive constitutional rights, may obtain, *inter alia,* injunctive or declaratory relief, nominal damages, punitive damages and/or compensatory damages for actual injury, notwithstanding the extent, or even lack, of any injury alleged. *See, e.g. Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) ("[T]he denial of procedural due process should be actionable for nominal damages without proof of actual injury."); *Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) (holding that the limitation of recovery for mental and emotional injury in the absence of physical injury prescribed by 42 U.S.C. § 1997e(e) does not prevent prisoners from obtaining injunctive or declaratory relief, nominal damages, punitive damages or compensatory damages for actual injuries); *Amato v. City of Saratoga Springs, N.Y,* 170 F.3d 311, 317 (2d Cir.1999) ("While the main purpose of a § 1983 damages award is to compensate individuals for injuries caused by the deprivation of constitutional rights, a litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury."): *Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994) ("In an action brought pursuant to Section 1983, 'even when a litigant fails to prove actual compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right.' " (quoting *Smith v. Coughlin,* 748 F.2d 783, 789 (2d Cir.1984))). " '[B]y making the deprivation of such ['absolute'] rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed.' " *Amato,* 170 F.3d at 317 (quoting *Carey,* 435 U.S. at 266, 98 S.Ct. 1042, 55 L.Ed.2d 252) (second brackets in original).

Furthermore, "if [a prisoner] can establish that the levels of alleged exposure to toxic substances at [prison] posed a significant risk of serious harm, then he will have proven a[ ] [constitutional] violation and be entitled at least to nominal damages." *Jackson,* 664 F.Supp.2d at 317.

The cases cited by the County defendants wherein the courts dismissed prisoners' Section 1983 claims based upon *de minimis* injuries are inapposite insofar as they involved either: (1) deliberate indifference claims based upon a deprivation of adequate medical care which require, *inter alia,* proof that the "defendant was deliberately indifferent to *a serious medical need," Sledge v. Kooi,* 564 F.3d 105, 108 (2d Cir.2009) (emphasis added); or (2) claims seeking damages for mental duress or emotional suffering, for which recovery is limited absent "a prior showing of physical injury" by 42 U.S.C. § 1997e(e). *See, e.g. Purdie v. City of N.Y.,* 10 Civ. 5802, 2011 WL 1044133, at \* 3 (S.D.N.Y. Mar.15, 2011) (deliberate indifference to medical needs claim); *Thompson v. Carlsen,* No. 08–CV–0965, 2010 WL 3584409, at \* 14 (N.D.N.Y. Aug.16, 2010), *report and recommendation adopted by* 2010 WL 3584396 (N.D.N.Y. Sept.7, 2010) (Section 1997e(e)); *Dolberry,* 567 F.Supp.2d at 417–18 (Section 1997e(e); *Swindell v. Supple,* 02 Civ. 3182, 2005 WL 267725, at \* 7 (S.D.N.Y. Feb.3, 2005) (deliberate indifference to medical needs claim); *Troy v. Kuhlmann,* 96 Civ. 7190, 1999 WL 825622, at \*13 (S.D.N.Y. Apr.15, 1999) (deliberate indifference to medical needs claim). Although a serious injury or medical need is an element of a deliberate indifference claim

based upon a deprivation of adequate medical care, the same is not true of a deliberate indifference claim based upon inhumane or unhealthy conditions of confinement. Moreover, although Section 1997e(e) prevents a prisoner from "recover[ing] damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury." *Thompson, 284 F.3d at 417*, it "does not prevent a prisoner from obtaining injunctive or declaratory relief[,] * * * nominal damages [,] * * * punitive damages[,] * * * [or] compensatory damages * * * provided he can establish actual injury." *Id.* at 418. Accordingly, the allegations in the complaints and amended complaint are sufficient at the pleadings stage to satisfy the objective element of a deliberate indifference claim based upon the conditions of confinement at the NCCC.

b. Subjective Element

**\*17** "[D]eliberate indifference describes a state of mind more blameworthy than negligence * * * [but] less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer, 511 U.S. at 835, 114 S.Ct. 1970, 128 L.Ed.2d 811.* "[A] prison official cannot be found liable under the Eighth Amendment [or Due Process Clause of the Fourteenth Amendment] * * * unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811. A prisoner "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id* . at 842, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811.

"To establish a due process violation of the Fourteenth Amendment, an inmate must show that a government official made a deliberate decision to deprive him of his life, liberty, or property. * * * Merely negligent conduct does not give rise to claims under the Fourteenth Amendment." *Jabbar, 683 F.3d at 57; see also Walker, 717 F.3d at 125* ("To meet the subjective element, the plaintiff must show that the defendant acted with 'more than mere negligence.'" (quoting *Farmer, 511 U.S. at 835, 114 S.Ct. 1970, 128 L.Ed.2d 811)*). "A prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or

learned of the inmate's complaint and failed to remedy it, or created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates." *Gaston, 249 F.3d at 164.* In addition, "[e]vidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Walker, 717 F.3d at 125* (quoting *Brock v. Wright, 315 F.3d 158, 164 (2d Cir.2003)*); *see also Farmer, 511 U.S. at 842, 114 S.Ct. 1970, 128 L.Ed.2d 811* ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.")

Nonetheless, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer, 511 U.S. at 844, 114 S.Ct. 1970, 128 L.Ed.2d 811.* In sum, "a prison official may be held liable * * * for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811.

In their first memorandum of law, the County defendants address the subjective element of a deliberate indifference claim in just the following three (3) conclusory sentences: (1) "Even if [the consolidated plaintiffs] were able to satisfy [the objective] burden, they cannot demonstrate that prison officials had the sufficiently culpable state of mind so as to be 'deliberately indifferent' to his [sic] discomfort[;]" (2) "While Consolidated Plaintiffs make no mention of any officials in the Consolidated Complaint [sic], so long as an official acted reasonably, he cannot be found liable under the Cruel and Unusual Punishments Clause [;]" and (3) "Thus, Consolidated Plaintiffs, too, fails [sic] the second prong of his [sic] Eighth Amendment claim regarding the temperatures in the cell." (County Mem. I at 24–25).

**\*18** In their second memorandum of law, the County defendants make a similar assertion to the first one in their first memorandum of law and contend that the consolidated plaintiffs

> "allege that [they] were 'deliberately indifferent' but proffer no proof as to how [they] acted. In fact, Plaintiffs mention that [they] provided Plaintiffs with Corcraft

soap, exhibiting not deliberate indifference but care that the Plaintiffs maintain a level of cleanliness and sanitation. * * * Without further proof of any sort of deliberate indifference, the Plaintiffs allegations are 'naked assertions' devoid of 'further factual enhancement [,]' *Twombly,* 550 U.S. at 557[,] * * * [which] cannot survive this motion; similarly, their § 1983 claim about the conditions at NCCC is deficient."

(County Mem. II at 13). With respect to the food issues, the County defendants contend that "[w]ith a higher burden than mere negligence, 'deliberate indifference' is difficult for the Plaintiffs here to prove [;]" that "Plaintiffs do not allege that [they] had any knowledge of the alleged food issues at NCCC; without knowledge, the County Defendants certainly cannot be held to have been 'deliberately indifferent[;]' " and that "[t]hus, Plaintiffs' food grievances are legally deficient." (County Mem. II at 15–16). With respect to cell temperature issues, the County defendants contend, *inter alia,* that since the consolidated plaintiffs "are provided layers of clothing, socks, and a towel (and presumably the jail-issued bedding) with which to keep warm * * * [and][t]here is no mention of prison officials denying Plaintiffs extra bedding or in any way relieving 'deliberate indifference' to Plaintiffs' alleged plight," (County Mem. II at 17) [17], the amended complaint fails to satisfy the subjective element of a Section 1983 conditions of confinement claim.

The allegations in the complaints and/or amended complaint, *inter alia,* that the consolidated plaintiffs, other inmates at the NCCC and State officials filed numerous grievances and/or made complaints about the challenged conditions at the NCCC are sufficient at the pleadings stage to satisfy the subjective element of a deliberate indifference claim, i.e., to show that the County defendants knew that the challenged conditions, which posed a substantial risk of serious harm to those exposed to them, existed at the NCCC and failed to take any reasonable measures to abate or remedy those conditions. Contrary to the County defendants' contention, the consolidated plaintiffs need not proffer any "proof" at the pleadings stage in order to avoid dismissal of their complaints and amended complaint. In addition, some of the conditions alleged, e.g., rodent and insect infestation, human excrement on the floors and walls, black mold, etc., and the risks that those conditions pose to those frequently exposed to them, are arguably obvious.

Moreover, the issue of whether it was reasonable to provide the consolidated plaintiffs with only Corcraft soap in light of the purported unsanitary conditions existing at the NCCC, or with only "clothing, socks, and a towel" in light of the "extrem[e]ly cold" temperatures in the cells during the winter months, is properly determined by the finders of fact, not on a motion to dismiss on the pleadings. In addition, the consolidated plaintiffs' allegations that some of the conduct of which they complain was intentional, e.g., the contamination of Jovany's vegetarian meals by the "County Cooks," clearly satisfy the subjective element. Accordingly, the branches of the County defendants' motions seeking dismissal of the consolidated plaintiffs' Section 1983 conditions of confinement claims are denied. [18]

### 5. Deprivation of Adequate Medical Care Claims

**\*19** Delosrios and Jackson do not claim a denial or delay of adequate medical treatment. Reid contends, *inter alia,* that the medical treatment he received for a rash on the bottom of his foot was "improper" because the rash is still there. Cazares contends, *inter alia,* that medical treatment for his complaints of an infection on his arms and back, severe headaches, dizzy spells and stomachache and pains was delayed for two (2) weeks. The amended complaint alleges, *inter alia:* (1) that Armor (a) ignored (i) signs of mental illness in A. Torres and (ii) G. Torres's complaints of knee and shoulder pain, and (b) failed to investigate and treat Jovany's head infection; and (2) that A. Torres did not receive her prescribed medication for months. Attached to the amended complaint are, *inter alia:* (1) a sick call request by Jovany, dated February 3, 2012, indicating, "I have a bleeding rash on my neck [and] head! [I]t has been four months since I have reported this. I have been seen by Med, Doc prescribed several different medications (None) have made an improvement in my condition. I also need to address my dietary issues. Thank you[,]" (Amend.Compl., Ex. 1); (2) a grievance form completed by Jovany, dated March 11, 2012, indicating, *inter alia,* (a) "I have serious condition[.] I have bumps on back on [sic] my head[.] I've been writing grievances for the last 5 months[.] Now I have a large bump in different area of my head. [B]umps are not leaving with medication

given to me[,]" (Amend.Compl., Ex. 2), (b) "I would like to be taken to outside hospital or doctor concerning this serious matter[,]" (*id.*), (c) that the grievance was accepted on March 21, 2012, and (d) that "the healthcare provider informed [the grievance coordinator] lab work was performed and the provider is waiting for the results before adjusting the grievant's [illegible] [,]" (*id.*); and (3) a sick call request by G. Torres, dated January 7, 2013, indicating, "[m]y knee keeps hurting[.] Please help me. My back been hurting me too and my left shoulder. I never got a copy of my blood test results[.] I need one[,]" (Amend.Compl., Ex. 5).

Claims for deliberate indifference to serious medical needs have both an objective and subjective component. *See Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011); *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005); The objective component of a deliberate indifference to serious medical needs claim requires that "the alleged deprivation * * * be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain, exists." *Hill,* 657 F.3d at 122 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)); *see also Farmer,* 511 U.S. at 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 ("First, the deprivation alleged must be, objectively, sufficiently serious." (quotations and citation omitted)); *Johnson,* 412 F.3d at 403. In order to determine whether an alleged deprivation of medical care was objectively serious, the court must inquire (1) whether the inmate was "actually deprived of adequate medical care," i.e., whether the prison officials acted reasonably in response to the inmate's medical needs; and (2) "whether the inadequacy in medical care [was] sufficiently serious," i.e., how the challenged conduct was inadequate and what harm, if any, the inadequacy has caused or will likely cause the inmate. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006); *see also Thompson v. Racette,* 519 F. App'x 32, 33–34 (2d Cir. June 4, 2013) (summary order); *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir. Sept.26, 2007) (summary order).

a. Objective Element

**\*20** "When a prisoner alleges denial of adequate medical care, [courts] evaluate the seriousness of the prisoner's underlying medical condition." *Bellotto,* 248 Fed. Appx. at 236; *see also Salahuddin,* 467 F.3d at 280. However, "[w]hen the basis for a prisoner's [deliberate indifference] claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment,

it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support a[ ] [deliberate indifference] claim." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003) (emphasis, quotations and citations omitted); *see also Bellotto,* 248 Fed. Appx. at 236 ("When a prisoner alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment, [courts] focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." (quotations and citation omitted)). "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant * * *." *Smith,* 316 F.3d at 186; *see also Salahuddin,* 467 F.3d at 280. In evaluating the objective component of a deliberate indifference claim based upon a delay or interruption in treatment, courts must "focus[ ] on the particular risks attributable to the missed * * * medication [or other delay or interruption in treatment], rather than on [the plaintiff's underlying medical condition alone] * * *." *Smith,* 316 F.3d at 187. Where the "risk of harm" the plaintiff faced as a result of missed medication, or other delay in treatment, is "not substantial," there is no constitutional violation. *Bellotto,* 248 Fed. Appx. at 237.

Reid and Jovany fail to state a plausible claim for deliberate indifference to a serious medical need because a persistent skin rash or infection does not constitute a "sufficiently serious" medical need. [19] *See, e.g. Lewal v. Wiley,* 29 F. App'x 26, 29 (2d Cir. Jan.4, 2002) (summary order) (affirming dismissal of a deliberate indifference to serious medical needs claim based upon allegations that the defendants refused to treat the plaintiff for a slightly low red blood cell count and a persistent rash on the ground that the plaintiff had not alleged, *inter alia,* the existence of a serious medical condition); *Purdie,* 2011 WL 1044133, at \* 3 ("A skin rash is generally insufficient to meet the objective requirement of a sufficiently grave and serious condition giving rise to a deliberate indifference [to serious medical needs] claim."); *Gillard v. Rovelli,* No. 9:09–cv–0860, 2010 WL 4905240, at \*11 (N.D.N.Y. Sept.29, 2010), *report and recommendation adopted by* 2010 WL 4945770 (N.D.N.Y. Nov.24, 2010) (holding that complaints of a facial rash, elbow pain for five years, back

and spine pain and left ankle pain did not plausibly suggest the existence of a serious medical condition); *Gonzalez v. Wright,* No. 9:06–cv–1424, 2010 WL 681323, at * 11 (N.D.N.Y. Feb.23, 2010) (holding that a rash or infection on various parts of the body is not sufficiently serious to state a claim for deliberate indifference to serious medical needs).

**\*21** Likewise, it cannot reasonably be inferred from the allegations in Cazares's complaint that the risk of harm he faced as a result of the purported two (2)-week delay in providing him medical treatment for his complaints of an unidentified infection, headaches, dizzy spells and stomachache and pains was substantial. Accordingly, the branches of the County defendants' motions seeking dismissal of the consolidated plaintiffs' Section 1983 deliberate indifference to medical needs claims is granted to the extent that Reid's, Cazares's and Jovany's Section 1983 deliberate indifference to medical needs claims are dismissed in their entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. [20] Likewise, the branch of Armor's motion seeking dismissal of Jovany's Section 1983 deliberate indifference to medical needs claim against it is granted and Jovany's Section 1983 deliberate indifference to medical needs claim is dismissed in its entirety with prejudice as against Armor pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. [21]

However, although A. Torres does not identify the mental disorder from which she allegedly suffers, the allegations in the amended complaint that she was receiving medication for a mental health condition is sufficient, at the pleadings stage, to satisfy the objective element of a Section 1983 deliberate indifference to serious medical needs claim. *See, e.g. Taylor v. Lawrence,* No. 9:05–cv–1316, 2008 WL 2357066, at * 6 (N.D.N.Y. June 4, 2008) ("[B]ecause [the plaintiff] was receiving medication for a mental health condition, he has presumptively alleged facts sufficient to provide relief as to whether he suffered a serious medical need.") In addition, for purposes of this motion only, it is assumed, *arguendo,* that G. Torres's complaints of knee swelling and pain and shoulder pain are sufficient to satisfy the objective element of a deliberate indifference to medical needs claim. *Compare Johnson v. Wright,* 477 F.Supp.2d 572, 575–76 (W.D.N.Y.2007) (finding that a torn meniscus was not sufficiently serious to give rise to a constitutional

claim), *aff'd,* 324 F. App'x 144 (2d Cir. May 21, 2009), and *Henderson v. Sommer,* Nos. 08 Civ. 3440, 09 Civ. 611, 2011 WL 1346818, at * 3 (S.D.N.Y. Apr.1, 2011) (finding that knee injuries, e.g., meniscal damage, are insufficient to support a deliberate indifference to serious medical needs claim), *with Rosario v. Anson,* No. 9:12–cv–1506, 2013 WL 5236568, at * 9 (N.D.N.Y. Sept.17, 2013) (finding that allegations of repeated complaints about chronic swelling, pain and discomfort in the knee were sufficient to satisfy the objective element of a deliberate indifference to serious medical needs claim).

b. Subjective Element
Subjectively, the official must have acted "with a sufficiently culpable state of mind, * * * [i.e.,] with deliberate indifference to inmate health." *Nielsen,* 746 F.3d at 63 (quotations and citation omitted); *see also Farmer,* 511 U.S. at 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (holding that the second requirement for a deliberate indifference claim is that a prison official must have acted or failed to act with a "sufficiently culpable state of mind."); *Wilson, 501 U.S. at 299, 111 S.Ct. 2321, 115 L.Ed.2d 271* (holding that a deliberate indifference claim "mandate[s] inquiry into a prison official's state of mind"). The official must have "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280; *see also Farmer,* 511 U.S. at 842, 114 S.Ct. 1970, 128 L.Ed.2d 811; *Caiozzo,* 581 F.3d at 72 (holding that the plaintiff must establish that the official "knew of and disregarded an excessive risk to [the plaintiff's] health or safety and * * * was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." (alterations and quotations omitted)). "Deliberate indifference is a mental state equivalent to subjective recklessness[.]" *Nielsen,* 746 F.3d at 63 (quotations and citation omitted), and "describes a state of mind more blameworthy than negligence." *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970, 128 L.Ed.2d 811; *see also Jabbar,* 683 F.3d at 57.

**\*22** Generally, "mere allegations of negligent malpractice do not state a claim of deliberate indifference." *Hathaway,* 99 F.3d at 553; *see also Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim * * * under the Eighth Amendment. Medical malpractice does not become a

constitutional violation merely because the victim is a prisoner."); *Hill, 657 F.3d at 123* ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessnessan act or a failure to act by a prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (quotations and citation omitted)); *Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir.2003)* (" 'Deliberate indifference' describes a mental state more blameworthy than negligence * * * [and] is a state of mind that is the equivalent of criminal recklessness. * * * A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act * * * that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations and citations omitted)).

Moreover, "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Hill, 657 F.3d at 123; see also Hanrahan v. Mennon, 470 F. App'x 32, 33 (2d Cir. May 18, 2012)* (summary order). "[M]ere disagreement over the proper treatment does not create a constitutional claim." *Hill, 657 F.3d at 123* (quoting *Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)); see also Fuller v. Lantz, 549 F. App'x 18, 21 (2d Cir. Dec.19, 2013)* (summary order). "[T]he essential test is one of medical necessity and not one simply of desirability." *Hill, 657 F.3d at 123* (quoting *Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir.1986)).

The amended complaint is bereft of any factual allegations from which it may reasonably be inferred that any of the County defendants, or any employee or agent of Armor, acted or failed to act with knowledge that a substantial risk of serious harm would result: (a) to A. Torres by allegedly denying her treatment for her mental disorder or failing to dispense her prescribed medication, or (b) to G. Torres by allegedly failing to treat his complaints of knee and shoulder pain. Accordingly, the branches of the County defendants' motion and Armor's motion seeking dismissal of A. Torres's and G. Torres's Section 1983 deliberate indifference to serious medical needs claims are granted and A. Torres's and G. Torres's Section 1983 deliberate indifference to serious medical needs claims are dismissed in their entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. [22]

**6. Cazares's Excessive Force Claim**

**\*23** The County defendants contend, *inter alia,* that Cazares's excessive force claim, i.e., that an unidentified correction officer intentionally "bang [ed] the cell door on [his] foot," fracturing it, must be dismissed because it cannot be reasonably inferred from his complaint that the correction officer acted willfully or wantonly to inflict pain upon him.

"Although not every malevolent touch by a prison guard gives rise to a federal cause of action, * * * inmates have the right to be free from the unnecessary and wanton infliction of pain at the hands of prison officials * * *." *Hogan v. Fischer, 738 F.3d 509, 515 (2d Cir.2013)* (quotations and citations omitted). "To establish a claim under the Eighth [or Fourteenth] Amendment for excessive force, a plaintiff must satisfy both an objective and subjective element." *Chambliss v. Rosini, 808 F.Supp.2d 658, 667 (S.D.N.Y.2011)* [23]; *see also Wright v. Goord, 554 F.3d 255, 268 (2d Cir.2009)* ("A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect.")

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright, 554 F.3d at 268* (quotations and citation omitted). The "core judicial inquiry" for a claim alleging that a prison officer used excessive force upon a prisoner in violation of the Eighth Amendment, is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Wilkins v. Gaddy, 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010)* (quoting *Hudson, 503 U.S. at 7, 112 S.Ct. 995, 117 L.Ed.2d 156.* "Where 'no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may ... be sufficient evidence of a culpable state of mind.' " *Hogan, 738 F.3d at 516* (quoting *Bod die v. Schneider, 105 F.3d 857, 861 (2d Cir.1997)).

To satisfy the objective prong of an Eighth Amendment excessive force claim, "an inmate must establish that

the conduct alleged is 'sufficiently serious' to reach constitutional dimensions." *Hogan,* 738 F.3d at 515. "This inquiry is 'context specific, turning upon 'contemporary standards of decency.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999)). "[W]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated[,] whether or not significant injury is evident." *Id.* (quotations, alterations and citations omitted). Nonetheless, "[t]he Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Wilkins,* 559 U.S. at 37–38, 130 S.Ct. 1175, 175 L.Ed.2d 995 (quotations and citation omitted).

**\*24** In his complaint, Cazares alleges, in relevant part:

> "Correction Officer John Doe, bang [sic] the cell door on [Cazares's] foot intentionally, that caused [him] to 'fracture his foot,' do [sic] to the Correction Officer banging the cell door's [sic] daily as a means of waking inmates up and are banged throughout the day to count inmates, instead of using their P.A. system, which the banging is loud and violent."

(Compl., ¶ IV(5)). Based upon the allegations in Cazares's complaint, there was a legitimate penological purpose for the banging of the cell doors, i.e., to wake and count inmates. Since there are no allegations in Cazares's complaint from which it may reasonably be inferred that, by banging the cell doors, the John Doe Correction Officer, or any other County defendant, acted maliciously or sadistically to cause Cazares harm, the complaint fails to state a plausible Section 1983 excessive force claim. Accordingly, the branch of the County defendants' motion seeking dismissal of Cazares's Section 1983 excessive force claim is granted and Cazares's Section 1983 excessive force claim is dismissed in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. [24]

### 7. Qualified Immunity

The County defendants contend: (1) that the individual County defendants are shielded from the consolidated plaintiffs' Section 1983 claims against them by the doctrine of qualified immunity because the consolidated plaintiffs "fail to allege the bare minimum to establish an objectively serious deprivation [,]" (County Mem. I at 32); and (2) that Sheriff Sposato has qualified immunity because (a) Jovany's, A. Torres's and G. Torres's "claim [sic] is void of a valid 'deprivation' " and their "complaints about the conditions at NCCC, the food at NCCC, their cell temperatures, and their medical treatment do not amount to Eighth Amendment violations * * * " and, thus, "do not violate any 'clearly-established constitutional rights[,]' " and (b) "[w]hile [Jovany, A. Torres and G. Torres] argue their clearly-established constitutional rights were violated by County Defendants[,] specifically their rights to be free from cruel and unusual punishment * * *, none of their rights were violated." (County Mem. II at 27).

"Qualified immunity protects federal and state officials from both civil damages and 'unnecessary and burdensome discovery or trial proceedings [,]' " *Spavone,* 719 F.3d at 134 (quoting *Crawford–El v. Britton,* 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)); *see also Coollick v. Hughes,* 699 F.3d 211, 219 (2d Cir.2012) (accord), "where the officials' conduct was not in violation of a 'clearly established' constitutional right." *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir.2012). *cert. denied,* —— U.S. ——, 133 S.Ct. 2777, 186 L.Ed.2d 219 (2013); *see also Walker,* 717 F.3d at 125 ("A federal official is entitled to qualified immunity from suit for money damages unless the plaintiff shows that the official violated a statutory or constitutional right, and that the right was 'clearly established' at the time of the challenged conduct.") "It is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment." *Spavone,* 719 F.3d at 134 (quotations and citation omitted); *see also Sudler,* 689 F.3d at 174 ("Qualified immunity is an affirmative defense, on which the defendant officials bear the burden of proof.")

**\*25** "Qualified immunity * * * extends to circumstances where an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' and applies 'regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' " *Spavone,*

719 F.3d at 135 (quoting *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)); *see also Vincent v. Yelich,* 718 F.3d 157, 166 (2d Cir.2013) ("Qualified immunity, an affirmative defense on which the defendant officials bear the burden of proof, * * * protects public officials performing discretionary functions from personal liability in a civil suit for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *Taylor v. Vermont Department of Education,* 313 F.3d 768, 793 (2d Cir.2002) ( "Individual public officials are entitled to qualified immunity from claims for monetary damages if the statutory right infringed was not clearly established at the time of the violation or if it was objectively reasonable for officials to believe their acts did not infringe upon those rights.") "So long as a defendant has an objectively reasonable belief that his actions are lawful, he is entitled to qualified immunity." *Spavone,* 719 F.3d at 135 (quotations and citation omitted); *see also Sudler,* 689 F.3d at 174 ("If the conduct did not violate a clearly established right, or if it was objectively reasonable for the official to believe that his conduct did not violate such a right, then the official is protected by qualified immunity." (quotations, brackets and citation omitted)). "Qualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.' " *Vincent,* 718 F.3d at 166 (emphasis omitted) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); *see also Sudler,* 689 F.3d at 174 ("Qualified immunity * * * shields government officials from liability when they make reasonable mistakes about the legality of their actions * * *." (quotations and citation omitted)).

"Because the immunity not only protects against a judgment for damages but also is in part an entitlement not to be forced to litigate, * * * early resolution of the qualified immunity defense is encouraged * * *." *Vincent,* 718 F.3d at 166–67 (quotations and citations omitted); *see also Walker,* 717 F.3d at 126 ("[C]ourts should resolve the question of qualified immunity at the 'earliest possible stage in litigation[.]" (quotations and citation omitted)). However, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route[.]" *Walker,* 717 F.3d at 126 (quoting *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004)). "[O]n a motion to dismiss, 'it is the defendant's conduct as alleged in the complaint

that is scrutinized for objective legal reasonableness.' " *McGarry v. Pallito,* 687 F.3d 505, 514 (2d Cir.2012) (quoting *Behrens v. Pelletier,* 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)). Accordingly, "qualified immunity is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed." *Walker,* 717 F.3d at 130.

**\*26** "Where the nonexistence of a constitutional right may be discerned from the face of the complaint, an official defendant sued in his individual capacity may be granted a dismissal on the ground of qualified immunity pursuant to Rule 12(b)(6) * * *." *Vincent,* 718 F.3d at 167; *see also Bush v. City of Utica, N.Y .,* 558 F. App'x 131, 133 (2d Cir. Mar.17, 2014) (summary order) (accord). However, "a ruling on the availability of a qualified immunity defense would be premature [on a motion to dismiss] [if,] [f]or example, the objective reasonableness of the defendants' acts depends in part on what information they had at the time." *Taylor,* 313 F.3d at 793–94.

Since, liberally read, the consolidated plaintiffs' complaints and amended complaint plausibly allege violations of their rights under the Eighth and/or Fourteenth Amendments by the County defendants with respect to the conditions of confinement at the NCCC, and that the County defendants acted with at least deliberate indifference with respect to those rights, as set forth above, the issue with respect to qualified immunity in this case is whether defendants reasonably believed that their conduct did not violate those rights. Where, as here, "[i]t is unclear what information the individual defendants possessed when they allegedly deprived [the consolidated] plaintiffs of [their] rights under the [Constitution], or whether other facts may come to light that would render their actions objectively reasonable[,]" *Taylor,* 313 F.3d at 794, a qualified immunity defense is properly denied at the pleadings stage. *See id.; Starkey ex rel. Starkey v. Somers Cent. Sch. Dist.,* 319 F.Supp.2d 410, 421 (S.D.N.Y.2004) ("[T]he qualified immunity issue turns on factual questions that cannot be resolved at the motion to dismiss stage of proceedings." (quotations, brackets and citation omitted)). Accordingly, the branches of the County defendants' motions seeking dismissal of the consolidated plaintiffs' Section 1983 claims against the individual defendants as barred by the doctrine of qualified immunity are denied.

**C. The Prison Litigation Reform Act of 1995**

1. Exhaustion of Administrative Remedies

Section 1997e(a) of the Prison Litigation Reform Act of 1995 ("PLRA"), 110 Stat. 1321–71, as amended, 42 U.S.C. § 1997e *et seq.,* provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock,* 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *see also Woodford v. Ngo,* 548 U.S. 81, 85, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (holding that under the PLRA, "[e]xhaustion is no longer left to the discretion of the district court, but is mandatory.") Although "failure to exhaust is an affirmative defense under the PLRA * * *[,]" *Jones,* 549 U.S. at 216, 127 S.Ct. 910, 166 L.Ed.2d 798; *see also Grullon,* 720 F.3d at 141, once the defense is asserted "no unexhausted claim may be considered." *Jones,* 549 U.S. at 219–20, 127 S.Ct. 910, 166 L.Ed.2d 798; *see also Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir.2011) ("Exhaustion is mandatory—unexhausted claims may not be pursued in federal court.")

**\*27** "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Johnson v. Killian,* 680 F.3d 234, 238 (2d Cir.2012) (brackets in original) (quoting *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "[T]he PLRA exhaustion requirement requires proper exhaustion[.]" *Woodford,* 548 U.S. at 93, 126 S.Ct. 2378, 165 L.Ed.2d 368, "that is, 'using all steps that the agency holds out, and doing so properly.' " *Amador,* 655 F.3d at 96 (quoting *Woodford,* 548 U.S. at 90, 126 S.Ct. 2378, 165 L.Ed.2d 368); *see also Jones,* 549 U.S. at 218, 127 S.Ct. 910, 166 L.Ed.2d 798 ("Compliance with prison grievance procedures * * * is all that is required by the PLRA to 'properly exhaust.' ") "This entails both completing the administrative review process in accordance with the applicable procedural rules, * * * and providing the level of detail necessary in a grievance to comply with the grievance procedures." *Amador,* 655 F.3d at 96 (quotations, brackets and citations omitted); *see also Woodford,* 548 U.S. at 90–91, 126 S.Ct. 2378, 165 L.Ed.2d

368 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules * * *.") "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones,* 549 U.S. at 218, 127 S.Ct. 910, 166 L.Ed.2d 798; *see also Johnson,* 680 F.3d at 238.

Moreover, "complete exhaustion of administrative remedies through the highest level for each claim is required." *Bennett v. James,* 737 F.Supp.2d 219, 224 (S.D.N.Y.2010), aff'd, 441 Fed. Appx. 816 (2d Cir. Dec.20, 2011)) (alterations, quotations and citation omitted); see also *Schwartz v. Dennison,* 518 F.Supp.2d 560, 568 (S.D.N.Y.2007), aff'd, 339 Fed. Appx. 28 (2d Cir. July 22, 2009) ("A prisoner must completely exhaust the administrative remedies to the highest level for each claim he seeks to present. * * * Moreover, a claim must be completely exhausted prior to commencing suit."); *Baez v. Kahanowicz,* 469 F.Supp.2d 171, 178–79 (S.D.N.Y.2007), aff'd, 278 Fed. Appx. 27 (2d Cir. May 15, 2008) (accord).

"The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. * * * The PLRA also was intended to reduce the quantity and improve the quality of prisoner suits." *Woodford,* 548 U.S. at 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (quotations, brackets and citations omitted); *see also Johnson,* 680 F.3d at 238 ("[T]he purpose of the PLRA is to reduce the quantity and improve the quality of prisoner suits[,] and to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." (second brackets in original) (quoting *Amador,* 655 F.3d at 96)). Where "a prior [properly exhausted] grievance identifies a specific and continuing complaint that ultimately becomes the basis for a lawsuit," *Johnson,* 680 F.3d at 239, the prior grievance is sufficient to exhaust a prisoner's administrative remedies with respect to continuing violations at the facility. *Id.* at 238–39. However, "generalized complaints regarding the conditions of an inmate's confinement will [not] suffice to shortcut the administrative remedy process." *Id.* at 239.

**\*28** In *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004), the Second Circuit "established a three-part inquiry to guide the analysis of whether a plaintiff has met the requirements of Section 1997e(a) of the PLRA." *Amador,* 655 F.3d at 102. Pursuant to that inquiry,

> "[t]he court must ask whether administrative remedies were in fact 'available' to the prisoner. * * * The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it * * *, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense * * *. If the court finds that administrative remedies were available to the plaintiff, and that the defendants ar not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."

*Hemphill,* 380 F.3d at 686 (quotations and citations omitted).[25] "If any of the three parts is satisfied, the prisoner is deemed to have exhausted internal procedures for purposes of the PLRA." *Amador,* 655 F.3d at 102.

### a. Reid

Although Reid alleges that there is no prisoner grievance procedure in the NCCC, (Reid Compl., ¶ 11(A)), all of the other consolidated plaintiffs admit that there is a prisoner grievance procedure available at the NCCC. (Compls., ¶ 11(A)). For the question on the complaint form: "[d]id you present the facts relating to your complaint in the prisoner grievance procedure[,]" Reid crossed out the check he put next to the word, "Yes," and left the question unanswered. Reid also omitted any response to the follow-up questions: "[i]f your answer is YES, 1. What steps did you take? [and] 2. What was the result?" (Compl., ¶ 11(B)). However, for the follow-up question: "[i]f your answer is NO, explain why not," Reid wrote, "[d]idn't get to that yet." [26] (Compl., ¶ 11(D)). Reid answered the question: "[i]f there is no prison grievance procedure in the institution, did you complain to prison authorities[,]" in the affirmative, (Compl., ¶ 11(E)), and indicated in the follow-up questions that he "filled out a few sick call sheets and they gave [him] something to put on the rash[,]" but his "rash is still there." (Compl., ¶ 11(F)).

Since, *inter alia,* there were administrative remedies available to Reid at the NCCC; the County defendants preserved the affirmative defense of non-exhaustion by asserting it in their instant motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; and Reid failed to oppose the County defendants' motion, thereby waiving any contention that the County defendants are estopped from asserting the non-exhaustion defense or that "special circumstances" otherwise exist justifying his failure to exhaust the available grievance procedures, the branch of the County defendants' motion seeking dismissal of the consolidated plaintiffs' Section 1983 claims for failure to exhaust is granted to the extent that Reid's Section 1983 claims are dismissed in their entirety with prejudice pursuant to 42 U.S.C. § 1997e(a) for failure to exhaust available administrative remedies.

### b. The Other Consolidated Plaintiffs

**\*29** Delosrios, Cazares and Jackson all contend that there is a prisoner grievance procedure available in the NCCC and that they presented the facts relating to their respective complaints in the prisoner grievance procedure. (Compls., ¶¶ II(A) and (B)). Specifically, Delosrios and Cazares both contend that they presented " 'two' grievances" to the NCCC's grievance committee and Jackson alleges that on March 8, 2013, he "filed * * * a grievance" about the conditions at the NCCC, which defendants "choose [sic] to ignore and fail[ed] to correct * * *." (Compls., ¶¶ 11(C)(1) and IV). For the follow-up question, "[w]hat was the result[,]" Delosrios responded, "none, cannot remedy the grievances[;]" Cazares responded, "cannot correct or remedy grievances[;]" and Jackson responded, "cannot remedy problem on grievance." (Compls., ¶ 11(C)(2)). Jovany, A. Torres and G. Torres also allege in their

amended complaint that they filed grievances, and attach copies of some grievances filed by them to the amended complaint.

The County defendants improperly rely upon matters outside the pleadings, i.e., the NCCC's Inmate Handbook, in support of the branches of their motions seeking dismissal of the consolidated plaintiffs' claims for failure to exhaust administrative remedies. Unlike Reid's complaint, which demonstrated on its face that Reid had not complied with the NCCC's prisoner grievance procedure, i.e., he never even filed a grievance with respect to his claims, the complaints and amended complaint of the other consolidated plaintiffs all allege that those consolidated plaintiffs at least filed grievances regarding their claims. Thus, unlike Reid's complaint, the issue of whether the other consolidated plaintiffs properly exhausted their administrative remedies is not discernible from the face of their complaints and amended complaint.

Rule 12(d) of the Federal Rules of Civil Procedure provides, in relevant part, that "[i]f, on a motion under Rule 12(b)(6) * * *, matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56[ ][and][a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." "A district court may not convert a motion under Fed.R.Civ.P. 12(b)(6) into a Rule 56 motion for summary judgment without sufficient notice to an opposing party and an opportunity for that party to respond." *Groden v. Random House, Inc.,* 61 F.3d 1045, 1052 (2d Cir.1995); *see also Hernandez v. Coffey,* 582 F.3d 303, 307 (2d Cir.2009) ("[A] district court acts properly in converting a motion for judgment on the pleadings into a motion for summary judgment when the motion presents matters outside the pleadings, but the rule requires that the court give sufficient notice to an opposing party and an opportunity for that party to respond." (quotations and citation omitted)). "In the case of a *pro se* party, * * * notice is particularly important because the *pro se* litigant may be unaware of the consequences of his failure to offer evidence bearing on triable issues." *Hernandez,* 582 F.3d at 307 (quotations, brackets and citation omitted); *see also Parada v. Banco Industrial de Venezuela, C.A.,* 753 F.3d 62, 68 (2d Cir.2014) ("Notice is particularly important for a *pro se* litigant, who must be unequivocally informed of the meaning and consequences of conversion to summary judgment." (quotations, brackets and citation omitted)).

"Accordingly, *pro se* parties must have unequivocal notice of the meaning and consequences of conversion to summary judgment." *Hernandez,* 582 F.3d at 307–08 (quotations and citation omitted). Thus, before a district court converts a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure into a motion for summary judgment, *pro se* plaintiffs are "entitled to (i) an opportunity to take relevant discovery and to submit any evidence relevant to the issues raised by the motion, and (ii) absent a clear indication that [they] already possessed such understanding, an explanation of the consequence of a grant of summary judgment, as well as of what [they] could do to defeat the motion." *Id.* at 308.

**\*30** However, even if converted to a motion for summary judgment, these branches of the County defendants' motions would be denied because they have not satisfied their burden of showing that each consolidated plaintiff, other than Reid, did not properly exhaust all administrative remedies available to him or her. Although the County defendants contend, *inter alia,* that the other consolidated plaintiffs did not take their grievances to the highest level of administrative review, (*See* County Mem. I at 19; County Mem. II at 30), they have not submitted any evidence, e.g., an affidavit or declaration, in support of that assertion. Rule 56(c) of the Federal Rules of Civil Procedure requires, in relevant part, that all factual assertions must be supported by "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations * * *, admissions, interrogatory answers, or other materials; * * *."[27] Accordingly, the branches of the County defendants' motion seeking dismissal of the other consolidated plaintiffs' Section 1983 claims pursuant to 42 U.S.C. § 1997e(a) for failure to exhaust administrative remedies are denied with leave to renew as a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[28]

### 2. Claims for Mental or Emotional Injury

The County defendants contend, *inter alia,* that the consolidated plaintiffs' "claim[s] for damages should be dismissed under the PLRA [42 U.S.C. § 1997e(e) ] for lack of a—or enough of a—'compensable physical injury.' " (County Mem. I at 28; County Mem. II at 32).

Section 1997e(e) of Title 42 of the United States Code provides, in relevant part, that "[n]o Federal civil action may be brought by a prisoner * * * for mental or emotional injury suffered while in custody without a prior showing of physical injury * * *." "[T]here is no statutory definition of 'physical injury' as used in Section 1997e(e)." *Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). In *Liner,* the Second Circuit held:

> "[T]he alleged sexual assaults qualify as physical injuries as a matter of common sense. Certainly,; the alleged sexual assaults would constitute more than *de minimis* injury if they occurred. *Cf. Siglar v. Hightower,* 112 F.3d 191, *93 (5th Cir.1997)* (relying on Eighth Amendment jurisprudence, court holds that the physical injury required by § 1997e(e) must simply be more than *de minimis* )."

*Id.* Since *Liner,* district courts in this Circuit have consistently held that "[t]he Prison Litigation Reform Act requires more than a showing of *de minimis* physical injury to allow an inmate to pursue an emotional or mental injury claim." *Jacoby v. Conway,* No. 10 cv 920, 2013 WL 1559292, at * 1 (W.D.N.Y. Apr.10, 2013) (citing cases). Although district courts in the Southern, Northern and Western Districts of New York have found that allegations of bruising, abrasions, dizzy spells and blurred vision, *see, e.g. Jacoby,* 2013 WL 1559292, at * 1; chronic headaches, episodic "black [ ] out[s]", depression, insomnia and dizziness, *see, e.g. Abreu v. Nicholls,* No. 04 Civ. 7778, 2011 WL 1044373, at* 3 (S.D.N.Y. Mar. 22, 2011), *report and recommendation adopted by* 2012 WL 1079985 (Mar. 30, 2012); "dry, cracked skin and athlete's foot fungus," *Thompson v. Carlsen,* No. 9:08–cv–0965, 2010 WL 3584409, at * 14 (N.D.N.Y. Aug.16, 2010), *report and recommendation adopted by* 2010 WL 3584396 (Sept. 7, 2010); a skin rash, *see, e.g. Dolberry,* 567 F.Supp.2d at 418; and "a 'physical injury' that was essentially *emotional* in nature (e.g., anxiety, depression, stress, nausea, hyperventilation headaches, insomnia, dizziness, appetite loss, weight loss, etc.)," *Darvie v. Countyman,* No. 9:08–cv–0715, 2008 WL 2725071, at * 7 (N.D.N.Y. July 10, 2008). *report and recommendation adopted by* 2008 WL 3286250 (Aug. 7, 2008), are not the types of physical injuries contemplated by Section 1997e(e), two (2) courts in this district, i.e., the

Eastern District of New York, have found that allegations of "intestinal illnesses," "skin conditions," respiratory and fungal infections, nose bleeds, headaches, blurred vision and dizziness, *Bugler v. Suffolk County,* 289 F.R.D. 80, 93–94 (E.D.N.Y.2013); and dizziness, "uncontrollable coughing," lack of appetite, runny eyes and high blood pressure, *Enigwe v. Zenk,* No. 03–cv–854, 2006 WL 2654985, at * 6 (E.D.N.Y. Sept. 14, 20071. *reconsideration denied, 2007 WL 2713849 (Sept. 14, 2007),* may constitute "physical injury" within the meaning of the PLRA. [29]

**\*31** "Section 1997e(e) applies to all federal civil actions including claims alleging constitutional violations," *Thompson,* 284 F.3d at 416, "so that the plaintiff cannot recover damages *for mental or emotional injury* for a constitutional violation in the absence of a showing of actual physical injury." *Id.* at 417 (emphasis added). However, "[b]ecause Section 1997e(e) is a limitation on recovery of damages *for mental and emotional injury* in the absence of a showing of physical injury, it does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." *Id.* at 416 (emphasis added). As the Second Circuit indicated,

> "By its terms, [Section 1997e(e) ] does not limit the prisoner's right to request injunctive or declaratory relief. Nor should it be read as a general preclusion of all relief if the only injury the prisoner can claim—other than the intangible harm presumed to flow from constitutional injuries —is emotional or mental. * * * Both in its text and in its caption ['Limitation on recovery'], Section 1997e(e) purports only to limit recovery for emotional and mental injury, not entire lawsuits."

*Id.* at 418. Similarly, since Section 1997e(e) refers only to claims for mental or emotional injury, it "does not limit the availability of nominal damages for the violation of a constitutional right or of punitive damages," *id.,* or provide any basis "for barring an award of compensatory damages * * * provided [the plaintiff] can establish actual injury." *Id.*

In addition, "Section 1997e(e) * * * does not limit [a] [p]laintiff's ability to recover compensatory damages for a serious risk of future physical harm" due to exposure to a toxic substance, *Rahman v. Schriro,* ——F.Supp.2d —— 2014 WL 2208010, at * 10 (S.D.N.Y. May 27, 2014), e.g., radiation, friable asbestos, environmental tobacco smoke, etc. *See id.* (radiation exposure); *Enigwe,* 2006 WL 2654985, at * 5 (environmental tobacco smoke); *Crawford v. Artuz,* 98 Civ. 0425, 1999 WL 435155, at * 6 (S.D.N.Y. June 24, 1999) (friable asbestos). In sum, "[t]he PLRA's limitation on recovery of damages does not apply where the claim asserted is not one for mental or emotional injury." *Rahman,* —— F.Supp.2d ——, 2014 WL 2208010, at * 10.

Since Delosrios, Cazares and Jackson do not allege that they suffered any mental or emotional injury, or seek damages on the basis of any mental or emotional injury [30], Section 1997e(e) does not apply to any of their claims against the County defendants. Although Jovany, A. Torres and G. Torres allege, *inter alia,* that they suffer from "mental issues," stress and sleep disturbances, they also allege, *inter alia,* the following injuries: "persistent and recurring digestive issues," "skin and head infections," severe migraine headaches, dizzy spells and "severe fungal infections" on their feet. It is unnecessary at this stage of the litigation to determine whether those injuries satisfy the "physical injury" requirement of the PLRA because, *inter alia:* (1) in addition to those injuries, the amended complaint can be liberally read to assert a claim for a serious risk of future physical harm due to Jovany's, A. Torres's and G. Torres's exposure to a toxic substance, i.e., black mold; and (2) in addition to compensatory damages, Jovany, A. Torres and G. Torres also seek injunctive and declaratory relief and punitive damages. Thus, Jovany's, A. Torres's and G. Torres's Section 1983 conditions of confinement claims will proceed to trial regardless of how the "physical injury" issue is decided. Therefore, the better course is to allow the finder of fact to determine the issues of whether Jovany, A. Torres and G. Torres show a physical injury and, if so, to what compensatory damages they are entitled for both the physical, as well as the mental and emotional, Injuries they sustained as a result of the County defendants' constitutional violations. *See, e.g. Abjeau,* 2011 WL 1044373, at * 4. Accordingly, the branches of the County defendants' motions seeking dismissal of the consolidated plaintiffs' "claims for damages" pursuant to Section 1997e(e) are denied. [31]

D. State Law Claims

1. Jovany's, A. Torres's and G. Torres's Negligence Claim

**\*32** The County defendants contend, *inter alia,* that they "are only liable to Plaintiffs for foreseeable injuries[ ][and] [t]he injuries alleged * * * are not foreseeable" and that "[t]he injuries alleged by the Plaintiffs here hardly rise to the level of prisoner negligence claims that have stated a valid cause of action, particularly prisoner-on-prisoner attack cases." (County Mem. II at 36–37).

"To establish a *prima facie* case of negligence under New York law, a plaintiff must show (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *In re World Trade Center Lower Manhattan Disaster Site Litigation,* ——F.3d ——, 2014 WL 3360598, at * 5 (2d Cir. July 10, 2014) (quotations and citations omitted); *see also Greenberg, Trager & Herbst, LLP v. HSBC Bank USA,* 17 N.Y.3d 565, 576, 934 N.Y.S.2d 43, 958 N.E.2d 77 (N.Y.2011) ("To establish a cause of action sounding in negligence, a plaintiff must establish the existence of a duty on defendant's part, breach of the duty and damages [.]") "[T]he scope of the duty owed by the defendant is defined by the risk of harm reasonably to be perceived * * *." *Sanchez v. State of N.Y.,* 99 N.Y.2d 247, 252, 754 N.Y.S.2d 621, 784 N.E.2d 675 (N.Y.2002) (citation omitted). "Although the precise manner in which the harm occurred need not be foreseeable, liability does not attach unless the harm is within the class of reasonably foreseeable hazards that the duty exists to prevent * * *." *Sanchez,* 99 N.Y.2d at 252, 754 N.Y.S.2d 621, 784 N.E.2d 675 (citation omitted); *see also Aegis Ins. Services, Inc. v. 7 World Trade Co., L.P.,* 737 F.3d 166, 177 (2d Cir.2013) ("While a plaintiff must establish that a harm was within the ambit of reasonably foreseeable risk, a plaintiff need not demonstrate that the precise manner in which the accident happened, or the extent of the injuries, was foreseeable." (quotations, alterations and citation omitted)).

The allegations in the amended complaint are sufficient to allege, *inter alia,* that the County defendants owed a duty to Jovany, A. Torres and G. Torres to provide them with life's basic necessities; that the County defendants breached that duty by depriving them of adequate food and shelter; and that Jovany, A. Torres and G.

Torres sustained injuries, e.g., bug and rodent bites, weakness, dizzy spells, headaches, rashes, illness, etc., that were reasonably foreseeable based upon the County defendants' purported deprivations of adequate food and shelter. Accordingly, the branch of the County defendants' motion seeking dismissal of Jovany's, A. Torres's and G. Torres's negligence claim is denied.

**2. Jovany's, A. Torres's and G. Torres's "Ministerial Negligence" Claim**

The County defendants contend, *inter alia:* (1) that "[b]ecause [Jovany's, A. Torres's and G. Torres's] ordinary negligence claim is attenuated, their ministerial negligence claim is also slim[;]" and (2) that Jovany, A. Torres and G. Torres "cannot make out *a* [sic] *prima facie* negligence, and, by inference, also cannot make out a ministerial negligence claim." (County Mem. II at 38).

**\*33** "[T]here is no independent cause of action for ministerial neglect in New York." *Hayut* 352 F.3d at 755. "Rather, a claim of ministerial neglect 'merely removes the issue of governmental immunity from a given case [,]' " *Id.* (quoting *Lauer v. City of New York,* 95 N.Y.2d 95, 99, 711 N.Y.S.2d 112, 733 N.E.2d 184 (N.Y.2000)), and is "a defense * * * potentially available to [a municipality]." *Valdez v. City of New York,* 18 N.Y.3d 69, 75, 936 N.Y.S.2d 587, 960 N.E.2d 356 (N.Y.2011). With respect to the "governmental function immunity defense," *Valdez,* 18 N.Y.3d at 75, 936 N.Y.S.2d 587, 960 N.E.2d 356, the Court of Appeals of the State of New York, in *Lauer,* explained that

> "[m]unicipalities long ago surrendered common-law tort immunity for the negligence of their employees. A distinction is drawn, however, between 'discretionary' and 'ministerial' governmental acts. A public employee's discretionary acts—meaning conduct involving the exercise of reasoned judgment—may not result in the municipality's liability even when the conduct is negligent. By contrast, ministerial acts—meaning conduct requiring adherence to a governing rule, with a compulsory result—may subject the municipal employer to liability for negligence * * *."

*Lauer,* 95 N.Y.2d at 99, 711 N.Y.S.2d 112, 733 N.E.2d 184 (citation omitted); *see also Valdez,* 18 N.Y.3d 69, 75–76, 936 N.Y.S.2d 587, 960 N.E.2d 356 ("Although the State long ago waived sovereign immunity on behalf of itself and its municipal subdivisions, the common-law doctrine of governmental immunity continues to shield public entities from liability for discretionary actions taken during the performance of governmental functions * * *." (citations omitted)). "In other words, even if a plaintiff establishes all elements of a negligence claim, a state or municipal defendant engaging in a governmental function can avoid liability if it timely raises the [governmental function immunity] defense and proves that the alleged negligent act or omission involved the exercise of discretionary authority." *Valdez,* 18 N.Y.3d at 76, 936 N.Y.S.2d 587, 960 N.E.2d 356. However, "the governmental function immunity defense cannot attach unless the municipal defendant establishes that the discretion possessed by its employees was in fact exercised in relation to the conduct on which liability is predicated." *Id.*

In *Valdez,* the Court of Appeals of the State of New York held that

> "[i]n order to prevail on a governmental function immunity defense, a municipality must do much more than merely allege that its employee was engaged in activities involving the exercise of discretion. 'Whether an action of a governmental employee or official is cloaked with any governmental immunity requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judgment. If these functions and duties are essentially clerical or routine, no immunity will attach' (*Mon [v. City of New York],* 78 N.Y.2d [309,] 313, 574 N.Y.S.2d 529, 579 N.E.2d 689 [N.Y.1991] [citations omitted] ).

**\*34** Beyond the role the individual employee plays in the organization, the availability of governmental function immunity also turns on 'whether the conduct giving rise to the claim is related to an exercise of that discretion' (*id.*). The defense precludes liability for a 'mere error of judgment' (*see Haddock,* 75 N.Y.2d at 485, 554 N.Y.S.2d 439, 553 N.E.2d 987) but this immunity is not available unless the municipality establishes that the action taken actually resulted from discretionary decision-making—i.e., 'the exercise

of reasoned judgment which could typically produce different acceptable results' (*Tango [by Tango v. Tulevech],* 61 N.Y.2d [34,] 41, 471 N.Y.S.2d 73, 459 N.E.2d 182 [N.Y.1983] )."

*Valdez,* 18 N.Y.3d at 79, 936 N.Y.S.2d 587, 960 N.E.2d 356.

Nonetheless, "a ministerial breach by a governmental employee [does not] necessarily give[ ] rise to municipal liability" under New York law. *Lauer,* 95 N.Y.2d at 99, 711 N.Y.S.2d 112, 733 N.E.2d 184. "Ministerial negligence may not be immunized, but it is not necessarily tortious * * *." *Id.* (citation omitted). "There must still be a basis to hold the municipality liable for negligence ." *Id.* at 100, 95 N.Y.2d 95, 711 N.Y.S.2d 112, 733 N.E.2d 184.

In order to impose liability upon a governmental entity, "there must be some showing that the conduct by the official violated some duty to the injured party directly, as opposed to a general duty to society." *Hayut* 352 F.3d at 755 (quotations and citation omitted); *see also Lauer,* 95 N.Y.2d at 100, 711 N.Y.S.2d 112, 733 N.E.2d 184 ("To sustain liability against a municipality, the duty breached must be more than that owed the public generally.") "Without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm * * *." *Lauer,* 95 N.Y.2d at 100, 711 N.Y.S.2d 112, 733 N.E.2d 184 (citation omitted); *see also Hayut,* 352 F.3d at 755 (accord).

In sum, "government action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general [.]" *Valdez,* 18 N.Y.3d at 76–77, 936 N.Y.S.2d 587, 960 N.E.2d 356 (quotations, brackets and citation omitted). "[I]f plaintiffs cannot overcome the threshold burden of demonstrating that defendant owed the requisite duty of care, there will be no occasion to address whether defendant can avoid liability by relying on the governmental function immunity defense." *Id.* at 80, 18 N.Y.3d 69, 936 N.Y.S.2d 587, 960 N.E.2d 356; *see also Metz v. State of New York,* 20 N.Y.3d 175, 179, 958 N.Y.S.2d 314, 982 N.E.2d 76 (N.Y.2012) ( "[C]laimants must first establish the existence of a special duty owed to them by the State [or municipality] before it becomes necessary to address whether the State can rely upon the defense of governmental immunity .")

In *Valdez,* the Court of Appeals of the State of New York held that

"[t]o establish a special relationship, plaintiffs [are] required to show that there was: (1) 'an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking' (*Cuffy v. City of New York,* 69 N.Y.2d 255, 260, 513 N.Y.S.2d 372, 505 N.E.2d 937)."

**\*35** *Valdez,* 18 N.Y.3d at 80, 936 N.Y.S.2d 587, 960 N.E.2d 356. "Special relationships that have been recognized to give rise to a governmental duty * * * have included custodial relationships such as a prison and inmate * * *." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 533 (2d Cir.1993); *see also P.W. Fairport Cent. Sch. Dist.,* 927 F.Supp.2d 76, 81 (W.D.N.Y.2013) ("The State may be responsible for the care and protection of individuals where a special relationship exists between the State and the individual * * *. Such a special relationship exists, for example, when a person is incarcerated in a state prison * * *.")

As noted above, the allegations in the amended complaint are sufficient to allege, *inter alia,* that the County owed a duty to Jovany, A. Torres and G. Torres to, *inter alia,* provide them with life's basic necessities, e.g., adequate food and shelter, during their incarceration at the NCCC; that County employees breached that duty by depriving them of adequate food and shelter; and that Jovany, A. Torres and G. Torres sustained injuries, e.g., bug and rodent bites, weakness, dizzy spells, headaches, rashes, illness, etc., that were reasonably foreseeable based upon the purported deprivations of adequate food and shelter. Since Jovany's, A. Torres's and G. Torres's claim seeking damages for "ministerial negligence" in their amended complaint, liberally construed, states a plausible claim for negligence against the County, and the County defendants have not even alleged, much less demonstrated, that the challenged acts or omissions were discretionary, the branch of the County defendants' motion seeking dismissal of Jovany's, A. Torres's and G. Torres's "ministerial negligence" claim is denied.

3. Notice of Claim

The County defendants contend that all of the consolidated plaintiffs' state law claims are barred because they fail to allege that they filed a notice of claim in compliance with New York General Municipal Law § 50–e,

Attached to G. Torres's opposition to the County defendants' motion is a notice of claim, dated June 13, 2013, indicating, *inter alia:* (1) that he intended to make claims against the County defendants and Armor for "[p]oor medical care, and conditions of confinement in violations [sic] of [his] rights under the Eighth and Fourteenth Amendments, and Due Process Clause of New York State Constitution[;]" (2) that his claims occurred at "[v]arious times (Day and Night), on or about March 11, 2013, at [NCCC] at different times[;]" and that he sustained "[r]ashes on buttocks, skin infections, severe headaches [and] stomach pains."

Attached to A. Torres's opposition to the County defendants' motion is a notice of claim, dated May 7, 2013, indicating, *inter alia:* (1) that she claims "unsanitary conditions at the NCCC[,] food preparation and service is unsanitary, [f]ailure to control rodents [illegible] [;]" (2) that the nature of her claim is "[c]ondition [sic] of confinement[,] unsanitary that was caused by [the County defendants], that caused health damage to claimant[;]" (3) that her claims arose at "[v]arious times on or about March 17, 2013 at NCCC at 5:16 p.m. on housing units throughout the jail[;]" and (4) that she sustained an "[i]nfection on arms from roaches and [i]nsect bites[,] severe [m]igraine headaches, experiencing [d]izzy spells, and stomach aches."

**\*36** State notice of claim requirements apply to state law claims brought in federal court. *See Felder v. Casey,* 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988); *Parise v. New York City Department of Sanitation,* 306 F. App'x 695, 697 (2d Cir. Jan.16, 2009) (summary order); *Hardy v. New York City Health & Hosp. Corp.,* 164 F.3d 789, 793 (2d Cir.1999). Under New York law, service of a notice of claim upon a municipality is a condition precedent to maintaining a tort action against the municipality, or any of its officers, agents or employees acting within the scope of their employment. N.Y. Gen. Mun. L. §§ 50–e and 50–i(1); *see Heslin v. County of Greene,* 14 N.Y.3d 67, 73–74, 896 N.Y.S.2d 723, 923 N.E.2d 1111 (N.Y.2010); *Davidson v. Bronx Municipal*

*Hospital,* 64 N.Y.2d 59, 61, 484 N.Y.S.2d 533, 473 N.E.2d 761 (N.Y.1984). "Notice of claim requirements 'are construed strictly by New York state courts \* \* \* [and a] [f]ailure to comply with th[o]se requirements ordinarily requires a dismissal for failure to state a cause of action.'" *Hardy,* 164 F.3d at 793–794; *see also Davidson,* 64 N.Y.2d at 62, 484 N.Y.S.2d 533, 473 N.E.2d 761 ("Failure to comply with provisions requiring notice and presentment of claims prior to the commencement of litigation ordinarily requires dismissal.") Moreover, "[t]o survive a motion to dismiss, a plaintiff must affirmatively plead that a notice of claim was filed." *Naples v. Stefanelli,* 972 F.Supp.2d 373, 390 (E.D.N.Y.2013) (citing N.Y. Gen. Mun. Law § 50–i(1)(b)).

With the exception of A. Torres and G. Torres, all of the consolidated plaintiffs' state law claims against the County defendants must be dismissed because none of them allege that they served a notice of claim in accordance with New York General Municipal Law § 50–e. *See, e.g. Naples,* 972 F.Supp.2d at 390; *Dillon v. Suffolk County Department of Health Services,* 917 F.Supp.2d 196, 217 (E.D.N.Y.2013); *Burks v. Nassau County Sheriff's Department,* 288 F.Supp.2d 298, 301 (E.D.N.Y.2003). Accordingly, the branch of the County defendants' motion seeking dismissal of the consolidated plaintiffs' state law claims for failure to serve a notice of claim in accordance with New York General Municipal Law § 50–e is granted to the extent that any state law claims asserted by the consolidated plaintiffs, except A. Torres and G. Torres, are dismissed in their entirety for failure to comply with New York General Municipal Law § 50–e.

a. Sufficiency of A. Torres's and G. Torres's Notices of Claim

New York General Municipal Law § 50–e(2) requires that a notice of claim "be in writing, sworn to by or on behalf of the claimant and \* \* \* set forth: (1) the name and post-office address of each claimant, and of his attorney, if any; (2) the nature of the claim; (3) the time when, the place where and the manner in which the claim arose; and (4) the \* \* \* injuries claimed to have been sustained so far as then practicable \* \* \*." Section 50–e(2) "does not require those things to be stated with literal nicety or exactness." *Brown v. City of New York,* 95 N.Y.2d 389, 393, 718 N.Y.S.2d 4, 740 N.E.2d 1078 (2000) (internal quotations and citation omitted); *see also Rosenbaum v. City of New York,* 8 N.Y.3d 1, 10–11, 828 N.Y.S.2d 228, 861 N.E.2d 43 (N.Y.2006).

Rather, "[t]he test of the sufficiency of a Notice of Claim is merely 'whether it includes information sufficient to enable the [municipality] to investigate [the claim]." *Brown*, 95 N.Y.2d at 393, 718 N.Y.S.2d 4, 740 N.E.2d 1078 (quoting *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 358, 445 N.Y.S.2d 687, 429 N.E.2d 1158 (1981)). "Thus, in determining compliance with the requirements of General Municipal Law § 50–e, courts should focus on the purpose served by a Notice of Claim: whether based on the claimant's description municipal authorities can locate the place, fix the time and understand the nature of the [incident]." *Id.*

**\*37** Clearly, A. Torres's and G. Torres's notices of claim are facially deficient insofar as, *inter alia*, they do not indicate, *inter alia*, "the place where and the manner in which the claim[s] arose," nor provide any description of the acts or omissions upon which they are basing their state law claims or how such acts or omissions caused any injury to them, so as to allow the County defendants to understand the nature of, and investigate, their claims against them. Accordingly, the branch of the County defendants' motion seeking dismissal of the consolidated plaintiffs' state law claims for failure to serve a notice of claim in accordance with New York General Municipal Law § 50–e is granted to the extent that A. Torres's and G. Torres's state law claims are dismissed in their entirety for failure to comply with New York General Municipal Law § 50–e. [32]

III. Conclusion

For the reasons set forth above, (1) the branches of the County defendants' motions seeking dismissal of (a) all of Reid's Section 1983 claims, (b) the consolidated plaintiffs' Section 1983 claims (i) against Sposato in his official capacity and (ii) alleging deliberate indifference to their medical needs, (c) Cazares's Section 1983 excessive force claim, and (d) the consolidated plaintiffs' state law claims for failure to serve a notice of claim in accordance with New York General Municipal Law § 50–e are granted and those Section 1983 claims, and all state law claims of the consolidated plaintiffs, are dismissed in their entirety with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and the County defendants' motion is otherwise denied; and (2) the branch of Armor's motion seeking dismissal of the amended complaint against it for Jovany's, A. Torres's and G. Torres's failure to state a plausible Section 1983 claim of deliberate indifference to their medical needs is granted and the amended complaint is dismissed in its entirety with prejudice as against Armor pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. [33]

Pursuant to Rule 77(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court shall serve notice of entry of this order, as provided in Rule 5(b) of the Federal Rules of Civil Procedure, upon each party remaining in this action and record such service on the docket.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4185195

Footnotes

1   Four (4) other individuals, Kevin Lee Benloss ("Benloss"), Nelson Herrera ("Herrera"), Johans Cabrera ("Cabrera") and Daquan Wagner ("Wagner"), also filed complaints that were consolidated with this action, but their claims have subsequently been dismissed.

2   With respect to the complaints at issue on this motion, only plaintiff Dwayne M. Reid ("Reid") names the NCSD as a defendant.

3   With respect to the complaints at issue on this motion, only Reid names "John Doe," Superintendent of the NCCC, as a defendant.

4   With respect to the complaints at issue on this motion, all of the consolidated plaintiffs, except Reid, name the County as a defendant.

5   A fourth consolidated plaintiff, Cabrera, also jointly filed the amended complaint. However, by order dated December 18, 2013, Cabrera's motion to "withdraw voluntarily" from this consolidated action was granted and his claims were dismissed in their entirety without prejudice pursuant to Rule 41(a) of the Federal Rules of Civil Procedure.

6   Reid, Delosrios, Cazares, Jackson, Jovany, A. Torres and G. Torres will collectively be referred to herein as "the consolidated plaintiffs."

**7**    The County defendants also sought dismissal of the complaints filed by Benloss, Wagner and Cabrera. However, by order dated April 9, 2014, *inter alia,* Benloss's and Wagner's claims were dismissed in their entirety with prejudice pursuant to Rules 37(b) (2)(a)(v) and 41(b) of the Federal Rules of Civil Procedure for, *inter alia,* their failure to comply with a January 13, 2014 order of this Court. The April 9, 2014 order also dismissed Cazares's claims. However, by letter dated April 21, 2014, Cazares subsequently sought to have his claims reinstated. Since Cazares has shown good cause for his failure to comply with this Court's January 13, 2014 order, his motion, (Doc. No. 105), is granted and his claims in this consolidated action are reinstated, except to the extent otherwise dismissed herein.

**8**    With the exception of G. Torres, who indicates that he was "awaiting sentence" at the time that the amended complaint was filed, none of the other consolidated plaintiffs indicate whether they are convicted prisoners or pretrial detainees. However, the same "deliberate indifference" standard applies to claims challenging prison conditions regardless of whether the claim is brought under the Eighth Amendment or the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Caiozzo v. Koreman,* 581 F.3d 63, 70–1 (2d Cir.2009); *see also Nielsen v. Rabin,* 746 F.3d 58, 63 n. 3 (2d Cir.2014).

**9**    Although the quotations marks are in the original, the County defendants fail to cite any authority for those quotes.

**10**    Although the County defendants also seek dismissal of the consolidated plaintiffs' claims against Sergeant Krueger and Captain Ford, (County Mem. I at 15–18), for purposes of these motions, only Benloss asserted claims against those defendants and, as set forth above, his claims in this consolidated action have already been dismissed.

**11**    Since Delosrios sues Sposato only in his official capacity, i.e., "as Sheriff of Nassau County," his Section 1983 claims against Sposato are dismissed in their entirety.

**12**    Since Reid has not opposed the County defendants' motion, nor sought leave to amend his complaint, his claims against the Superintendent are dismissed with prejudice.

**13**    According to the County defendants, the consolidated plaintiffs "still have access to plumbing for their urinary and fecal needs, they are sheltered from the weather in their cells, and they are not being 'tortured' by their conditions. Indeed, the vermin infestation is undesirable, but these uncomfortable prison conditions are 'part of the penalty that [they] * * * pay for their offenses against society.' " (County Mem. II at 12–13) (quoting *McMillian,* 503 U.S. at 9, 112 S.Ct. 995, 117 L.Ed.2d 156).

**14**    The Court was unable to find any case in this Circuit involving a conditions of confinement claim based upon exposure to black mold. District courts in other circuits have held that allegations of exposure to black mold may, in certain circumstances, satisfy the objective element of an Eighth Amendment claim provided that the plaintiff alleges that he or she suffered, or is at a substantial risk of suffering from, an injury or health problem as a result of such exposure. *See, e.g. Maxie v. Levenhagen,* No. 3:13–cv–1280, 2014 WL 3828292, at * 1 (N.D.Ind. Aug.4, 2014) (holding that allegations that the plaintiff was exposed to, *inter alia,* "excessive amounts of 'black mold, mildew, and asbestos,' " which caused him "breathing difficulties," were sufficient to withstand dismissal); *Reynolds v. Herrington,* No. 4:13–cv–P132–M, 2014 WL 1330190, at * 5 (W.D.Ky. Apr.1, 2014) (dismissing Eighth Amendment claim based upon the plaintiff's exposure to "black mold" because the plaintiff did not allege any injury suffered as a result of his exposure to the mold or that he was "housed in the area where the mold was located[,] nor present any basis for his belief that the mold is a harmful type of mold[,] * * * stat [ing] only that the mold was black"); *Dartz v. Vienna Correctional Center,* No. 13–cv–00889–JPG, 2013 WL 5435806, at * 1 (S.D.Ill. Sept.30, 2013) (holding that allegations, *inter alia,* that the plaintiff is being exposed to asbestos and mold, and that water drips from the ceiling and there is black mold, "are actionable Eighth Amendment claims"); *Lyons v. Wickersham,* No. 2:12–cv–14353, 2012 WL 6591581, at * 4 (E.D.Mich. Dec.18, 2012) (holding that although, "[u]nder certain circumstances, exposure to black mold may be sufficiently serious to satisfy the objective component of the Eighth Amendment[,]" where the plaintiff "does not allege that the presence of mold has caused him any health problems or that he is presently at any substantial risk to his health[,] * * * [his] conclusory allegations about the presence of mold do not demonstrate the existence of a sufficiently serious risk to prisoner health."); *Walton v. Topps,* No. Civ.A 12–0931, 2012 WL 3947629, at * 7 (E.D.La. July 23, 2012), *report and recommendation adopted by* 2012 WL 3947976 (Sept. 10, 2012) (dismissing Eighth Amendment claims alleging "[c]ommon sanitation problems," such as insects, dust and mold in the prison, because the plaintiff did not allege, *inter alia,* that he "suffered any injury, other than inconvenience, as a result of the conditions of the jail."); *Dillingham v. Schofield,* No. 2:11–cv–07, 2011 WL 3664470, at * 8 (E.D.Tenn. Aug.19, 2011) (holding that claims of, *inter alia,* black mold "may arguably state a claim for relief"); *Perryman v. Graves,* No. 3:10–mc–00109, 2010 WL 4237921, at *3 (M.D.Tenn. Oct.20, 2010) (dismissing Eighth Amendment conditions of confinement claim based upon presence of black mold in the jail because the plaintiff did not allege "that his exposure to black mold has caused him to suffer any physical harm or will cause him to suffer harm in the future"); *Cameron v. Howes,* No. 1:10–cv–539, 2010 WL 3885271, at * 8 (W.D.Mich. Sept.28, 2010) (holding that the plaintiffs' allegations of the presence of mold in the showers did not demonstrate the existence of a sufficiently serious risk to prisoner health

because the plaintiffs did not "suggest that the mold is airborne[,] * * * that the presence of mold causes them health problems or that they are presently at any substantial risk to their health").

15    The County defendants' contention that the consolidated plaintiffs' allegations that "they are only being served #400 calories each day' * * * are insufficient to state a claim under § 1983 * * * [because] they have * * * alternative sources of food, such as the Commissary," (County Mem. II at 15), is without merit. The Constitution "require[s] that prisoners *be served* nutritionally adequate food," *Robles,* 725 F.2d at 15 (emphasis added), which is not satisfied by serving them meals purportedly accounting for approximately one-fifth (1/5) of their recommended daily caloric allowance and requiring them to expend their own money in the commissary to obtain the rest. Indeed, the County defendants do not cite to even one (1) case in support of their contention.

16    "[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights [under the First Amendment]." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004); *see also Holland v. Goord,* —— F.3d ——, 2014 WL 3360615, at * 5 (2d Cir. July 10, 2014) ("[I]nmates have a 'clearly established' right to a diet consistent with their religious scruples." (quotations and citations omitted)). The case cited by the County defendants in their second memorandum of law, *Kole v. Lappin,* 551 F.Supp.2d 149 (D.Conn.2008), for the proposition that Jovany was not prevented from exercising his religious beliefs because he was provided an alternative meal, i.e., lettuce and tuna, whenever he suspected that his meal had been tainted with meat, is distinguishable. In *Kole,* the plaintiff claimed that the defendants reduced the number of "kosher-for-Passover" foods available for purchase at the commissary by inmates wanting to supplement the daily "kosher-for-Passover" meals provided by the defendants in accordance with the plaintiff's religious dietary restrictions. *Id.* at 154. Unlike this case, there was no claim in *Kole* that the defendants intentionally interfered with a meal provided by the prison so as to contravene the plaintiff's religious beliefs.

17    In fact, Cazares alleges that his request for an extra blanket was denied.

18    In light of this determination, the County defendants' contentions seeking dismissal of the consolidated plaintiffs' state law claims for lack of jurisdiction, and of Jovany's, A. Torres' and G. Torres's claim for violations of the Due Process Clause of the New York State Constitution, are denied.

19    In any event the allegations in Reid's complaint and Jovany's amended complaint and attached exhibits state, at most, a claim for negligence, not deliberate indifference, in treating Reid's foot rash and Jovany's head rash or infection. *See, e.g. Lewal,* 29 F. App'x at 29; *Gonzalez,* 2010 WL 681323, at * 11.

20    Since Reid, Cazares and Jovany have not opposed the County defendants' motion to dismiss, or sought leave to amend their complaints, the dismissal of their Section 1983 deliberate indifference to medical needs claims is with prejudice.

21    Since Jovany has not opposed Armor's motion to dismiss, or sought leave to amend the amended complaint, the dismissal of his Section 1983 deliberate indifference to medical needs claim against Armor is with prejudice.

22    In light of this determination, it is unnecessary to consider Armor's remaining contentions. Moreover, since neither A. Torres nor G. Torres has opposed Armor's motion to dismiss, nor sought leave to amend the amended complaint, the dismissal of their Section 1983 deliberate indifference to medical needs claims against Armor is with prejudice.

23    "A court considers a [Fourteenth Amendment] claim of excessive force by a pretrial detainee under the same standards that govern a claim, under the Eighth Amendment, to be free from cruel and unusual punishment." *Chambliss,* 808 F.Supp.2d at 667.

24    Since Cazares did not oppose the County defendants' motion, or seek leave to amend his complaint, the dismissal of his Section 1983 excessive force claim is with prejudice. However, since Cazares's Section 1983 conditions of confinement claims remain in this action, the branch of the County defendants' motion seeking dismissal of Cazares's state law claims for lack of jurisdiction is denied.

25    In *Amador,* the Second Circuit indicated that "[s]ubsequent decisions have questioned the continued viability of th[e] [*Hemphill* ] framework following the Supreme Court's decision in *Woodford* * * * [and] whether, in light of *Woodford,* the doctrines of estoppel and special circumstances survived[,]" 655 F.3d at 102 (citing *Macias v. Zenk,* 495 F.3d 37, 43 n. 1 (2d Cir.2007) and *Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006)), and "decline[d] to reach the issue * * *." *Id.* However, in a subsequent case, *Johnston v. Maha,* 460 F. App'x 11, 15 n. 6 (2d Cir. Feb.2, 2012) (summary order), the Second Circuit rejected as "meritless" the defendant's argument that *Woodford* abrogated *Hemphill,* indicating that "[a]lthough [*Woodford* ] requires that prisoners 'properly' exhaust the available remedies under the PLRA, it certainly does not abrogate the unavailability defense to nonexhaustion." *Id.*

26    By indicating that he "didn't get to that [i.e., presenting the facts relating to his complaint in the prisoner grievance procedure] yet," Reid contradicts his claim, refuted by all of the other consolidated plaintiffs, that there is no prisoner grievance procedure available at the NCCC.

27    In addition, although the County defendants correctly contend that "exhaustion is an affirmative defense[ ] [that] must be raised by the defendants, *and need not be pleaded by the plaintiff,"* (County Mem. I at 19; County Mem. II at 29) (emphasis added), they erroneously argue: (1) that the consolidated plaintiffs' purported failure to exhaust administrative remedies is not excused on the grounds of estoppel or otherwise because they "allege no complications[,]" (County Mem. I at 20; County Mem. II at 30), i.e., that the NCCC "did anything to complicate or eschew [their] use of the grievance procedure," (County Mem. I at 19), or that there existed "complicated procedures [ ]or inhibiting factors at NCCC," (County Mem. II at 30); and (2) that "[n]o extenuating circumstances appear to be present in the NCCC that would warrant Consolidated Plaintiffs' non-compliance." (County Mem. I at 20; County Mem. II at 30). The consolidated plaintiffs were not required to plead such matters in their complaints.

28    In the event that the County defendants renew this branch of their motion as a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, they must serve, as a separate document, the "Notice To Pro Se Litigants Who Oppose a Motion for Summary Judgment" contained in Local Civil Rule 56.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rules"), together with the full texts of Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1, upon each consolidated plaintiff. *See* Local Civil Rule 56.2.

29    The Court was unable to find any case in this Circuit determining whether insect bites constitute "physical injury" within the meaning of the PLRA. While the Fifth Circuit seems to suggest that they do, *see, e.g. Harrison v. Smith,* 83 F. App'x 630, 631 (5th Cir. Dec.11, 2003) (affirming dismissal of a conditions of confinement claim pursuant to Section 1997e(e) because, *inter alia,* the plaintiff "did not suffer any insect bites" and, therefore, "[a]ny deficiencies in * * * the jail's pest-control measures did not physically harm him"), a district court in the Western District of Louisiana has held that insect bites constitute a *de minimis* injury. *Ordon v. Jack,* Civ. Action No. 09–0164, 2009 WL 2044654, at * 4 (W.D.La. July 7, 2009).

30    Delosrios, Cazares and Jackson assert claims seeking compensatory damages for, *inter alia,* suffering infections on various parts of their bodies, bug bites, "severe migraine headaches," and dizzy spells and/or weakness. Delosrios and Cazares also seek compensatory damages for stomachaches, stomach pain and fevers and Jackson seeks compensatory damages for suffering a mouse bite, for which he received a shot. All three (3) of these consolidated plaintiffs also seek injunctive and declaratory relief, as well as nominal and punitive damages.

31    Since, with the exception of Reid, the consolidated plaintiffs' Section 1983 conditions of confinement claims remain in this action, the branches of the County defendants' motion seeking dismissal of this action for lack of jurisdiction are denied.

32    In light of this determination, it is unnecessary to consider the County defendants' contention that the consolidated plaintiffs' state law claims against them are barred by the doctrine of qualified immunity under New York State law.

33    For the sake of clarity, with respect to the complaints and amended complaint at issue on these motions, only the following claims remain: (1) Jovany's, Cazares's, Jackson's, A. Torres's and G. Torres's Section 1983 conditions of confinement claims against the County and Sposato, in his individual capacity; (2) Delosrios's Section 1983 conditions of confinement claims against the County; and (3) Jovany's, A. Torres's and G. Torres's Section 1983 conditions of confinement claims against the County Cooks. Since all of Reid's claims have been dismissed in this action, the Clerk of the Court shall amend the caption of this consolidated action to ***Jovany Henrius, et al. v. County of Nassau, et al.***

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 681323
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond GONZALES, Plaintiff,

v.

Dr. Lester WRIGHT, et al.,, Defendants.

No. 9:06–CV–1424 (JMH).
|
Feb. 23, 2010.

West KeySummary

1    **Civil Rights**
     👉 Criminal Law Enforcement;Prisons

Prison officials' motion for summary
judgment was properly granted in prisoner's
§ 1983 action where prisoner failed to
demonstrate they were involved in any
alleged constitutional violation. Prisoner
failed to demonstrate prison superintendent
and deputy were personally involved in any
alleged constitutional violation for denial of
medical care and his claims against them were
properly dismissed. Additionally, prisoner
failed to allege any conduct by medical
director or facility health director regarding
his treatment, but merely named them in their
official capacity and for "responsibility of
medical care of inmates," but the fact that
they held positions of medical director and
facility health administrator was insufficient
to provide requisite personal involvement to
state a constitutional claim. 42 U.S.C.A. §
1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Raymond Gonzales, Romulus, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Albany,
NY, for Defendants.

**DECISION and ORDER**

HOOD, District Judge.

**\*1** Raymond Gonzales complains in this action
brought pursuant to 42 U.S.C. § 1983 that, while he
was incarcerated at the Upstate Correctional Facility
("Upstate"), Defendants, various New York penal
officers and employees, denied him the protections of
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.[1] The matter is before the
Court on Defendants' motion for summary judgment
pursuant to Fed.R.Civ.P. 56. (Dkt. No. 81). Plaintiff
having responded to the motion *sub judice* (Dkt. No. 88),
it is ripe for review.

**Plaintiff's Allegations**

Plaintiff claims that beginning shortly after his arrival on
July 3, 2006, in Building 10 SHU at Upstate Correctional
Facility, some unidentified "infections harmful chemical
substance" came out of the ventilation system. Although
Defendants John Finazzo and Gerald Caron looked for
the substance, they claimed not to see anything and
mocked him. (Dkt. No. 1, ¶¶ 38, 39). In response to
his ongoing complaints, Plaintiff claims that Defendants
James Spinner, Sheen Pombrio, Brian Grant, Michael
Riley, Scott Dumas, Jonathan Price, Jeffrey Hyde,
William Brown, and Lynn Furnace looked for the
substance, but claimed that they did not see nor find
anything. (Dkt. No. 1, ¶¶ 41, 42).

Plaintiff also claims that all the above-named Defendants,
along with Defendants Steven Salls, Jeffrey Bezio, Ricky
Colton, N. Guerin, Dean Sauther, Brian Bogardus,
Michael Welch, Michael Albert, and non-movant D.
Ravelle[2], made comments and placed "infections
harmful chemical substance" in the ventilation system in
retaliation for filing lawsuits at other facilities and that
Defendants Robert Woods and Norman Bezio directed
this conspiracy. (Dkt. No. 1, ¶¶ 45–50). Defendant
Bogardus is alleged to have gestured and looked with
satisfaction and gladness towards the ventilation system

while delivering mail. (Dkt. No. 1, ¶ 55). Plaintiff also states that the above-named Defendants tried to poison his food with an unknown "infectious chemical substance." (Dkt. No. 1, ¶¶ 108–110) [3] .

Plaintiff further alleges that the above Defendants denied him access to the courts by denying him a pen needed to complete his 45 page, 177 paragraph complaint as well as legal work related to his other pending lawsuits. (Dkt. No. 1, ¶¶ 162–67). Plaintiff claims that he requested a pen from the correctional officers as supplies were given out and was repeatedly denied one. (Dkt. No. 1, ¶¶ 127, 129, 132, 162–67, 170–71).

Additionally, Plaintiff alleges that after his food was supposedly tainted he refused to return his food tray (Dkt. No. 1, ¶¶ 130, 168–69) which prompted a search of Plaintiff's cell. (Dkt. No. 1, ¶¶ 126, 134–41). Plaintiff further alleges that during the cell search, the officers damaged his legal documents in retaliation for his other lawsuits against DOCS employees at other correctional facilities. (Dkt. No. 1, ¶¶ 142–43). Plaintiff further alleges that the cell search was unlawful because he said he returned all the pieces of the broken food tray. Therefore, the officers had no right to conduct the search, and did it for the sole purpose of retaliation. (Dkt. No. 1, ¶¶ 142–43).

**\*2** Plaintiff alleges that due to the "infectious harmful chemicals," his face, chest, and other body parts became infected. (Dkt. No. 1, ¶ 43). Due to Plaintiff's alleged "infections, he made several sick call requests, requesting medical attention for his "infections." (Dkt. No. 1, ¶¶ 44, 74, 85). Plaintiff also wrote letters to Facility Health Service Director Wiessman requesting medical care. (Dkt. No. 1, ¶ 74). Plaintiff also wrote Lester Wright, the Associate Commissioner of Health Services/ Chief Medical Officer of New York State Department of Correctional Services at Albany, asking Wright to order Defendant Louise Tichenor to provide Plaintiff with medical care. (Dkt. No. 1, ¶ 78). Plaintiff claims that, although seen by Defendant Tichenor on July 14, 2006, he did not receive proper medical care. (Dkt. No. 1, ¶ 77). Thus, Plaintiff alleges that Defendant Evelyn Wiessman, failed to properly supervise Plaintiff's medical providers. (Dkt. No. 1, ¶ 7A).

Plaintiff also alleges that Defendant Tichenor failed to adequately examine him during his medical call out on July 14, 2006, asking with intrigue what had happened to Plaintiff's skin, but failing to properly examine Plaintiff's chest, back, shoulders, testicles and penis. (Dkt. No. 1, ¶¶ 64, 66). Plaintiff also states that Defendant Tichenor prescribed him Loratadine, which Plaintiff refused to take because Plaintiff knew that he was given the medicine only to conceal and hide the evidence of the damage caused to him by the "infectious substances." (Dkt. No. 1, ¶¶ 68–69, 72). Plaintiff then states that he was given a prescription cream for his skin problem, but not enough of it. (Dkt. No. 1, ¶¶ 73, 75).

Plaintiff also alleges that Defendant Tichenor wrongfully discontinued and denied Plaintiff the nutritional supplement, Ensure, although Plaintiff acknowledges that he failed to comply with facility procedure by refusing to drink the Ensure in front of the Nurses. (Dkt. No. 1, ¶¶ 145–60).

Finally, Plaintiff alleges that nurses J. Chesbrough, R. Holmes, and Walsh failed to provide Plaintiff with non-prescription medication even though Plaintiff completed all required sick call procedures. (Dkt. No. 1, ¶¶ 85, 89–106). Plaintiff contends that all these Defendants were deliberately indifferent to his medical needs.

### Defendants' Statement of Material Facts

Defendants have provided a different view of what happened while Plaintiff was confined at Upstate, as detailed in their statement of material facts. Although quite lengthy, they are recounted in detail below to provide a better understanding of Defendants' position in the matter:

1. Plaintiff Raymond Gonzalez was seen on a nearly daily basis from his arrival at Upstate on or about July 3, 2006. Weissman Declaration, Exhibit 1.

2. On July 5, 2006, Plaintiff demanded that he be given skin cream and became very agitated when he was told that he had to wait until he was examined by the PA in order to receive the cream. Weissman Declaration, Exhibit 2.

**\*3** 3. Plaintiff also received an orientation on sick call procedure on July 5, 2006. Weissman Declaration, Exhibit 3.

4. On July 6, 2006, Plaintiff refused to drink his Ensure in the presence of the nurse and became very vulgar and abusive. As a result, Plaintiff received a misbehavior report. Weissman Declaration, Exhibit 4.

5. On July 6, 2006, it was once again explained to Plaintiff that medical procedure required that Plaintiff consume the Ensure in view of the nurse to insure that it was properly consumed. *Id.*

6. Plaintiff was also informed that Ensure and skin cream would be withheld pending an examination by the PA. *Id.*

7. Plaintiff was again seen on July 8, 2006 and July 10, 2006 and requested skin cream and indigestion aids. Plaintiff did not exhibit any symptoms and continued to be very demanding. Weissman Declaration, Exhibit 5.

8. On July 12, 2006, Plaintiff demanded Ensure, ibuprofen and hemorrhoid cream and refused hepatitis B vaccination. Weissman Declaration, Exhibit 6.

9. On July 14, 2006, Plaintiff was examined by the PA. Weissman Declaration, Exhibit 8.

10. On July 15, 2006, Plaintiff demanded the medication ordered by the PA. Weissman Declaration, Exhibit 7.

11. On July 17, 2006, Plaintiff refused to be weighed and refused medication for allergies. *Id.*

12. On July 19, 20, and 21, 2006 Plaintiff refused treatment, demanded to see Dr. Weissman and was vulgar and loud indicating he did not want further treatment from the PA. Weissman Declaration, Exhibit 9.

13. On July 24, 2006, Plaintiff refused to be examined and became verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 10.

14. On July 25, 2006, the refusals and tirades were repeated and Plaintiff refused treatment. *Id.*

15. On July 26, 2006, Plaintiff once again refused to cooperate in his examination and treatment could not be provided. Once again, Plaintiff began to be verbally abusive, using the vilest of language, threats and sexually explicit rants. Weissman Declaration, Exhibit 11.

16. On July 27, 2006, Plaintiff rejected his medication by throwing it on the floor and indicating that he did not want to be examined or treated by the PA. *Id.*

17. On July 28, 2007, Plaintiff refused treatment yet again. Additionally, Plaintiff continued to express that he did not want what was being prescribed. Weissman Declaration, Exhibit 12.

18. On July 29, 2006, Plaintiff once again refused to be examined and insisted that he be given medication without examination. Plaintiff also persisted in his abusive and vulgar language until he was given a misbehavior report. Weissman Declaration, Exhibit 13.

19. On July 30, 2006, Plaintiff continued to refuse examination, making treatment impossible. Plaintiff also refused to consume Ensure as directed and treated the nurse to more vulgarity. *Id.*

20. On July 31, 2006, Plaintiff was again seen and reminded that he was required to consume the Ensure in the presence of the nurse or it would be discontinued. Examination revealed that Plaintiff's face was clear and had no redness, however, Plaintiff continued to insist that his face was real bad, dry and itching. Weissman Declaration, Exhibit 14.

**\*4** 21. On August 1, 2006, Plaintiff once again refused to consume Ensure in the presence of the nurse and was warned again that non-compliance would cause the Ensure to be stopped. Plaintiff continued to refuse to comply and the Ensure was ordered stopped. Weissman Declaration, Exhibits 15–16.

22. On August 2, 2006, Plaintiff again refused to be examined and became vulgar and abusive. An attempt to talk with Plaintiff about taking Ensure was met with more abuse and vulgarity. Plaintiff was finally given a misbehavior report when he began to threaten staff. Weissman Declaration, Exhibit 17.

23. On August 4, 2006, Plaintiff again refused to be examined and refused treatment. Once more the nurse was treated to a vulgar and threat filled tirade. *Id.*

24. On August 5, 2006, Plaintiff was non-compliant with sick call procedure. *Id.*

25. On August 6, 2006, Plaintiff again refused to be examined and refused treatment. Once more the

nurse was treated to a vulgar and threat filled tirade. Weissman Declaration, Exhibit 18.

26. On August 7, 2006, Plaintiff's medicine was renewed and once again he was uncooperative and vulgar and received another misbehavior report. Weissman Declaration, Exhibit 19.

27. On August 9, 2006, the PA examined Plaintiff and Plaintiff was once more instructed that he must talk to and cooperate with the nurse in order to be treated. *Id.*

28. On August 8, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. Weissman Declaration, Exhibit 20.

29. On August 10, 2006, Plaintiff refused to speak to the nurse and instead simply held up a piece of paper. When told that he must cooperate, Plaintiff once more became enraged and vulgar and refused treatment. *Id.*

30. On August 12, 2006, Plaintiff failed to comply with sick call procedures. Weissman Declaration, Exhibit 21.

31. On August 13, 2006, Plaintiff failed to comply with sick call procedures and instead exposed himself and stood silently as the nurse tried to examine and find out symptoms. *Id.*

32. On August 14 and 16, 2006, once more Plaintiff refused to speak and held up a piece of paper when asked what he needed. The session was ended with a vulgar threat. Weissman Declaration, Exhibits 21 and 22.

33. On August 17, 2006, Plaintiff was treated for indigestion and allergies. Weissman Declaration, Exhibit 22.

34. On August 18 and 19, 2006, Plaintiff refused to speak to the nurse doing sick call[,] thus, refusing to be evaluated and instead held up a piece of paper. Weissman Declaration, Exhibits 22 and 23.

35. On August 21, 2006, Plaintiff allowed an evaluation and was found to be without nasal congestion and a minor rash for which he was given medication. It was noted that his face was clear of any rash. Weissman Declaration, Exhibit 24.

36. On August 22, 2006, Plaintiff was once again noncompliant and abusive rendering any attempt to examine and treat him as impossible. *Id.*

**\*5** 37. On August 23, 2006, Plaintiff was once again noncompliant and abusive rendering any attempt to examine and treat him as impossible. Medications were reordered in spite of Plaintiff's lack of cooperation. Weissman Declaration, Exhibit 25.

38. On August 24, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. *Id.*

39. On August 25 and 27, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibits 26 and 27.

40. On August 28, 2006, Plaintiff complained of gas and a headache and allowed an evaluation and was treated for a headache and given antacid. Weissman Declaration, Exhibit 27.

41. On August 31, 2006 and September 1, 2006, Plaintiff was once again non-compliant, vulgar and abusive rendering any attempt to examine and treat him as impossible. Weissman Declaration, Exhibits 27–28.

42. On September 4, 2006, Plaintiff complained that he had a rash on his face, chest and back. Plaintiff was examined and no rash was seen. *Id.*

43. On September 5, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and no tenderness or redness was noted in his throat. Weissman Declaration, Exhibit 29.

44. On September 8, 2006, Plaintiff complained of gas and a rash on his testicles. Plaintiff was examined and irritation was noted and Plaintiff advised to keep clean and dry. *Id.*

45. On September 12, 2006, Plaintiff requested ibuprofen and nasal pills. Plaintiff was examined and given fluids and dispensed medications. Weissman Declaration, Exhibit 30.

46. On September 13, 2006, Plaintiff requested sinus medication and antacid. Plaintiff was examined and given antacid and sinus medication. Weissman Declaration, Exhibit 31.

47. On September 15, 2006, Plaintiff complained of a sore on his penis. Plaintiff was examined and irritation was noted but there was no evidence of a fungal infection or broken skin. Plaintiff was given bacitracin ointment to apply. *Id.*

48. On September 17, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

49. On September 18, 2006, Plaintiff requested ibuprofen and hemorrhoid treatment. Plaintiff was examined and give ibuprofen and hemorrhoid medication. Weissman Declaration, Exhibit 32.

50. On September 20, 2006, Plaintiff requested ibuprofen and antacid. Plaintiff was examined and treated with ibuprofen, antacid and warm compresses to his back. Weissman Declaration, Exhibit 33.

51. On September 20, 2006, Plaintiff refused to go to the infirmary for examination of possible tuberculosis infection. Plaintiff became abusive and vulgar and received a misbehavior report. *Id.*

52. On September 21, 2006, Plaintiff again refused to be tested or evaluated. Weissman Declaration, Exhibit 34.

53. On September 28 and 30, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 35.

**\*6** 54. On October 3, 2006, Plaintiff complained of a headache, upset stomach and infected skin. Plaintiff was examined and given ibuprofen and antacid. Weissman Declaration, Exhibit 36.

55. On October 4, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given ibuprofen and antacid. *Id.*

56. On October 6, 2006, Plaintiff's medications were renewed. *Id.*

57. On October 9, 2006, Plaintiff complained of a headache, cold sore and gas. Plaintiff was examined and given ibuprofen, cold sore medication and antacid. Weissman Declaration, Exhibit 37.

58. On October 10, 2006, Plaintiff complained of a headache and gas. Plaintiff was examined and given Tylenol and antacid. *Id.*

59. On October 11, 2006, Plaintiff complained of a headache, rash and gas. Plaintiff was examined and it was noted that his penis was irritated. Plaintiff was given ibuprofen, bacitracin ointment and antacid. *Id.*

60. On October 23, 2006, Plaintiff complained of infection on his back, chest and shoulders and demanded to see Dr. Weissman. Plaintiff was examined and no sores or rash was noted. The skin appeared dry and unremarkable. Plaintiff was given Tylenol and antacid. Weissman Declaration, Exhibit 38.

61. On October 24, 2006, Plaintiff complained of infection on his back, chest and shoulders and demanded to see Dr. Weissman. Plaintiff was examined and no sores or rash was noted, although a small patch of dryness was noted on Plaintiff's thigh. The skin appeared dry and unremarkable. Plaintiff was given Tylenol and antacid. *Id.*

62. On October 25, 2006, Plaintiff complained of an infected penis. Plaintiff was examined and there was no evidence of sores or breaks in the skin. Weissman Declaration, Exhibit 39.

63. October 26, 2006, Plaintiff refused to cooperate with lab tests and with a consultation. Plaintiff also complained of an infected groin, face chest and head. Plaintiff was examined and no infection was seen. Weissman Declaration, Exhibit 40.

64. On October 30, 2006, Plaintiff once again refused laboratory tests. *Id.*

65. On November 3, 2006, Plaintiff complained of gas and a lip injury. Plaintiff was examined and give[n] antacid and antibiotic cream for his lip. *Id.*

66. On November 4, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 41.

67. On November 5, 2006, Plaintiff complained of gas and a split lip. Plaintiff was examined and given antacid and bacitracin for his lip. *Id.*

68. On November 6, 2006, Plaintiff complained of gas and infected skin. Plaintiff's wrist, face, head, chest and back were examined but no infection could be found. Plaintiff was given antacid for his gas. Plaintiff continued to request Ensure but it was not ordered. Weissman Declaration, Exhibit 42.

69. On November 8, 2006, Plaintiff complained of gas and a split lip. After examination Plaintiff was given triple antibiotic cream for his lip and antacid. *Id.*

 **\*7** 70. On November 9, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

71. On November 10, 2006, Plaintiff received his quarterly review and examination. Three issues were discussed. Plaintiff's lip was treated with bacitracin and antacids were given for his gas problem. It was determined that Ensure would not be restarted due to non-compliance with medical protocol. Weissman Declaration, Exhibit 43.

72. On November 11, 2006, Plaintiff reported stomach problems and requested lip cream. Following an examination it was determined that Plaintiff did not require additional lip cream and was give[n] Tylenol and antacid. *Id.*

73. On November 14, 2006, Plaintiff again requested antacid and lip cream. Following an examination, it was determined that Plaintiff did not require any treatment other than antacid. Weissman Declaration, Exhibit 44.

74. On November 15, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. *Id.*

75. On November 17, 2006, Plaintiff reported stomach upset and general body aches. Following examination, Plaintiff was given antacid and analgesics for body pain. *Id.*

76. On November 18, 2006, Plaintiff did not comply with sick call procedure and could not be evaluated or treated. Weissman Declaration, Exhibit 45.

77. On November 19 and 21, 2006, Plaintiff requested antacids and ibuprofen. Plaintiff was examined and given antacid and Tylenol. Weissman Declaration, Exhibits 45 and 46.

78. On November 22, 2006, Plaintiff requested antacids and Tylenol. Plaintiff was examined and given antacids and Tylenol. Weissman Declaration, Exhibit 46.

79. On November 24, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Weissman Declaration, Exhibit 47.

80. On November 27, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. *Id.*

81. On November 30, 2006, Plaintiff requested Ensure, lip cream and antacids. Plaintiff was examined and found to have no problems that required lip cream. Plaintiff was also informed that Ensure was suspended due to non-compliance. Tylenol and antacid was prescribed. Weissman Declaration, Exhibit 48.

82. Defendants Tichenor, Wash, Holmes and Chesbrough saw the Plaintiff for his sick call and also prescribed him medication which the Plaintiff refused. Complaint ¶ 72.

83. Plaintiff admits that every time he submitted a sick call, at the very least, the nurses would examine him. Dep. Pg. 30, ¶¶ 8–10.

84. Any lack of examination or treatment was due to Plaintiff's actions, either not responding to the nurse or creating a situation where evaluation and treatment was not possible. Weissman Declaration.

 **\*8** 85. While Plaintiff claimed various needs, including a rash, examination failed to confirm any medical condition existed, thus rendering treatment unnecessary. Weissman Declaration.

86. Any deprivation that Plaintiff suffered was due to his own conduct. Weissman Declaration.

87. Plaintiff was not given Ensure due to his unwillingness to consume the Ensure as directed by staff. Weissman Declaration.

88. No reasonable health care professional, on the above record, would believe that any conduct by the staff involved, violated any right enjoyed by Plaintiff. Weissman Declaration.

89. On the contrary, all personnel involved exhibited extraordinary restraint and professionalism in the face of vile, uncooperative and potentially dangerous conduct by Plaintiff. Weissman Declaration.

90. Plaintiff never saw Superintendent Woods throw the chemicals on him, rather he imagined Woods did. Deposition at pg. 22, ¶¶ 14–17.

91. Plaintiff admits he did not see Deputy Superintendent Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 18–20.

92. Plaintiff admits that he did not see Sergeant J. Bezio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 21–23.

93. Plaintiff admits that he did not see Sergeant Pombrio ever throw any infectious chemical on him. Deposition at pg. 22, ¶¶ 24–25; pg.23, ¶ 2.

94. Plaintiff admits that he did not see Sergeant Salls ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 3–5.

95. Plaintiff admits that he did not see Sergeant Spinner ever throw any infectious chemical on him. Deposition at pg. 23, ¶¶ 6–8.

96. Plaintiff never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the defendants use. Deposition at pg. 23,¶¶ 9–17.

97. [Plaintiff] does not know who was throwing the beige substance at him but imagines it was Defendants, because they worked at Upstate. Deposition at pg. 24, ¶¶ 12–15.

98. Plaintiff has no knowledge of who was burning him with laser beams, because he had not seen the lasers or anyone use them. Deposition at pg. 24, ¶¶ 16–19.

99. Plaintiff never saw anyone throw chemical agents at him, and that he doesn't know who (if anyone) was throwing them, but that he assumes it is Defendants because they work at the facility. Deposition at pg. 24, ¶¶ 20–25.

100. Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman as Facility Health Director and Defendant Wright as Medical Director and for "responsibility of medical care of inmates". Complaint ¶¶ 4, 7A, 62; ¶¶ 78, 79; ¶¶ 82, 83.

101. Plaintiff never saw any defendant place anything in his food. Dep. Pg 34, ¶¶ 18–20; Dep. Pg. 35, ¶¶ 7–8.

102. Cell searches of Plaintiff's cell were made necessary by Plaintiff's behavior. Specifically, Plaintiff refused to return his tray after meals on several occasions and broke them into pieces. Dumas Declaration.

*9 103. The broken pieces then had to be recovered and the tray reassembled to insure that all pieces were accounted for and out of the cell. Dumas Declaration.

104. The broken pieces present a safety and security issue. Dumas Declaration.

105. At no time did the staff involved enter the cell with the purpose of destroying Plaintiff's possessions but Plaintiff's own behavior required that the searches be made. Dumas Declaration.

106. Searches of his cell, delay in getting a pen and alleged destruction of his papers delayed Plaintiff's legal work, but it had no lasting impact, because any deadlines he missed, he got extended and Plaintiff was able to submit his legal papers to the court. Dep. Pg. 46, ¶¶ 3–15.

(Dkt. No. 88–1, ¶¶ 1–106).

Although Plaintiff has contested some of the facts asserted by Defendants in the motion now before the Court (Dkt. No. 88–2), his conclusory assertions do not preclude summary judgment.[4] The standard for granting summary judgment is well-known.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R. Civ. Pro. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, this Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Furthermore, the evidence and all facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**Personal Involvement**

To allege a constitutional violation under 42 U.S.C. § 1983, a pleading must state facts sufficient to support a finding that the defendant was personally involved in the alleged violation. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006). For this reason, liability of a state official cannot be established under the doctrine of *respondeat superior. Iqbal,,* 129 S.Ct. at 1948.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001). Moreover, a plaintiff must allege personal acts of wrong on behalf of each Defendant he names in the complaint. *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999).

In the present complaint, Plaintiff solely brings suit against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS, alleging supervisory liability. Under 42 U.S.C. § 1983 liability cannot be imposed on a supervisory official on the theory of *respondeat superior. Id.* In order for a supervisory official to be involved in a constitutional violation, he or she must have (1) directly participated in the alleged constitutional violation; (2) learned of the violation through a report or appeal and failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom; (4) been grossly negligent in supervising subordinates who committed the wrongful act; or (5) exhibited deliberate indifference to

inmates' rights by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

**\*10** In the instant case, Plaintiff has merely alleged *respondent superior* liability against Superintendents Woods, Deputy Superintendent for Security Bezio, Facility Medical Director Weissman and Lester Wright, the Medical Director of DOCS. The Superintendent's and Deputy Superintendent's delegation of medical judgment to appropriate staff was proper as the Second Circuit has cautioned that non-medical Defendants should not intercede in the medical care and treatment of an inmate. *Cuoco v. Moritsugu,* 222 F.3d 99, 111(2d Cir.2000) ("One can imagine the repercussions if non-medical prison officials were to attempt to dictate the specific medical treatment to be given particular prisoners...."). Concomitantly, the Second Circuit has also explicitly held the denial of a grievance on medical matter is insufficient to demonstrate personal involvement on behalf of a prison Superintendent. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Similarly, the mere receipt of letters from an inmate by a facility Superintendent regarding a medical claim is insufficient to constitute personal liability. *Swindell v. Supple,* 2005 WL 267725, at \*11 (S.D.N.Y.2005); *Burgess v. Morse,* 259 F.Supp.2d 240, 250 (W.D.N.Y.2003). Therefore, Plaintiff cannot demonstrate that Superintendent Woods and Deputy Bezio were personally involved in any alleged constitutional violation for denial of medical care and his claims against them must be dismissed.

Plaintiff also names as Defendants Dr. Evelyn Weissman, Facility Health Director and Dr. Lester Wright, the Medical Director for the Department. Once again, Plaintiff does not allege any conduct by Defendants Wright or Weissman regarding his treatment, but rather names them in their capacity as Defendant Weissman, Facility Health Director, and Defendant Wright, Medical Director, and for "responsibility of medical care of inmates." The mere fact that Defendant Dr. Wright held the position of Medical Director and Defendant Dr. Weissman the title of Facility Health Administrator is insufficient to provide the requisite personal involvement to state an Eighth Amendment claim. *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003); *Swindell,* 2005 WL 267725, at \*9–10. Based on the above, the motion for summary judgment should be granted as to Defendants

Dr. Evelyn Weissman, Dr. Lester Wright, Robert Woods, and Norman Bezio.

### Medical Indifference

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court recognized that the government has an obligation to provide medical care for those it incarcerates, because they are unable to obtain such care on their own, and held that a prisoner may have a claim for failure to do so under the Eighth Amendment. To prevail on an Eighth Amendment claim involving prison medical care, an inmate must establish that the Defendant acted with deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 294–95, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *West v. Atkins,* 487 U.S. 42, 46, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). This indifference may be manifested by prison doctors in their response to a prisoner's needs, or by officers in intentionally denying or delaying access to medical care or treatment. *Estelle,* 429 U.S. at 104. The inmate must prove both the subjective and objective elements of a claim: (1) deliberate indifference, and (2) a serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). In the instant case, Plaintiff fails to satisfy either of these elements.

*11 A review of the record pertaining to Plaintiff's complaints to prison medical personnel reveals that he complained frequently of a rash or infection on various parts of his body including his face, around his testicles, and on his penis. There is nothing which would indicate that the rash was "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Throughout Plaintiff's complaint, he describes his rash, but never does he state that the rash caused him pain, much less extreme pain, that it was spreading anywhere else, besides the areas he already claimed, or that it was likely to produce death.

Even if the rash is a serious medical condition, the subjective element of the test is not met. To meet the subjective element, a prisoner must satisfy *Farmer v. Brennan's* test for deliberate indifference—the Defendant must know of and disregard an excessive risk to inmate health. A Defendant need not expressly intend to inflict pain—but Plaintiff must establish at least that a Defendant acted with the criminal recklessness discussed

in *Farmer v. Brennan. See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996); *Morales v. Mackalm,* 278 F.3d 126, 132 (2d. Cir.2002).

Turning to the deliberate indifference element, the record is replete with evidence that Defendant medical personnel examined Plaintiff (when they were allowed to) and prescribed appropriate topical and/or allergy medicines. Although Plaintiff may have desired some other type of medicine, that desire would have, at the very best, demonstrated negligence, not deliberate indifference.

The above analysis would apply with equal force to each medical condition reported. The medical personnel treated or attempted to treat every condition despite abusive conduct on Plaintiff's part. No Eighth Amendment violation on the part of the prison medical personnel is perceived.

### Powders and Lasers

Defendants J. Finazzo and G. Caron were called and requested by the Plaintiff to look into his room for substances coming from the ventilator and the roof of his cell. Both J. Finazzo and G. Caron are accused of reacting "in the shape of mockery" and said or showed to Plaintiff that they did not see the substance. Also at Plaintiff's request, Defendants J. Spinner, S. Pombrio, B. Grant, M. Riley, S. Dumas, J. Price, J. Hyde, W. Brown, and L Furnace, looked into the cell at the ventilator and the roof and "almost made the same gesture (as J. Finazzo and G. Caron)" and told the Plaintiff they did not see any substance. Plaintiff alleges that Defendant B. Bogardus, would, while collecting or delivering the mail, looked towards the ventilator and roof of Plaintiff's cell and made a "gesturing of satisfaction and gladness." Even if true, the above allegations by Plaintiff fail to state a claim with regard to looks and smirks. Looks and smirks are not actionable.

Plaintiff alleges that Defendants S. Salls, J. Hyde, J. Bezio, S. Pombrio, J. Spinner, R. Colton, N. Guerin, D. Sauther, G. Caron, M. Riley, B. Grant, S. Dumas, B. Bogardus, M. Welch, J. Price, M. Albert, D. Ravelle, L. Furnace, J. Finazzo and W. Brown allegedly threw infectious harmful chemicals upon the Plaintiff via ventilator and the roof of his cell with a machine-like system that was allegedly placed in the room above his cell. Plaintiff alleges that all

these actions were taken in retaliation for Plaintiff's other lawsuits against other DOC's employees, yet Plaintiff concedes in his deposition that he has no proof or evidence that any named Upstate employees had any knowledge of his other lawsuits. (Dkt. No. 81–3, Ex. A at 25, ¶¶ 2–10). Tellingly, all Defendants deny knowledge of any lawsuits brought by Plaintiff at other facilities.

**\*12** Equally demonstrative of the frivolous nature of the complaint, during his deposition, Plaintiff stated that he never saw Superintendent Woods throw the chemicals on him; rather he imagined Woods did. (Dkt. No. 81–3, Ex. A. at 22, ¶¶ 14–17). Additionally, Plaintiff admits he did not see Defendants Deputy Superintendent Bezio, Sergeant J. Bezio, Sergeant Pombrio, Sergeant Salls, Sergeant Spinner, ever throw any infectious chemical on him. (Dkt. No. 81–3, Ex. A at 22 ¶¶ 1–20,21–23, 24–25; 23, 2, 3–5, 6–8). In fact, Plaintiff admits that he never saw any of the corrections staff throw any substance in his cell, rather he believes they did it through an apparatus, which he has never seen and never saw any of the Defendants use. (Dkt. No. 81–3, Ex. A at 23, ¶¶ 9–17). Plaintiff further admits that he does not know who was throwing the beige substance at him but imagines it was them, because they work there. (Dkt. No. 81–3, Ex. A.24, ¶¶ 12–15). Plaintiff also admitted under oath that he has no knowledge of who was burning him with laser beams, because he had not seen the lasers or anyone use them. (Dkt. No. 81–3, Ex. A.24,¶¶ 16–19). Plaintiff testified that he never saw anyone throw chemical agents at him, and that he doesn't know who was throwing them, but that he assumes it is Defendants because they work at the facility. (Dkt. No. 81–3, Ex. A.24, ¶¶ 20–25). Similarly, while Plaintiff alleges that Defendants, M. Riley and B. Grant, on August 14th, placed "a strange harmful substance" in his lunch, he stated in his deposition that he never saw either Defendant place anything in his food on the day in question or on any other day for that matter. (Dkt. No. 81–3, Ex. A. 34, ¶¶ 18–20; 35, ¶¶ 7–8).

As the Second Circuit and New York District Courts have steadily recognized, it is utterly unjust to haul people into federal court to defend against, and disprove, delusions. *See, e.g. Pillay v. INS,* 45 F.3d 14, 17 (2d Cir.1995); *Lewis v. New York,* 547 F.2d 4, 6 (2d Cir.1976); *Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y.1993) (*sua sponte* dismissing complaint alleging conspiracy to enslave and oppress), *affd* 41 F.3d 1500 (2d Cir.1994). A victimization fantasy, with no existence beyond Plaintiff's

insistence, cannot be allowed to pass review under Fed.R.Civ.P. 56(b). "Genuine issue of material fact" must mean substantially more. Plaintiff admitted under oath that he has no facts nor evidence which states the involvement of any Defendants in somehow infecting him with "infectious harmful chemicals," or laser beams. Plaintiff's complaints are mere surmise and consist of conclusory statements that contain no specific allegations of fact indicating a deprivation of rights. Accordingly, the motion for summary judgment should be granted on this issue.

### Retaliation

Plaintiff has charged that Defendants' actions were in retaliation for him bring lawsuits against other prison employees elsewhere in the New York penal system. The use of "buzz words" such as retaliation do not cure a pleading defect such as the one herein. *See Barr v. Abrams,* 810 F.2d 358, 362 (2d Cir.1986) (the Second Circuit has repeatedly held, "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning"); *see also, e.g., Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("unsupported, speculative, and conclusory" allegations should be dismissed); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[c]laims by prisoners that particular administrative decisions have been made for retaliatory purposes are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes); *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (where allegations of retaliation and conspiracy are "wholly conclusory," the complaint "can be dismissed on the pleadings alone"); *Justice v. Coughlin,* 941 F.Supp. 1312, 1316 (N.D.N.Y.1996) ("In recognition of the reality that retaliation claims can be fabricated easily, [inmates] bear a somewhat heightened burden of proof, and dismissal can be granted if the claim appears insubstantial"). Therefore, Plaintiff's claims based on some retaliatory animus shall be dismissed. *See Iqbal,* 129 S.Ct. at 1948–49.

### Cell Search

**\*13** Plaintiff further alleges that Defendants B. Grant, M. Riley, and M. Welch, under orders from N. Guerin, during a cell search to look for any remaining pieces of a tray broken by the Plaintiff, "did mess up, crush, spoil, destroy" legal documents and scattered shampoo on them as well. On September 8, 2006, Plaintiff alleges he asked Defendants D. Ravelle, Riley, Grant, S. Dumas and Albert for a pen throughout the day. Plaintiff alleges that no one gave Plaintiff a pen in retaliation for Plaintiff's refusal to hand in his empty food tray and, as a consequence, he broke it into pieces. Following Plaintiff's admitted refusal to give back the food tray, Defendant G. Caron and M. Albert asked Plaintiff to exit cell for a cell search. Plaintiff refused. Following his initial refusal, Defendants J. Hyde, G. Caron, S. Dumas, and M. Albert, requested that Plaintiff leave his cell for a cell search, but Plaintiff again admittedly refused. Following the second refusal to exit the cell, M. Tirone and J. Irvin came and asked Plaintiff to exit his cell for a cell search. Plaintiff agreed to do so.

During the ensuing cell search, Plaintiff alleges that Defendants G. Caron, S. Dumas, M. Albert, and an unknown officer, "did mess up, crush, spoil, destroy, and mix" Plaintiff's legal documents, with the consent of J. Hyde.

This aspect of the complaint has two aspects. The first, the legitimacy of the cell search, will not take long to address. Prison officials have every right to search a cell to retrieve broken pieces of a food tray, pieces which could easily be made into some form of a weapon. Plaintiff in this instance was simply removed from his cell while the search ensued.

"The Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)." No constitutional violation is perceived.

The second aspect of the cell search which must be addressed is Plaintiff's claim regarding the destruction of his legal papers. This claim will not delay the Court long either.

Although Plaintiff claims that the destruction of his papers delayed his legal work, he admits that it had no lasting impact as any deadlines he missed he was able to get extended and was able to submit his legal papers to the court. Hence, as he had no actual injury even if the events as he saw them occurred, he is not entitled to relief on this aspect either. *See Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

**Conclusion**

Accordingly,

**IT IS ORDERED** Defendants' motion for summary judgment be, and the same here by is, **GRANTED.**

This the 22nd day of February, 2010.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 681323

Footnotes

1   The Eleventh Amendment recognizes the fundamental principle of sovereign immunity. Thus, the Eleventh Amendment bars any suit in federal court against a state by citizens of another state. Further, the Supreme Court has held that the amendment also bars a citizen from bringing a suit against his or her own state in federal court. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Sovereign immunity under the Eleventh Amendment protects state agencies and department sas well as the state itself. As the Supreme Court has noted: "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the Defendant is proscribed by the Eleventh Amendment.... This jurisdictional bar applies regardless of the relief sought." *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Moreover, "[o]bviously, state officials literally are persons. But a suit against a state official in his official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

As Plaintiff is suing Defendants only in their official capacities, the action would be subject to dismissal on this ground alone. However, Plaintiff's failure to seek relief against Defendants in their individual capacities could be remedied through amendment.

2    Although named as a Defendant, D. Ravelle has never been served with process or appeared in this action. By separate order, Plaintiff will be required to show cause why this action should not be dismissed as to this Defendant pursuant to Fed.R.Civ.P. 4(m).

3    Additionally, though not in his complaint, Plaintiff also alleges that as a part of this conspiracy laser beams were shot at him through the lights in his cell. (Dkt. No. 81–3, Ex. A, 14.)

4    Had this matter been before the Court on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the teachings of *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), would guide this Court. There, the Supreme Court wrote:

> We turn to respondent's complaint. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.,* at 555, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929.

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.,* at 557, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (brackets omitted).

> *Id.* at 1949.

The undersigned strongly believes that Plaintiff's complaint would not survive under this standard either.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Slip Copy, 2011 WL 767546 (N.D.N.Y.)

(Cite as: 2011 WL 767546 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Raymond GONZALES, Plaintiff,
v.
D. CARPENTER, et. al, Defendants.
No. 9:08-CV-629 (LEK/ATB).

Feb. 25, 2011.
Raymond Gonzalez, Marcy, NY, pro se.

Richard Lombardo, New York State Attorney General, Albany, NY, for Defendants.

### DECISION and ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on January 3, 2011 by the Honorable Andrew T. Baxter, United States Magistrate Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 132). On February 23, 2011, after receiving multiple extensions of time by which to respond to the Report and Recommendation, Plaintiff Raymond Gonzales filed his objections ("Objections") to the Magistrate Judge's findings. Dkt. No. 137.

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a *de novo* review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 132) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant's Motion to dismiss (Dkt. No. 120) is **GRANTED** and Plaintiff's Amended Complaint (Dkt. No. 106-1) is **DISMISSED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Gonzales v. Carpenter
Slip Copy, 2011 WL 767546 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.